FILED

13 JUN 13 PM 1:52

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

Norman Siegel, Pro Hac Vice Pending
nsiegel@stellp.com
Saralee Evans, Pro Hac Vice Pending
sevans@stellp.com
Herbert Teitelbaum, Pro Hac Vice Pending
hteitelbaum@stellp.com
SIEGEL TEITELBAUM & EVANS, LLP
260 Madison Avenue - 22nd Floor
New York, NY 10016
(212) 455-0300

Steven J. Hyman, Pro Hac Vice Pending
shyman@mclaughlinstern.com
Paul H. Levinson, Pro Hac Vice Pending
plevinson@mclaughlinstern.com
Bruce A. Langer, Pro Hac Vice Pending
blanger@mclaughlinstern.com
McLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100

Craig J. Stein, (SBN # 98041)
craig@craigsteinlaw.com
The Stein Law Firm
801 S. Figueroa Street - 12th Floor
Los Angeles, CA  90017
Telephone: (213) 233-2271
Facsimile: (213) 622-1444

Attorneys for Plaintiff
EUNICE HUTHART

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

EUNICE HUTHART,

Plaintiff,

v.

NEWS CORPORATION,  NI
GROUP LIMITED
f/k/a NEWS INTERNATIONAL
LIMITED, NEWS GROUP

CASE NO. CV13-04253-MWF(AJWx)

COMPLAINT FOR:

1.  **Violation Of The Stored
    Communications Act, 18 U.S.C.
    §§2701 and 2707;**

NEWSPAPERS LIMITED, and
JOHN and JANE DOES 1-10,

Defendants.
_____

2.    Violation Of Wiretap Act, 18 U.S.C.
       §§2510, 2511 & 2520;

3.    Violation Of Article I, Section 1 Of
       The California State Constitution;

4.    Violation Of California Penal Code
       §§630, 631, 632, 632.7 & 637(2)(a);

5.    Violation Of California Civil Code §§
       1708.8(b), 1708.8(d), 1708.8(e)

6.    Intrusion Into Private Affairs -
       California Common Law

## DEMAND FOR JURY TRIAL

Plaintiff, EUNICE HUTHART, by her attorneys, SIEGEL TEITELBAUM & EVANS, LLP, McLAUGHLIN & STERN, LLP, and THE STEIN LAW FIRM, as and for her Complaint against Defendants, alleges the following:

## PRELIMINARY STATEMENT

1.    This is a civil action brought against Defendants for damages for violations of Plaintiff's right to privacy; for the unlawful access to stored communications; and for the intrusion into, interception of, and interference with the voice-mail messages left and stored on Plaintiff's cellular telephone system while she lived and worked as a professional stunt double for the actress Angelina Jolie ("Ms. Jolie") in Los Angeles, California, in violation of 18 U.S.C. §§2701, 2707; 18 U.S.C. §§2510, 2511, 2520; Article I, Section 1 of the California State Constitution; §§630-637.9 of the California Penal Code; §1708.8 of the California Civil Code; and California common law.

## JURISDICTION AND VENUE

2.    This action is brought pursuant to 18 U.S.C. §§2701 and 2707, 18 U.S.C. §§2510, 2511 and 2520. This Court has jurisdiction of the action pursuant to 28 U.S.C. §1331, as this is a civil action arising under the laws of the United States. This Court has jurisdiction over the supplemental claims arising

1  under the Constitution of the State of California, California state law and
2  California common law pursuant to 28 U.S.C. §1367(a).

3       3.    Venue is proper in the United States District Court for the Central
4  District of California pursuant to 28 U.S.C. §1391(a) and (b)(2) because the
5  claims arose in this district.

6                                **PARTIES**

7       4.    Plaintiff EUNICE HUTHART ("Plaintiff" or "Ms. Huthart") is a
8  citizen of the United Kingdom who resides in Liverpool, England. Ms. Huthart
9  is a professional stunt double for Ms. Jolie and during the period from 2004 to
10 2010 she periodically performed this work in the United States.   From
11 approximately early January 2004 to mid-June 2004 and from mid-March 2005
12 to mid-May 2005, Ms. Huthart lived and worked in Los Angeles, California.

13      5.    Defendant NEWS CORPORATION is a diversified multinational
14 news media organization incorporated in Delaware and headquartered in New
15 York City. Its Chairman and Chief Executive Officer is Rupert Murdoch ("Mr.
16 Murdoch").   Its President and Chief Operating Officer is Chase Carey.   Its
17 properties include the Fox television networks, The Wall Street Journal, NI
18 GROUP LIMITED, a substantial shareholding in British Sky Broadcasting
19 Group, Twentieth Century Fox and The New York Post.

20      6.    Defendant NI GROUP LIMITED f/k/a NEWS INTERNATIONAL
21 LIMITED ("NEWS INTERNATIONAL") is a British newspaper publisher, and
22 a wholly-owned subsidiary of NEWS CORPORATION.   It is the holding
23 company of NEWS GROUP NEWSPAPERS LIMITED ("NEWS GROUP
24 NEWSPAPERS"), the publisher of The Sun newspaper, and the former publisher
25 of the now-defunct News Of The World newspaper. It undertakes many of the
26 administrative and legal functions of NEWS GROUP NEWSPAPERS.   Its
27 headquarters are in London, England.

28

1      7.      Defendant NEWS GROUP NEWSPAPERS, a subsidiary of NEWS

2    INTERNATIONAL, is a United Kingdom company that publishes The Sun

3    newspaper and previously published the News Of The World newspaper.  Its

4    headquarters are in London, England.  (Hereinafter, NEWS CORPORATION,

5    NEWS INTERNATIONAL and NEWS GROUP NEWSPAPERS, are referred

6    to, collectively, as the "NEWS CORPORATION Defendants.")

7      8.      Defendants JOHN and JANE DOES 1-3, whose identities are

8    presently unknown to the Plaintiff, are private investigators who work or worked

9    for or on behalf of some or all of the Defendants (collectively, the

10   "UNIDENTIFIED INVESTIGATORS"), and in such capacity, violated laws and

11   Plaintiff's right to privacy, and with some or all of the Defendants, knew, or

12   should have known of, and did nothing to stop the unlawful access to stored

13   communications, the intrusion into, the interception of, the interference with,

14   and/or the recording or attempted recording of voice-mail messages on Plaintiff's

15   cellular telephone system while she lived and worked as a stunt double for Ms.

16   Jolie in Los Angeles, California.

17     9.      Defendants JOHN and JANE DOES 4-7, whose identities are

18   presently unknown to the Plaintiff, are journalists, who are or were employed by,

19   agents of, and/or independent contractors, some or all of the NEWS

20   CORPORATION Defendants (collectively, the "UNIDENTIFIED

21   JOURNALISTS"), and in such capacity, violated laws and Plaintiff's right to

22   privacy, and with some or all of the Defendants, knew, or should have known of,

23   and did nothing to stop the unlawful access to stored communications, the

24   intrusion into, the interception of, the interference with, and/or the recording or

25   attempted recording of voice-mail messages on Plaintiff's cellular telephone

26   system while she was living and working as a stunt double for Ms. Jolie in Los

27   Angeles, California.

28

10. Defendants JOHN and JANE DOES 8-10, whose identities are presently unknown to the Plaintiff, are current or former officers and/or executives of some or all of the NEWS CORPORATION Defendants (collectively, the "UNIDENTIFIED EXECUTIVES"), and in such capacity, violated laws and Plaintiff's right to privacy, and with some or all of the Defendants, knew, or should have known of and did nothing to stop the unlawful access to stored communications, the intrusion into, the interception of, the interference with, and/or the recording or attempted recording of voice-mail messages on Plaintiff's cellular telephone system while she was living and working as a stunt double for Ms. Jolie in Los Angeles, California.

