Louis A. Karasik (Cal. Bar # 100672)
Alston & Bird LLP
333 South Hope Street, 16th Floor
Los Angeles, CA  90071-3004
Telephone:   (213) 576-1148
Facsimile:   (213) 576-1100
Email:   lou.karasik@alston.com

Brendan V. Sullivan (*Pro Hac Vice*)
Tobin J. Romero (*Pro Hac Vice*)
Joseph M. Terry (*Pro Hac Vice*)
Jonathan B. Pitt (*Pro Hac Vice*)
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:   (202) 434-5000
Facsimile:   (202) 434-5029
Email:   jpitt@wc.com

Counsel for Defendants News
Corporation, NI Group Limited f/k/a
News International Limited, News Group
Newspapers Limited

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EUNICE HUTHART, <br><br> Plaintiff, <br><br> v. <br><br> NEWS CORPORATION, NI GROUP LIMITED f/k/a NEWS INTERNATIONAL LIMITED, NEWS GROUP NEWSPAPERS LIMITED, and JOHN and JANE DOES 1-10, <br><br> Defendants. | Case No. CV 13-4253 MWF (AJWx) <br><br> Honorable Michael W. Fitzgerald <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** <br><br> **[FED. R. CIV. P. 12]** <br><br> [Filed concurrently with Declaration of Louis A. Karasik and [Proposed] Order] <br><br> Date:          January 6, 2014 <br> Time:          10:00 a.m. <br> Courtroom:   1600 <br><br> Complaint Filed:  June 13, 2013 |

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ........................................................................ 1

II.     BACKGROUND ......................................................................... 1

III.    ARGUMENT .............................................................................. 6

A.      **THE COURT SHOULD DISMISS ALL CLAIMS UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*.** ......................... 7

    1.    The United Kingdom Is an Available and Adequate Forum. .............. 8

    2.    The Balancing of Private and Public Interests Greatly Favors the UK over the United States ................................................................. 11

        a.    The Private-Interest Factors Greatly Favor Transfer to the UK. ...................................................................................... 12

        b.    The Public-Interest Factors Also Overwhelmingly Favor the UK. .................................................................................. 15

B.      **THE COURT LACKS PERSONAL JURISDICTION OVER NI AND NGN.** .............................................................................. 17

    1.    The Court Lacks General Jurisdiction over NI and NGN. ................ 18

    2.    The Court Lacks Specific Jurisdiction over the Claims Against NI and NGN. ...................................................................................... 20

        a.    Plaintiff Does Not Allege NI and NGN Targeted California. ................................................................................ 21

        b.    Plaintiff's Claims Do Not Arise out of or Result from NI's or NGN's Forum-Related Activities. ......................................... 23

    3.    Exercising Jurisdiction over NGN or NI Would Be Unreasonable. ................................................................................ 24

C.      **IF THE COURT RETAINS JURISDICTION, IT SHOULD DISMISS ALL CLAIMS FOR FAILURE TO STATE A CLAIM.** ....... 27

    1.    Plaintiff Fails To State Claims Against News Corp. and NI. ............. 28

        a.    Plaintiff Alleges No Wrongdoing by News Corp. or NI. ......... 28

        b.    Plaintiff Cannot Pierce the Corporate Veil. ............................. 30

    2.    **The Wiretap Act and Stored Communications Act Claims Require Impermissible Extraterritorial Applications of Federal Law.** ......... 31

        a.    Plaintiff Fails To State a Claim Under the Wiretap Act. .......... 32

        b.    Plaintiff Fails To State a Claim Under the Stored Communications Act. ............................................................. 35

3.      Plaintiff Fails To State a Claim Under the Federal Wiretap Act and the California Penal Code Because She Does Not Allege Contemporaneous Interception of Her Communications. ..................36

4.      Plaintiff Fails To State a Claim Under the California Civil Code.......40

5.      All of Plaintiff's Claims are Time-Barred. ..........................................41

        a.      Plaintiff Fails To Invoke the Discovery Rule...........................42

        b.      Even If Plaintiff Had Properly Invoked the Discovery Rule, She Was on Inquiry Notice of Her Claims More Than Two Years Before Filing Her Complaint...........................................43

IV.   CONCLUSION ..............................................................................................46

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION TO DISMISS

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

### FEDERAL CASES

4   *Abrams Shell v. Shell Oil Co.*,

5   165 F. Supp. 2d 1096 (C.D. Cal. 2001) ................................................ 18

6   *Allstate Ins. Co. v. Countrywide Fin. Corp.*,

7   824 F. Supp. 2d 1164 (C.D. Cal. 2011) ............................................... 30

8   *Am. Home Assurance Co. v. TGL Container Lines, Ltd.*,
    347 F. Supp. 2d 749 (N.D. Cal. 2004) ................................................... 9

9   *Ashcroft v. Iqbal*,
10   556 U.S. 662 (2009) ........................................................................... 27

11   *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*,
12   223 F.3d 1082 (9th Cir. 2000) ...................................................... 21, 22

13   *Bell Atl. Corp. v. Twombly*,
14   550 U.S. 544 (2007) ........................................................................... 27

15   *Bibeau v. Pac. Nw. Research Found. Inc.*,
16   188 F.3d 1105 (9th Cir. 1999) ............................................................ 43

17   *Bowoto v. Chevron Texaco Corp.*,
18   312 F. Supp. 2d 1229 (N.D. Cal. 2004) .............................................. 28

19   *Burger King Corp. v. Rudzewiz*,
20   471 U.S. 462 (1985) ..................................................................... 21, 22

21   *Calder v. Jones*,
     465 U.S. 783 (1984) ..................................................................... 21, 22

22   *Cattie v. Wal-Mart Stores, Inc.*,
23   504 F. Supp. 2d 939 (S.D. Cal. 2007) ........................................... 29, 30

24   *Coakes v. Arabian Am. Oil Co.*,
25   831 F.2d 572 (5th Cir. 1987) ............................................................... 9

26   *Contact Lumber Co. v. P.T. Moges Shipping Co.*,
27   918 F.2d 1446 (9th Cir. 1990) ................................................ 8, 14, 17

28

*Core-Vent Corp. v. Nobel Indus. AB*,
   11 F.3d 1482 (9th Cir. 1993) .......................................................................... 25, 26

*Creative Tech. v. Aztech Sys. Pte., Ltd.*,
   61 F.3d 696 (9th Cir. 1995) ...................................................................... 11, 13, 14

*Data Disc, Inc. v. Sys. Tech. Assoc, Inc.*,
   557 F.2d 1280 (9th Cir. 1971) ............................................................................. 20

*Doe v. Geller*,
   533 F. Supp. 2d 996 (N.D. Cal. 2008) ........................................................... 25, 26

*EEOC v. Arabian Am. Oil Co.*,
   499 U.S. 244 (1991) ............................................................................... 31, 32, 33

*Fields v. Sedwick Associated Risks Ltd.*,
   796 F.2d 299 (9th Cir. 1986) ............................................................................... 18

*Foley Bros., Inc. v. Filardo*,
   336 U.S. 281 (1949) ............................................................................................. 31

*FR 8 Singapore Pte. Ltd. v. Albacore Mar. Inc.*,
   794 F. Supp. 2d 449 (S.D.N.Y. 2011) ................................................................. 31

*Fraser v. Nationwide Mut. Ins. Co.*,
   352 F.3d 107 (3d Cir. 2003) ................................................................................ 37

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*,
   284 F.3d 1114 (9th Cir. 2002) ....................................................................... 19, 23

*Goodyear Dunlop Tires Op'ns v. Brown*,
   131 S. Ct. 2846, 180 L. Ed. 2d 769 (2011) ........................................................ 18

*Gulf Oil Corp. v. Gilbert*,
   330 U.S. 501 (1947) ....................................................................................... 7, 11

*Harlow v. Children's Hosp.*,
   432 F.3d 50 (1st Cir. 2005) ................................................................................. 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iv

*Hernandez v. Path, Inc.*,
   No. 12-CV-01515, 2012 WL 5194120 (N.D. Cal. Oct. 19, 2012) ...................... 38

*Hirsch v. Arthur Andersen & Co.*,
   72 F.3d 1085 (2d Cir. 1995) ................................................................... 30

*Hopkins v. Dow Corning Corp.*,
   33 F.3d 1116 (9th Cir. 1994) ........................................................... 42, 43

*In re Am. Apparel, Inc. S'holder Litig.*,
   855 F. Supp. 2d 1043 (C.D. Cal. 2012) ............................................... 45

*In re Library Editions of Children's Books*,
   299 F. Supp. 1139 (J.P.M.L. 1969) ...................................................... 11

*In re Tyson*,
   433 B.R. 68 (S.D.N.Y. 2010) ............................................................... 31

*In re W. States Wholesale Natural Gas Antitrust Litig.*,
   605 F. Supp. 2d 1118 (D. Nev. 2009) ............................................. 19, 21

*Injen Tech. Co. v. Advanced Engine Mgmt., Inc.*,
   270 F. Supp. 2d 1189 (S.D. Cal. 2003) ............................................... 20

*Ins. Co. of N. Am. v. Marina Salina Cruz*,
   649 F.2d 1266 (9th Cir. 1981) ................................................... 25, 26, 27

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ............................................................................. 18

*Konop v. Hawaiian Airlines, Inc.*,
   302 F.3d 868 (9th Cir. 2002) ......................................................... 37, 39

*Kultur Int'l Films Ltd. v. Covent Garden Pioneer, FSP., Ltd.*,
   860 F. Supp. 1055 (D.N.J. 1994) .......................................................... 9

*L.B. Indus., Inc. v. Smith*,
   817 F.2d 69 (9th Cir. 1987) ................................................................. 29

*Lockman Found. v. Evangelical Alliance Mission*,
   930 F.2d 764 (9th Cir. 1991) ........................................................... 8, 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Loya v. Starwood Hotels & Resorts Worldwide, Inc.*,
   583 F.3d 656 (9th Cir. 2009) ................................................................. 8

*Lueck v. Sundstrand Corp.*,
   236 F.3d 1137 (9th Cir. 2001) ........................................ 8, 9, 11, 12, 13, 14, 15, 16

*Mastr Asset Backed Sec. Trust 2007-WMC1, ex rel. U.S. Bank N.A. v. WMC Mortgage LLC*,
   880 F. Supp. 2d 418 (S.D.N.Y. 2012) ................................................. 15

*Migliori v. Boeing N. Am., Inc.*,
   114 F. Supp. 2d 976 (C.D. Cal. 2000) ........................................... 42, 43

*Mitan v. Feeney*,
   497 F. Supp. 2d 1113 (C.D. Cal. 2007) ......................................... 25, 26

*Morrison v. Dietz*,
   No. C-09-05467, 2010 WL 395918 (N.D. Cal. Feb. 1, 2010) ............................ 32

*Morrison v. Nat'l Austl. Bank Ltd.*,
   130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010)................................. 31, 32, 36

*Murray v. British Broad. Corp.*,
   906 F. Supp. 858 (S.D.N.Y. 1995) ....................................................... 9

*Omeluk v. Langsten Slip & Batbyggeri A/S*,
   52 F.3d 267 (9th Cir. 1995) ....................................................... 20, 21, 23

*Palnik v. Westlake Entm't, Inc.*,
   344 F. App'x 249 (6th Cir. 2009) ....................................................... 24

*Pebble Beach Co. v. Caddy*,
   453 F.3d 1151 (9th Cir. 2006) ......................................................... 20, 21

*Piper Aircraft Co. v. Reyno*,
   454 U.S. 235 (1981)........................................................ 7, 8, 11, 17

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
   329 F.3d 64 (2d Cir. 2003) ................................................................. 9

*Schwarzenegger v. Fred Martin Motor Co.*,
   374 F.3d 797 (9th Cir. 2004) ..................................................... 18, 21, 22

*Simcox v. McDermott Int'l, Inc.*,
   152 F.R.D. 689 (S.D. Tex. 1994) ....................................................... 9

*Snyder v. Dolphin Encounters Ltd.*,
   235 F. Supp. 2d 433 (E.D. Pa. 2002)......................................................... 20

*Stowe v. Devoy*
   588 F.2d 336 (2d Cir. 1978) ....................................................................... 34

*Suzlon Energy Ltd. v. Microsoft Corp.*,
   671 F.3d 726 (9th Cir. 2011) ...................................................................... 36

*Terracom v. Valley Nat'l Bank*,
   49 F.3d 555 (9th Cir. 1995) ............................................................ 17, 24, 25

*United States v. Barona*,
   56 F.3d 1087 (9th Cir. 1995) ...................................................................... 32

*United States v. Bestfoods*,
   524 U.S. 51 (1998).............................................................................. 28, 29

*United States v. Chao Fan Xu*,
   706 F.3d 965 (9th Cir. 2013) ...................................................................... 32

*United States v. Cotroni*
   527 F.2d 708 (2d Cir. 1975) ....................................................................... 35

*United States v. Peterson*,
   812 F.2d 486 (9th Cir. 1987) ................................................................ 32, 34

*United States v. Steiger*,
   318 F.3d 1039 (11th Cir. 2003) .................................................................. 37

*Wehlage v. EmpRes Healthcare Inc.*,
   821 F. Supp. 2d 1122 (N.D. Cal. 2011).................................................... 30

*Zheng v. Yahoo!, Inc.*,
   No. C-08-1068, 2009 WL 4430297 (N.D. Cal. Dec. 2, 2009) ...................... 32, 35

**STATE CASES**

*Arsdol v. Ragir*,
   No. SC102996, 2009 WL 7738854 (Cal. Super. Ct. Oct. 14, 2009)................... 41

*Bernson v. Browning-Ferris Indus.*,
   7 Cal. 4th 926, 30 Cal. Rptr. 2d 440 (1994) ......................................... 44

*Cain v. State Farm Mut. Auto. Ins. Co.*,
  62 Cal. App. 3d 310, 132 Cal. Rptr. 860 (1976) .................................................. 41