## STATEMENT OF FACTS

### BACKGROUND

#### (A)   The Hacking Scheme

11. Beginning around 1998 various British media companies participated in continuous wrongful conduct engaging in illegally intercepting, interfering with, listening to, accessing, recording and/or duplicating (sometimes collectively referred to herein as "hacking") the voice-mail messages on cellular telephone systems and the computer files of thousands of private individuals and public officials in England, and upon information and belief, elsewhere, and made corrupt payments in the United Kingdom in order to obtain private and confidential information. As of August 31, 2012, the London Metropolitan Police ("Metropolitan Police") have identified over 4,700 people as potential victims of phone hacking, of which more than 1,000 were identified as likely victims of phone hacking.

12. These illegal activities were undertaken in part by officers, agents, employees, and/or representatives of the NEWS CORPORATION Defendants, principally through the two newspapers, The Sun and News Of The World, in

1   order to publish and exploit news articles concerning the private and confidential

2   affairs of specific individuals and third parties associated with them (e.g., family

3   and/or friends, and/or colleagues) (also referred to as "targets"), in order to boost

4   circulation and thereby increase profits (the "Hacking Scheme").

5       13.   The Sun is a newspaper published in the United Kingdom and

6   Ireland. It is published by NEWS GROUP NEWSPAPERS, a subsidiary of NI

7   GROUP LIMITED, formerly NEWS INTERNATIONAL. The Sun has the

8   world's tenth largest circulation and the largest daily circulation in the United

9   Kingdom, averaging 2,409,811 copies in January 2013.

10       14.   News Of The World was a newspaper published in the United

11   Kingdom from 1843 to 2011. It ceased publication on July 10, 2011 due to its

12   involvement in the illegal phone-hacking scandal, as discussed below. In April

13   2011, its average daily circulation was 2,606,397 copies. It was published by

14   NEWS GROUP NEWSPAPERS, a subsidiary of NI GROUP LIMITED,

15   formerly NEWS INTERNATIONAL.

16       15.   Upon information and belief, Defendants' agents, employees and/or

17   representatives within the scope of their duties and responsibilities, directed,

18   induced, solicited, caused, encouraged, acquiesced in, permitted and/or employed

19   others to capture and obtain or attempt to capture sound recordings in a manner

20   that violated Plaintiff's right to privacy by the unlawful access of stored

21   communications and/or intrusion into, interception of, and interference with the

22   voice-mail messages left and stored on Plaintiff's cellular telephone system.

23       16.   Glenn Mulcaire ("Mr. Mulcaire") is a private investigator, who

24   provided services to News Of The World. In January 2007, he pleaded guilty in

25   England to illegally intercepting phone messages and was imprisoned for six

26   months. Officials of the Metropolitan Police seized approximately 11,000 pages

27   of papers from Mr. Mulcaire's home and business premises. These pages consist

28   in part of a trove of confidential, non-public and private information, which

1   includes a vast quantity of names, addresses and land-line and cellular telephone

2   numbers, PIN numbers and personal information about people, places and things

3   of interest to reporters for News Of The World and other tabloids.  Following

4   renewed investigations by the Metropolitan Police in 2011, Mr. Mulcaire and 89

5   other individuals were arrested and thus far 16 of them, including Mr. Mulcaire,

6   have been formally charged with crimes involving the illegal acquisition of

7   confidential information.

8        17.   In or about October 1998, Mr. Mulcaire entered into an agreement

9   with NEWS GROUP NEWSPAPERS regarding News Of The World, by which

10   he agreed to obtain, upon request, private and highly confidential information

11   about targets by means of illegal acts, including the hacking of voice-mail

12   messages on cellular telephone systems.  Mr. Mulcaire also agreed to provide

13   transcripts of voice-mail messages to journalists and others at News Of The

14   World.  This agreement continued until in or about August 2006, when Mr.

15   Mulcaire was arrested for, in part, engaging in these illegal activities.

16        18.   Mr. Mulcaire was acting on behalf of and within the scope of the

17   authority conferred upon him by NEWS GROUP NEWSPAPERS.  NEWS

18   GROUP NEWSPAPERS is indemnifying Mr. Mulcaire for his legal costs in the

19   Hacking Scheme litigation in the United Kingdom.

20        19.   Among other misconduct engaged in to further the Hacking Scheme,

21   Mr. Mulcaire and the UNIDENTIFIED INVESTIGATORS fraudulently induced

22   mobile telephone companies and others to disclose confidential information (a

23   practice known as "blagging"), including, inter alia, direct-dial mobile numbers

24   and/or call data, text data, location data, passwords and PIN numbers, and to

25   reset PIN numbers and passwords on the voicemails of their targets.  Mr.

26   Mulcaire, the UNIDENTIFIED INVESTIGATORS and the UNIDENTIFIED

27   JOURNALISTS used and exploited the unlawfully-obtained information to note,

28

1  record and/or transcribe voice-mail messages for use in the preparation of articles
2  or stories to be published by The Sun and News Of The World.

3      20.   Mr. Mulcaire and the UNIDENTIFIED INVESTIGATORS provided
4  direct dial mobile numbers, call data, text data, location data, passwords, PIN
5  numbers and other information to the UNIDENTIFIED JOURNALISTS working
6  for NEWS GROUP NEWSPAPERS to enable them to hack and/or to listen to,
7  or to read transcripts of voice-mail messages of targets.   The information
8  obtained, consisting of cellular numbers, contents of messages, names of
9  individuals communicating with each other, locations and proposed locations
10 (the "Private Information"), was used in the research, preparation and writing of
11 articles, stories and reports by the UNIDENTIFIED JOURNALISTS, which
12 were published by The Sun and News Of The World. Consequently, the NEWS
13 CORPORATION Defendants garnered a substantial worldwide profit, by using
14 the illegally obtained information to boost circulation of The Sun and News Of
15 The World.

16      21.   Mr. Mulcaire agreed to obtain the Private Information of targets for
17 the UNIDENTIFIED JOURNALISTS.   Upon information and belief, such
18 hacking was not an "isolated incident" or "an aberration," but a "systemic
19 practice" for Mr. Mulcaire, the UNIDENTIFIED INVESTIGATORS, the
20 UNIDENTIFIED JOURNALISTS, and the UNIDENTIFIED EXECUTIVES.

21

22  **(B)   The Inquiries And Defendants' Cover-Up**

23      22.   For many years, Defendants denied that News Of The World, the
24 UNIDENTIFIED INVESTIGATORS, the UNIDENTIFIED JOURNALISTS
25 and/or Mr. Mulcaire, had accessed and engaged in hacking the voicemails of
26 targets or that they had instructed Mr. Mulcaire, the UNIDENTIFIED
27 INVESTIGATORS, and/or the UNIDENTIFIED JOURNALISTS to access and
28 engage in hacking voice-mails of individuals.