*Doe v. Roman Catholic Bishop of Sacramento*,
  189 Cal. App. 4th 1423, 117 Cal. Rptr. 3d 597 (2010) ........................................ 43

*Flanagan v. Flanagan*,
  27 Cal. 4th 766, 117 Cal. Rptr. 2d 574 (2002) ..................................................... 39

*Fox v. Ethicon Endo-Surgery, Inc.*,
  35 Cal. 4th 797, 27 Cal. Rptr. 3d 661 (2005) ....................................................... 44

*In re Sunstates Corp. S'holder Litig.*,
  788 A.2d 530 (Del. Ch. 2001) ............................................................................... 30

*Jolly v. Eli Lilly & Co.*,
  44 Cal. 3d 1103 (1988) .......................................................................................... 43

*Mangini v. Aerojet–Gen. Corp.*,
  230 Cal. App. 3d 1125, 281 Cal. Rptr. 827 (1991) .............................................. 42

*Marich v. MGM/UA Telecomms., Inc.*,
  113 Cal. App. 4th 415, 7 Cal. Rptr. 3d 60 (2003) ............................................... 39

*Moore v. Cal. State Bd. of Accountancy*,
  2 Cal. 4th 999, 9 Cal. Rptr. 2d 358 (1992) ........................................................... 38

*People v. Drennan*,
  84 Cal. App. 4th 1349, 101 Cal. Rptr. 2d 584 (2000) ......................................... 39

*People v. Wilson*,
  17 Cal. App. 3d 598, 94 Cal. Rptr. 923 (1971) .................................................... 38

*Ribas v. Clark*,
  38 Cal. 3d 355, 212 Cal. Rptr. 143 (1985) ........................................................... 39

*Saliter v. Pierce Bros. Mortuaries*,
  81 Cal. App. 3d 292, 146 Cal. Rptr. 271 (1978) .................................................. 42

*Wallace ex rel. Cencom Cable Income Partners II, Inc., LP v. Wood*,
  752 A.2d 1175 (Del. Ch. 1999) ............................................................................. 30

1

## FEDERAL STATUTES

2

18 U.S.C. § 2510 ................................................................................ 31, 35

3

18 U.S.C. § 2511 ............................................................................ 32, 33, 37

4

18 U.S.C. § 2520 ................................................................................ 41, 42

5

18 U.S.C. § 2522 .................................................................................... 31

6

18 U.S.C. § 2701 ................................................................................ 31, 35

7

18 U.S.C. § 2707(f) ............................................................................ 41, 42

8

18 U.S.C. § 2712 .................................................................................... 31

9

10

11

## STATE STATUTES

12

California Civil Code § 1708.8(b) ........................................................ 40, 41

13

California Code of Civil Procedure § 335.1 ............................................. 41

14

California Code of Civil Procedure § 340(a) ............................................ 42

15

California Code of Civil Procedure § 410.10 ........................................... 18

16

California Penal Code § 631 ................................................... 36, 37, 38, 39

17

California Penal Code § 632 ........................................................ 36, 39, 40

18

California Penal Code § 632.7 ...................................................... 36, 40

19

20

21

## RULES

22

Federal Rule of Civil Procedure 12(b) ................................................ 17, 32

23

24

25

## CONSTITUTIONAL PROVISIONS

26

California Constitution, Article 1, § 1 .................................................... 41

27

28

# OTHER AUTHORITIES

3 Witkin, Cal. Proc. (5th 2008) Actions, § 556 ........................................... 41

2009 California Legis. Serv. Chapter 449 (A.B. 524, § 1(b)) .................................. 41

*American Heritage Dictionary of the English Language* 593 (4th ed. 2000) ........... 41

California Telephonic Communication Interception Statute, § 632.7 ...................... 40

Electronic Communications Privacy Act of 1986 (ECPA), Pub. L. No. 99-508,
   100 Stat. 1848 ........................................................................... 33

http://www.vodafone.com ................................................................. 22

S. Rep. No. 99-541 (1986) ........................................................... 33, 35

U. S. Courts, *Judicial Business of the U.S. Courts 2012*, *Detailed Stat. Tables-Other*, Tbl. X-1A, *available at*
   www.uscourts.gov/Statistics/JudicialBusiness/2012/appendices/X01ASep1
   2.pdf ..................................................................................... 16

Wiretap Act in the Omnibus Crime Control and Safe Streets Act of 1968, Pub.
   L. No. 90-351, 82 Stat. 211 ........................................................... 33

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

This case is brought by a citizen and resident of the United Kingdom, against UK newspapers and their parent companies, alleging that UK-based journalists, with the assistance of a UK private investigator, impermissibly accessed the voicemail of plaintiff's UK cellular telephone account, for the purpose of obtaining information to use in articles published in UK newspapers.  It is but one of over 600 claims filed against News Group Newspapers Limited ("NGN"), the UK publisher of the now-defunct *News of the World*, by individuals who, like plaintiff, allege *News of the World* reporters and/or Glenn Mulcaire, a private investigator who did work for the newspaper, accessed their mobile phone voicemails.  With the exception of this lawsuit, each of those 600+ actions has proceeded, or is proceeding, either under a voluntary UK compensation scheme established by NGN or in the English High Court, pursuant to a specialized set of procedures painstakingly developed to balance the competing interests of the UK authorities (which are still investigating these matters) and the parties to the litigation, and to put compensation in the hands of victims as quickly and efficiently as possible.

Plaintiff's claim too should proceed in the UK, if anywhere.  Plaintiff does not allege that any of the claimed tortious acts occurred in the United States, nor that any U.S. entity engaged in wrongdoing.  None of the UK defendants is subject to the personal jurisdiction of this Court, and none of the conduct at issue is within the reach of U.S. law.  The Court should dismiss the complaint on the grounds of lack of personal jurisdiction and failure to state a claim.  But it need not even reach those issues—instead, the Court should dismiss this lawsuit under the doctrine of *forum non conveniens* with instructions that it be re-filed, if at all, in the United Kingdom.

## II.  BACKGROUND

Plaintiff's claims arise from a set of allegations virtually identical to those that have proceeded by the hundreds through the English Court system over the last

several years and that have ignited a widespread debate in the UK about freedom of the press and media intrusion into the private lives of UK citizens.

Plaintiff alleges that at various times from 2004 to 2005, a UK private investigator, Glenn Mulcaire, acting on behalf of journalists at *News of the World*, a UK newspaper, accessed her mobile voicemail messages for the purpose of obtaining celebrity gossip to be published in two UK newspapers.  Compl. ¶¶ 47, 52-55, 60-62, 64-65.  She does not allege Mulcaire undertook this conduct in the United States (he did not); nor does she allege her voicemails were stored in the U.S. (they were not). Plaintiff's mobile phone was a UK phone,[1] and her service provider, Vodafone (*id.* ¶ 49), stores voicemail messages for UK subscribers such as plaintiff on servers in the UK.  Rogers Decl. ¶ 6.  Plaintiff alleges officers of the London Metropolitan Police Service ("MPS"), in connection with their wide-ranging investigation, informed her that her voicemails were accessed by Mulcaire while she was in the UK.  Compl. ¶ 60; *see also id.* ¶¶ 52-53.  She asserts that England's Crown Prosecution Service charged Mulcaire and two *News of the World* reporters with unlawfully accessing her voicemail messages and the messages of others.  *Id.* ¶ 61.

In the nine years since plaintiff claims the voicemails on her UK phone were accessed, such claims of phone "hacking" by journalists and private investigators in the UK have triggered numerous British Parliamentary and police investigations, scores of arrests and prosecutions, numerous public reports by UK entities, thousands of news articles in the UK and throughout the world, the closure of one of the UK's largest and oldest newspapers, and, most importantly, the creation of two separate avenues in the UK to address the litigation arising from such claims.  A few examples should suffice to demonstrate the extraordinary attention these issues have

---

[1] Plaintiff's phone number contained eleven digits and started with "07," Band Decl. ¶ 14, which identifies it as a UK mobile phone number, Rogers Decl. ¶ 7.

received in the UK, the resources that have been devoted to them in the UK, and the uniquely British character of the matters at the heart of the complaint:

- The events that ignited the "hacking" issues—the August 2006 arrests of Mulcaire and *News of the World* reporter Clive Goodman by the MPS for unlawfully accessing mobile voicemails of members of the British royal household, and their November 2006 guilty pleas and January 2007 sentencing regarding that conduct—were the subject of extensive coverage by every major news publication in the UK.  Pitt Decl. ¶ 2 & Ex. 1.

- The 2006 MPS investigation led MPS to raid Mulcaire's home and seize thousands of pages of handwritten notes in which Mulcaire detailed his work.  Compl. ¶¶ 16, 31.  These notes contained the names of thousands of UK citizens later identified as potential victims of Mulcaire's conduct.  *Id.*  The MPS has retained these notes in the UK and has used them to inform potential victims of such unauthorized voicemail retrieval, including plaintiff herself.  Compl. ¶ 52.

- The British Parliament repeatedly has focused on allegations of unlawful voicemail access relating to Mulcaire.  In 2007, 2009, and 2011, it held a series of public hearings lasting more than 30 days, and issued more than 1500 pages of public evidence and reports on the topic.  Band Decl. ¶ 21.

- In January 2011, as a result of evidence News International provided to the MPS, the MPS opened Operation Weeting to further investigate allegations of unlawful voicemail access.  As of September 2013, Operation Weeting and the subsequent investigation, Operation Pinetree, have led to at least 35 arrests and charges against nine individuals on the basis of phone hacking, Band Decl. ¶ 20, including one charge relating to the alleged unlawful access of plaintiff's mobile voicemails, Compl. ¶ 61.

- In 2011 the Prime Minister appointed Lord Justice Leveson to conduct an independent public inquiry ("Leveson Enquiry") into unauthorized

3

voicemail access and the practices of the press in the UK.  Compl. ¶ 30; Band Decl. ¶ 22.  The Leveson Enquiry heard evidence over the course of nine months, from 337 witnesses, and considered written statements from nearly 300 others.  Band Decl. ¶ 22.

Given that all of the relevant conduct at issue occurred in the UK, and the obvious UK national interest in these issues, two separate avenues have been established in the UK to address civil voicemail-access litigation.  First, on April 8, 2011, the company issued a broad apology, admitted liability in various UK civil claims brought to date, and established a voluntary compensation scheme in the UK to address new litigation.  Pitt Decl. ¶ 3 & Ex. 2; Band Decl. ¶ 9.[2]  The compensation scheme has been extraordinarily successful at delivering satisfaction to applicants: it has received 611 inquiries from individuals alleging they were victims of voicemail interception, of whom 426 applied to join the scheme, resulting in 359 being invited to join the scheme, and 272 settling their claims thus far.  Band Decl. ¶ 9.  Not a single applicant to date has seen fit to take his or her case to a hearing.

Second, on a parallel track, the English High Court established a comprehensive and consolidated judicial process to adjudicate, in England and Wales, all claims arising from the unauthorized access of mobile telephone voicemail by Mulcaire and/or employees of NGN, known as the Mobile Telephone Voicemail Interception Litigation ("MTVIL") system.  Band Decl. ¶¶ 4-8, 10-11.  This system not only establishes a set of procedures specifically tailored to bring these mobile voicemail access claims to resolution through trial or settlement on a streamlined basis, but also provides for: expedited access to police disclosure material, early (pre-complaint) disclosure from NGN, early assessment of claims, enhanced case management to reduce attorney's fees, mechanisms for common

---

[2] Plaintiff references the apology, but carefully avoids disclosing that it occurred more than two years prior to her filing of this complaint.  Compl. ¶ 37.

discovery issues to be addressed without unnecessary duplication, and a means to obtain discovery from third parties (such as the MPS) that would be beyond the subpoena powers of U.S. courts. *Id.* These procedures result from years of effort by the court, the parties, and the police, and seek to balance the interests of the MPS to avoid their ongoing criminal investigations being compromised by the civil proceedings, the interests of the defendants in early evaluation and settlement, and the interests of victims in quickly obtaining compensation without incurring unnecessary legal fees. *Id.* ¶ 6.

The MTVIL procedures have been extraordinarily successful in delivering satisfaction to claimants and limiting court congestion and have been a model of efficiency. To date, 250 claims have been brought under the MTVIL procedures in the UK and further claims have been intimated on a pre-action basis; of those claims and pre-action notifications, there have been 276 settlements. There are currently 32 active claims. No claimant has to date pursued his or her case to trial. By any measure, the early-evaluation procedures and efforts to resolve all legitimate claims have been widely successful. *Id.* ¶¶ 4-5.

The conduct now alleged by plaintiff—Mulcaire's and/or NGN's alleged unauthorized retrieval of voicemails in 2004-2005—is precisely the conduct at issue in the hundreds of cases proceeding through these two litigation avenues in the UK. To the extent plaintiff's claims differ, it is only in that she alleges she was in the United States for a few months during a time when Mulcaire and/or others retrieved voicemails left on the servers of her UK mobile phone provider. Whatever strategic interest plaintiff or her counsel may have in a U.S. forum,[3] the matters at the heart of

---

[3]    The public record of press events held by plaintiff's UK solicitor Mark Lewis and counsel of record Norman Siegel traces their efforts to import this litigation. On September 23, 2011 Mr. Lewis announced he had "teamed up with US-based lawyer Norman Siegel, . . . to take on [Rupert] Murdoch," and sought a U.S. forum for UK hacking claims because "the American damages in civil claims are far higher than might be awarded in an English court." Pitt Decl. Ex. 3. He informed "various news outlets" that he and Mr. Siegel planned to file a lawsuit in the United States "next week." *Id.* Ex. 4. Seven months later, no such lawsuit had

*(cont'd)*

1  the complaint are uniquely UK issues, involving UK parties, evidence and witnesses.

2  Accordingly, Ms. Huthart's claims ought to proceed alongside those of the hundreds

3  of other alleged victims of Mulcaire's conduct.