23.   Les Hinton ("Mr. Hinton") was Executive Chairman of NEWS CORPORATION's subsidiary NEWS INTERNATIONAL from 1995 to 2007. In 2007, he became CEO of Dow Jones & Company and Publisher of The Wall Street Journal. On July 15, 2011 Mr. Hinton resigned as Publisher of The Wall Street Journal after the revelation of illegal phone hacking at the News Of The World.  On May 1, 2012 the United Kingdom House of Commons Culture, Media and Sport Select Committee (the "Select Committee") published an exhaustive report accusing Mr. Hinton of misleading the Select Committee during its several investigations of the illegal phone hacking scandal.  It found that Mr. Hinton had been "complicit in the cover-up at NEWS INTERNATIONAL."  In its 2012 report, the Select Committee referred to Mr. Hinton's testimony as "selective amnesia."  In its 2010 report it stated:

"the forgetfulness of News International reached new levels on 15 September 2009, when Les Hinton, formerly Chief Executive of News International, appeared before the Committee and stated that he did not know, could not recall, did not remember or was not familiar with the events under scrutiny a total of 72 times."

24.   In March 2007, Mr. Hinton, then Executive Director of NEWS INTERNATIONAL appeared before the Select Committee. The Chairman of the Select Committee asked the following question to Mr. Hinton:

You carried out a full, rigorous internal inquiry, and you are absolutely convinced that Clive Goodman was the only person who knew what was going on?

Mr. Hinton replied:

Yes, we have and I believe he was the only person, but that investigation, under the new editor, continues.

1    This testimony concerning Clive Goodman was false when given.

2        25.    The Select Committee, in its 2010 Report, stated, "The News Of The

3    World and its parent companies did not initially volunteer the existence of

4    pay-offs to Clive Goodman and Glenn Mulcaire, and their evidence has been

5    contradictory.  We do not know the amounts, or terms, but we are left with a

6    strong impression that silence has been bought."  In the Committee's 2012

7    Report, the Select Committee stated, "We have subsequently learnt that News

8    International paid Clive Goodman a total of £243,502.08 from the time of his

9    arrest in August 2006.  The size of the pay-off serves to confirm our view that

10   it was used to buy Clive Goodman's silence."

11       26.    On January 8, 2010, The Guardian reported that Rebekah Brooks

12   ("Ms. Brooks") "said that payments to Goodman and Mulcaire were approved

13   by the former NEWS INTERNATIONAL Chairman, Les Hinton."

14       27.    Ms. Brooks was Editor of News Of The World from 2000 to 2003

15   and Editor of The Sun from 2003 to 2009.  She was the Chief Executive Officer

16   ("CEO") of NEWS INTERNATIONAL from 2009 to 2011.  On July 15, 2011,

17   Ms. Brooks resigned as CEO of NEWS INTERNATIONAL in the wake of the

18   public revelations of widespread phone hacking at News Of The World.  On July

19   17, 2011, she was arrested, in part, on suspicion of conspiring to intercept

20   communications.  On July 24, 2012, "the Crown Prosecution Service announced

21   [Ms.] Brooks would be charged, along with six other former members of the staff

22   of News Of The World, with conspiring to intercept communications without

23   lawful authority, from 3 October 2000 to 9 August 2006."  In addition to this

24   "generic charge, [Ms.] Brooks would be charged with four specific counts of

25   conspiracy to intercept communications without lawful authority. These include

26   a charge relating to the hacking of the voicemail messages [on the cell phone

27   system] of the murdered schoolgirl Milly Dowler."

28

28.   In 2008, as part of the intentional effort by the NEWS CORPORATION Defendants to prevent the factual nature and scope of the Hacking Scheme from becoming public, News Of The World privately entered into a settlement in the United Kingdom with an individual, Gordon Taylor ("Mr. Taylor"), Chief Executive of the Professional Footballers Association, who had been a victim of the Hacking Scheme, for an amount reported to be in excess of $1,000,000.   This payment to Mr. Taylor was personally approved by Mr. Murdoch's son, James Murdoch, who at that time headed NEWS CORPORATION's operations in Europe and Asia.

29.   On July 21, 2009, Colin Myler ("Mr. Myler"), who was then Editor of News Of The World, appearing before the Select Committee on behalf of NEWS GROUP NEWSPAPERS, testified that there was no evidence of widespread wrongdoing and/or hacking of telephone message systems at News Of The World.   Andy Coulson ("Mr. Coulson"), who was Mr. Myler's predecessor, told the Select Committee on July 21, 2009 that he was not aware of and did not condone phone hacking at News Of The World. Mr. Coulson was Editor of News Of The World from 2003 until he resigned in 2007, following Clive Goodman's conviction on charges relating to phone hacking.   On July 8, 2011, Mr. Coulson was arrested by the Metropolitan Police in connection, in part, with allegations of phone hacking.   On July 24, 2012, Mr. Coulson and seven others were charged with "conspiring to intercept communications without lawful authority from 3rd October 2000 to 9th August 2006."   He was also charged in Scotland with committing  perjury in 2010 in HM Advocate v. Sheridan and Sheridan, a case that dealt, in part, with phone hacking.

30.   In 2011, Lord Justice Leveson conducted a Public Inquiry ("The Leveson Inquiry") into the practices of the press in the United Kingdom.   The Leveson Inquiry focused, in part, on alleged phone hacking.   It concluded that the evidence revealed "serious and systemic illegality."

31.   Documents seized from Mr. Mulcaire's home by the Metropolitan Police included "dozens of notebooks and two computers containing 2,978 complete or partial mobile phone numbers and 91 PIN codes; at least three names of other News Of The World journalists, and 30 tape recordings made by Mulcaire."

32.   The Select Committee found it "inconceivable" that managers at News Of The World did not know of widespread phone hacking at the paper and concluded that News Of The World and NEWS INTERNATIONAL had "misled the [Select] Committee," that "their instinct was to cover up," that they "ignore[d] evidence of widespread wrongdoing," and that they "exhibited wilful blindness."

33.   The Guardian newspaper reported on July 8, 2009 that "27 different journalists from News Of The World and four from The Sun" made more than 1,000 requests to private investigators to secure phone records, or to otherwise illegally obtain personal and confidential information.   The Guardian further stated, "these purchases were not secret within the News Of The World office: they were openly paid for by the accounts department with invoices that itemised illegal acts."

34.   Sean Hoare ("Mr. Hoare"), a former reporter at News Of The World for more than ten years, who worked closely with Mr. Coulson, told the magazine Vanity Fair in June 2011, "Either [Coulson] was a dreadful editor or a liar.   You cannot run a newspaper and not know where things come from." Indeed, at News Of The World, phone hacking, Mr. Hoare continued, "was encouraged as long as you didn't get caught. [Coulson] was aware that the practice was going on." Mr. Hoare also told The New York Times Magazine in 2010 that he played tape recordings of illegally hacked voice-mails for Mr. Coulson while the two worked together at The Sun.

35.     Paul McMullan ("Mr. McMullan"), a former Deputy Features Editor and member of News Of The World's investigations team, told The Guardian in September 2010 that "he personally commissioned private investigators to commit several hundred acts which could be regarded as unlawful, that use of illegal techniques was no secret at the papers, and that senior editors, including Mr. Coulson, were aware this was going on."   Mr. McMullan told Vanity Fair in June 2011 that Ms. Brooks "knew that the practice (of engaging in phone hacking) was common."

36.     On or about January 26, 2011, the Metropolitan Police began the investigation known as "Operation Weeting," the focus of which is phone hacking.

37.     Under inquiries from the police, the press, the House of Commons, and Lord Justice Leveson, NEWS INTERNATIONAL was forced to admit that hacking and other violations of privacy were a standard business practice at News Of The World, and at its sister paper, The Sun.  Deputy Prime Ministers, Members of Parliament, Scotland Yard officials, sports figures, relatives of British soldiers killed in Iraq, members of the Royal Household, private individuals, including a 13 year-old murdered girl named Milly Dowler, crime victims, celebrities and others were among the targets.  Major arrests followed this admission throughout 2011 to 2012, including NEWS INTERNATIONAL CEO Ms. Brooks, Editors Mr. Coulson and Ian Emondson, chief reporter Neville Thurlbeck, and journalist James Weatherup.  To date, more than thirty journalists have been charged – including six uncovered in a new hacking investigation announced in 2013 ("Operation Pinetree") – and many face imprisonment.  The victims of phone hacking have suffered immeasurably.  Some have had their reputations and personal lives irreparably damaged.  Many await redress.