4  **III.**   **ARGUMENT**

5      Plaintiff's claims have no place in this Court.  ***First***, the Court should dismiss

6  all claims against all defendants under the doctrine of *forum non conveniens*.  The

7  UK is an available and adequate alternative forum, and the private- and public-

8  interest factors weigh overwhelmingly in favor of transfer.  Indeed, the UK is the

9  forum in which hundreds of essentially identical claims have been and are being

10 adjudicated pursuant to the MTVIL procedures—procedures that were carefully

11 developed to compensate victims, enhance efficiency, balance the interests of the UK

12 authorities and the parties, and reign in attorney's fees.  ***Second***, even if the Court

13 retains this case, it must dismiss all claims against the two UK entities, News Corp.

14 UK & Ireland Limited f/k/a NI Group Limited ("NI")[4] and NGN, because neither is

15 subject to the personal jurisdiction of this Court.  ***Third***, the complaint fails to state a

16 claim against NI or the single U.S. defendant—News Corporation ("News

17 Corp.")[5]—because it does not allege either entity participated in the claimed

18

*(cont'd from previous page)*

19 yet been filed, but their plaintiff-recruitment efforts continued.  In April 2012,
   Messrs. Lewis and Siegel held a joint press conference and claimed they would file
20 lawsuits in the United States "imminently," *id.* Ex. 5, and were planning to file "at
   least three civil suits related to phone hacking at The News of the World," *id.* Ex. 6.
21 But no such lawsuit was in fact "imminent," even though Mr. Lewis conceded he
   had been aware of the potential for bringing such civil claims since 2006, a time
22 (nearly seven years before filing this complaint) he described as "my light-bulb
   moment."  *Id.*  Instead, the instant complaint was not filed until June 13, 2013, more
23 than two years after NGN's apology and admission of liability, and after Messrs.
   Lewis and Siegel conducted "a lengthy search for a plaintiff who would take on the
24 company in a U.S. courtroom."  Pitt Decl. Ex. 7.

25     [4]   The proper name of this defendant is News Corp. UK & Ireland Limited.
   Longcroft Decl. ¶ 3.  For ease of reference, this Memorandum will use "NI," since
26 that is the name plaintiff uses.

27     [5]   The proper name for this defendant is 21st Century Fox, Inc.  Plaintiff
   sued "News Corporation" prior to the company's June 28, 2013 separation into two
28 independent publicly traded companies (the "Separation").  The company currently

*(cont'd)*

1    wrongdoing by their subsidiary NGN, and the complaint is devoid of any basis for

2    piercing the corporate veil.  **Fourth**, each of the six causes of action is subject to

3    dismissal because the statutes underlying the two federal claims do not apply to

4    extraterritorial conduct such as that alleged by plaintiff; three of the six causes of

5    action fail to state a claim; and all claims are time-barred.  Though plaintiff's claims

6    are fatally defective for several reasons, the Court need reach no issue other than

7    *forum non conveniens*—this UK controversy should be litigated, if at all, in the UK.

8    ## A.    THE COURT SHOULD DISMISS ALL CLAIMS UNDER THE

9    ## DOCTRINE OF *FORUM NON CONVENIENS*.

10   Federal courts have the "inherent power" to decline to exercise jurisdiction

11   over a case where another forum would be more convenient.  *Gulf Oil Corp. v.*

12   *Gilbert*, 330 U.S. 501, 502 (1947).  Such dismissal is appropriate where an available

13   and adequate alternative forum exists, and where the balance of applicable private

14   and public interests demonstrate that a *forum non conveniens* dismissal would serve

15   the interests of justice.  *Id.* at 507-09; *see, e.g.*, *Piper Aircraft Co. v. Reyno*, 454 U.S.

16   235, 254 n.22, 257 (1981).

17   This lawsuit presents a paradigm case for application of the doctrine.  It

18   involves a UK citizen suing on the basis of alleged UK conduct undertaken by UK

19   citizens acting on behalf of a UK corporation, and all relevant witnesses and

20   evidence are located in the UK.  Given the strong UK interest in the adjudication of

21   claims arising from the unauthorized access of mobile telephone voicemail by Glenn

22   Mulcaire and/or employees of NGN—the very claims asserted by plaintiff—the

23   English court system has established a consolidated and comprehensive judicial

24

25   *(cont'd from previous page)*

26   called "News Corporation" became the parent of NI (and, indirectly, of NGN) in
     connection with the Separation.  The company that was known as "News

27   Corporation" prior to the Separation has since been renamed 21st Century Fox, Inc.
     Zweifach Decl. ¶ 2.  Nevertheless, for ease of reference, this Memorandum will use

28   "News Corp.," since that is the name plaintiff uses.

process to address these claims, which already has served as the vehicle for the just and efficient adjudication of hundreds of them.   The UK thus is not simply an available and adequate forum, but is by far the best and most convenient for the adjudication of plaintiff's claims.

### 1.   The United Kingdom Is an Available and Adequate Forum.

An alternative forum is available and adequate if it can assert jurisdiction over the defendant and confer a remedy upon the plaintiff.   *See, e.g.*, *Piper Aircraft*, 454 U.S. at 254 n.22.   Only where the alternative forum cannot afford the plaintiff <u>any</u> remedy should it be regarded as inadequate or unavailable.   *Id.*; *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1143 (9th Cir. 2001); *Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 768-69 (9th Cir. 1991).

The United Kingdom plainly is an available forum.   The hundreds of plaintiffs who have brought essentially identical civil claims in the UK have been litigating in the English courts, based upon these same alleged events, since 2007.   Band Decl. ¶¶ 4-5.   The English courts would have jurisdiction over plaintiff's claims were they to be brought there, and would be required to exercise it.   Orr Decl. ¶¶ 19-29.   And if there were any doubt regarding whether an English court could exercise personal jurisdiction as to News Corp., which is the only non-UK entity in this lawsuit, the company has agreed to waive any challenge to personal jurisdiction in the English courts in this case.   Zweifach Decl. ¶ 3.[6]

The UK also is an adequate forum.   "[A] foreign forum will be deemed adequate unless it offers no practical remedy for the plaintiff's complained of wrong."

---

[6]   A defendant's waiver of jurisdiction objections is sufficient to overcome any challenges to the jurisdiction of the foreign forum.   *See, e.g.*, *Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 664 (9th Cir. 2009); *Lueck*, 236 F.3d at 1143; *Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1450 (9th Cir. 1990).

*Lueck*, 236 F.3d at 1144.  That standard is easily met, as England's legal system contains all the key features relevant to plaintiff's claims, including, among others:

- a right of action for unauthorized voicemail access and invasion of privacy;
- the right to collect money damages to compensate for one's injuries;
- the right of all parties to a timely and fair trial based on the evidence presented;
- procedures to gather evidence, obtain the testimony of witnesses, and compel the production of documents; and
- a way to obtain appellate review of adverse decisions.

Orr Decl. ¶¶ 5-18.  It is not surprising, therefore, that numerous U.S. courts have held the UK is an adequate forum for UK plaintiffs suing American defendants (and, *a fortiori*, for UK plaintiffs suing UK defendants).  *See, e.g.*, *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003); *Coakes v. Arabian Am. Oil Co.*, 831 F.2d 572, 575 (5th Cir. 1987); *Am. Home Assurance Co. v. TGL Container Lines, Ltd.*, 347 F. Supp. 2d 749, 766 (N.D. Cal. 2004); *Murray v. British Broad. Corp.*, 906 F. Supp. 858, 861-62 (S.D.N.Y. 1995), *aff'd*, 81 F.3d 287 (2d Cir. 1996); *Kultur Int'l Films Ltd. v. Covent Garden Pioneer, FSP., Ltd.*, 860 F. Supp. 1055, 1064 (D.N.J. 1994).  As one federal court put it, "To suggest that the courts of the United Kingdom are inadequate compared to those of . . . the United States is both impudent and ill-founded."  *Simcox v. McDermott Int'l, Inc.*, 152 F.R.D. 689, 695 (S.D. Tex. 1994).

Moreover, the ongoing MTVIL proceedings in England demonstrate that <u>as to these claims in particular</u>, the UK is by far the superior, most convenient, and most sensible forum.  As discussed above, the MTVIL is designed to secure the efficient resolution of claims, encourage early settlement, and prevent excessive attorney's fees and costs, while safeguarding the interests of the MPS in not compromising its investigation.  Band Decl. ¶ 6.  The MTVIL provides:

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION TO DISMISS

- a set of procedures specifically tailored to claims for mobile voicemail interception, aimed at bringing all claims to resolution, before a single judge, on an expedited basis;

- a process by which individuals who have been contacted by the MPS in connection with Operation Weeting (the police investigation into voicemail interception allegations) may obtain early (pre-action) disclosure from both NGN and the MPS, and other discovery from third parties that would be beyond the subpoena powers of U.S. courts;

- a way to address common discovery issues without unnecessary duplication, thereby greatly saving the court's and parties' time, energy, and expense;

- a docket-management system that enables the court and the parties to manage the large number of claimants and claims on a timely and efficient basis;

- a confidentiality regime and process by which disclosed documents may be shared with other claimants, which also prevents others (including U.S. counsel for any of the parties to the instant lawsuit) from accessing information critical to these issues[7]; and

- procedures for managing litigation costs, including: (1) the management of common issues on behalf of all claimants by a single solicitors' firm, (2) a costs budgeting process whereby recoverable legal costs at each stage of the litigation are capped at levels that are pre-determined by the court, and (3) undertakings by NGN not to seek to recover any costs from any current or

---

[7]     To take one example, the documents demonstrating that plaintiff's mobile phone had a UK phone number at the time of the alleged access are themselves subject to this confidentiality regime; undersigned counsel were not even allowed to have access to information from those documents regarding the general characteristics of the phone number (the area code and the total number of digits in the phone number) without an order from the English High Court, which had to be sought and obtained on an urgent basis in the UK to permit undersigned counsel to demonstrate to this Court that plaintiff's phone had a UK number.  Band Decl. ¶¶ 12-14.  This is yet another reason why litigation in the United States is exceedingly inconvenient; transfer to the UK would eliminate this problem altogether.

future claimant before a formal settlement offer is made to that individual and the time for acceptance of the offer has expired (which provides a significant benefit to potential claimants in the UK, who could otherwise be liable for NGN's costs in the event that their claim does not prevail).

Band Decl. ¶¶ 6-8, 10-11.  These features make the UK an especially appropriate forum for plaintiff's claims, which, like the hundreds of other claims in the MTVIL system, arise from alleged unauthorized voicemail access by Glenn Mulcaire and/or employees of NGN.[8]

## 2.    **The Balancing of Private and Public Interests Greatly Favors the UK over the United States.**

If an alternative forum is available and adequate, dismissal for *forum non conveniens* is appropriate where, as here, the balance of public and private factors demonstrate the suitability of the alternative forum.  *Gulf Oil*, 330 U.S. at 507-09. As set forth below, none of the private or public factors weighs in favor of permitting plaintiff—a citizen and resident of the UK,  (Compl. ¶¶ 4, 45)—to pursue her claims in the United States.  Nor should her strategic decision to file in the United States be afforded any deference.  A foreign plaintiff does not receive the deference normally afforded a U.S. plaintiff who chooses to file in the United States, and thus courts more readily dismiss such cases on *forum non conveniens* grounds.  *Piper Aircraft*, 454 U.S. at 256; *Lueck*, 236 F.3d at 1145; *Creative Tech. v. Aztech Sys. Pte., Ltd.*, 61

---

[8]    In the closely related context of multidistrict litigation, courts recognize the immense benefits to parties, witnesses, and courts of coordinated proceedings and the problems inherent in permitting similar cases to proceed before a separate tribunal.  *See, e.g.*, *In re Library Editions of Children's Books*, 299 F. Supp. 1139, 1142 (J.P.M.L. 1969) ("The purposes served by consolidated or coordinated pretrial proceedings include reduction of court congestion, conservation of judicial energy, saving of time and trouble for parties and witnesses, resolution of conflicting discovery demands, acceleration of solutions of major controversies, and fostering sound results on the merits.  These benefits of central pretrial management are diminished—absent very special circumstances—to the extent that any cases of a similar nature are not included in the pretrial coordination or consolidation.").

F.3d 696, 703 (9th Cir. 1995).  By any measure this case ought to be adjudicated in the UK.

        a.    <u>The Private-Interest Factors Greatly Favor Transfer to the UK.</u>

Each of the private-interest factors to be considered overwhelmingly favors dismissal here:  "(1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other practical problems that make trial of a case easy, expeditious and inexpensive."  *Lueck*, 236 F.3d at 1145 (internal quotation marks omitted).

<u>Residence of Parties and Witnesses and Forum's Convenience</u>:  The parties and relevant witnesses all reside in the UK, including:  plaintiff herself (Compl. ¶ 4), as well as her husband and daughter, who allegedly experienced harm as a result of the alleged voicemail retrieval (*id.* ¶¶ 45, 50-51); NGN's current and former employees, agents, and contractors, including Glenn Mulcaire, Neville Thurlbeck, and James Weatherup, all of whom are identified in the complaint as having been involved with the alleged interception of plaintiff's voicemails (*id.* ¶ 61), as well as any "unidentified" journalists and investigators who worked for NGN, a UK corporation; and lay witnesses to the claims of pain and suffering and economic loss (Band Decl. ¶¶ 18).[9]  As such, the UK is clearly the most convenient forum for this litigation.

---

    [9]    To the extent others are identified in the complaint—Rupert and James Murdoch, Les Hinton, Rebekah Brooks, Colin Myler, and Andy Coulson—they are not alleged to have caused the harm alleged in the complaint, but rather to have been aware of or on constructive notice of the alleged harm, and/or to have failed to disclose publicly the extent of the alleged wrongdoing prior to April 2011.  Compl. ¶¶ 23-24, 26-29, 34-35, 38, 41.