38.    On July 16, 2011, NEWS INTERNATIONAL published a public letter of apology issued by Mr. Murdoch entitled "We are sorry," which was run as an advertisement in seven United Kingdom-based newspapers. It said, in part,

"We are sorry for the serious wrongdoing that occurred. We are deeply sorry for the hurt suffered by the individuals affected. In the coming days, as we take further steps to resolve these issues and make amends for the damage they have caused, you will hear more from us."

The advertisement ended, "Sincerely, Rupert Murdoch."

39.    On July 18, 2011, NEWS INTERNATIONAL published a statement as an advertisement entitled "Putting right what's gone wrong" in four Sunday newspapers in the United Kingdom.

40.    As of February 2013, approximately 700 victims have settled claims for phone hacking in the United Kingdom for a total of approximately $25,000,000. A substantial number of cases of phone-hacking claims are still pending.

41.    NEWS CORPORATION, Mr. Hinton, Mr. Mulcaire, Ms. Brooks and some or all of the UNIDENTIFIED EXECUTIVES knew or should have known that officers, employees and agents of its newspapers The Sun and News Of The World, including Mr. Mulcaire, the UNIDENTIFIED INVESTIGATORS and the UNIDENTIFIED JOURNALISTS, were engaged in widespread phone hacking of victims' and targets' voice-mail messages on their cellular telephone systems, including this Plaintiff's voice-mail messages on her cellular telephone system in order to obtain private information about Ms. Jolie. The Hacking Scheme victims ranged from a missing school girl to grieving families, celebrities, royals and public officers. The Hacking Scheme produced sensitive, private and confidential information that was used to create attention-grabbing

1 | headlines, in an effort to increase NEWS GROUP NEWSPAPERS' circulation

2 | and profits.

3 |     42.    Mr. Murdoch knew or should have known that executives,

4 | employees and agents of The Sun and News Of The World were engaged in

5 | widespread phone hacking of victims' and targets' voice-mail messages on their

6 | cellular telephone systems, given that, upon information and belief, Mr.

7 | Murdoch, Chairman and CEO of NEWS CORPORATION, called the editors at

8 | News Of The World each Saturday evening to inquire about, and to discuss, the

9 | headline stories scheduled to run in The Sunday edition of News Of The World.

10 |     43.    After meeting with Milly Dowler's parents on July 22, 2011, Mr.

11 | Murdoch signed a letter to Mr. & Mrs. Dowler, on NEWS CORPORATION

12 | stationery from its headquarters in New York City, which said, in part, "This is

13 | to reiterate everything I said to you and my particular horror at the fact that we

14 | added to your distress.  I pledged to you and to Parliament this week that I will

15 | not rest until we have cleared up this whole matter."

16 |     44.    In a March 11, 2013 post, #Hackgate, at

17 | http://stevennott.wordpress.com/

18 | 2013/03/11/hackgate-phone-hacking-victims-publicly-known-so-far/, published

19 | a "list of confirmed victims of News Of The World hacking made public so far

20 | ... ."  The list included: "Eunice Huthart – Stunt double for Angelina Jolie,"

21 | "Angelina Jolie – Actress" and "Brad Pitt – Actor."

22 |

23 | **Defendants' Illegal Phone Hacking**

24 | **Of Ms. HUTHART In Los Angeles**

25 |     45.    Ms. HUTHART is a stunt double who resides with her family in

26 | Liverpool, England.  Ms. HUTHART first met and worked with Ms. Jolie in

27 | May 2000.

28 |

46.   Throughout 2001 to 2003 Plaintiff worked closely with Ms. Jolie at numerous locations on the films Beyond Borders and Tomb Raider 2. Plaintiff and Ms. Jolie developed a close friendship and often traveled and socialized together. For example, Plaintiff and Ms. Jolie and their family members spent Christmas 2003 and 2004 together. Plaintiff is the godmother for Ms. Jolie's first biological child.

47.   From approximately early January 2004 to mid-June 2004, Plaintiff, Ms. Jolie and Ms. Jolie's personal assistant lived together in a house in Brentwood, Los Angeles while working on the film Mr. & Mrs. Smith.

48.   From approximately mid-March 2005 to mid-May 2005, Plaintiff lived and worked in Los Angeles doing reshoots for the film Mr. & Mrs. Smith.

49.   On occasions from 2004 to 2005, Plaintiff did not receive messages left and stored on her cellular telephone system while she was in the United States and in the United Kingdom. Plaintiff complained to her service provider, Vodafone, about lost voice messages. On occasions friends and relatives asked Plaintiff why she had not replied to their messages. They included Ms. Jolie, who left messages concerning hotel arrangements where she was staying, code names for hotels and individuals, dinner reservations, meet-up times and, on occasion, when she sought the help of Plaintiff during times of need.   On occasion while in Los Angeles, Plaintiff responded to Ms. Jolie's queries that she had not received messages from her that had been left on Plaintiff's cellular telephone.

50.   During 2004 to 2005, Plaintiff instructed her teenage daughter, at home in Liverpool, to call whenever she needed her when Plaintiff was in the United States. Plaintiff did not answer her cellular telephone during filming. However, on the occasions that her daughter called and Plaintiff did not answer the phone, her daughter left a voice-mail message. Often, Plaintiff did not receive the message. During one period when Plaintiff was in Los Angeles

1   working on the film Mr. & Mrs. Smith, her daughter called several times to
2   report that she was being bullied in school in Liverpool, England.  Although
3   Plaintiff's daughter left messages asking her mother to call her back, Plaintiff did
4   not receive those messages and could not console her daughter.   As a
5   consequence, Plaintiff believed that she failed her daughter in a time of need.
6   Plaintiff was despondent, and believed she had failed as a parent.

7       51.   During the same period, Plaintiff's husband criticized her for not
8   responding to his calls and the voice messages he left on her cellular telephone
9   system.  He became very insecure as a result of her not getting back to him after
10  he left voice messages.   Their relationship suffered.   Plaintiff's husband
11  suspected she was having an affair because she did not return his voice
12  messages.

13      52.   Plaintiff's name, her cellular telephone number, her account number
14  and/or her PIN number appear on four separate pages of Mr. Mulcaire's notes,
15  obtained by the Metropolitan Police.  On two of those pages, the name "Angelina
16  Jolie" appears.  Plaintiff believes that they were hacking her cellular telephone
17  as a means to obtain information about Ms. Jolie.

18      53.   Plaintiff's file at the Metropolitan Police contains five spreadsheets
19  of call data demonstrating the times when Mr. Mulcaire called Plaintiff's cellular
20  telephone during February, March and May of 2006.

21      54.   The UNIDENTIFIED INVESTIGATORS, the UNIDENTIFIED
22  JOURNALISTS and Mr. Mulcaire, upon information and belief, had Plaintiff's
23  cellular telephone number, and its PIN number, and they intentionally and
24  willfully reset Plaintiff's PIN number on several occasions in order to intercept
25  her cellular telephone messages.   After a "left" message was accessed, the
26  message was automatically transferred to "saved" messages. Upon information
27  and belief, some or all of the UNIDENTIFIED JOURNALISTS would then
28  delete the voice-mail messages in order to gain an exclusive of the private and

1  confidential information that was on the voice-mail message.  On several

2  occasions, said Defendants intentionally and willfully reset Plaintiff's PIN

3  number, thereby  rendering her unable to access any messages.  When this

4  occurred, Plaintiff was unable to identify the messages left and stored for her,

5  and in due course, the messages would entirely disappear.