1    <u>Access to Sources of Proof</u>:  The most relevant documents and physical

2    evidence on liability, causation, and damages critical for any trial in this case are

3    located in the UK.  These include the massive files recovered by the MPS from

4    Mulcaire's home and office such as the notebooks and journals in which he allegedly

5    recorded mobile voicemail access activities (Compl. ¶¶ 16, 31); the contracts with

6    Glenn Mulcaire that NGN is alleged to have entered into (*id.* ¶ 17); any documents

7    relating to the UK news stories that plaintiff alleges were published based upon her

8    confidential information (*id.* ¶¶ 62, 64-65); as well as call logs, payment records,

9    published articles, emails, audio files, and a variety of other electronic and hardcopy

10   documents (Band Decl. ¶¶ 15-17).  The extensive documents located in the UK, and

11   the vast quantity of information available in the UK (including, among other things,

12   a database of over 30 million electronic documents, 52 million electronically

13   searchable call data billing records, and an extensive archive of hard copy

14   documents), are detailed in the Declaration of Christa Band.  *Id.*  This factor alone

15   supports dismissal.  *See, e.g.*, *Lueck*, 236 F.3d at 1146 (dismissal appropriate even

16   where "[b]oth the United States evidence and the New Zealand evidence are crucial

17   to this dispute"); *Creative Tech.*, 61 F.3d at 703 ("Both primary parties, the key

18   infringing conduct, and the bulk of the witnesses are located in Singapore, and the

19   case can best be litigated there.").

20       <u>Compulsion of Witnesses and Documents</u>:  Obtaining the relevant documents

21   would be far easier in the UK as many if not most of them have been gathered in the

22   UK in connection with the UK hacking investigations, court proceedings,

23   parliamentary proceedings, and other governmental processes.  Band Decl. ¶¶ 15-17.

24   Indeed, these documents are still part of the evidence in the ongoing proceedings to

25   determine liability and appropriate compensation to claimants arising out of the

26   voicemail retrievals that took place.  Moreover, much of this necessary documentary

27   evidence, and the witnesses discussed above, would not be subject to the compulsory

28   process of this Court, since they are situated in or reside in the UK and would

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION TO DISMISS

therefore be subject to the subpoena powers of the UK courts.  This is especially so with respect to the trove of evidence recovered and held by the MPS (Compl. ¶¶ 16, 31), which is subject to compulsory process in the UK, Band Decl. ¶ 7, but not the United States, *see, e.g.*, *Lueck*, 236 F.3d at 1146-47 (dismissal appropriate where relevant evidence is under control of foreign government, because U.S. court lacks ability to compel its production).

    <u>Expense and Inconvenience</u>:  The expense and inconvenience of litigating this matter in the United States also would be driven up substantially by the amount of travel required, whether by parties and witnesses willing to travel from the UK to the United States or by U.S. counsel traveling to the UK to obtain critical documents and testimony from witnesses unwilling to travel.   None of these expenses and inconveniences would exist if the lawsuit were brought in the UK.  *See, e.g.*, *Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1451 (9th Cir. 1990) ("desire for an expeditious trial" is key private-interest factor).  Moreover, if the case were litigated here, the parties and the Court would realize none of the cost savings of the MTVIL system, such as procedures for managing attorney's fees and costs. Band Decl. ¶ 7.

    <u>Enforceability of Judgment and Litigation Efficiency</u>:  The fact that hundreds of claims arising from the same alleged conduct have been and are being litigated against NGN in the UK under the MTVIL system—and no other voicemail access claim has been brought in the U.S.—leaves no doubt as to whether any judgment would be enforceable, and as to which forum offers the best opportunity for an expeditious and efficient trial on these matters.  *See, e.g.*, *Lueck*, 236 F.3d at 1147 ("Given the existence of the related proceedings [in the alternative forum], it is all the more clear that the private interest factors weigh in favor of dismissal."); *Creative Tech.*, 61 F.3d at 703 (private-interest factors favored dismissal where "the parallel action in the High Court of Singapore was further advanced than the United States action"); *Contact Lumber*, 918 F.2d at 1452 (where there are multiple

potential victims arising out of the same alleged conduct or event, and one forum is already the locus for most of the ensuing civil litigation, private-interest factors weigh heavily in favor of transfer); *cf. Lockman Found.*, 930 F.2d at 770 (dismissal appropriate to avoid "fragmented litigation"); *Mastr Asset Backed Sec. Trust 2007-WMC1, ex rel. U.S. Bank N.A. v. WMC Mortgage LLC*, 880 F. Supp. 2d 418, 424 (S.D.N.Y. 2012) ("[T]he benefits for consolidating related cases in a common forum are often substantial.  Such consolidation may advance the strong policy interests of achieving efficient pretrial discovery, avoiding duplicative litigation, and avoiding inconsistent results.").

b.   The Public-Interest Factors Also Overwhelmingly Favor the UK.

Each of the public factors confirms that the UK would provide a superior forum:  "(1) local interest of lawsuit; (2) the court's familiarity with governing law; (3) burden on local courts and juries; (4) congestion in the court; and (5) the costs of resolving a dispute unrelated to this forum."  *Lueck*, 236 F.3d at 1147.

Local Interest and Familiarity:  California has no meaningful interest in, or connection with, these claims.  Plaintiff's voicemails were accessed from the UK, by UK citizens working for a UK publication owned by NGN, a UK corporation. Plaintiff's voicemails were stored in servers owned and maintained in the UK by the UK provider Vodafone.  Compl. ¶ 49; Band Decl. ¶ 14; Rogers Decl. ¶¶ 6-7.  Two UK newspapers allegedly published in the UK the information obtained through voicemail access.  Compl. ¶¶ 62, 64-65.  Not one of plaintiff's causes of action is founded upon action alleged to have occurred in the U.S.

By contrast, the UK courts have an undeniable interest in adjudicating any claims pertaining to these events.  Over 600 claimants already have obtained or are seeking compensation for mobile telephone voicemail access in the UK.  Band Decl. ¶¶ 4-5, 9.  And the mobile voicemail hacking issues have constituted a major national event with implications for the UK's justice system.  Operations Weeting

and Pinetree have led to more than 35 arrests and charges against 9 individuals on the basis of phone hacking related to Mulcaire, Band Decl. ¶ 20, including the alleged hacking of plaintiff's own mobile voicemail.  Compl. ¶¶ 16, 61.  There have been numerous Parliamentary hearings devoted to these matters in the UK, spanning 30 days and filling over 1500 pages of the UK public record.  *Id.* ¶ 21.  The independent Leveson Enquiry, also convened to investigate and make findings regarding these matters, heard evidence from 337 witnesses during nine months of hearings, and considered written statements from nearly 300 others.  *Id.* ¶ 22.

The events described in plaintiff's complaint have been a matter of great public concern and Parliamentary focus in the UK since Glenn Mulcaire and Clive Goodman were first arrested in 2006, and remain so today.  The matter implicates significant issues of UK national interest, including the freedom and responsibilities of their press, and the security of UK telecommunications.  Indeed, plaintiff alleges she was made aware of the unauthorized access to her mobile voicemails because she was visited by the MPS in the UK, who informed her that her voicemails were accessed while she was in the UK.  Compl. ¶ 60.

Burden, Congestion, and Costs: A trial on these matters in the United States would be complex, expensive, and burdensome for a Court with one of the most congested dockets in the United States, *see* Admin. Off. of U.S. Courts, *Judicial Business of the U.S. Courts 2012*, *Detailed Stat. Tables-Other*, Tbl. X-1A, *available at* www.uscourts.gov/Statistics/JudicialBusiness/2012/appendices/X01ASep12.pdf (C.D. Cal. has more weighted filings per judgeship than 83 of the 90 other U.S. judicial districts).  It would require substantial expenditures of judicial resources and taxpayer dollars, and a substantial commitment on the part of a California jury totally removed from these events or their consequences.  And of course, these efforts would be duplicative of, and far less efficient than, those already undertaken in the UK through the MTVIL system.  *See, e.g.*, *Lueck*, 236 F.3d at 1147 (public-interest factors favor dismissal where claims arise out of event whose "aftermath, including

1  the . . . investigation, the post-investigation activity, and the various legal
2  proceedings including an ongoing criminal probe, have all received significant
3  attention by the local media" in the alternative forum, and where "local interest in
4  this lawsuit" in plaintiff's chosen forum "is comparatively low," such that its citizens
5  "should not be forced to bear the burden of this dispute"); *Contact Lumber*, 918 F.2d
6  at 1453 ("Given the common factual predicate that links the many lawsuits that have
7  been filed, efficiency and economy militate in favor of consolidating all claims in
8  one trial.").  Any interest California could possibly have in deterring individuals or
9  corporations from improperly accessing private voicemail messages in the UK "is
10 simply not sufficient to justify the enormous commitment of judicial time and
11 resources that would inevitably be required if the case were to be tried here." *Piper*
12 *Aircraft*, 454 U.S. at 261.

13                              *       *       *

14      When considered together, the balance of public and private factors point to a
15 single conclusion:  The UK would serve as the most appropriate forum for plaintiff's
16 claims.  Accordingly, these claims should be dismissed pursuant to the doctrine of
17 *forum non conveniens*, and should be re-filed, if at all, in the UK, where they belong.

18   **B.   THE COURT LACKS PERSONAL JURISDICTION OVER NI**
19        **AND NGN.**

20      Even if the Court somehow were to conclude this was the proper forum for
21 plaintiff's claims, it should dismiss all claims against the UK defendants—NI and
22 NGN—because it lacks personal jurisdiction over them.  Fed. R. Civ. P. 12(b)(2).

23      Before this Court can exercise jurisdiction over the defendants, "[d]ue process
24 requires only that [plaintiff establish that the nonresident defendant] have certain
25 minimum contacts with [the forum state] such that the maintenance of the suit does
26 not offend 'traditional notions of fair play and substantial justice.'" *Terracom v.*
27 *Valley Nat'l Bank*, 49 F.3d 555, 559 (9th Cir. 1995) (second alteration in original)
28

1  (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).[10]  Plaintiff bears

2  the burden to establish facts demonstrating that jurisdiction is proper.  *See Fields v.*

3  *Sedgwick Associated Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir. 1986).  Plaintiff may

4  supply proof of jurisdictional facts by affidavit or declaration and "the court cannot

5  assume the truth of allegations in a pleading contradicted by a sworn affidavit."

6  *Abrams Shell v. Shell Oil Co.*, 165 F. Supp. 2d 1096, 1103 (C.D. Cal. 2001).  As

7  discussed below, plaintiff has not pleaded and cannot establish facts sufficient to

8  allow this Court to exercise general or specific jurisdiction as to NI or NGN.

### 1.    The Court Lacks General Jurisdiction over NI and NGN.

10      NI and NGN are not subject to the general jurisdiction of this Court because

11  they have not established contacts with California so "substantial" or "continuous

12  and systematic" as to justify the exercise of jurisdiction over them even as to matters

13  unrelated to their forum-related activities.  *Abrams Shell*, 165 F. Supp. 2d at 1104

14  (describing test for general jurisdiction).

15      The standard for establishing general jurisdiction is "exacting . . . as it should

16  be, because a finding of general jurisdiction permits a defendant to be haled into

17  court in the forum state to answer for any of its activities anywhere in the world."

18  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004).  Such

19  "all purpose" jurisdiction is proper only when a defendant's "affiliations with the

20  State are so 'continuous and systematic' as to render them essentially at home in the

21  forum State."  *Goodyear Dunlop Tires Op'ns v. Brown*, 131 S. Ct. 2846, 2851, 180

22  L. Ed. 2d 769, 803 (2011) (citation omitted).  To evaluate whether a defendant has

23

24      [10]    "A federal court has powers of personal jurisdiction as broad as the
courts of the state in which it sits . . . ."  *Abrams Shell v. Shell Oil Co.*, 165 F. Supp.
25  2d 1096, 1104 (C.D. Cal. 2001).  California's personal jurisdiction statute provides
that state courts may exercise jurisdiction "on any basis not inconsistent with the
26  Constitution of [the] state or of the United States."  Cal. Code Civ. Proc. § 410.10
(West 2013).  The Court may therefore exercise personal jurisdiction to the extent
27  permitted by due process.  *See, e.g.*, *Fields v. Sedwick Associated Risks Ltd.*, 796
F.2d 299, 301 (9th Cir. 1986).

28

the requisite substantive contacts, courts ask to what extent it makes sales, solicits, or engages in business in the state; serves the state's markets; designates an agent for service of process; holds a license; or is incorporated there. *See Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1124-25 (9th Cir. 2002); *In re W. States Wholesale Natural Gas Antitrust Litig.*, 605 F. Supp. 2d 1118, 1131 (D. Nev. 2009).

Plaintiff does not and cannot plead facts sufficient to show that the Court has general jurisdiction over NI or NGN. Both are incorporated in the UK and do business there. Neither entity is registered or licensed to do business in California; maintains an office or bank account, or pays taxes, in California; solicits or engages in business in California or is incorporated in California[11]; or has designated an agent for service of process in California. Longcroft Decl. ¶¶ 4-7. NI is not a publisher— it is the holding company of NGN (publisher of the *Sun* and, formerly, *News of the World*) and Times Newspapers Ltd. (publisher of the *Times* and the *Sunday Times*), each of which is a separately incorporated entity. *Id.* ¶ 4. NI has no contacts at all with California—it has no employees and engages in no business here. *Id.* ¶ 5. NGN's contacts with California are no more meaningful: Of its 590 employees, just two work in the United States, only one of whom is located in California. He works out of his home as NGN has no office in California. *Id.* ¶ 6. NGN does not sell any print newspapers in California, and although a small number of individuals located in California purchase electronic access to *The Sun*, payments for those electronic subscriptions—which are the only payments NGN receives from California— constitute a tiny fraction of one percent of NGN's total revenue. *Id.* Nor does NGN sell advertising in California or have any other sales in California. *Id.* ¶ 7.