6        55.    Mr.    Mulcaire,    some    or    all    of    the    UNIDENTIFIED

7  INVESTIGATORS, and some or all of the UNIDENTIFIED JOURNALISTS,

8  engaged in a pattern and practice of activity in which the methodology employed

9  involved simultaneous and/or contemporaneous hacking of voice-mail messages

10  on cellular telephone systems.  For example, upon information and belief, said

11  Defendants intentionally and willfully hacked the voice-mail messages by

12  contemporaneously placing two phone calls from two separate phones, utilized

13  as "devices," to Plaintiff's cellular telephone number so that they could access,

14  intercept, interfere with, listen to, and record voice-mail messages left and stored

15  on her cellular telephone system.

16        56.    Distressed by her inability to access her voice-mail messages,

17  Plaintiff asked her cellular telephone carrier to reset her PIN number to allow her

18  to access her messages.

19        57.    The actions and conduct of the Defendants, individually and/or in

20  concert, in intentionally and willfully depriving Plaintiff of the capacity to listen

21  to the messages left and stored for her constituted unlawful access to stored

22  electronic communications, intrusion of, interception of, and/or interference with

23  voice-mail messages left and stored on her cellular telephone system, a violation

24  of her right to privacy, and a malicious interception of a confidential

25  communication under circumstances in which Plaintiff had a reasonable

26  expectation of privacy and in which it was reasonable to expect that the message

27  giver desired the message to be confined to Plaintiff and the message giver.

28

58. Extending the scope of their illegal activities, at a time not known to Plaintiff, upon information and belief, Defendants engaged in actions and conduct in the United States, including in California, designed and implemented in accordance with and in furtherance of the Hacking Scheme. Upon information and belief, such surreptitious activities included, without limitation, placement of, and arrangements with, the UNIDENTIFIED INVESTIGATORS and the UNIDENTIFIED JOURNALISTS within the United States, including in California, in order to illegally extract, capture, obtain and exploit private information from Plaintiff and other targets located in the United States, including in California, for use in boosting circulation of The Sun and News Of The World, so as to increase profits of the NEWS CORPORATION Defendants.

59. On February 27, 2012, Bloomberg News Service reported that NEWS CORPORATION had "agreed to pay £600,000 pounds sterling ($950,000) to Charlotte Church, the U.K. pop star and admitted its News Of The World tabloid hacked her mobile-phone messages 'for many years,' starting when she was 16 years old." The article further reported that a source said, "Church's agent in Los Angeles and publicist in New York have been identified as the first potential American victims of the tabloid's hacking."

60. Officials of the Metropolitan Police visited Plaintiff to inform her that they had evidence indicating that her cellular telephone was hacked by some or all of the Defendants when she was in the United Kingdom. Plaintiff's cellular telephone was also surreptitiously hacked by some or all of the Defendants, including the UNIDENTIFIED INVESTIGATORS, the UNIDENTIFIED JOURNALISTS and Mr. Mulcaire when she lived and worked in Los Angeles in 2004 and 2005, at which times she did not receive voice-mail messages from, among others, her daughter, her husband and Ms. Jolie. Plaintiff was unaware of these illegal activities and had no reasonable opportunity to

1  become aware of them due to Defendants' intentional and ongoing cover-up of

2  the Hacking Scheme until most recently.

3      61.    The full charge sheet from the Crown Prosecution Service, July 24,

4  2012, lists Plaintiff as a phone-hacking victim.  Charge 10 states:

5          "Neville Thurlbeck and James Weatherup, between 5th day of July

6          2005 and the 4th day of May 2006, conspired together and with

7          Glenn Mulcaire and persons unknown, to intercept communications

8          in the course of their transmissions, without lawful authority, namely

9          the voice mail messages of persons associated with Angelina Jolie

10         and Brad Pitt, who included Eunice Huthart."  (Emphasis added.)

11     62.    On April 1, 2005, while Plaintiff was in Los Angeles, a story

12 appeared in The Sun entitled "Brad's £4M Pad Is Jolie Nice." Upon information

13 and belief, no one except Brad Pitt's bodyguard, Ms. Jolie's bodyguard, their

14 respective personal assistants and Plaintiff knew that Brad Pitt and Ms. Jolie

15 were now an "item." Yet at the end of the story in The Sun, it is stated:

16         "Yesterday The Sun exclusively revealed [Brad] and Angelina

17         checked into a hotel posing as a married couple during a weekend

18         trip to plug their new movie Mr. & Mrs. Smith."

19 The story appeared during the period Plaintiff was doing reshoots just outside of

20 Los Angeles.

21     63.    On one occasion, Plaintiff went to Ms. Jolie's hotel not knowing

22 under what pseudonym Ms. Jolie was registered. Ms. Jolie had left Plaintiff a

23 voice message earlier saying that she was staying at the hotel under the name

24 "Pocohontas." However, Plaintiff never got the message. Ms. Jolie's assistant

25 had to come down to the lobby to find Plaintiff. Ms. Jolie said to Plaintiff, "I left

26 you a message." However, Plaintiff never received it.

27     64.    On May 1, 2005, while Plaintiff was in Los Angeles, a story

28 appeared in News Of The World entitled "Pitt Stop For Jolie." This article

1  reported that Ms. Jolie threatened to quit making movies for good. The News Of
2  The World article began by stating, "Hollywood babe Angelina Jolie has
3  threatened to quit movies for good." Ms. Jolie had communicated with Plaintiff
4  on this subject prior to the article appearing in the newspaper, and would leave
5  messages on Plaintiff's cell phone, some of which she did not receive. This was
6  during the time Plaintiff believes her cell phone was hacked, and the information
7  contained in the article was privately shared with Plaintiff.

8     65.   On May 4, 2005, while Plaintiff was in Los Angeles, a story
9  appeared in The Sun entitled "Off Road Biking Is Jolie Fun." Ms. Jolie wanted
10 to learn how to take motorbike trips with Brad Pitt. Plaintiff arranged to pick up
11 an MV Augusta Brutale motorcycle in Kent, England. When Plaintiff began to
12 make these arrangements, she called her friend Ray Da Haan ("Mr. Da Haan")
13 in Kent, England from Los Angeles. Mr. Da Haan was planning to teach Ms.
14 Jolie to ride on his farm there. Upon information and belief, Mr. Da Haan left
15 messages for Plaintiff, but those messages appear to have been hacked and
16 deleted before she heard them. Concurrent with these arrangements between Mr.
17 Da Haan and Plaintiff, The Sun reported that "Brad Pitt's lover has been learning
18 on a nippy 750 cc MV Augusta Brutale." The story also states, "A source ... said
19 ... she's a natural." Plaintiff believes that the quote "she's a natural" is
20 attributable to Mr. Da Haan's leaving a message to that effect. Upon information
21 and belief, this specific information about the motorcycle and the arrangements,
22 and the "natural" remark were known only to Plaintiff, Ms. Jolie and Mr. Da
23 Haan.