---

[11]   NGN's sole employee located in California may at times buy stories locally from news agencies and may on occasion contract with individuals (such as photographers) to assist on stories, but these activities do not rise above the *de minimis* level. Longcroft Decl. ¶ 6.

Such contacts are insufficient to establish general jurisdiction—*i.e.*, that NI and NGN are "essentially at home" in California.  *See, e.g.*, *Harlow v. Children's Hosp.*, 432 F.3d 50, 65-66 (1st Cir. 2005) (no general personal jurisdiction over Massachusetts hospital, despite hospital's mailings to 82 pediatricians in Maine, its maintenance of a website accessible in Maine, and its receipt of admissions and payments from Maine residents which accounted for 0.5% of its income); *Injen Tech. Co. v. Advanced Engine Mgmt., Inc.*, 270 F. Supp. 2d 1189, 1194 (S.D. Cal. 2003) (sales within San Diego County which "account for only 2% of its total business, are not the kind of 'systematic and continuous' contacts that would warrant the exercise of general jurisdiction"); *Snyder v. Dolphin Encounters Ltd.*, 235 F. Supp. 2d 433, 437 (E.D. Pa. 2002) (holding general personal jurisdiction over foreign company unavailable, even though company received 5% of its online inquiries from Pennsylvania residents).

## 2.   The Court Lacks Specific Jurisdiction over the Claims Against NI and NGN.

Plaintiff also fails to allege, and cannot adduce, facts sufficient to allow this Court to exercise "specific jurisdiction" over NI and NGN for the purpose of her claims.  Such jurisdiction may be exercised only where the plaintiff can establish the presence of three factors:  "(1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws[;] (2) [t]he claim must be one which arises out of or results from the defendant's forum-related activities[; and] (3) [e]xercise of jurisdiction must be reasonable."  *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995) (alterations in original) (quoting *Data Disc, Inc. v. Sys. Tech. Assoc, Inc.*, 557 F.2d 1280, 1287 (9th Cir. 1971)).  "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law," and the claim must be dismissed.  *Pebble*

20

*Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006) (quoting *Omeluk*, 52 F.3d at 270).

          a.    <u>Plaintiff Does Not Allege NI and NGN Targeted California.</u>

A foreign act may be deemed to satisfy the purposeful availment prong only if a defendant purposefully directed its conduct toward the forum state. *See Schwarzenegger*, 374 F.3d at 803. A plaintiff must show that the defendant: "'(1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state.'" *Pebble Beach Co.*, 453 F.3d at 1156 (quoting *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000)). Although this is often referred to as the "effects test," the Ninth Circuit has "warned courts not to focus too narrowly on the test's third prong—the effects prong." *Id.* (internal quotation marks omitted).

To demonstrate purposeful direction, a plaintiff must show "'express aiming' at the forum state," in addition to foreseeable harm (and actual harm) there. *Pebble Beach Co.*, 453 F.3d at 1156 (citation omitted). Plaintiff must adduce some proof that the wrongful acts were the result of "individualized targeting" of a known forum resident. *Id.* at 1158; *see also In re W. States Wholesale Natural Gas Litig.*, 605 F. Supp. 2d at 1132. And the Supreme Court repeatedly has explained that even foreseeability of harm in a forum state is not enough for personal jurisdiction. *Calder v. Jones*, 465 U.S. 783, 789 (1984) ("The mere fact that [defendants] can 'foresee' that the [allegedly libelous] article will be circulated and have an effect in [the forum state] is not sufficient for an assertion of [specific] jurisdiction."); *Burger King Corp. v. Rudzewiz*, 471 U.S. 462, 474 (1985) ("Although it has been argued that foreseeability of causing injury in another State should be sufficient to establish such contacts . . . the Court has consistently held that this kind of foreseeability is not a 'sufficient benchmark' for exercising personal jurisdiction." (internal citation and footnote omitted)); *see also Schwarzenegger*, 374 F.3d at 804 ("effects" test "'cannot

stand for the broad proposition that a foreign act with foreseeable effects in the forum state always gives rise to specific . . . jurisdiction'" (quoting *Bancroft & Masters*, 223 F.3d at 1087)).

Plaintiff cannot make this showing as to NI or NGN.  She alleges no conduct at all on the part of NI.  *Infra* Subection III.A.1.  As to NGN, plaintiff alleges certain acts taken by UK journalists and private investigators working for UK newspapers (*id*. ¶¶ 6-9, 12-15), accessed voicemail messages left on her UK cell phone (*id*. ¶¶ 49, 55-54),[12] to obtain information that was later published in the UK (*id*. ¶¶ 62, 64-65).  Plaintiff further alleges these actions were part of a "Hacking Scheme" that spanned from 1998 through 2006.  *Id*. ¶¶ 11, 17.  Her claim that she came to California for seven months during this eight-year timeframe, *id*. ¶ 4, does not provide any evidence that NGN's alleged actions were "expressly aimed" at California.  At most, the alleged conduct's tenuous connections to California are the type of "mere untargeted negligence," and "random," "fortuitous," or "attenuated" contacts that the Supreme Court repeatedly has held are insufficient to establish personal jurisdiction.  *See Calder*, 465 U.S. at 789; *Burger King*, 471 U.S. at 475.

Although plaintiff claims to have suffered harm while she happened to be in California, the Ninth Circuit has rejected the notion that jurisdiction over a foreign entity can be based on the allegation that the plaintiff experienced the harm while in the forum state:  "It may be true that [defendant's] intentional act eventually caused harm to [plaintiff] in California, and [defendant] may have known that [plaintiff] lived in California.  But this does not confer jurisdiction, for [defendant's] express aim was local."  *Schwarzenegger*, 374 F.3d at 807.  Here, the "express aim" of the alleged activity was the UK, and plaintiff cannot show NI or NGN purposefully availed itself of the benefits and protection of California's laws.  Moreover, the

---

[12]    *See supra* note 1.  Plaintiff's service provider is Vodafone, Compl. ¶ 49, a UK carrier that does not offer services in the United States, *see* http://www.vodafone.com (last visited Sept. 7, 2013); Rogers Decl. ¶ 6.

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION TO DISMISS

majority of harm plaintiff alleges occurred in the UK.  *See, e.g.*, Compl. ¶ 50 (alleging plaintiff could not console her daughter, who "was being bullied in school in Liverpool, England"); *id*. ¶¶  45, 51 (alleging Plaintiff's marital relationship suffered because her husband, who "resides . . . in Liverpool, England," "suspected she was having an affair"); *id*. ¶¶ 62, 64-65 (alleging Plaintiff's private and confidential information was published in two UK newspapers).  Because the alleged actions by NI and NGN were not targeted at California, the Court cannot assert personal jurisdiction over them.

> b.  Plaintiff's Claims Do Not Arise out of or Result from NI's or NGN's Forum-Related Activities.

"[A] claim arises out of the forum-related activities if it would not have happened <u>but for</u> the forum-related activities."  *Omeluk*, 52 F.3d at 271 (emphasis added); *see also Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co*., 284 F.3d 1114, 1123 (9th Cir. 2002) ("[Plaintiff] must show that it would not have been injured 'but for' [defendant's] contacts with California.").  Plaintiff cannot demonstrate this is the case as to NI and NGN.  The wrongdoing she alleges involves UK actors accessing voicemails from the UK.  Neither NI nor NGN is alleged to have engaged in forum-related activities that underlie any of the causes of action.  Moreover, the complaint asserts that the alleged conduct underlying the causes of action would have occurred regardless of whether plaintiff was in California:  the alleged "Hacking Scheme" spanned eight years, and plaintiff was in the U.S. for just a few months of that time (Compl. ¶¶ 4, 11, 17); the activity targeted other UK residents with no connection to the U.S. (*id*. ¶ 37); and some of plaintiff's own voicemails allegedly were accessed while she was in the UK (*id*. ¶ 60).

Plaintiff's limited attempt to allege some "forum-related activities" is insufficient to satisfy this prong of the personal jurisdiction test.  Plaintiff alleges, on information and belief, that at unknown times, unknown investigators and journalists came into "the United States, including California," supposedly "to illegally extract,

capture, obtain and exploit private information from Plaintiff," Compl. ¶ 58, but she does not link these allegations to the asserted causes of action, which relate to voicemail access by Mulcaire and others in the UK.  In any event, such vague and conclusory allegations do not satisfy plaintiff's burden of alleging facts to establish specific jurisdiction.  *See, e.g.*, *Palnik v. Westlake Entm't, Inc*., 344 F. App'x 249, 251 (6th Cir. 2009) (applying *Twombly*'s pleading standards and stating that "the complaint must have established with reasonable particularity those specific facts that support jurisdiction" (internal quotation marks omitted)).[13]

### 3. <u>Exercising Jurisdiction over NGN or NI Would Be Unreasonable.</u>

Even if plaintiff could show that NI or NGN purposefully directed their actions at California and knew the brunt of the harm would be felt here, she cannot show the exercise of such jurisdiction would be reasonable.  The Ninth Circuit uses a seven-factor test to evaluate the reasonableness of exercising jurisdiction over a nonresident defendant:  "(1) [t]he extent of the defendant['s] purposeful injection into the forum state's affairs; (2) the  burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum."  *Terracom*, 49 F.3d at 561 (second alteration in original).  Each of these factors favors defendants and counsels against the exercise of personal jurisdiction over NI and NGN.

---

[13]    Equally unavailing are plaintiff's allegations that a news article reported that an unnamed source stated that the phones of a Los Angeles agent and New York publicist for UK citizen Charlotte Church were hacked.  Compl. ¶ 59.  These allegations are entirely unrelated to plaintiff's claims for relief.

1    Extent of Purposeful Interjection:  As discussed above, NI and NGN did not
2    purposefully avail themselves of California laws or expressly direct their alleged
3    activity at California.  And if they had, "the degree of interjection [would] still be so
4    small as to weigh against the reasonableness of jurisdiction."  *Mitan v. Feeney*, 497
5    F. Supp. 2d 1113, 1122 (C.D. Cal. 2007); *see also Core-Vent Corp. v. Nobel Indus.*
6    *AB*, 11 F.3d 1482, 1488 (9th Cir. 1993) ("[T]he smaller the element of purposeful
7    interjection, the less is jurisdiction to be anticipated and the less reasonable its
8    exercise." (internal quotation marks omitted)).

9    Defendant's Burden:  [T]he law of personal jurisdiction is asymmetrical and is
10   primarily concerned with the defendant's burden."  *Terracom*, 49 F.3d at 561.  This
11   makes sense, because "[i]f the burdens of trial are too great for a plaintiff, the
12   plaintiff can decide not to sue or, perhaps, to sue elsewhere.  A defendant has no
13   such luxury.  The burdens on a defendant are of particular significance if, as here, the
14   defendant has done little to reach out to the forum state."  *Ins. Co. of N. Am. v.*
15   *Marina Salina Cruz*, 649 F.2d 1266, 1272 (9th Cir. 1981).  This factor heavily favors
16   NI and NGN because they are UK entities with virtually no U.S. contacts.  Forcing
17   these entities to defend themselves in a foreign jurisdiction, especially when plaintiff
18   is herself a UK citizen, and the UK offers a far superior forum, is unreasonable.

19   Conflict with Sovereignty of Defendant's State:  When a nonresident
20   defendant is not simply from a different state, but a foreign country, the exercise of
21   jurisdiction is less reasonable.  *See, e.g.*, *Marina Salina Cruz*, 649 F.2d at 1272
22   ("[F]oreign nations present a higher sovereignty barrier than that between two states
23   within our union.  This is only a recognition of what is obvious.  That the [defendant]
24   is in a foreign country is therefore a factor bearing negatively on the reasonableness
25   of personal jurisdiction.").  In particular, courts "may presume that England has a
26   sovereign interest in adjudicating a claim against a British corporation."  *Doe v.*
27   *Geller*, 533 F. Supp. 2d 996, 1008 (N.D. Cal. 2008).  This concern is increased
28   where, as here, the "alleged acts took place in" the defendant's state, which "has

1  already invested time and resources adjudicating" these issues.  *Mitan*, 497 F. Supp.

2  2d at 1122.

3      <u>Forum State's Interest</u>:  As discussed in detail above, California has no interest

4  in this case.  Every pertinent event alleged in the complaint occurred in the UK; the

5  defendants are UK residents; and plaintiff herself is a UK resident.  *See, e.g.*, *Geller*,

6  533 F. Supp. 2d at 1008 ("Because the plaintiff is not a California resident,

7  California's legitimate interests in the dispute have considerably diminished."

8  (internal quotation marks omitted)); *Marina Salina Cruz*, 649 F.2d at 1272-73

9  ("Alaska would have a greater interest if [plaintiffs] had been Alaskan residents.").

10  This factor heavily favors defendants.

11      <u>Efficient Judicial Resolution</u>:  "In evaluating this factor," the Ninth Circuit

12  looks "primarily at where the witnesses and the evidence are likely to be located."

13  *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1489 (9th Cir. 1993).  Deference

14  is given to a jurisdiction "that is already familiar with the underlying facts."  *Geller*,

15  533 F. Supp. 2d at 1009-10.  As discussed above, this factor heavily favors

16  defendants.  The parties and witnesses are UK citizens.  The evidence is located in

17  the UK.  The UK courts, which have adjudicated these disputes for years, are highly

18  familiar with the underlying facts and have set up a specialized procedure to deal

19  with cases substantially identical to plaintiff's in an efficient manner.

20      <u>Plaintiff's Interest in Convenient and Effective Relief</u>:  This factor weighs in a

21  defendant's favor where, as here, the plaintiff is not a resident of the forum state and

22  when there is an adequate alternative forum.  *See, e.g.*, *Geller*, 533 F. Supp. 2d at

23  1010 ("California does not appear to be important to the plaintiff's interest in

24  convenient and effective relief.  In fact, quite the opposite: No doctorate in

25  astrophysics is required to deduce that trying a case where one lives is almost always

26  a plaintiff's preference." (brackets and internal quotation marks omitted)); *Marina*

27  *Salina Cruz*, 649 F.2d at 1273 ("This aspect of inquiry may also be less weighty if a

28  plaintiff has the power to select a different forum.").