24    66.   While living and working in Los Angeles, Plaintiff had an actual and
25 objectively reasonable expectation that voice-mail messages left and stored on
26 her cellular telephone system were intended solely for her and would not be
27 accessed, interfered with, intruded upon, intercepted, hacked and/or re-recorded.
28

67.    The messages left and stored on Plaintiff's cellular telephone system when she was living and working in Los Angeles concerned private matters, which Plaintiff was entitled to keep confidential.  Plaintiff had an objectively reasonable expectation that this private and confidential information and communications were intended solely for her and would not become published and/or made public, and the actions and conduct of Defendants were offensive to a reasonable person.

68.    Defendants' wrongful conduct was the direct and proximate cause of violations of Plaintiff's rights under Federal laws, California state law, Article I, Section 1 of the California State Constitution, and the California common law.

## FIRST CLAIM FOR RELIEF

### (Violation Of The Stored Communications Act, 18 U.S.C. §§2701 and 2707 - All Defendants)

69.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 68.

70.    The Stored Communications Act (the "SCA") broadly defines an "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce ... ." 18 U.S.C. §2711(1); 18 U.S.C. §2510(12).

71.    The SCA broadly defines a "wire communication" as "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or

foreign communications or communications affecting interstate or foreign commerce ... ." 18 U.S.C. §2711(1); 18 U.S.C. §2510(1).

72.     Pursuant to the SCA, "electronic storage" means any (a) "temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof," and (b) "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. §2711(1); 18 U.S.C. §2510(17)(A)(B). This type of electronic storage includes communications in intermediate electronic storage that have not yet been delivered to their recipient.

73.     Congress enacted the SCA to prevent "unauthorized persons deliberately gaining access to, and sometimes tampering with, electronic or wire communications that are not intended to be available to the public." Senate Report No. 99-541, S. REP. 99-541, 35, 1986 U.S.C.C.A.N. 3555, 3589.

74.     As such, the SCA mandates, among other things, that it is unlawful for a person to obtain access without authorization to stored communications, including communications sent to and temporarily stored on a cellular telephone's voice-mail system. 18 U.S.C. §2701(a).

75.     Defendants violated 18 U.S.C. §2701(a)(1), in that they accessed a "facility through which an electronic communication service is provided." (18 U.S.C. §2701(a)) by intentionally accessing Plaintiff's voicemails without authorization and obtaining and/or altering authorized access to a wire or electronic communication while in electronic storage by collecting and accessing temporarily stored voicemails or those maintained for purposes of backup protection. This occurred while Plaintiff lived and worked as a stunt double for Ms. Jolie in Los Angeles, California in 2004 and 2005. Defendants had actual knowledge of, participated in, directed and/or approved of, and benefitted from, this practice.

76.     Additionally, Defendants violated 18 U.S.C. §2701(a)(2) because they intentionally exceeded or had no authorization to access Plaintiff's communications and obtained, altered, or prevented authorized access to a wire or electronic communication while in electronic storage by interfering with Plaintiff's temporarily stored voicemails, as disclosed hereinabove. Defendants had actual knowledge of, participated in, directed and/or approved of, and benefitted from, this practice.

77.     As a result of Defendants' conduct described herein, and their violation of §2701, Plaintiff has suffered injuries and seeks an award of the maximum statutory actual damages, including profits made by Defendants, plus reasonable attorneys' fees and costs, pursuant to 18 U.S.C. §2707.

78.     By reason of the foregoing, Defendants' actions here were intentional and willful, and accordingly, Plaintiff is further entitled to punitive damages, pursuant to 18 U.S.C. §2707.

### SECOND CLAIM FOR RELIEF

(Violation Of Wiretap Act, 18 U.S.C. §§2510, 2511 & 2520 - All Defendants)

79.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 68 and 70 through 78.

80.     The Wiretap Act generally prohibits the "interception" of "wire, oral, or electronic communications." 18 U.S.C. §2511(1).

81.     The Wiretap Act provides a private right of action against any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication," 18 U.S.C. §2511(1)(a), or who "intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of [the

1  Wiretap Act.]" §2511(1)(d); §2511(1)(c) ("intentionally discloses, or endeavors

2  to disclose, to any other person the contents ...").

3      82.    The statute prohibits "interceptions" of electronic communications

4  and defines "intercept" as "the aural or other acquisition of the contents of any

5  wire, electronic, or oral communication through the use of any electronic,

6  mechanical, or other device." §2510(4). The "contents" of a communication, in

7  turn, are defined in the statute as "any information concerning the substance,

8  purport, or meaning of that communication." §2510(8). "[A]ny transfer of

9  signs, signals, writing, images, sounds, data, or intelligence of any nature

10  transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic

11  or photooptical system that affects interstate or foreign commerce," with certain

12  exceptions, qualifies as an "electronic communication." §2510(12). "Content"

13  includes information the user intended to communicate, such as the words

14  spoken during a phone call that are preserved in voice-mail messages, which

15  were wrongfully hacked and intercepted.

16      83.    Defendants intercepted "wire, oral or electronic communications"

17  and used or disclosed their contents, by contemporaneously hacking into

18  Plaintiff's cellular telephone system.   Defendants captured and obtained

19  voice-mail messages intended for Plaintiff before Plaintiff could access them.

20  Defendants listened to these messages, copied their contents and/or disseminated

21  them in violation of the Wiretap Act.  This occurred while Plaintiff lived and

22  worked as a stunt double for Ms. Jolie in Los Angeles, California in 2004 and

23  2005.  Defendants had actual knowledge of, participated in, directed and/or

24  approved of, and benefitted from, this practice.

25      84.    As a direct result of Defendants' actions as alleged here, Plaintiff

26  suffered irreparable harm in her personal and professional life and is entitled to

27  the greater of actual damages and any profits made by Defendants due to their

28

1  violations of 18 U.S.C. §§2520 and 2511 or statutory damages, pursuant to 18
2  U.S.C. §2520.

3      85.   As a result of Defendants' actions as alleged here, Plaintiff is also
4  entitled to punitive damages, as well as reasonable attorneys' fees and costs,
5  pursuant to 18 U.S.C. §2520.

6

7              **THIRD CLAIM FOR RELIEF**
8      (Violation Of Article I, Section 1 Of The California State Constitution -
9                      All Defendants)

10     86.   Plaintiff repeats and realleges each and every allegation contained
11 in paragraphs 1 through 68, 70 through 78 and 80 through 85.

12     87.   The aforementioned wrongful actions and practices of Defendants
13 violated Plaintiff's rights under Article I, Section 1 of the California State
14 Constitution, which provides:

15         "All people are by nature free and independent and have inalienable
16         rights.  Among these are enjoying and defending life and liberty,
17         acquiring, possessing and protecting property, and pursuing and
18         obtaining safety, happiness and <u>privacy</u>."  (Emphasis added.)

19     88.   The California State Constitution was amended to add the
20 constitutional right to privacy following a 1972 ballot initiative.  The California
21 Supreme Court has since suggested the State Constitution's enumerated right to
22 privacy is sometimes greater than the United States Constitution's unenumerated
23 right to privacy.

24     89.   During 2004 and 2005, Defendants repeatedly intercepted, accessed
25 and listened to voice-mail messages intended solely for Plaintiff's private
26 cellular telephone system.  Further, Defendants knew and/or should have known
27 that the voice- mail messages were intended solely for Plaintiff, and yet they
28 continued to intercept, access and listen to them.

90.   Defendants' actions rendered Plaintiff unable to retrieve voice-mail messages intended solely for her, which were on Plaintiff's cellular telephone system.

91.   Defendants published information, including articles in The Sun and News Of The World, using sensitive, private and confidential information intended solely for Plaintiff.

92.   Defendants' unauthorized interceptions of Plaintiff's voice-mail messages were an egregious breach of well-established social norms that recognize the need to maximize individual control over the dissemination and use of such information in order to prevent unjustified embarrassment and indignity, and violated Plaintiff's reasonable expectation of privacy.