1    Existence of an Alternative Forum:   "If a plaintiff wishes to argue the

2 unavailability of an alternative forum as a factor increasing the reasonableness of

3 jurisdiction in the forum, he must carry the burden of going forward on this issue."

4 *Marina Salina Cruz*, 649 F.2d at 1273.  For all the reasons discussed above, plaintiff

5 cannot contest the availability and adequacy of the UK.

6                                   *        *        *

7    Because neither NI nor NGN is subject to the general or specific personal

8 jurisdiction of this Court, the claims against each must be dismissed.

9    **C.    IF THE COURT RETAINS JURISDICTION, IT SHOULD**

10        **DISMISS ALL CLAIMS FOR FAILURE TO STATE A CLAIM.**

11    "To survive a motion to dismiss, a complaint must contain sufficient factual

12 matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

13 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

14 U.S. 544, 570 (2007)).   Such allegations must allow "the court to draw the

15 reasonable inference that the defendant is liable for the misconduct alleged." *Id.*   "A

16 pleading that offers 'labels and conclusions' or 'a formulaic recitation of the

17 elements of a cause of action' will not do. . . . Nor does a complaint suffice if it

18 tenders 'naked assertion[s]' devoid of 'further factual enhancement." *Iqbal*, 556

19 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).

20    Plaintiff's complaint is wholly deficient under these standards.  First, all

21 claims against News Corp. and NI are defective because the complaint fails to allege

22 any conduct by either of them and provides no basis to pierce the corporate veil and

23 hold them liable for the conduct of their subsidiary (or subsidiary of a subsidiary),

24 NGN.  Second, both federal claims are defective because they do not apply to the

25 extraterritorial conduct alleged in the complaint.  Third, plaintiff's claims under the

26 California and Federal Wiretap Acts, Anti-Paparazzi Statute, and Privacy Act fail to

27 state a claim upon which relief can be granted.  Finally, all claims are time-barred, as

28 plaintiff was on notice of her claims more than two years before filing her complaint.

1        **1.      Plaintiff Fails To State Claims Against News Corp. and NI.**

2        Plaintiff's claims against News Corp. and NI should be dismissed because the

3   complaint fails to allege either entity engaged in wrongdoing—plaintiff only alleges

4   conduct by NGN through its agents, contractors, and employees.  Nor does plaintiff

5   allege any reason to disregard the corporate form to hold News Corp. or NI liable for

6   their subsidiary's alleged wrongdoing.  "It is a general principle of corporate law

7   deeply ingrained in our economic and legal systems that a parent corporation . . . is

8   not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61

9   (1998) (internal quotation marks omitted).  "Only in unusual circumstances will the

10  law permit a parent corporation to be held either directly or indirectly liable for the

11  acts of its subsidiary." *Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229,

12  1234 (N.D. Cal. 2004).

13           a.      Plaintiff Alleges No Wrongdoing by News Corp. or NI.

14       Every allegation of wrongdoing in the complaint involves the conduct of

15  employees or agents of NGN.  The basis for all six causes of action is the alleged

16  unauthorized retrieval of plaintiff's mobile voicemail.  Compl.  ¶¶ 69-128.  Persons

17  working for two UK newspapers, *News of the World* and the *Sun*, allegedly engaged

18  in this conduct.  *Id.* ¶ 12.[14]  NGN published those two newspapers.  Longcroft Decl.

19  ¶ 4.  NI is named in this lawsuit simply because it is the parent of NGN, and News

20  Corp. is named simply because it is the parent of NI.  *Id.* ¶¶ 6, 13, 14.  The complaint

21  does not allege News Corp. or NI engaged in any conduct that conceivably could

22  underlie any of the six causes of action.  The allegations involving News Corp. and

23

24

25

26       [14] Mulcaire, who engaged in phone hacking allegedly including that of
     Plaintiff, Compl. ¶ 52, is alleged to have been "acting on behalf of and within the
27   scope of the authority conferred upon him by" NGN alone—not by News Corp. or
     NI. *Id.* ¶ 18.
28

1   NI assert, at most, that they had general knowledge, or should have known, of

2   wrongful activity of the type allegedly undertaken by NGN.  *Id.* ¶¶ 23-27; 41-43.[15]

3          These allegations are plainly insufficient to state a claim for direct liability,

4   because plaintiff does not and cannot allege the parent corporations directly or

5   actively participated in the subsidiary's allegedly unlawful actions.  *See, e.g.*,

6   *Bestfoods*, 524 U.S. at 64-65 (distinguishing "derivative liability cases" from those in

7   which "the parent is directly a participant in the wrong complained of," such that

8   "the parent is directly liable for its own actions"); *L.B. Indus., Inc. v. Smith*, 817 F.2d

9   69, 71 (9th Cir. 1987) ("[T]o be held liable a corporate director must specifically

10  direct, actively participate in, or knowingly acquiesce in the fraud or other

11  wrongdoing of the corporation or its officers."); *Cattie v. Wal-Mart Stores, Inc*., 504

12  F. Supp. 2d 939, 944-45 (S.D. Cal. 2007).

13         Absent a basis to allege participation by News Corp. and NI, the complaint

14  lumps all defendants together—News Corp., NI, and NGN—by using the term

15  "News Corporation Defendants," and makes broad allegations about them as if they

16  were a single entity.  *Id.* ¶ 7 ("Hereinafter, [News Corp.], [NI], and [NGN], are

17  referred to, collectively, as the "NEWS CORPORATION Defendants.").  Thus, the

18  complaint alleges the investigators and journalists who purportedly engaged in

19  wrongdoing were employed by "some or all of the News Corporation Defendants,"

20  *id*. ¶¶ 8-9,[16] which flies in the face of the complaint's more specific allegations

21  alleging only conduct by investigators and journalists working for NGN.  Plaintiff

22  makes no specific allegations regarding conduct of News Corp. and NI.  As a matter

23

24         [15]  The complaint fails even to allege News Corp. or NI had knowledge of the
25  interception of <u>plaintiff's</u> voicemails.

26         [16]  *See also id*. ¶ 10 ("[S]ome or all of the NEWS CORPORATION
    Defendants . . . violated laws and Plaintiff's right to privacy . . . ."); *id*. ¶ 12 ("These
27  illegal activities were undertaken in part by officers, agents, employees, and/or
    representatives of the NEWS CORPORATION Defendants, principally through the
28  two newspapers, The Sun and News of the World . . . .").

of law, the complaint fails to provide a basis to hold these two parent corporations liable for the alleged conduct of their subsidiary.  *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) ("General, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint.").

b.   <u>Plaintiff Cannot Pierce the Corporate Veil.</u>

In light of plaintiff's failure to allege direct participation by News Corp. or NI, the only way to hold those defendants liable for the conduct of NGN would be to pierce the corporate veils of the subsidiaries (NI and NGN).  *Cattie*, 504 F. Supp. 2d at 944-45 (direct-participation and veil-piercing theories are the "two exceptions" to the "well-established [rule] that a parent-subsidiary relationship alone is an insufficient basis on which to hold a parent liable for a subsidiary's actions").  In determining whether to pierce the corporate veil of a non-California corporation, federal courts in California generally look to the law of the state of incorporation.  *See, e.g.*, *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1172 (C.D. Cal. 2011) (collecting cases from a "number of courts" that apply the "internal affairs doctrine" in "the closely analogous context of corporate veil-piercing"); *Wehlage v. EmpRes Healthcare Inc.*, 821 F. Supp. 2d 1122, 1128 (N.D. Cal. 2011) (applying "internal affairs doctrine" under California's government interests choice of law test and concluding that the interests of the state of incorporation must control the veil piercing question).

NI and NGN are both UK corporations.  Compl. ¶ 6; Longcroft Decl. ¶ 4.  Veil-piercing principles in the UK are similar to those of most U.S. jurisdictions, in that the corporate form will be disregarded only where one entity is proved to be "'a sham and exist for no other purpose than as a vehicle for fraud.'"  *See In re Sunstates Corp. S'holder Litig.*, 788 A.2d 530, 534 (Del. Ch. 2001) (quoting *Wallace ex rel. Cencom Cable Income Partners II, Inc., LP v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999)).  Thus,

> the fact that a person engages in the carrying on of a business using a duly incorporated, yet seemingly artificial, entity is not sufficient to justify piercing that entity's veil. Instead, legal formalisms must be respected even at the risk of abiding a seeming injustice. Accordingly, veil piercing is quite rare under English law.
>
> [C]ourts may pierce the corporate veil only where special circumstances exist indicating that it is a mere façade concealing the true facts. Evidence of impropriety is a necessary condition to justify veil-piercing, but impropriety on its own is insufficient; the impropriety must be linked to the use of the company structure to avoid or conceal liability.

*FR 8 Singapore Pte. Ltd. v. Albacore Mar. Inc.*, 794 F. Supp. 2d 449, 459-60 (S.D.N.Y. 2011) (alterations, citations, and internal quotation marks omitted); *accord In re Tyson*, 433 B.R. 68, 86-88 (S.D.N.Y. 2010). Plaintiff does not attempt to allege any such impropriety, nor could she—whatever wrongdoing she alleges, it plainly has nothing to do with the use of NI's or NGN's corporate structure to avoid or conceal liability. As such, her claims against News Corp. and NI should be dismissed.

## 2. The Wiretap Act and Stored Communications Act Claims Require Impermissible Extraterritorial Applications of Federal Law.

Plaintiff fails to state a claim under federal law because she does not allege the misconduct at issue occurred in the United States and neither of the federal statutes she invokes—the Stored Communications Act, 18 U.S.C. §§ 2701–2712, and the Federal Wiretap Act, 18 U.S.C. §§ 2510–2522—applies to extraterritorial conduct.

"It is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (*Aramco*) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). In applying that presumption, a court must engage in a two-step inquiry. *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2877–78, 2883–84, 177 L. Ed. 2d 535, 547-48, 554-55 (2010). <u>First</u>, the court must look to the text of the statute to determine whether Congress "clearly expressed" its "affirmative intention" to give the statute

1   extraterritorial effect; if not, the court "must presume [the statute] is primarily

2   concerned with domestic conditions." *Aramco*, 449 U.S. at 248 (internal quotation

3   marks omitted). <u>Second</u>, if a statute lacks extraterritorial effect, then a court must

4   determine whether the conduct that was the "focus" of Congress's concern in

5   enacting the statute occurred within the territorial boundaries of the United States.

6   *Morrison*, 130 S. Ct. at 2884 (quoting *Aramco*, 499 U.S. at 255); *accord United*

7   *States v. Chao Fan Xu*, 706 F.3d 965, 975 (9th Cir. 2013).  Where, as here, a plaintiff

8   fails to allege facts showing such conduct occurred in the United States, the claims

9   must be dismissed pursuant to Rule 12(b)(6).  *Morrison*, 130 S. Ct. at 2877.

10                          a.       Plaintiff Fails To State a Claim Under the Wiretap Act.

11          The Ninth Circuit has held that the Wiretap Act has no extraterritorial reach.

12   *See United States v. Peterson*, 812 F.2d 486, 492 (9th Cir. 1987) (Kennedy, J.) (then-

13   current version of the Wiretap Act had "no extraterritorial force"); *see also United*

14   *States v. Barona*, 56 F.3d 1087, 1090 (9th Cir. 1995) (confirming *Peterson*).  And

15   although Congress has amended the Wiretap Act since *Peterson,* district courts in the

16   Ninth Circuit continue, without exception, to rely on *Peterson* to hold that the

17   Wiretap Act does not apply to conduct abroad.  *Morrison v. Dietz*, No. C-09-05467,

18   2010 WL 395918, at *4 (N.D. Cal. Feb. 1, 2010); *Zheng v. Yahoo!, Inc.*, No. C-08-

19   1068, 2009 WL 4430297, at *4 (N.D. Cal. Dec. 2, 2009).

20          These holdings comport with the text of the Wiretap Act, which contains no

21   clear indication that the Act applies abroad.  As relevant here, the Act generally

22   prohibits the "intercept[ion]" of "wire, oral, or electronic communication[s]" and

23   further proscribes the use or disclosure of the contents of any such communication

24   obtained through an "interception."  18 U.S.C. § 2511(1)(a), (c), (d).  None of those

25   prohibitions refers to events occurring outside the United States.  The Act

26   additionally sets forth detailed procedures that law enforcement officials must follow

27   to obtain authorization to install wiretaps, but makes no provision for authorizing

28   wiretaps in other countries.  *Id.* § 2703.  The Act does refer to "foreign

32

1   communications" and "foreign commerce" in its definition of a "wire
2   communication"; specifically, it defines that term as any aural transfer made through
3   the use of a facility for the "transmission of interstate or foreign communications or
4   communications affecting interstate or foreign commerce." *Id.* § 2510(1). But those
5   references merely designate the types of facilities within the United States that are
6   covered by the Act. They do not evince any intent to give the statute extraterritorial
7   effect. The Supreme Court has "repeatedly held" that similarly "broad language"
8   about foreign commerce in other statutes is insufficient to overcome the presumption
9   against extraterritoriality. *Aramco*, 449 U.S. at 251.