93.   As a result of Defendants' actions, Plaintiff was unable to make intimate decisions or conduct personal activities relating to both her family and career without observation, intrusion, or interference.

94.   Defendants' actions violated Plaintiff's specific, legally protected privacy interest and reasonable expectation of privacy through conduct that was sufficiently serious in its nature, scope and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right.

95.   As a result of Defendants' action as alleged here, Plaintiff was caused irreparable harm in her personal and professional life and is entitled to general and specific damages.

96.   Pursuant to 28 U.S.C. §1367, this Court has pendent or supplemental jurisdiction to hear and adjudicate such claims.

///

///

**FOURTH CLAIM FOR RELIEF**

(Violation Of California Penal Code §§630, 631, 632, 632.7 & 637(2)(a) -
All Defendants)

97.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 68, 70 through 78, 80 through 85 and 87 through 96.

98.   The actions and practices of Defendants violated Plaintiff's rights under the California Penal Code §§630, 631, 632, 632.7 and 637.2(a).

99.   The purpose of the California Penal Code §630 is to protect private communications in an era of ever improving technology. California Penal Code §630 begins as follows:

"The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

100.  California Penal Code §631(a) defines the acts that violate the law as follows:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report,

or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

101.   While Plaintiff lived and worked as a stunt double in Los Angeles, California in 2004 and 2005, Defendants and/or their agents, employees or representatives intentionally intercepted, interfered with, accessed and hacked Plaintiff's voice-mail messages on her cellular telephone system or directed, caused, permitted and/or conspired for Plaintiff's cellular telephone voice-mail to be intercepted, interfered with, accessed and hacked. Defendants intentionally made unauthorized connections to the voice-mail on Plaintiff's cellular telephone system without the consent of Plaintiff or any other party to the voice-mail communications.   Defendants also made unauthorized attempts to learn the contents of confidential communications contained in the voice-mail of Plaintiff's cellular telephone system. Defendants used or attempted to use and/or communicated information that was obtained through such activities. Defendants' actions were thus in violation of §631 of the California Penal Code. Defendants had actual knowledge or, participated in, directed and/or approved of, and benefitted from, this practice.

102.   A violator of California Penal Code §632(a) is defined as "every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio ... ."

California Penal Code §632(b) defines "person" in this context as including any "individual, business association, partnership, corporation, limited liability company ... ." California Penal Code §632(c) defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto," excluding public proceedings or other instances where there would not be an expectation of privacy.

103. A violator of California Penal Code §632.7(a) is defined as "every person who, without the consent of all parties to a communication, intercepts or receives and intentionally records, or assists in the interception or reception and intentional recordation of, a communication transmitted between two cellular radio telephones, a cellular radio telephone and a landline telephone, two cordless telephones, a cordless telephone and a landline telephone, or a cordless telephone and a cellular radio telephone ... ."

104. While Plaintiff lived and worked as a stunt double in Los Angeles, California in 2004 and 2005, Defendants and/or their agents, employees or representatives intentionally, and without the consent of all parties to the communications, used an electronic device to access and to record Plaintiff's voice-mail messages on her cellular telephone system, including voice-mail messages generated by calls from other cellular phones and landlines. Defendants then used or attempted to use the information obtained in this manner. The voice-mail messages left and stored on Plaintiff's cellular telephone system were private and confidential because at least one party to the communication reasonably expected the communication to be limited to the parties. Defendants' actions were thus in violation of §§631, 632 and 632.7 of the California Penal Code. Defendants had actual knowledge of, participated in, directed and/or approved of, and benefitted from, this practice.

105.  As a result of Defendants' actions as alleged here, Plaintiff was caused irreparable harm in her personal and professional life.  Plaintiff's actual damages include, but are not limited to, emotional distress, anxiety, embarrassment, humiliation, the deterioration of family relationships, and the fear of, or actual loss of, professional credibility and integrity.  Defendants' actions were a substantial factor in causing this harm.  Under §637.2(a) of the California Penal Code, "any person who has been injured by a violation of this chapter may bring an action against the person who committed the violation."

106.  By reason of the foregoing, Plaintiff is entitled to the greater of statutory damages, pursuant to §637.2(a)(1), or three times the actual damages she suffered for each instance in which Defendants violated §§631, 632 and 632.7 of the California Penal Code, pursuant to §637.2(a)(2).

107.  Pursuant to 28 U.S.C. §1367, this Court has pendent or supplemental jurisdiction to hear and adjudicate such claims.

## FIFTH CLAIM FOR RELIEF

(Violation Of California Civil Code §§1708.8(b), 1708.8(d) & 1708.8(e) - All Defendants.)

108.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 68, 70 through 78, 80 through 85, 87 through 96 and 98 through 107.

109.  The actions and practices of Defendants violated Plaintiff's rights under the California Civil Code §§1708.8(b), 1708.8(d) and 1708.8(e).

110.  California Civil Code §1708.8(b) states:

"A person is liable for constructive invasion of privacy when the defendant attempts to capture, in a manner that is offensive to a reasonable person, any type of visual image, sound recording, or other physical impression of the plaintiff engaging in a person or

familial activity under circumstances in which the plaintiff had a reasonable expectation of privacy, through the use of a visual or auditory enhancing device, regardless of whether there is a physical trespass, if this image, sound recording, or other physical impression could not have been achieved without a trespass unless the visual or auditory enhancing device was used."

111.   California Civil Code §1708.8(e) states:

"A person who directs, solicits, actually induces, or actually causes another person, regardless of whether there is an employer-employee relationship, to violate any provision of subdivision (a), (b), or (c) is liable for any general, special, and consequential damages resulting from each said violation ... ."

112.   Defendants constructively invaded Plaintiff's privacy when they and/or their agents, employees, or representatives, directed, induced, caused or employed others to attempt or themselves attempted to capture a sound recording, in a manner that was offensive to a reasonable person. The sound recordings that Defendants captured or attempted to capture involved matters related to Plaintiff's personal and/or familial activity and otherwise could not have been captured without trespass. In doing so, Defendants and/or their agents, employees, or representatives violated California Civil Code §§1708.8(b) and 1708.8(e).

113.   Defendants invaded Plaintiff's privacy for a commercial purpose, with the intention of selling, publishing, or otherwise transmitting these records for financial gain or other consideration.

114.   As a result of Defendants' actions alleged here, Plaintiff was caused irreparable harm in her personal and professional life.

115. By reason of the foregoing, pursuant to California Civil Code §1708.8(d), Plaintiff is entitled to up to three times her general and specific damages, as well as punitive damages, as a result of the violations of §1708.8(b).

116. Under California Civil Code §1708.8(d), Defendants are also subject to disgorgement upon a demonstration that Defendants committed the invasion of privacy "for a commercial purpose." Because Defendants committed the invasion of privacy primarily for commercial purposes, including publishing articles in the publications The Sun and News Of The World, Defendants are subject to disgorgement of "any proceeds or other consideration obtained as a result of [these violations]."

117. Pursuant to 28 U.S.C. §1367, this Court has pendent or supplemental jurisdiction to hear and adjudicate such claims.

## SIXTH CLAIM FOR RELIEF

(Intrusion Into Private Affairs - California Common Law - All Defendants.)

118. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 68, 70 through 78, 80 through 85, 87 through 96, 98 through 107 and 109 through 117.