10      The Wiretap Act's legislative history confirms this conclusion. Congress
11  originally enacted the Wiretap Act in the Omnibus Crime Control and Safe Streets
12  Act of 1968, Pub. L. No. 90-351, 82 Stat. 211, and then amended it in the Electronic
13  Communications Privacy Act of 1986 (ECPA), Pub. L. No. 99-508, 100 Stat. 1848.
14  The Senate Report for the latter expressly addresses the issue of extraterritoriality,
15  explaining that the Wiretap Act's reference to "foreign commerce" is "not meant to
16  suggest that the [ECPA] applies to interceptions made outside the territorial United
17  States." S. Rep. No. 99-541, at 12 (1986) (internal quotation marks omitted).
18  Instead, the report continues, "[l]ike the Omnibus Crime Control and Safe Streets
19  Act of 1968 which it revises, the [ECPA] regulates only those interceptions
20  conducted within the territorial United States." *Id.*

21      Because the Wiretap Act has no extraterritorial effect, plaintiff cannot assert a
22  cognizable claim unless she alleges the conduct that was the <u>focus</u> of the statute—the
23  act of interception—occurred in the United States. *See* 18 U.S.C. § 2511(1)
24  (prohibiting the "intercept[ion]" of covered communications); *id.* § 2511(c), (d)
25  (prohibiting the use or disclosure of a covered communication only if it was obtained
26  through an "interception"); S. Rep. No. 99-541, at 12 (the Act "regulates only <u>those</u>
27  <u>interceptions conducted</u> within the territorial United States." *Id.* (emphasis added)).
28  The complaint is devoid of any allegations that such conduct occurred in the United

States.  To the contrary, it alleges Mulcaire entered into an agreement with a UK company to provide voicemails to reporters at UK newspapers.  Compl. ¶¶ 7, 13, 14, 17, 19.  The complaint details the alleged scheme in the UK, the ensuing investigation by UK authorities, and the eventual arrest and prosecution of individuals in the UK.  *See generally* Compl. ¶¶ 11–44.  As part of this alleged scheme, Mulcaire and some unidentified individuals allegedly "intercepted" plaintiff's communications by calling her phone number, entering a personal identification number, and accessing her stored voicemails.  Compl. ¶¶ 54–55.  The complaint does not allege any facts indicating that Mulcaire and the unidentified individuals committed these acts in the United States.  Nor does it allege plaintiff had a U.S. service provider or that her voice-mail messages were stored on a system in the U.S. at the relevant time.  To the contrary, plaintiff alleges her cellphone provider was Vodafone, Compl. ¶ 49, which does not operate in the United States and does not maintain any voicemail storage systems here.  Rogers Decl. at ¶ 6.

That plaintiff herself may have been in the United States at the time of these alleged acts is irrelevant:  No claim can lie under the Wiretap Act unless the individual <u>intercepting</u> the communication does so within the United States.  Two Second Circuit cases relied upon by the Ninth Circuit in *Peterson*, 812 F.2d at 492, make this point.

In *Stowe v. Devoy*, Canadian officials acting in Canada intercepted telephone calls between a criminal defendant in the United States and a person in Canada.  588 F.2d 336, 338 (2d Cir. 1978).  The Second Circuit rejected the notion that a violation of the Wiretap Act could be found simply because the defendant was located in the United States.  *Id.* at 341.  As the court explained, the fact the defendant "was in the United States when his calls were intercepted [did] not change the result" because "[t]he law of the locality in which the tap exists (and where the interception takes place) governs its validity."  *Id.* at 341 n.12.

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION TO DISMISS

1   Similarly, in *United States v. Cotroni*, Canadian officials acting in Canada
2   intercepted phone calls that "traveled in part" over communication systems in the
3   United States.   527 F.2d 708, 710–11 (2d Cir. 1975).   The defendants argued the
4   Wiretap Act applied because their communications passed over those domestic
5   systems. *Id.* at 711.  The Second Circuit disagreed, reasoning that "Congress sought
6   by [the Wiretap Act] to regulate interceptions, not wire communications." *Id.*  Thus,
7   "it is not the route followed by foreign communications which determines the
8   application of [the Wiretap Act]; it is where the interception took place." *Id.*

9   Absent allegations of any acts of interception in the United States, plaintiff's
10   Wiretap Act claim must be dismissed.

11           b.   <u>Plaintiff Fails To State a Claim Under the Stored</u>
12               <u>Communications Act.</u>

13   The Stored Communications Act, like the Wiretap Act, is part of the ECPA.
14   As relevant here, the Stored Communications Act generally prohibits any person
15   from "intentionally access[ing]" an electronic communication service without proper
16   authorization and thereby obtaining, altering, or preventing access to a wire or
17   electronic communication "while it is in electronic storage in such system."   18
18   U.S.C. § 2701(a)(1).

19   Like the Wiretap Act, the Stored Communications Act has no extraterritorial
20   effect. *Zheng*, 2009 WL 4430297, at *2–4.  Nothing in the Act's prohibitions refers
21   to events occurring abroad, *see* 18 U.S.C. § 2701, and none of its elaborate
22   procedural provisions set forth any mechanism for obtaining access to stored
23   communications in other countries, *see id.* § 2703.  The Act does incorporate the
24   Wiretap Act's definition of a "wire communication," which refers to foreign
25   commerce and communications, *id.* § 2711 (adopting the definitions set forth in 18
26   U.S.C. § 2510), but, as explained above, Congress did not intend to use those terms
27   to give the statute extraterritorial reach. *See* S. Rep. No. 99-541, at 12–13.

28

Because the Stored Communications Act lacks extraterritorial force, it applies only if the event that was the focus of Congress's concern in enacting the statute occurred in the United States.  Without deciding the issue, the Ninth Circuit has suggested that the focus of the statute is on either the protection of stored documents or the prevention of unauthorized acts of access.  *Suzlon Energy Ltd. v. Microsoft Corp.*, 671 F.3d 726, 730 (9th Cir. 2011) (noting that the court was not addressing "whether the [Stored Communications Act] applies to <u>documents stored</u> or <u>acts occurring</u> outside of the United States" (emphasis added)).  This Court likewise need not resolve which of those two potential foci Congress had in mind, because plaintiff fails to allege either occurred in the United States.

As with her Wiretap Act claim, plaintiff alleges no connection to the United States other than the fact that she was physically present in the United States when her voicemail data was accessed by UK journalists and investigators.  Nothing in the statute, however, evinces any intent to regulate acts or storage on foreign soil merely because a plaintiff passes through this country.  As the Supreme Court has instructed, "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States.  But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case."  *Morrison*, 130 S. Ct. at 2884.  Because plaintiff fails to allege her voicemail data was stored in or accessed from the United States, her claim must be dismissed.

### 3. **Plaintiff Fails To State a Claim Under the Federal Wiretap Act and the California Penal Code Because She Does Not Allege Contemporaneous Interception of Her Communications.**

Plaintiff's claims under the Federal Wiretap Act (Count II) and the California Penal Code's wiretap statute (Cal. Penal Code § 631), eavesdropping statute (Cal. Penal Code § 632) and telephonic communication interception statute (Cal. Penal

Code § 632.7) (collectively alleged in Count IV) fail because those statutes apply only to the contemporaneous, live interception of electronic or wire communications. Plaintiff's claims center on her allegation that Mulcaire and some unidentified individuals accessed "voice-mail messages <u>left</u> and <u>stored</u> on her cellular telephone system."  Compl. ¶¶ 53-55 (emphasis added).  By her own allegations, these messages were accessed only <u>after</u> they were transmitted—not during their transmission.  That type of conduct is not actionable under the Wiretap Act or the California Penal Code.

<u>Federal Wiretap Act</u>.  The Wiretap Act prohibits the "intercept[ion]" of certain wire, electronic, and oral communications.  18 U.S.C. § 2511(1)(a).  "Interception" means "acquisition contemporaneous with transmission."  *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002).  Plaintiff's Wiretap Act claim therefore fails:  for a communication to be "intercepted" in violation of the Wiretap Act, "it must be acquired during transmission, not while it is in electronic storage."  *Id.*; *accord Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113 (3d Cir. 2003); *United States v. Steiger*, 318 F.3d 1039, 1048-49 (11th Cir. 2003) ("a contemporaneous interception—*i.e.*, an acquisition during 'flight'—is required to implicate the wiretap act").  Indeed, the Act was amended in 2001 specifically to eliminate voicemail from the scope of its coverage.  *Konop*, 302 F.3d at 878.

<u>California Wiretap Act</u>.  California Penal Code § 631, titled "Wiretapping," imposes liability on anyone who (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument"; (2) without proper authorization "reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within th[e] state"; or (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information" obtained in violation of the statute or "who aids, agrees with, employs, or conspires with any person or

1   persons to unlawfully do, or permit, or cause to be done any of the acts or things"

2   prohibited by the statute.  Cal. Penal Code § 631(a).  The complaint fails to state a

3   claim under any of these prongs of the statute.

4          To state a claim under the first prong of Section 631(a), a plaintiff must allege

5   a person tapped or made an unauthorized connection to a facility for <u>transmitting</u>, as

6   opposed to storing, communications.  Section 631(a) applies only to connections

7   with any "telegraph or telephone wire, line, cable, or instrument."  Plainly, "wire[s]",

8   "line[s]", and "cable[s]" are all used to <u>transmit</u> communications; the term

9   "instrument" should be understood in this light as well.  *See Moore v. Cal. State Bd.*

10  *of Accountancy*, 2 Cal. 4th 999, 1011-12, 9 Cal. Rptr. 2d 358, 365 (1992) ("[W]hen a

11  statute contains a list or catalogue of items, a court should determine the meaning of

12  each by reference to the others, giving preference to an interpretation that uniformly

13  treats items similar in nature and scope.").  The complaint does not allege defendants

14  tapped or made an unauthorized connection to any facility for transmitting voicemail

15  messages—it alleges defendants improperly accessed the system for "stor[ing]"

16  those messages.  Compl. ¶¶ 1, 57.

17         The second prong expressly applies only to the interception of a

18  communication "while the same is in transit or passing."  *See People v. Wilson*, 17

19  Cal. App. 3d 598, 602-03, 94 Cal. Rptr. 923, 926 (1971).  The complaint fails to

20  allege defendants learned or attempted to learn the contents of a communication

21  "<u>while</u>," *id.* (emphasis added), "the same [wa]s in transit or passing over any wire,

22  line, or cable, or [wa]s being sent from, or received at any place within the state,"

23  Cal. Penal Code § 631.  To the contrary, the complaint expressly alleges that

24  defendants attempted to learn the contents of the messages <u>after</u> they were "left and

25  stored" on the voice-mail system.  Compl. ¶ 1.  Accordingly, the complaint fails to

26  state a claim under the second prong of Section 631(a).  *See Hernandez v. Path, Inc.*,

27  No. 12-CV-01515, 2012 WL 5194120, at *3, *5 (N.D. Cal. Oct. 19, 2012)

28

1 (dismissing § 631(a) claim where defendant allegedly obtained a communication

2 after it was posted on a website, not while it was in transit).

3      And the third prong applies only where one makes use of a communication

4 whose acquisition was otherwise unlawful under the statute. *Cf. Konop*, 302 F.3d at

5 879 n.7 (plaintiff cannot maintain claim for improper use or disclosure under Federal

6 Wiretap Act where she fails to allege an underlying interception).  Because plaintiff

7 has not adequately alleged any underlying violation of Section 631(a), her ancillary

8 claim also fails.

9      <u>California Eavesdropping Statute</u>.  California's eavesdropping statute imposes

10 liability on any person "who, intentionally and without the consent of all parties to a

11 confidential communication, by means of any electronic amplifying or recording

12 device, eavesdrops upon or records the confidential communication, whether the

13 communication is carried on among the parties in the presence of one another or by

14 means of a telegraph, telephone, or other device, except a radio."  Cal. Penal Code §

15 632(a).   To state a claim under Section 632, a plaintiff must allege an act of

16 eavesdropping or recording contemporaneous with a communication.    This

17 requirement flows from the text:  the statute applies only when a "communication <u>is</u>

18 <u>carried on</u> among the parties"—not after a communication is stored.  *Id.* (emphasis

19 added).   It is aimed at preventing the "'<u>simultaneous</u> dissemination [of a

20 communication] to an unannounced second auditor, whether that auditor be a person

21 or a mechanical device.'"  *Flanagan v. Flanagan*, 27 Cal. 4th 766, 775, 117 Cal.

22 Rptr. 2d 574, 580 (2002) (emphasis added) (quoting *Ribas v. Clark*, 38 Cal. 3d 355,

23 360-61, 212 Cal. Rptr. 143, 146 (1985)).  Thus, Section 632 prohibits only a "'real

24 time' interception of a communication," *Marich v. MGM/UA Telecomms., Inc.*, 113

25 Cal. App. 4th 415, 431, 7 Cal. Rptr. 3d 60, 72 (2003) (quoting *People v. Drennan*, 84

26 Cal. App. 4th 1349, 1356, 101 Cal. Rptr. 2d 584, 589 (2000)), not the conduct

27 plaintiff alleges—the accessing of a stored communication.

28

1    California Telephonic Communication Interception Statute.   Section 632.7
2    addresses communications involving cordless or cellular telephones.   As relevant
3    here, it imposes liability on any person "who, without the consent of all parties to a
4    communication, intercepts or receives and intentionally records . . . a communication
5    transmitted between" a cellular telephone and some other telephone.   Cal. Penal
6    Code §632.7(a).   Section 632.7 thus applies only to communications transmitted
7    between a cellular telephone and some other telephone.   The section does not address
8    access to communications that, like those at issue here, already have reached their
9    destinations and been placed in storage.

10        **4.      Plaintiff Fails To State a Claim Under the California Civil**
11             **Code.**

12       Plaintiff's claim that defendants violated Section 1708.08 of the California
13   Civil Code, Compl. ¶¶ 108–117, is also defective.   As relevant here, Section
14   1708.8(b) prohibits any person from attempting to capture a "visual image, sound
15   recording, or other physical impression of the plaintiff engaging in a personal or
16   familial activity" "through the use of a visual or auditory enhancing device" if the
17   image, recording or other physical impression otherwise could not have been
18   obtained without a trespass.   Cal. Civ. Code § 1708.8(b).   For two reasons, this
19   statute does not apply to plaintiff's allegation that defendants accessed voicemails
20   left and stored on a cellular telephone system.   Compl. ¶ 1.