119. While Plaintiff was living and working as a stunt double in Los Angeles in 2004 to 2005, she had a reasonable expectation of privacy concerning her voice-mail messages on her cellular telephone system. However, Defendants intercepted, interfered with, accessed and hacked her voice-mail messages on her cellular telephone system. In so doing, Defendants surreptitiously intruded upon Plaintiff's private affairs, concerns and communications.

120. Defendants' actions and conduct in intentionally and willfully intercepting, interfering with, intruding upon, accessing and hacking Plaintiff's voice-mails on her cellular telephone system, even though Plaintiff had clearly

never authorized Defendants to do so, were highly offensive and highly objectionable to Plaintiff and to a reasonable person of ordinary sensibilities.

121. Defendants acted with reckless disregard of Plaintiff's privacy rights and for the fact that a reasonable person of ordinary sensibilities would find such invasion and intrusion highly offensive. Defendants had actual knowledge of, participated in, directed and/or approved of, and benefitted from, this practice.

122. Defendants' actions were highly offensive because the degree of intrusion into Plaintiff's personal and professional life was significant, the context, conduct and circumstances surrounding the intrusion revealed a complete disregard of Plaintiff's privacy rights, and the Defendants' motives and objectives were for financial profit at Plaintiff's expense.

123. Defendants' intercepting, interfering with, intruding upon, accessing and hacking Plaintiff's voicemails on her cellular telephone was malicious and served no legitimate public interest.

124. The facts publicly disclosed and published by Defendants were private and confidential matters – involving Plaintiff, and Plaintiff's close friends and business associates – which were offensive and objectionable to a reasonable person and not of legitimate public concern, and which Plaintiff was entitled to keep private and confidential.

125. Defendants were motivated for financial profit and gain and to exploit Plaintiff's private and confidential information for their own ends without regard to Plaintiff's privacy rights.

126. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered emotional distress, an invasion of her rights of privacy and other incidental and consequential damages. Plaintiff was harmed and Defendants' conduct was a substantial factor in causing such harm.

127. By reason of the foregoing, Plaintiff is entitled to actual damages in an amount to be determined by the Court.

1    128.   By reason of Defendants' actions, which constituted outrageous
2  conduct, were reckless, showed a callous indifference to, and willful disregard,
3  of Plaintiff's rights of privacy, and were contrary to the public policy of the State
4  of California, Plaintiff is also entitled to punitive damages in an amount to be
5  determined by the Court.
6    129.   Pursuant to 28 U.S.C. §1367, this Court has pendent or supplemental
7  jurisdiction to hear and adjudicate such claims.
8
9  **PRAYER FOR RELIEF**
10   WHEREFORE, Plaintiff requests the following relief:
11   On the First Claim For Relief:
12   1.   An award of the maximum statutory actual damages, including
13  profits made by Defendants, pursuant to 18 U.S.C. §2707;
14   2.   Punitive damages, pursuant to 18 U.S.C. §2707(b)(3);
15   3.   Reasonable attorneys' fees and costs, pursuant to 18 U.S.C.
16  §2707(b)(3); and
17   4.   Such other and further relief as the Court may deem just, proper and
18  equitable.
19   On the Second Claim For Relief:
20   1.   The greater of actual damages and any profits made by Defendants
21  by their violations of 18 U.S.C. §§2520 and 2511, or statutory damages, pursuant
22  to 18 U.S.C. §2520;
23   2.   Punitive damages, pursuant to 18 U.S.C. §2520;
24   3.   Reasonable attorneys' fees and costs, pursuant to 18 U.S.C. §2520;
25  and
26   4.   Such other and further relief as the Court may deem just, proper and
27  equitable.
28

On the Third Claim For Relief:

1.    General and specific damages, in an amount to be determined by the Court; and

2.    Such other and further relief as the Court may deem just, proper and equitable.

On the Fourth Claim For Relief:

1.    The greater of statutory damages, pursuant to §637(2)(a)(1) or three times the actual damages Plaintiff suffered for each instance in which Defendants violated §§631 and 632 of the California Penal Code, pursuant to §637(2)(a)(2); and

2.    Such other and further relief as the Court may deem just, proper and equitable.

On the Fifth Claim For Relief:

1.    An award of three times Plaintiff's general and specific damages, pursuant to §1708.8(d) of the California Civil Code;

2.    Disgorgement of any proceeds or other consideration obtained by Defendants as a result of their violations of Plaintiff's rights under §1708.8(d) of the California Civil Code;

3.    Punitive damages by reason of Defendants' violations of Plaintiff's rights under §1708.8(d) of the California Civil Code; and

4.    Such other and further relief as the Court may deem just, proper and equitable.

On the Sixth Claim For Relief:

1.    Actual damages in an amount to be determined by the Court;

2.    Punitive damages in an amount to be determined by the Court; and

3.    Such other and further relief as the Court may deem just, proper and equitable.

1    **DEMAND FOR JURY TRIAL:**

2        Plaintiff demands trial by jury.

3    Dated: June 13, 2013                    SIEGEL TEITELBAUM & EVANS, LLP

4

5                                             By *Norman Siegel*

6                                             Norman Siegel
7                                             Saralee Evans
                                              Herbert Teitelbaum

8                                             McLAUGHLIN & STERN, LLP

9

10                                            By

11                                            Steven J. Hyman
12                                            Paul H. Levinson
                                              Bruce A. Langer

13

14                                            THE STEIN LAW FIRM

15

16   BY:

17                                            Craig J. Stein, Esq.

18                                            Attorneys for Plaintiffs

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

EUNICE HUTHART

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

NEWS CORPORATION, NI GROUP LIMITED f/k/a NEWS
INTERNATIONAL LIMITED, NEWS GROUP NEWSPAPERS
LIMITED, and JOHN and Jane DOES 1-10;

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you
are representing yourself, provide same.)
Craig J. Stein (SBN #98041)
The Stein Law Firm
801 S. Figueroa Street - 12th Floor
Los Angeles, CA 90017  *See Attached Rider
(213) 233-2771

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you
are representing yourself, provide same.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government
Plaintiff

☒ 3. Federal Question (U.S.
Government Not a Party)

☐ 2. U.S. Government
Defendant

☐ 4. Diversity (Indicate Citizenship
of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original
Proceeding

☐ 2. Removed from
State Court

☐ 3. Remanded from
Appellate Court

☐ 4. Reinstated or
Reopened

☐ 5. Transferred from Another
District (Specify)

☐ 6. Multi-
District
Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No   (Check "Yes" only if demanded in complaint)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes  ☒ No     ☒ **MONEY DEMANDED IN COMPLAINT:** Actual, statutory and punitive damages

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Civil Action for Damages for violation of The Stored Communications Act, 18 U.S.C. §§2701, et seq.; and
The Wiretap Act, 18 U.S.C. §§2510, 2511 & 2520

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influ-enced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Com-modities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☒ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

FOR OFFICE USE ONLY: Case Number: CV13-04253

**AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO   ☐ YES

If yes, list case number(s):

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☒ NO   ☐ YES

If yes, list case number(s):

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | **United Kingdom** |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | **United Kingdom** |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
NOTE: In land condemnation cases, use the **location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| **Los Angeles County** | |

**\*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):**    DATE: June 13, 2013

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

## RIDER

**Attorneys for Plaintiff:**

SIEGEL TEITELBAUM & EVANS, LLP
Norman Siegel
Saralee Evans
Herbert Teitelbaum
260 Madison Avenue - 22nd Floor
New York, NY 10016
(212) 455-0300


McLAUGHLIN & STERN, LLP
Steven J. Hyman
Paul H. Levinson
Bruce A. Langer
260 Madison Avenue
New York, NY 10016
(212) 448-1100