21       First, to state a claim under Section 1708.8(b), a plaintiff must allege that a
22   person attempted to capture an image, recording, or other impression of "the plaintiff
23   engaging in a personal or familial activity."   Cal. Civ. Code. § 1708.8(b) (emphasis
24   added).   Here, plaintiff does not allege journalists or investigators recorded her
25   engaging in any such activity.   Instead, she alleges they accessed voicemails left by
26   third parties that merely "related" to her "personal and/or familial activity."   Compl.
27   ¶ 112 (emphasis added).   That allegation is insufficient under the plain terms of the
28   statute, and plaintiff's claim should therefore be dismissed.

Second, to state a claim under Section 1708.8(b), a plaintiff must also allege that a person attempted to capture an image, recording, or other impression "through the use of a visual or auditory enhancing device."  Cal. Civ. Code. § 1708.8(b).  A "visual or auditory enhancing device" is a device that operates primarily by increasing the effectiveness of a person's natural senses of sight and hearing.  *See, e.g.*, *American Heritage Dictionary of the English Language* 593 (4th ed. 2000) (defining "enhance" as "[t]o make greater, as in value, beauty, or effectiveness; augment").  Thus, as the California legislature has observed, such devices include "powerful telephoto lenses and hyperbolic [sic] microphones."  2009 Cal. Legis. Serv. Ch. 449 (A.B. 524, § 1(b)).

In her complaint, plaintiff does not allege the use of any such "visual or auditory enhancing device."  *See* Compl. ¶ 112.  Instead, she alleges that the investigators or journalists simply placed calls on telephones in order to access her stored voicemails.  *Id*. ¶ 55.  Because a telephone is not a "visual or auditory enhancing device" within the meaning of the statute, plaintiff's claim should be dismissed.

## 5. All of Plaintiff's Claims are Time-Barred.

Even if plaintiff had sued the appropriate defendant in the appropriate forum, and even if her causes of action were not otherwise infirm, all of her claims should be dismissed as time-barred.

The limitations period for five of plaintiff's six claims is two years.  *See* 18 U.S.C. § 2707(f) (Count I – Stored Communications Act); 18 U.S.C. § 2520(e) (Count II – Wiretap Act); Cal. Code Civ. Proc. § 335.1 (Counts III, V, & VI – Cal. Const. art. 1, § 1, Cal. Civ. Code § 1708.9, and California common law); *see also* 3 Witkin, Cal. Proc. (5th 2008) Actions, § 556, p. 706; *Cain v. State Farm Mut. Auto. Ins. Co.*, 62 Cal. App. 3d 310, 132 Cal. Rptr. 860 (1976); *Arsdol v. Ragir*, No. SC102996, 2009 WL 7738854 (Cal. Super. Ct. Oct. 14, 2009).  The statute for plaintiff's remaining claim—Count IV, alleging violations of the California Penal

1    Code—is one year.  Cal. Code Civ. Proc. § 340(a).   These periods begin to run as

2    soon as a plaintiff is injured, "'even if the plaintiff is unaware of [the] cause of

3    action.'"  *Migliori v. Boeing N. Am., Inc*., 114 F. Supp. 2d 976, 982-83 (C.D. Cal.

4    2000) (alteration in original) (quoting *Mangini v. Aerojet–Gen. Corp*., 230 Cal. App.

5    3d 1125, 1149–50, 281 Cal. Rptr. 827, 842 (1991)).  Because plaintiff alleges that

6    the conduct at issue occurred eight to nine years ago—in 2004 and 2005, Compl. ¶¶

7    46-67—her claims are time-barred unless she can prove some exception, such as the

8    discovery rule, applies.  Yet plaintiff not only fails properly to invoke the rule, she

9    pleads (and incorporates by reference) facts that would affirmatively preclude her

10   from seeking refuge in the rule.

11                   a.      Plaintiff Fails To Invoke the Discovery Rule.

12           To invoke the discovery rule, plaintiff must plead facts which show "'(1) the

13   time and manner of discovery and (2) the inability to have made earlier discovery

14   despite reasonable diligence.'"  *Hopkins v. Dow Corning Corp*., 33 F.3d 1116, 1120

15   (9th Cir. 1994) (quoting *Saliter v. Pierce Bros. Mortuaries*, 81 Cal. App. 3d 292, 146

16   Cal. Rptr. 271 (1978)).[17]  Plaintiff fails to make either showing.  First, she fails to

17   allege when she discovered the cause of action:  Despite claiming she was "visited"

18   by the MPS, who informed her "that they had evidence indicating that her cellular

19   telephone was hacked by some or all of the Defendants," Compl. ¶ 60, plaintiff does

20   not allege <u>when</u> this occurred, or whether it was within two years prior to the filing

21   of her complaint.  Second, plaintiff fails to allege she conducted <u>any</u> investigation

22   into the circumstances surrounding her claim, much less a reasonably diligent

23   investigation that nevertheless somehow failed to result in the discovery of her

24   claim.[18]

25           [17] Plaintiff's federal claims expressly require pleading the date upon which
26   plaintiff "first discovered" or had a "reasonable opportunity to discover" the alleged
     violation.  18 U.S.C. §§ 2707(f) & 2520(e).

27           [18]     Plaintiff's conclusory allegation that she "was unaware of these illegal
28   activities and had no reasonable opportunity to become aware of them due to

                                                                                        *(cont'd)*

1
2
3

        b.     <u>Even If Plaintiff Had Properly Invoked the Discovery Rule, She Was on Inquiry Notice of Her Claims More Than Two Years Before Filing Her Complaint.</u>

4
5
6
7
8
9
10
11
12
13
14
15
16

       Under the discovery rule, the statute of limitations is only tolled until "'the plaintiff suspects or should suspect that her injury was caused by wrongdoing.'" *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1120 (9th Cir. 1994) (quoting *Jolly v. Eli Lilly & Co.* 44 Cal. 3d 1103, 1110 (1988)).  This occurs when a plaintiff has "'notice or information of circumstances to put a reasonable person <u>on inquiry</u>.'" *Migliori*, 114 F. Supp. 2d at 982-83 (quoting *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d at 1111 (1988) (internal quotations omitted; emphasis in original)).  At that point, the plaintiff is required "to conduct a reasonable investigation . . . and [is] charged with knowledge of the information that would have been revealed by such an investigation."  *Doe v. Roman Catholic Bishop of Sacramento*, 189 Cal. App. 4th 1423, 1431, 117 Cal. Rptr. 3d 597, 603 (2010); *see also Bibeau v. Pac. Nw. Research Found. Inc.*, 188 F.3d 1105, 1108 (9th Cir. 1999) ("The plaintiff must be diligent in discovering the critical facts.").

17
18
19
20
21

       Under these standards, plaintiff was on inquiry notice of her claims more than two years before filing her complaint—certainly no later than April 2011, when NI and NGN publicly and prominently admitted their journalists had engaged in the very "phone hacking" alleged by plaintiff and by which date she herself had numerous indications that she was among the victims.

22
23
24

       Plaintiff specifically alleges that in 2004 and 2005 she realized she was not receiving her voicemail messages.  *See, e.g.*, Compl. ¶ 49 ("On occasions from 2004 to 2005, Plaintiff did not receive messages left and stored on her cellular telephone

25

_____

26
27
28

(cont'd from previous page)
Defendants' intentional and ongoing cover-up of the Hacking Scheme until most recently," Compl. ¶ 60, cannot be credited because it is contradicted by the complaint's specific factual allegations and by facts of which the Court can and should take judicial notice, as described in this section.

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION TO DISMISS

system . . . Plaintiff complained to her service provider, Vodafone, about lost voice messages."); *id.* ¶ 50 (alleging that, during the "same period," "Plaintiff's husband criticized her for not responding to his calls and the voice messages he left on her cellular telephone system"); *id.* ¶ 56 ("Distressed by her inability to access her voice-mail messages, Plaintiff asked her cellular telephone carrier to reset her PIN number to allow her to access her messages."). And plaintiff had numerous indications as to who might have been responsible for the voicemail access, because she specifically alleges three articles that appeared in the *News of the World* and *The Sun* in 2004 and 2005 contained her private information.[19] *See* Compl. ¶¶ 62-64.

Moreover, as plaintiff alleges in her complaint, the voicemail hacking allegations received massive and worldwide publicity during the years leading to 2011. Plaintiff's complaint notes that there were numerous UK Parliamentary inquiries about these allegations prior to 2011, Compl. ¶¶ 24, 29; describes the 2010 report resulting from one of the Parliamentary inquiries, *id.* ¶¶ 23, 25, 32; comments on the Metropolitan Police investigation into these allegations launched in January 2011, *id.* ¶¶ 16, 36; and lists a variety of prominent news articles written about these allegations in 2009, 2010, and June 2011; *id.* ¶¶ 26, 33-35. Indeed, plaintiff's own lawyer describes a 2006 news report, which named celebrities who may have been victims of unauthorized voicemail access by Mulcaire and NGN, as "my light-bulb moment." Pitt Decl. Ex. 6.

---

[19] Even if plaintiff did not know the identity of the alleged wrongdoer, such ignorance would not toll the statute. *See Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807-08, 27 Cal. Rptr. 3d 661, 667-68 (2005) (under discovery rule, "plaintiffs are required to conduct a reasonable investigation," "pursue their claims diligently," and not engage in "dilatory tactics," even if "the plaintiff does not have reason to suspect the defendant's identity"); *Bernson v. Browning-Ferris Indus.*, 7 Cal. 4th 926, 932, 30 Cal. Rptr. 2d 440, 443 (1994) ("[T]he general rule in California has been that ignorance of the identity of the defendant . . . will not toll the statute. . . . [This is] premised on the commonsense assumption that once the plaintiff is aware of the injury, the applicable limitations period (often effectively extended by the filing of a Doe complaint) normally affords sufficient opportunity to discover the identity of all the wrongdoers.").

1    Finally, on April 8, 2011, NGN <u>affirmatively admitted liability</u> in various civil

2   claims brought to date and announced a compensation scheme to address new

3   claims.   The complaint carefully omits the date of this admission of liability, even

4   while reiterating the extent of prior worldwide publicity.   *See* Compl. ¶ 37 ("Under

5   inquiries from the police, the press, the House of Commons, and Lord Justice

6   Leveson, News International was forced to admit that hacking and other violations of

7   privacy were a standard business practice at News of the World, and at its sister

8   paper, The Sun.").   In full, NI's and NGN's April 8, 2011 statement admitting

9   liability explained:

> In 2007, a News of the World journalist and a private investigator working for the paper were jailed for accessing voicemail messages between 2004 and 2006.

> Since then, a number of individuals have brought breach of privacy claims against the News of the World over wrongful voicemail interception during that period, and others are threatening claims.

> Evidence has recently come to light which supports some of these claims. We have written to relevant individuals to admit liability in these civil cases and to apologise unreservedly, and will do the same to any other individuals where evidence shows their claims to be justifiable.

> We hope to be able to pay appropriate compensation to all these individuals, and have asked our lawyers to set up a compensation scheme to deal with genuine claims fairly and efficiently.

> Here today, we publicly and unreservedly apologise to all such individuals. What happened to them should not have happened. It was and remains unacceptable.

22   Pitt Decl. ¶ 3 & Ex. 2.   This public admission of liability, of which the Court can and

23   should take judicial notice, *see, e.g.*, *In re Am. Apparel, Inc. S'holder Litig.*, 855 F.

24   Supp. 2d 1043, 1062 (C.D. Cal. 2012) ("Courts in the Ninth Circuit routinely take

25   judicial notice of press releases."), forecloses any conceivable argument that the

26   statutes of limitations on plaintiff's claims began running any later than April 2011.

27

28

1  In other words, by April 2011, according to plaintiff's own allegations and
2  judicially noticeable documents, plaintiff was on notice that: (1) she had not been
3  receiving some of her voicemails; (2) newspaper articles had been printed by NGN
4  publications in the UK about her that revealed private information contained in those
5  voicemails; (3) UK Parliament was conducting widespread inquiries into illegal
6  accessing of voicemails by NGN journalists; (4) UK police had begun further
7  inquiries into the illegal accessing of voicemails by NGN journalists; (5) widespread
8  media attention had focused on these allegations; <u>and</u> (6) NGN had affirmatively
9  admitted liability for unauthorized voicemail access in a variety of civil cases that
10 had already been brought in the UK.  Because Plaintiff did not file her complaint
11 until June 13, 2013—more than two years after she was on notice of all of these
12 facts—it must be dismissed as untimely.

13 **IV.  <u>CONCLUSION</u>**

14  All of plaintiff's claims should be dismissed pursuant to the doctrine of *forum*
15 *non conveniens*, and plaintiff should be required to re-file her claims, if at all, in the
16 United Kingdom.  In the event the Court disagrees with that analysis, all claims
17 should be dismissed because: the Court lacks personal jurisdiction as to NI and
18 NGN; plaintiff alleges no wrongdoing on the part of News Corp. and NI and cannot
19 pierce the corporate veil; the complaint fails to state a claim upon which relief can be
20 granted; and all claims are time-barred.

21
22 Dated:  September 20, 2013          ALSTON & BIRD LLP
23
24                                      By:    /s/ Louis A. Karasik
25                                        Louis A. Karasik (Bar # 100672)
26                                        *Counsel for Defendants News*
                                         *Corporation, NI Group Limited  f/k/a*
                                         *News International Limited, News*
27                                       *Group Newspapers Limited*
28

Dated:  September 20, 2013            WILLIAMS & CONNOLLY LLP


                                     By:   /s/ Brendan V. Sullian
                                           Brendan V. Sullivan (*pro hac vice*)
                                           Tobin J. Romero (*pro hac vice*)
                                           Joseph M. Terry (*pro hac vice*)
                                           Jonathan B. Pitt (*pro hac vice*)

                                           *Counsel for Defendants News
                                           Corporation, NI Group Limited f/k/a
                                           News International Limited,
                                           News Group Newspapers Limited*

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION TO DISMISS