Norman Siegel, Pro Hac Vice
nsiegel@stellp.com
Saralee Evans, Pro Hac Vice
sevans@stellp.com
Herbert Teitelbaum, Pro Hac Vice
hteitelbaum@stellp.com
SIEGEL TEITELBAUM & EVANS, LLP
260 Madison Avenue - 22nd Floor
New York, NY 10016
(212) 455-0300

Steven J. Hyman, Pro Hac Vice
shyman@mclaughlinstern.com
Paul H. Levinson, Pro Hac Vice
plevinson@mclaughlinstern.com
Bruce A. Langer, Pro Hac Vice
blanger@mclaughlinstern.com
McLAUGHLIN & STERN, LLP
260 Madison Avenue - 18th Floor
New York, NY 10016
(212) 448-1100

Craig J. Stein (State Bar No. 98041)
craig@craigsteinlaw.com
THE STEIN LAW FIRM
801 S. Figueroa Street - 12th Floor
Los Angeles, California 90017
Telephone:   (213) 233-2271
Facsimile:    (213) 622-1444

Attorneys for Plaintiff EUNICE HUTHART

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EUNICE HUTHART,<br><br>          Plaintiff,<br><br>v.<br><br>NEWS CORPORATION, *et al.*,<br><br>          Defendants.<br>_____ | CASE NO.: CV 13-4253 MWF (AJWx)<br><br>Honorable Michael W. Fitzgerald<br><br>PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS<br><br>[FED. R. CIV. P. 12]<br><br>Date: February 10, 2014<br>Time: 10:00 a.m.<br>Place: Courtroom 1600 |

1

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................iii-xi

I.   INTRODUCTION...............................................................................1

II.  ARGUMENT.......................................................................................2

    A.   DEFENDANTS FAILED TO SATISFY THE DEMANDING
        BURDEN REQUIRED TO ACHIEVE FNC DISMISSAL......................2

        1.   Defendants Misconstrued the Burden Required for
            Dismissal on *Forum Non Coveniens* Grounds....................................2

        2.   An Available and Adequate Alternative Was Not
            Established..............................................................................................3

        3.   Private and Public Interest Factors Favor Trial in
            the United States......................................................................................6

            a.   Plaintiff's Forum Selection is Entitled to Deference..................7

            b.   Private Interest Factors Strongly Favor Trial in
                 the United States............................................................................7

            c.   The Public Interest Factors Strongly Favor Trial
                 in the United States.......................................................................11

    B.   DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION
        IN THIS COURT...........................................................................................16

        1.   This Court May Exercise Jurisdiction Over Defendants
            When Doing So Would Not Violate Due Process Under
            the Federal Constitution.......................................................................17

        2.   Defendants Are Subject to Personal Jurisdiction
            Specifically in California, or Alternatively, Generally
            in the United States................................................................................17

            a.   Specific Jurisdiction in California: Minimum Contacts...........17

                i.   Intentional Act...................................................................17

                ii.  Express Aiming and Activities Directed into
                    the Forum.............................................................................18

            b.   Specific Jurisdiction in California: Plaintiff's Claims
                Arise from Defendants' Forum Related Conduct....................20

            c.   General Jurisdiction in the United States...................................21

                i.   Requisite Contacts.............................................................22

         3.   Exercising Jurisdiction over Defendants is Reasonable...................24

        4.   Dismissal Prior to Discovery Would Be Premature........................28

C.   PLAINTIFF HAS SUFFICIENTLY PLED FACTUAL
MATTER TO STATE CLAIMS TO RELIEF...........................................30

    1.   Piercing the Corporate Veil.................................................30

    2.   Agency Relationship...........................................................34

D.   PLAINTIFF HAS STATED CLAIMS UNDER THE STORED
COMMUNICATIONS AND WIRETAP ACTS......................................35

    1.   Application of the SCA and WA to Defendants Is
Not an Extraterritorial Application....................................35

        a.   Nexus with the United States.......................................36

    2.   Even if Defendants Conduct is Extraterritorial
Sections 2701 and 2707 of the SCA Apply Extraterritorially..........39

        a.   Extraterritoriality of Criminal Statutes Can Be
Inferred.......................................................................44

E.   PLAINTIFF HAS SUFFICIENTLY STATED CLAIMS
UNDER CALIFORNIA LAW.................................................................46

    1.   California Penal Code Sections 631, 632 and 632.7......................46

        a.   Penal Code § 631: Wiretap Act.................................46

            i.   Defendants Intercepted a Wire Communication..............46

            ii.   Defendants Disclosed the Content of an
Intercepted Wire Communication.....................................47

            iii.   Defendants Participated, Directly or
Indirectly, in the Interception or Disclosure of
a Wire Communication.......................................................48

F.   PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE
STATUTE OF LIMITATIONS.................................................................51

III.   CONCLUSION...............................................................................................55

1

## TABLE OF AUTHORITIES

2

FEDERAL CASES

3

Akkerman v. Mecta Corp., 72 Fed. Appx. 652 (9th Cir.
2003)..............................54

4

5

Allstate Ins. Co. v. Countrywide Fin. Corp., 824 F. Supp. 2d 1164
(C.D. Cal 2011)................................................................................31

6

American Dredging Co. v. Miller, 510 U.S. 443, 114 S. Ct. 981,
127 L. Ed. 2d 285 (1994).................................................................16

7

8

American West Airlines, Inc. v. GPA Group, Ltd., 877 F.2d 793 (9th Cir.
1989)...29

9

Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed 2d 868 (2009)...........30

10

AT&T v. Compagnie Bruxelles Lambert, 94 F.3d 586 (9th Cir. 1996)...................17

11

Bancroft & Masters, Inc. v. Augusta Nat. Inc., 223 F.3d 1082 (9th Cir. 2000)......18

12

Bangor Punta Operations, Inc. v. Bangor & A.R. Co., 417 U.S. 703,
94 S. Ct. 2578, 41 L. Ed. 2d 418 (1974)............................................31-32

13

14

Bauman v. DaimlerChrysler Corp., 644 F.3d 909 (9th Cir. 2011),
cert. granted, 133 S. Ct. 1995 (2013)................................................passim

15

Bd. of Trustees v. Elite Erectors, Inc., 212 F.3d 1031 (7th Cir. 2000)...................10

16

Bibeau v. Pac. Northwest Research Found. Inc., 188 F.3d 1105
(9th Cir. 1999)................................................................................54

17

18

Boschetto v. Hansing, 539 F.3d 1011 (9th Cir. 2008)............................................29

19

Boston Telecomm. Group, Inc. v. Wood, 588 F.3d 1201 (9th Cir. 2009).............3, 7

20

Bowoto v. Chevron Texaco Corp., 312 F. Supp. 2d 1229 (N.D. Cal. 2004).....30, 34

21

Brainerd v. Governors of the Univ. of Alberta, 873 F.2d 1257
(9th Cir. 1989)................................................................................19, 25

22

Brayton Purcell LLP v. Recordon, 606 F.3d 1124 (9th Cir. 2010)..........................17

23

Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804
(1984)............................................................................................17, 19, 20

24

25

California Sansome Co. v. U.S. Gypsum, 55 F.3d 1402 (9th Cir. 1995).................52

26

Carijano v. Occidental Petroleum Corp., 643 F.3d 1216 (9th Cir. 2011)................3

27

Chapman Univ. v. Atl. Richfield Co., Civ. No. 12-05680,
2013 WL 3946117 (C.D. Cal. July 30, 2013)..........................................54

28

Points & Authorities In Opposition

Cheng v. Boeing, 708 F.2d 1406 (9th Cir. 1983), cert denied
464 U.S. 1017 (1983)..................................................................................3, 8

Chan v. Soc'y Expeditions, Inc., 123 F.3d 1287, 1294 (9th Cir. 1997)...................31

Chua Han Mow v. United States, 730 F.2d 1308, 1311 (9th Cir. 1984)..................45

Clark v. Martinez, 543 U.S. 371, 125 S. Ct. 716, 160 L. Ed. 2d 734 (2005)..........46

Contact Lumber Co. v. P.T. Moges Shipping Co., 918 F.2d 1446
(9th Cir. 1990)..............................................................................................8

Core-Vent Corp. v. Nobel Indus. AB, 11 F.3d 1482 (9th Cir. 1993)...............24, 26

Deirmenjian v. Deutsche Bank A.G., Civ. No. 06-00774,
2006 WL 4749756 (C.D. Cal. Sept. 25, 2006)..........................................2

Dichter-Mad Family Partners, LLP v. United States, 707 F. Supp. 2d 1016
(C.D. Cal. 2010), aff'd 709 F.3d 749 (9th Cir. 2013)..............................29

DISH Network LLC v. Vicxon Corp., 923 F. Supp. 2d 1259
(S.D. Cal. 2013).........................................................................................54

Doe v. Geller, 533 F. Supp. 2d 996 (N.D. Cal. 2008)......................................27, 28

Doe v. Unocal Corp., 248 F.3d 915 (9th Cir. 2001).........................................16, 17

Dole Food Co. v. Watts, 303 F.3d 1104 (9th Cir. 2002).................................3, 9, 18

Duha v. Agrium, Inc., 448 F.3d 867 (6th Cir. 2006)..........................................9, 11

Edmond v. U.S. Postal Serv. Gen. Counsel, 949 F.2d 415
(D.C. Cir. 1992)..........................................................................................29

Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-E
542 F.2d 1053 (9th Cir. 1976)...................................................................32

Gates Learjet Corp. v. Jensen, 743 F.2d 1325 (9th Cir. 1984),
cert. denied 471 U.S. 1066 (1985)..............................................................6

Glencore Grain Rotterdam B.V. v. Shivnah Rai Harnarain Co.,
284 F.3d 1114 (9th Cir. 2002)...................................................................21

Greenpeace, Inc. (U.S.A.) v. State of France, 946 F. Supp. 773
(C.D. Cal. 1996).........................................................................................29

Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S. Ct. 839, 91 L. Ed. 1055
(1947)...................................................................................................passim

Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.,
328 F.3d 1114 (9th Cir. 2003)..............................................................17, 27

Holland America Line Inc. v. Wartsila North America, Inc., 485 F.3d 450
(9th Cir. 2007)............................................................................................22

iv

Johnson v. Riverside Healthcare System, LP, 534 F.3d 1116
(9th Cir. 2008)..................................................................................30

Jones v. AIG Risk Management, Inc., 726 F. Supp. 2d 1049
(N.D. Cal. 2010)...............................................................................30

Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006 (2d Cir. 1986)..............29

Kirno Hill Corp. v. Holt, 618 F.2d 982 (2d Cir. 1980)........................31

Koehler v. Bank of Bermuda, 101 F.3d 863 (2d Cir. 1996)..................24

Lacey v. Cessna Aircraft Co., 932. F.2d 170 (3rd Cir. 1991)..................6

Laub v. U.S. Dep't of Interior, 342 F.3d 1080 (9th Cir. 2003)............29

Lehman v. Humphrey Cayman, Ltd., 713 F. Supp 339 (8th Cir. 1983)..........11

Local Billing, LLC v. Webbilling, Civ. No. 08-3083,
2008 WL 5210667 (C.D. Cal. Dec. 10, 2008)...........................................4

Lockman Found. v. Evangelical Alliance Mission, 930 F.2d 764
(9th Cir. 1991)...................................................................................3

London Film Productions Ltd. v. Intercontinental Comm., Inc.
580 F. Supp. 47, 49 (S.D.N.Y. 1984)................................................12

Lueck v. Sundstrand Corp., 236 F.3d 1137 (9th Cir. 2001).............4, 7, 10

Mavrix Photo, Inc. v. Brand Technologies, Inc., 647 F.3d 1218
(9th Cir. 2011)...................................................................................19

Metropolitan Life Ins. Co. v. Neaves, 912 F.2d 1062 (9th Cir. 1990)........19

Migliori v. Boeing North Am., Inc., 114 F. Supp. 2d 976 (C.D. Cal. 2000)..........54

Miskow v. Boeing Co., 664 F.2d 205 (9th Cir. 1981)..............................7

Mitan v. Feeney, 497 F. Supp. 2d 1113 (C.D. Cal. 2007)..................25, 29

Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 130 S. Ct. 2869
177 L. Ed. 2d 535 (2010).............................................................passim

Murray v. British Broadcasting Corp., 81 F.3d 287 (2d Cir. 1996)........11

Mujica v. Occidental Petroleum Corp., 381 F. Supp. 2d 1134
(C.D. Cal. 2005)..................................................................................7

New v. Armour Pharm. Co., 67 F.3d 716 (9th Cir. 1995)......................52

Norex Petroleum, Ltd. v. Access Indus., 416 F.3d 146 (2d Cir. 2005).........6, 7

Panavision Int'l v. Toeppen, 141 F.3d 1316 (9th Cir. 1998).................27

Patin v. Thoroughbred Power Boats, 294 F.3d 640 (5th Cir. 2002).......24

Points & Authorities In Opposition

Pebble Beach Co. v. Caddy, 453 F.3d 1151 (9th Cir. 2006)........................17, 21, 22

Pena v. Valo, 563 F. Supp. 742 (C.D. Cal. 1983)............................................29

Perloff v. Stern, Civ. No. 10-1758, 2011 WL 666167
(E.D. Pa. Feb. 23, 2011)..................................................................................37

Piper Aircraft Co. v. Hartzell Propeller, Inc., 454 U.S. 235, 102 S. Ct. 252,
70 L. Ed. 2d 419 (1981)..............................................................................passim

Raffaele v. Compagnie Generale Martitime, 707 F.2d 395 (9th Cir. 1983)............16

Raphael v. State Farm Fire and Cas. Co., 1990 WL 58238 (9th Cir. 1990).....51-52

Ravelo Monegro v. Rosa, 211 F.3d 509 (9th Cir. 2000)...................................2-3, 9

Reid-Walen v. Hansen, 933 F.2d 1390 (8th Cir. 1991).............................................9

Rio Prop., Inc. v. Rio Intern. Interlink, 284 F.3d 1007
(9th Cir. 2002)..................................................................................................17

San Luis Unit Food Producers v. United States, 772 F. Supp. 2d 1210
(E.D. Cal. 2011)................................................................................................54

Seymour v. Hull & Moreland Eng'g, 605 F.2d 1105 (9th Cir. 1979).....................32

Sher v. Johnson, 911 F.2d 1357 (9th Cir. 1990).......................................................22

Sinatra v. Nat'l Enquirer, Inc., 854 F.2d 1191 (9th Cir. 1988)........................25, 26

Starr v. Baca, 652 F.3d 1202 (9th Cir. 2011)..........................................................54

Suzlon Energy, Ltd. v. Microsoft Corp., 671 F.3d 726 (9th Cir. 2011)......36, 38, 42

Terracom v. Valley Nat. Bank, 49 F.3d 555 (9th Cir. 1995)...................................24

In Re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 157
(2d Cir. 2008)....................................................................................................43

Transfield ER Cape Ltd, v. Indus. Carriers Inc., 571 F.3d 221
(2d Cir. 2009)....................................................................................................24

TRW Inc. v. Andrews, 534 U.S. 19, 122 S. Ct. 441, 151 L. Ed. 2d 339
(2001)................................................................................................................40

Tuazon v. R.J. Reynolds Tobacco Co., 433 F.3d 1163 (9th Cir. 2006)....................8

Twentieth Century Fox Int'l Corp. v. Scriba, 385 F. Appx. 651
(9th Cir. 2010)..................................................................................................29

UA Local 343 United Ass'n of Journeymen & Apprentices of
Plumbing and Pipefitting Industry of U.S. and Canada,
AFL-CIO v. Nor-Cal Plumbing, Inc., 48 F.3d 1465 (9th Cir. 1994).....................31

United States v. Bestfoods, 524 U.S. 51 (1998).......................................................30

Points & Authorities In Opposition

United States v. Bonds, 608 F.3d 495 (9th Cir. 2010)..............................34

United States v. Bowman, 260 U.S. 94, 43 S. Ct. 39, 67 L. Ed. 149
(1922)..............................................................................................44, 45, 46

United States v. Campbell, 798 F. Supp. 2d 293 (D.D.C. 2011)............................44

United States v. Chao Fan Xu, 706 F.3d 965 (9th Cir. 2013)..................................35

United States v. Clark, 435 F.3d 1100 (9th Cir. 2006)..............................40

United Sterres v. Felix-Gutierrez, 940 F.2d 1200 (9th Cir. 1991)............................44

United States v. Golden Acres, Inc., 702 F. Supp. 1097 (D. Del. 1988)................30

United States v. Healthwin-Midtown Convalescent Hosp. &
Rehab. Ctr., Inc., 511 F. Supp. 416 (C.D. Cal. 1981), aff'd 685 F.2d 448
(9th Cir. 1982)..........................................................................................32

United States v. Ivanov, 175 F. Supp. 2d 367 (D. Conn. 2001)..............................40

United States v. Leija-Sanchez, 602 F.3d 797 (7th Cir. 2010)..............................44

United States v. Nordic Vill. Inc., 503 U.S. 30, 112 S. Ct. 1011,
117 L. Ed. 2d 181 (1992)..........................................................................40

United States v. Phillip Morris USA Inc., 566 F.3d 1095 (D.C. Cir. 2009)............35

United States v. Thomas, 893 F.2d 1066 (9th Cir. 1990)..........................44

United States v. Verdugo-Urquidez, 494 U.S. 259 (1990)..............................43-44

United States v. Vasquez-Velasco, 15 F.3d 833 (9th Cir. 1994)............................44

United States v. Vilar, 729 F.3d 62 (2nd Cir. 2013)..........................................45-46

United States v. Weingarten, 632 F.3d 60 (2nd Cir. 2011)..................40, 42, 43, 44

United States v. Wright, 625 F.3d 583 (9th Cir. 2010)..........................42

United States v. Wyatt Technology Corp. v. Smithson
345 Fed. Appx. 236 (9th Cir. 2009)..........................................................38

Van Cauwenberghe v. Biard, 486 U.S. 517, 108 S. Ct. 1945,
100 L. Ed. 2d 517 (1988)..........................................................................12

Ward v. Westinghouse Canada, Inc., 32 F.3d 1405 (9th Cir. 1994)........................52

Wehlage v. EmpRes Healthcare, 821 F. Supp. 2d 1122 (2011)..............................31

Weisel Partners LLC v. BNP Paribas, Civ. No. 07-6198,
2008 WL 3977887 (N.D. Cal. Aug. 26, 2008)....................................11, 12

Wash. Shoe Co. v. A-Z Sporting Goods Inc., 704 F.3d 668
(9th Cir. 2012)....................................................................................18, 19

Points & Authorities In Opposition

World-Wide Volkswagon Corp. v. Woodson, 444 U.S. 286,
100 S. Ct. 559, 62 L. Ed. 2d 1490 (1980)....................................................13

Wyatt Technology Corp. v. Smithson, 345 Fed. Appx. 236 (9th Cir. 2009)..........38

Zheng v. Yahoo!, Civ. No. 08-1068, 2009 WL 4430297
(N.D. Cal. Dec. 2, 2009)........................................................................38, 43

STATE CASES

April Enterprises, Inc. v. KTTV, 147 Cal. App. 3d 805,
195 Cal. Rptr. 421 (Cal. Ct. App. 1983).......................................................52

Associated Vendors, Inc., v. Oakland Meat Co., 210 Cal. App. 2d 825,
26 Cal. Rptr. 806 (Cal. Ct. App. 1962).........................................................32

Flanagan v. Flanagan, 27 Cal. 4th 766, 117 Cal. Rptr. 2d 574 (Cal. 2002)....49, 50

Marich v. MGM/UA Telecomms., Inc., 113 Cal. App. 4th 415,
7 Cal. Rptr. 3d 60 (Cal. Ct. App. 2004)...................................................49, 50

Montalti v. Catanzariti, 191 Cal. App. 3d 96, 236 Cal. Rptr. 231
(Cal. Ct. App. 1987)................................................................................52

Moore v. Cal. State Bd. of Accountancy, 2 Cal. 4th 999,
9 Cal. Rptr. 2d 358 (1992)........................................................................47

People v. Drennan, 84 Cal. App. 4th 1349, 101 Cal. Rptr. 2d 584
(Cal. Ct. App. 2000)................................................................................50

People v. Suite, 101 Cal. App. 3d 680, 101 Cal. Rptr. 825,
(Cal. Ct. App. 1980)................................................................................46

People v. Wilson, 17 Cal. App. 3d 598, 94 Cal. Rptr. 923
(Cal. Ct. App. 1971)................................................................................48

Ribas v. Clark, 38 Cal. 3d 555, 212 Cal. Rptr. 143 (Cal. 1985)...........................46

Tavernetti v. Superior Court, 22 Cal. 3d 187, 148 Cal. Rptr. 883
(Cal. 1978)......................................................................................46, 47

Wash. Mutual Bank v. Superior Court, 24 Cal. 4th 906, 103 Cal. Rptr. 2d
320  (Cal. 2001)....................................................................................15

FEDERAL STATUTES

18 U.S.C. § 1030..........................................................................40, 41, 45

18 U.S.C. § 2510..............................................................................passim

18 U.S.C. § 2511.................................................................................1, 2

Points & Authorities In Opposition

18 U.S.C. § 2520...........................................................................................1, 2, 51

18 U.S.C. § 2701.................................................................................................passim

18 U.S.C. § 2707.................................................................................................passim

STATE STATUTES

California Civil Code § 1708.8.....................................................................2, 13, 51

California Code of Civil Procedure §410.10.........................................................17

California Penal Code § 631.............................................................46, 47, 48, 51

California Penal Code § 632.............................................................................passim

California Penal Code § 632.7..............................................................46, 50, 51

California Penal Code § 637.........................................................................2, 51

RULES

Federal Rule of Civil Procedure 4(k)(2)...................................................17, 21, 22

Federal Rule of Civil Procedure 12.................................................................46, 54

Federal Rule of Evidence §201...........................................................................22

FEDERAL CONSTITUTIONAL PROVISIONS

The Constitution of the United States, Amendments 1, 4, 5, 9 and 14..................13

STATE CONSTITUTIONAL PROVISIONS

California Constitution, Article 1, § 1................................................1-2, 13, 46, 51

OTHER AUTHORITIES

2009 California Legis. Serv. Chapter 449 (A.B. 524, § 1(b)..................................51

British Film Institute, BFI Statistical Yearbook 2013...........................................20

Consolidated and Amended Class Action Complaint for Violation of Federal
Securities Law, Wilder v. News Corporation, Civ. No. 1:11-cv-04947
(S.D.N.Y. July 31, 2011).........................................................................9, 23, 32, 33

David Henke, et. al., Transcript: Rupert Murdoch Recorded at Meeting with
Sun Staff, Exaro News, July 3, 2013.......................................................................32

House of Lords Select Committee on Communications, The Ownership of the
News, Vol. I: Report, June 27, 2008........................................................................33

Points & Authorities In Opposition

H.R. Rep. No. 99-647 (1986)....................................................................................41

http://www.alexa.com/siteinfo/sunday-times.co.uk (last accessed Dec. 5, 2013)..23

http://www.alexa.com/siteinfo/thesun.co.uk (last accessed Dec. 5, 2013).............23

http://www.alexa.com/siteinfo/timesonline.co.uk (last accessed Dec. 5, 2013).....23

News Corporation, Annual Report 2012...................................................................34

News Corporation, Form 10-K (2013)......................................................................33

Jeremy Peters & Charlie Savage, Precautions at the New York Post as Tabloid
Inquiry Expands, N.Y. Times, July 29, 2011...........................................................9

Restatement (Third) of Foreign Relations Law of the United States § 402,
§ 402 Comment d..............................................................................................26, 45

S. Rep. No. 99-541
(1986).............................................................................................................36, 41, 43

S. Rep. No. 104-357
(1996)....................................................................................................................40

'Target Evaluation List' From Glen Mulcaire's Notes,
The Guardian, Nov. 12, 2013....................................................................................19

Verified Amended Shareholder Derivative Complaint, Shields v. Murdoch,
Civ. No. 1:11-cv-04917 (S.D.N.Y. Aug. 4, 2011)...............................................32, 33

Ryan Walsh, Extraterritorial Confusion: The Complex Relationship Between
Bowman and Morrison and a Revised Approach to Extraterritoriality,
Val. U. L. Rev. 627 (2013).........................................................................................44

Points & Authorities In Opposition

## I.   **INTRODUCTION**

This case presents serious questions about fundamental rights of privacy in the United States ("U.S.") and the consequences to an individual when such rights are violated. Defendants engaged in a scheme to target Eunice Huthart in California in order to access and extract her cell phone voicemails for news leads about her California employment with Angelina Jolie. Ms. Huthart seeks in this court just compensation for the violation of her right of privacy and the resulting injuries she suffered personally and professionally.

The court is asked to decide whether an individual can seek redress in a U.S. court when voicemail messages left and stored in her cellular telephone voicemail system are accessed without permission, listened to and commercially exploited and when this conduct prevents her from accessing her own voicemail messages. As discussed more fully in Section V(A) below, Plaintiff's technology experts clearly demonstrate that the wrongful conduct by Defendants occurred and/or impacted in the U.S., and specifically in California. With discovery, Plaintiff seeks to prove how the interception occurred, who did it, why they did it, and to hold the wrongdoers accountable so that the violations will not be repeated.

Defendants do not deny that the voicemail messages left and stored on Plaintiff's cell phone were unlawfully accessed, intruded into, intercepted, interfered with, nor that Plaintiff was prevented from accessing messages while she lived and worked in Los Angeles, as a professional stunt double for Angelina Jolie while filming *Mr. & Mrs. Smith* during the periods of approximately early January 2004 – mid-June 2004 and mid-March 2005 – May 2005.

The Complaint in this action ("Cplt.") was filed on June 13, 2013 against Defendants, News Corporation ("News Corp."), NI Group Limited f/k/a NI Limited ("NI") and News Group Newspapers Limited ("NGN") (collectively "News Corporation Defendants"), seeking damages in violation of 18 U.S.C. §§ 2701, 2707; 18 U.S.C. §§ 2510, 2511, 2520; Article I Section 1 of the California State

Points & Authorities In Opposition

Constitution; §§ 630-637.9 of the California Penal Code; §1708.8 of the California Civil Code and California Common Law.

The News Corporation Defendants moved to dismiss Ms. Huthart's complaint on September 20, 2013 on the grounds of: (i) *forum non conveniens* ("FNC"); (ii) the court lacks personal jurisdiction as to Defendants NI and NGN; (iii) Plaintiff alleges no wrongdoing on the part of Defendants News Corp and NI; (iv) the corporate veil may not be pierced; (v) the Complaint fails to state a claim upon which relief can be granted; and (vi) all claims are time-barred.

Defendants' motion is meritless because: (a) Defendants failed to meet their burden of demonstrating that England and Wales ("England") is an adequate alternative forum, and that a balancing of private and public interest factors favors dismissal on FNC grounds; (b) Defendants are subject to personal jurisdiction in this Court because (i) Defendants have the requisite contacts with California and the U.S. and (ii) exercising personal jurisdiction is reasonable; (c) Plaintiff has sufficiently pled facts to hold Defendants News Corp and NI liable for the conduct of NGN; (d) Plaintiff has stated valid and plausible claims for relief under federal law, as 18 U.S.C. §§ 2701's, 2707's, 18 U.S.C. §§ 2510's, 2511's and 2520's application to Defendants is not extraterritorial, and even if it were, 18 U.S.C. §§ 2701 and 2707 apply extraterritorially; (e) Plaintiff has sufficiently stated claims for relief under California Law; and (f) Plaintiff timely filed her Complaint on June 13, 2013.

## II.   **ARGUMENT**

### A.   **DEFENDANTS FAILED TO SATISFY THE DEMANDING BURDEN REQUIRED TO ACHIEVE FNC DISMISSAL**

#### 1.   **Defendants Misconstrued the Burden Required for Dismissal on *Forum Non Conveniens* Grounds**

The Ninth Circuit has cautioned that, "forum non conveniens is an exceptional tool to be employed sparingly." *Deirmenjian v. Deutsche Bank A.G.*, 2006 WL 4749756, *12 (C.D. Cal. Sept. 25, 2006) (quoting *Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000)). A FNC movant bears the heavy burden of demonstrating

that there is an adequate alternative forum, and that a balancing of private and public interest factors favors dismissal. *See Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 767 (9th Cir. 1991).

The Supreme Court has held that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947). A plaintiff's choice should only be upset when the defendant demonstrates that it would be unnecessarily burdensome for her to defend herself in the forum. *Piper Aircraft Co. v. Hartzell Propeller, Inc.*, 454 U.S. 235, 252 n.19, 256 n.23 (1981). A plaintiff is not required "to choose the optimal forum for their claim." *Dole Food Co. v. Watts*, 303 F.3d 1104,1118 (9th Cir. 2002) (citing *Ravelo Monegro*, 211 F.3d at 514) (internal quotation marks and citations omitted). *See also Cheng v. Boeing*, 708 F.2d 1406, 1410 (9th Cir. 1983), *cert. denied* 464 U.S. 1017 (1983).

The Ninth Circuit has cautioned against understating the difficulty of meeting the burden imposed on a defendant to prove oppression and vexation. A defendant attempting to deny a plaintiff her choice of forum must "ma[ke] a clear showing of facts which establish such oppression and vexation of a defendant as to be out of proportion to Plaintiff's convenience, which may be shown to be slight or nonexistent." *Boston Telecomm. Group, Inc. v. Wood*, 588 F.3d 1201, 1206 (9th Cir. 2009) (citing *Dole*, 303 F.3d at 1118) (internal quotations omitted).

The mere fact that it would be more convenient for Defendants to litigate in England does not justify dismissal for FNC. *See Carijano v. Occidental Petro. Corp*., 643 F.3d 1216, 1226 (9th Cir. 2011). As detailed below, Defendants failed to meet this demanding burden.

## 2.   An Available and Adequate Alternative Forum Was Not Established

As a threshold matter, Defendants bear the burden of establishing the existence of an available and adequate alternative forum. *Lueck v. Sundstrand Corp*., 236 F.3d

3

1   1137, 1143 (9th Cir. 2001) ("[T]he burden of showing the existence of an adequate
2   alternative forum is the defendant's."). *See also Local Billing, LLC v. Webbilling*,
3   2008 WL 5210667, *11 (C.D. Cal. Dec. 10, 2008) (same). Ordinarily, a forum is
4   considered available and adequate "if the defendant is 'amenable to process' in the
5   alternative forum." *See Gilbert*, 330 U.S. at 506-07; *Piper*, 454 U.S. at 254 n.22.
6   However, a foreign forum may not be an adequate alternative if it offers a "clearly
7   unsatisfactory" remedy for the wrong at issue in the complaint. *Id.* The question of
8   adequacy is not a general inquiry; rather, it is factual in nature and depends on the
9   specifics of the particular case. *Id.* at 249; *Local Billing*, 2008 WL 5210667 at *11.
10          Here, Defendants failed to establish that in this case, England is an available
11  and adequate alternative forum. A non-U.S. court is not an adequate alternative forum
12  for Plaintiff to press her claims under the Stored Communications Act ("SCA"), 18
13  U.S.C. §§ 2701 et. seq., and the Wiretap Act ("WA"), 18 U.S.C. §§ 2510 et. seq.
14  Defendants assert that there are two separate and adequate avenues for Plaintiff to
15  pursue her claims in England: NI's voluntary compensation scheme and the Mobile
16  Telephone Voicemail Interception Litigation ("MTVIL") case management system.
17  Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss
18  ("D. Mem.") at 15. However, both avenues are "clearly unsatisfactory" and therefore
19  neither avenue is an adequate alternative forum.
20          To begin with, the voluntary compensation scheme is closed and therefore is
21  plainly neither an adequate nor an available alternative forum to Plaintiff.  Declaration
22  of Mark Lewis, dated Dec. 5, 2013 ("Lewis Decl."),  ¶ 8.  Even if the scheme were
23  available, it would not be adequate as the remedy offered is clearly unsatisfactory. NI
24  established the voluntary compensation scheme to address claims arising from the
25  widespread illegal interception of voicemails by its agents and employees. Defendants
26  claim "[t]he compensation scheme has been extraordinarily successful at delivering
27  satisfaction to applicants," D. Mem. at 15, because of the 611 inquiries from victims
28  of voicemail interception, 426 applied to join the scheme, which resulted in 359

Points & Authorities In Opposition

invitations to join the scheme and 272 settlements and"[n]ot a single applicant" has "tak[en] his or her case to a hearing." *Id*. Plaintiff contends, however, that no claimaint has proceeded to a hearing, not because applicants are satisfied with the compensation scheme, but because NI controls the scheme and decides whom to accept into it, as discussed in detail in Lewis Decl. ¶¶ 9-13.

Regarding the MTVIL, Defendants assert "that, <u>as to these claims in particular</u>, the UK is by far the superior, most convenient, and most sensible forum," as the MTVIL is designed to secure the efficient resolution of claims, encourage early settlement, and prevent excessive attorney's fees and costs, while safeguarding the interests of [the Metropolitan Police Service ("MPS").] D. Mem. at 9. Defendants also assert that the MTVIL has been "extraordinarily successful" since, to date, none of the 250 MTVIL claimants has pursued his or her case to trial. D. Mem. at 5. However, this is not a sign of success, but a result of the MTVIL's system of "paired" settlement offers, which was devised by NI. Lewis Decl. ¶¶ 16-23. This system is unfair to claimants and effectively prevents claimants from having their day in court and from getting to the bottom of Defendants' wrongdoing towards them. *Id*.

Defendants also assert that "[t]he United Kingdom plainly is an available forum" because "hundreds of plaintiffs . . . have brought essentially identical civil claims in the UK…based upon these same alleged events." D. Mem. at 8. However, these purported "essentially identical claims" are nothing of the sort: Plaintiff's claims are brought here under U.S. federal law and California state constitutional and statutory law and are, by their nature, significantly different from those brought by claimants in the U.K. Similarly, Plaintiff's claims are based on a unique set of events, namely, Defendants' unlawful activities which were directed at California and/or the U.S. and targeted a temporary resident of California.

Finally, Defendants contend that the "U.K. courts" are "available" because 21st Century Fox has stated that it will submit to personal jurisdiction in the "U.K courts." D. Mem. at 8. That contention is not enough to meet Defendants' heavy

burden. In short, even if the "U.K. courts" (which is oxymoronic because there are separate legal systems for England and Wales and for Scotland;  Lewis Decl. ¶¶ 3, 5) are adequate and available, it does not overcome the deference owed to Plaintiff's choice of forum. *See Norex Petrol., Ltd. v. Access Indus*., 416 F.3d 146, 156 (2d Cir. 2005).

### 3.   <u>Private and Public Interest Factors Favor Trial in the United States</u>

Even assuming, without conceding, that Defendants have shown that an adequate alternative forum is available, they must also show that the private and public interest factors overwhelmingly favor trial in the alternative forum. *Piper Aircraft,* 454 U.S. at 254, 255; *Gilbert*, 330 U.S. at 508; *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1334 (9th Cir. 1984). Defendants have plainly failed to make this showing.[1]

The balance of private and public interest factors must be "strongly in favor of the defendant." *Gilbert*, 330 U.S. at 508. *See also, Jensen*, 743 F.2d at 1334 (holding dismissal was inappropriate because public and private interest factors were not strongly in defendants' favor). When the factors are in equipoise, or even lean marginally toward dismissal, the motion to dismiss must be denied. *Lacey v. Cessna Aircraft Co*., 932. F.2d 170, 180 (3rd Cir. 1991).

When balancing the private and public factors, "[t]he district court should look to any or all of the . . . factors which are relevant to the case before it, giving appropriate weight to each." *Lueck*, 236 F.3d at 1145. No single factor is dispositive. *Piper*, 454 U.S. at 249.[2]

### a.   <u>Plaintiff's Forum Selection Is Entitled to Deference</u>

---

[1] It is crucial to note that a U.S. district court cannot transfer a case to a foreign court. If Defendants motion is granted, the only possible procedure is dismissal, which would have dire consequences for Plaintiff, especially since NI's compensation scheme is closed and the deadline for new claims entering the MTVIL will have passed. Lewis Decl.¶¶ 7, 15.

[2] "If central emphasis were placed on any one factor, the [FNC] doctrine would lose much of the very flexibility that makes it so valuable." *Piper*, 454 U.S. at 249.

Points & Authorities In Opposition

1    Even when a plaintiff is a foreign citizen, the defendant still bears the burden

2    of demonstrating that the presumption in favor of that plaintiff's choice should be

3    disturbed. The Ninth Circuit has unequivocally stated that some deference is due to

4    the forum choice of even the "quintessentially foreign plaintiff[]." *Boston Telecomm.*

5    *Grp., Inc. v. Wood*, 588 F.3d 1201, 1207 (9th Cir. 2009).[3]

6    Defendants failed to make a "clear showing," *Miskow v. Boeing Co.*, 664 F.2d

7    205, 208 (9th Cir. 1981), that Plaintiff chose this forum to "vex," "harass," or

8    "oppress" the defendant. *Gilbert*, 330 U.S. at 508. *See also Piper*, 454 U.S. at 256 n.23

9    (defendant must demonstrate that litigation would be "unnecessarily burdensome").

10   Defendants rely heavily on the fact that Plaintiff is a U.K. citizen. However, Plaintiff

11   has significant ties to the forum. Plaintiff is the President, sole owner, and registered

12   agent of Pump Fitness, Inc., a California corporation. And, at the time of the alleged

13   injury, Plaintiff was working and residing in California and was paid through Pump

14   Fitness. Pump Fitness paid, and expects to pay in the future, California and federal

15   corporate taxes in all years relevant here. Declaration of Eunice Huthart, dated Dec.

16   6, 2013 ("Huthart Decl. ¶¶ 3-9").

17          **b.    Private Interest Factors Strongly
                    Favor Trial in the United States**

18   The private interest factors to be weighed in a FNC inquiry include ease of

19   access to sources of proof, the residence of the parties and witnesses, the forum's

20   convenience to the litigants, availability of compulsory process for attendance of

21   unwilling witnesses and the cost of obtaining attendance of willing witnesses, the

22   enforceability of the judgment and any "other practical problems" related to "easy,

25   [3] See also *Mujica v. Occidental Petrol. Corp.*, 381 F. Supp. 2d 1134, 1141 (C.D.
     Cal. 2005) ("'Less deference' is not 'no deference.'" (internal quotations omitted)).

26   When a Plaintiff's choice of forum is dictated by where the parties are subject to
     jurisdiction, such a decision merits substantial deference. *See Norex Petrol.*, 416

27   F.3d at 156; *Mujica*, 381 F. Supp. 2d at 1141. Plaintiff chose this forum in order to
     be assured of proper jurisdiction, given her ongoing ties to the forum and that

28   Defendants' unlawful actions were directed at and caused Plaintiff to be injured in
     this forum.

7

1   expeditious, and inexpensive" trial. *Gilbert*, 330 U.S. at 508.[4] Here, Plaintiff has a

2   strong interest in litigating her case in California and/or the U.S., in that it concerns

3   the unlawful actions of a domestic corporation and its subsidiaries, which targeted

4   Plaintiff while she was residing and working in California.

5      **Residence of Parties And Witnesses**: Although Plaintiff's permanent residence

6   is in the U.K., she conducts ongoing business in the U.S. through a California

7   corporation (Pump Fitness, Inc.) of which she is President, sole owner, and the

8   California registered agent, and Plaintiff regularly travels to California and other

9   locations in the U.S. for her business. Defendants targeted Plaintiff and injured her

10  while she was residing and working for Pump Fitness in California. Some of

11  Plaintiff's potential witnesses who are involved with her and/or Pump Fitness, such

12  as Ms. Jolie, are located in California.  Huthart Decl. ¶¶5-9, 11-15.

13     Defendant News Corp. is a Delaware corporation with headquarters in New

14  York. Although Defendant NI and Defendant NGN are U.K. corporations, according

15  to Defendants NI is a holding company only. Defendants' Declaration of Christopher

16  C.S. Longcroft, dated September 20, 2013 ("Longcroft Decl.").   ¶ 5. While

17  erroneously asserting that all relevant witnesses reside in the U.K[5], Defendants have

18  produced no evidence showing that access to witnesses will be unreasonably

19  burdensome or costly, or that unwilling witnesses could not be compelled to appear

---

21   [4]  The Supreme Court reaffirmed this list of relevant factors in *Piper*, 454 U.S.

22  241. The Ninth Circuit has adhered to the factors articulated by the Supreme Court
    in *Gilbert* and its progeny. *See e.g.*, *Cheng*, 708 F.2d at 1409-10 ; *Jensen*, 743 F.2d

23  at 1334; *Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1451
    (9th Cir. 1990); *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1180 (9th

24  Cir. 2006).

25   [5]  Defendants' claim is exaggerated.  James Murdoch, Rupert Murdoch and Les
    Hinton are U.S. citizens.  James and Rupert reside in the U.S.  As CEO of Dow

26  Jones & Co., Les Hinton resided in the U.S., and testified to Parliament via
    videoconference from News Corp.'s headquarters.  *See*, Consolidated and

27  Amended Class Action Complaint for Violation of Federal Securities Laws, *Wilder
    v. News Corp.*, Civ. No. 1:11-CV-04947(S.D.N.Y. July 31, 2012) ("Wilder Cplt.")

28  ¶¶ 26, 27, 115, to which the Court is respectfully referred.  *See*, Bruce A. Langer
    Declaration, dated December 9, 2013 ("Langer Decl.") ¶6, Ex. 3.

Points & Authorities In Opposition

in this forum.

**Convenience to Litigants**: Defendants have not asserted that it would be inconvenient to litigate in the U.S. Rather, they argue that litigation in the U.K. would be more convenient. However, a plaintiff is not required to choose the most convenient forum. *Ravelo Monegro*, 211 F.3d at 514.

**Access to Physical Evidence And Other Sources Of Proof**: With regard to ease of access, it is incumbent upon this Court to specifically weigh the locations of documents and the impact of foreign languages when evaluating the ease-of-access factor. *See Duha v. Agrium, Inc.,* 448 F.3d 867, 875 (6th Cir. 2006). That relevant evidence may be located in the U.K.,[6] does not, as Defendants argue, shift the balance of private interest factors in their favor. *Id.* at 867 ( "[T]he mere shipment [of documents] to the U.S. forum . . . can hardly be vexatious or oppressive.").[7] It is not sufficient for Defendants to argue that it would be "far easier" to obtain evidence in the U.K. D.Mem. at 13. Rather, Defendants must demonstrate that producing evidence in this forum would be so oppressive and vexatious as to be out of proportion to Plaintiff's convenience. *Dole*, 303 F.3d at 1118. They have not done so.

Moreover, the Ninth Circuit has deemphasized the inconvenience imposed by transporting witnesses and documents overseas, stressing that advances in travel and communication have rendered the "location of evidence and witnesses" increasingly less salient. *Jensen*, 743 F.2d at 1336. Surely, advances in modern technology since Jensen—including the proliferation and greater affordability of OCR scanning technology to convert paper documents to searchable electronic documents, e-mail, cloud computing, and long-distance video conferencing—have further diminished the

---

[6] Evidence may also exist in the U.S. *See Precautions at New York Post as Tabloid Inquiry* Expands, N.Y. TIMES, July 29, 2011, Langer Decl. ¶5, Ex. 2.

[7] *See also Reid-Walen v. Hansen*, 933 F.2d 1390, 1396-97 (8th Cir. 1991) (holding that the assertion, without more, that most of the witnesses and evidence were located in the foreign forum was insufficient to tip this factor in defendant's favor).

Points & Authorities In Opposition

importance of this factor. Whatever the burden to Defendants, it is hardly unduly burdensome, oppressive, or vexatious. *See Bd. of Trustees v. Elite Erectors, Inc.*, 212 F.3d 1031, 1037 (7th Cir. 2000) ("Easy air transportation, the rapid transmission of documents, and the abundance of law firms with nationwide practices make it easy these days for cases to be litigated with little extra burden in any major metropolitan areas.").

In addition, related investigations and proceedings are currently pending in both England and Scotland. Lewis Decl. ¶ 5. The burden of litigating in Scotland, also a separate and independent jurisdiction, is not substantially less than litigating in the U.S.: documents must be produced and transported, including material from the MPS, which is being, or has been, exported to Scotland. Despite Defendants' implications to the contrary, there is no reason why a federal court would be denied access to these sorts of materials.

Defendants rely on *Lueck*, 236 F.3d at 1137, to support their assertion that the location of "extensive documents" and a "vast quantity of information" in the U.K., alone, constitutes a sufficient basis for dismissal. D. Mem. at 13. However, in *Lueck,* litigating in Arizona, the plaintiffs' chosen forum, would have necessitated the shipping and storage of airplane wreckage from New Zealand to Arizona. The small burden of transporting documentation, most of which is available electronically, can hardly compare to transporting massive pieces of airplane wreckage. [8]

**Compulsion of Unwilling Witnesses**: In a motion to dismiss for FNC, the moving party must show that unwilling witnesses exist. *Duha*, 448 F.3d at 877. The availability of compulsory process is a proper consideration when witnesses are unwilling to appear. If, however, the moving party does not allege that a witness is unwilling to testify, "a district court should not attach much weight to the compulsory

---

[8] Moreover, unlike the plaintiffs in *Lueck* who lacked any ties to the U.S., here, not only was Plaintiff harmed by Defendants' actions while residing in the U.S., she also continues to derive income from her domestic corporation when working in the U.S. Huthart Decl. ¶¶ 5-7.

Points & Authorities In Opposition

process factor." *Id.* In showing the existence of unwilling witnesses, the district court must be given enough information to conclude that some witnesses should be categorized as unwilling rather than willing. *Id.* Here, Defendants have not alleged or provided evidence that a witness is unwilling to appear before this Court. And, even if they had, granting dismissal would only create the reciprocal problem: U.S.-based witnesses might be unwilling to appear before a court in England.

**Cost of Obtaining Willing Witnesses**: The financial hardship imposed on a defendant by virtue of Plaintiff's forum choice is but one factor to be considered when balancing the interests. *Murray v. British Broad. Corp.*, 81 F.3d 287, 292 (2d Cir. 1996); *see also*, *Weisel Partners LLC v. BNP Paribas*, No. C 07-6198 MHP, 2008 WL 3977887 *10-11 (N.D. Cal. Aug. 26, 2008) A district court should determine which witnesses "are critical or even relevant, to the plaintiff's cause of action," and should focus on witnesses' accessibility and convenience to the forum, and not merely on their location. *Duha*, 448 F.3d at 878. *See also, Lehman v. Humphrey Cayman*, Ltd., 713 F. Supp 339, 343 (8th Cir. 1983) ("Geographical location of the witnesses should not be dispositive.").

### c. The Public Interest Factors Strongly Favor Trial in the United States

The public interest factors to be considered include administrative difficulties, local interest in having localized controversies decided at home, the imposition of jury duty on a community with no relation to the litigation, the benefit of resolving cases in a forum familiar with the governing law, and the avoidance of unnecessary problems in conflicts of law, or in application of foreign law. *Gilbert* 330 U.S. at 508-09; *Piper*, 454 U.S. at 341 n.6. Here, the public interest factors weigh strongly in favor of Plaintiff.

**The Local Interest in Having This Controversy Decided at Home**: In weighing the public interests at stake, "[a] court must consider the locus of the alleged culpable conduct, often a disputed issue, and the connection of that conduct to the

Points & Authorities In Opposition

plaintiff's chosen forum." *Van Cauwenberghe v. Biard*, 486 U.S. 517, 528 (1988). Plaintiff does not dispute that England has an interest in resolving disputes involving its citizens, but if this factor were given controlling weight, it would prevent all suits in U.S. courts against foreigners, even when their illegal conduct causes harm felt within the U.S. Moreover, as detailed below, both California and the U.S. each have strong interests in Plaintiff's claims, despite Defendants' assertion that "local interest in this lawsuit in [California and/or the U.S.] 'is comparatively low,' such that its citizens should not be forced to bear the burden of this dispute." D. Mem. 16-17. Weighing the public interest factors, it is clear that England's interest is greatly outweighed by the importance to California and/or the U.S. of redressing and preventing similar violations of federal and state law violations.

First, the U.S. has an interest in deterring its domestic corporations, such as News Corp., and foreign corporations, such as NI and NGN, from engaging in activities that violate federal and California law.[9] It is also undeniable that California, as well as the U.S., has a strong interest in protecting its residents from unlawful conduct, whether perpetrated by foreign or domestic entities, and in providing a forum for injured residents.[10]

Plaintiff was residing and working in California when Defendants illegally intercepted and/or accessed her communications and prevented her from accessing her voice messages. California has a clear interest in protecting the privacy of its residents and those, such as Plaintiff, who conduct ongoing business in California through a California company. California, where Plaintiff maintains numerous professional and personal relationships, is the geographical center of the film industry and Plaintiff

---

[9] *See London Film Productions Ltd. v. Intercontinental Comm., Inc.*, 580 F. Supp. 47, 49 (S.D.N.Y. 1984) (recognizing an important interest in ensuring that foreign citizen's comply with U.S. laws).

[10] *See*, *e.g.*, *Weisel Partners*, 2008 WL 3977887 at *11 (noting that "[t]here is a strong local interest in the lawsuit since one of the plaintiffs is a California corporation allegedly injured while in the course of conducting business within the state" and denying the motion to dismiss for FNC).

Points & Authorities In Opposition

regularly travels there. Huthart Decl. ¶¶ 3-9 For these reasons, California has no less interest in protecting Plaintiff's privacy than it would if Plaintiff were a full-time resident of California. This is true for the U.S. as well. Indeed, Plaintiff is required to travel to film sets in Los Angeles and elsewhere in the U.S. and the U.S. has an interest in protecting the privacy of those conducting business within its borders.

Second, both California and the U.S. as a whole "partake[] of 'the shared interest of the States in furthering fundamental substantive social policies.'" *Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 927 (9th Cir. 1990), cert. granted 133 S. Ct. 1995 (2013) (quoting *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). In this case, the shared policy is the protection of an individual's right to privacy. This national policy is reflected most fundamentally in the privacy protections provided by the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the U.S. Constitution. It is also reflected in the two federal laws at issue here: the SCA and the WA. Furthermore, California has made a policy decision to provide strong privacy protections within its borders. Unlike other states, California's constitution explicitly protects an individual's right to privacy. *See* California State Constitution, Art. 1, § 1. Another example of California's strong privacy protection policy is its protection against constructive trespass. *See* Cal. Civ. Code § 1708.8. Both California and the U.S. have an interest in ensuring that attacks on privacy perpetrated against persons within their respective borders do not go unpunished merely because the perpetrator committed the attack from outside their borders.

Third, the television and film industries are an important part of the economies of the U.S. and, especially, California. Los Angeles and New York, in particular, serve as the part-time, if not full-time, residences of numerous celebrities and other public persons who are targeted by *The Sun* and were targeted by *The News of the World,* and other media owned by News Corp.  The U.S. and California have an economic interest in assuring these types of individuals that their privacy is adequately protected.

Finally, the U.S. has a national security interest in punishing those whose illegal

13

conduct abroad threatens the integrity and security of its data and telecommunications, which are vital to the national defense and the national economy.

**Potential Administrative Burdens**: This is not a case where, "given [a] common factual predicate that links [] many lawsuits . . . , efficiency and economy militate in favor of consolidating all claims into one trial," D. Mem. at 17, nor would litigation of Plaintiff's claims "be duplicative of, and far less efficient than, [litigation] already undertaken in the UK through the MTVIL." D. Mem. at 16. First, as discussed *supra* at 6, this case involves unique facts, not "a common factual predicate." Second, this case cannot be consolidated because, unlike the other claims pending in Scotland, and/or England and Wales, this case involves unique claims under U.S. federal law and California statutory and constitutional law.

Defendants claim that allowing litigation to proceed in the U.S. would be far less efficient is without merit. While the Central District maintains a busy docket, the FNC doctrine was not intended to be used as a tool for alleviating court congestion. *Jensen,* 743 F.2d at 1337. Court congestion only becomes relevant upon a showing that litigating in the chosen forum would be exceptionally slow, whereas litigation in an alternate forum would proceed with exceptional haste. *Id*. Defendants have made no such showing.[11]

Notwithstanding Defendants' contentions to the contrary, D. Mem. at 17, as discussed above, California and the U.S. each have significant interests at stake in this case. Further, this case does not present any exceptional administrative burdens. There are no documents or testimony which would require translation, or any large pieces of physical evidence to be stored while waiting for trial. Therefore, this factor does not support dismissal. While Defendants claim that a trial would require substantial expenditures of judicial resources and taxpayer dollars, they fail to recognize that

---

[11] And, even if they had, court congestion is simply not enough to overcome the heavy burden necessary for dismissal. Moreover, assuming, *arguendo*, that litigation in the U.S. is "far less efficient," this is not a sufficient basis for dismissal, given the high standard required in a motion to dismiss for FNC.

Points & Authorities In Opposition

1    Plaintiff pays state and federal taxes from wages earned through her California
2    corporation.

3         **Burden on Jurors**: The U.S. Supreme Court has explained that "[j]ury duty is
4    a burden that ought not be imposed upon the people of a community which has no
5    relation to the litigation." *Gilbert* 330 U.S. at 508-509. This is not such a case: the
6    issues at stake in this case are of substantial interest to and are directly pertinent to
7    both the national and California communities. In fact, Defendants acknowledge that
8    the phone hacking scandal and related events made headlines throughout the world.
9    D. Mem. at 2. Defendants' relevant conduct was directed at and caused harm in the
10   U.S. and, most specifically, in the Central District, which encompasses the Hollywood
11   area, and which has a direct interest in protecting its residents and corporations.

12        **Governing Law and Conflict of Laws**: The first step in any California choice-
13   of-law analysis is to determine whether the laws of jurisdictions are materially
14   different. *Wash. Mutual Bank v. Superior Court*, 24 Cal. 4th 906, 919 (2001). Where
15   there is no facial conflict shown, the analysis ends. *Id*. In this case, Defendants failed
16   to show a facial conflict or material difference between English and U.S. law. In the
17   instant matter, none of the claims involve issues of English law. Therefore, the
18   presumption is that U.S. federal and California state law applies.

19        This Court is well-acquainted with the applicable federal and state law and is
20   therefore perfectly situated to hear these claims, certainly more so than an English
21   Court. Plaintiff's claims arise under both complex federal law and California law. To
22   this point, the Supreme Court has proclaimed "the appropriateness" of litigating in a
23   forum that is "at home" with the governing law. *Am. Dredging Co. v. Miller,* 510 U.S.
24   443, 448 (1994). The Ninth Circuit echoed this sentiment when it held "the court most
25   competent to interpret the applicable law should normally try the case." *Raffaele v.*
26   *Compagnie Generale Maritime*, 707 F.2d 395, 399 (9th Cir. 1983).

27        While English courts are familiar with the applicable law governing claims
28   pending there, they are not familiar with complex federal law, such as the SCA or the

Points & Authorities In Opposition

WA, or with California statutory and constitutional law. In the digital age, where technologically advanced companies pose an increasing threat to privacy, federal courts have the opportunity to establish a body of law through the SCA and the WA that guards against invasions of privacy. Shifting such cases to foreign courts would not only risk jeopardizing the uniformity, reliability, and strength of U.S. federal privacy law, but would also invite foreign persons to engage in the sort of phone hacking at issue here.

### B.   DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION IN THIS COURT

"'When a district court acts on a . . . motion to dismiss [for lack of personal jurisdiction] without holding an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion.'" *Bauman*, 644 F.3d at 919 (9th Cir. 2011) (quoting *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001) (*per curiam*)). "In determining whether [the plaintiff] has met this burden, uncontroverted allegations in [the] complaint must be taken as true, and conflicts between facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor." *Rio Prop., Inc. v. Rio Intern. Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002) (citing *AT&T v. Compagnie Bruxelles Lambert*, 94 F.586, 588 (9th Cir. 1996)). Plaintiff has met this standard.

### 1.   This Court May Exercise Jurisdiction Over Defendants When Doing So Would Not Violate Due Process Under the Federal Constitution

Personal jurisdiction is proper over a defendant under both California's long-arm statute, Cal. Code Civ. Proc. § 410.10 (West 2013), and the federal long-arm statute, Rule 4(k)(2), so long as exercising that jurisdiction complies with due process. *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006).[12] Due process is satisfied when a nonresident defendant has "minimum contacts" with the forum state

---

[12]   See *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1114, 1129 (9th Cir. 2003) regarding the California long-arm statute and *Unocal*, 248 F.3d at 922 regarding Rule 4(k)(2)), cited by *Pebble Beach*, 453 F.3d at 1155.

Points & Authorities In Opposition

and exercising jurisdiction over the defendant is reasonable. *Id.*

### 2. Defendants Are Subject to Personal Jurisdiction Specifically in California, or Alternatively, Generally in the United States

#### a. Specific Jurisdiction in California: Minimum Contacts

The Ninth Circuit applies a three-prong test to determine if the defendant has the requisite "minimum contacts" with the forum to be subjected to specific personal jurisdiction, as set forth by D.Mem. at 20. The first prong requires a plaintiff to establish that the defendant purposefully directed its activities toward California or the United States as a whole." *Pebble Beach,* 453 F.3d at 1155. The Ninth Circuit applies the "*Calder* effects test" to evaluate purposeful direction. *Calder v. Jones*, 465 U.S. 783 (1984). This test requires the defendant to have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Brayton Purcell LLP v. Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010) (citation omitted).

#### i. *Intentional Act*

Plaintiff clearly alleged that Defendants have committed intentional acts: Defendants purposefully accessed without authorization, illegally intercepted, listened to, and/or deleted Plaintiff's messages, and/or changed the PIN code to Plaintiff's voicemail and prevented Plaintiff from accessing her voicemail messages. Cplt. ¶¶ 8-10, 11-12, 15-21, 27, 29, 32-37, 41-44, 52-55, 57-61. Plaintiff also alleged that Defendants published information gained through such illegal acts for the purpose of commercial gain and increased revenues. Cplt. ¶¶ 12, 16-20, 41, 52, 58, 62, 64-65, 41. These alleged acts are plainly "external manifestation[s] of the actor's intent to perform an actual physical act in the real world, not including any of its actual or intended results." *Wash. Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 674 (9th Cir. 2012).

#### ii. *Express Aiming and Activities Directed into the Forum*

Express aiming does not require that a defendant's intentional act occur in the

17

forum when the known effects of the act do occur in the forum. *Wash. Shoe Co.*, 704 F.3d at 675.[13] "[T]he 'express aiming requirement' is satisfied, and specific jurisdiction exists, when the defendant is alleged to have engaged in wrongful conduct targeted at plaintiff whom the defendant knows to be a resident of the forum state." *Id*. at 675 (quoting *Dole*, 303 F.3d at 1111).[14]

Moreover, the Ninth Circuit has found specific jurisdiction even when neither the defendant nor the plaintiff is a resident of the forum state: "where a defendant knows . . . that an intentional act will impact another state, the 'expressly aimed' requirement is satisfied."[15] *Id*. at 677. The Ninth Circuit has found both direct and constructive knowledge relevant to deciding what a corporate defendant knew. *Id*. (discussing *Mavrix Photo*, 647 F.3d at 1230) Even if this Court were to find that all intentional acts occurred in the U.K., the Court can still find that Defendants are subject to its personal jurisdiction. *See Brainerd v. Governors of the Univ. of Alberta*, 873 F.2d 1257, 1259 (9th Cir. 1989) (defendant in Canada knew effects would be felt in Arizona where plaintiff "<u>planned </u>to live and work" (emphasis added)). [16]

Here, Defendants' conduct constituted intentional torts, i.e., *inter alia*, illegally intercepting and/or accessing Plaintiff's voicemail without authorization, and

---

[13]   The court stated, "[T]he respective directions of the intentional act and the known impact need not coincide for 'express aiming' to be satisfied. . . . [T]he intentional act constituting the violation may occur solely within one state while the known impact of that [act] is directed at another state."

[14]   See also, *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) ("'Express aiming' encompasses wrongful conduct individually targeting a known forum resident.").

[15]   For example, in *Mavrix Photo, Inc. v. Brand Tech., Inc.*, 647 F.3d 1218 (9th Cir. 2011), the Ninth Circuit held that "personal jurisdiction was warranted where . . . [an Ohio corporation] had engaged in the intentional act of posting the copyrighted photos on its website outside of California with the knowledge that the impact . . . would be felt by the [Plaintiff, a Florida corporation,] in California." *Wash. Shoe*, 223 F.3d at 767-77 (discussing *Mavrix Photo*, 647 F.3d at 1221-1222, 1230).

[16]   See also, *Metropolitan Life Ins. Co. v. Neaves*, 912 F.2d 1062, 1065 (9th Cir. 1990) ("[T]he relevant consideration under *Calder* [is] the effect of the conduct in the forum state.").

Points & Authorities In Opposition

preventing Plaintiff's access to her voicemail messages, thereby violating her right to privacy with respect to her communications. Cplt.,¶¶ 69-126. Defendants' wrongful conduct specifically targeted Plaintiff, whom Defendants knew—directly or constructively—was working and residing in California at the time.[17]  Plaintiff was a subject of an express target list prepared by Mulcaire.  *See* Langer Decl. ¶5, Ex. 8.

Further, Defendants knew that deleting messages from, changing the PIN code to, and otherwise interfering with Plaintiff's voicemail would prevent her from receiving information regarding her business and personal affairs in California. Plaintiff regularly derives income from the U.S. film industry, which is centered in California.[18] By interfering with, and preventing Plaintiff from receiving professional communications, Defendants adversely affected Plaintiff's professional reputation as Jolie's stunt double and more generally, which harmed Plaintiff in California. Cplt. ¶¶ 49, 60, 62-65; Huhart Decl. ¶14. The mental and emotional harms experienced by Plaintiff as a result of Defendants' preventing her access to her voicemail were felt where she was residing at the time, which Defendants knew was in California. Cplt. at ¶¶ 45-47, 49, 50-51, 56, 60, 62-65; Huhart Decl. ¶¶ 8-9 .

Plaintiff's professional and personal reputations and relationships were also affected by the publication of the information wrongfully gained from Plaintiff's voicemail. Cplt. ¶¶ 46, 62-65; Huhart Decl. ¶ 14;. Defendants' publication of information provided in confidence to Plaintiff implicated her as a possible source, thereby undermining her professional and personal reputations and relationships in the U.S. movie industry, which is centered in California. Cplt. at ¶¶ 60, 62-65; Huhart

---

[17]  Defendants knew, and do not deny, that Plaintiff was employed as a stunt double for Jolie by 20th Century Fox, the producer of *Mr. and Mrs. Smith*, which was a wholly owned subsidiary of NC at the time. They knew that *Mr. and Mrs. Smith* was being filmed in California and therefore that Jolie and Plaintiff were required to be in California at the time.

[18]  According to the British Film Institute's Statistical Yearbook 2013, at 218 the UK film industry generated GBP7.7 billion in 2011 (the most recent year for which data was available) or roughly $12.3 billion, whereas the US film industry generated nearly $500 billion in 2012 (http://www.statista.com/topics/964/film/#chapter1).  *See* Langer Decl. ¶¶ 9, 11, Ex. 5.

Decl. ¶ 14.

Defendants argue that "the majority of harm Plaintiff alleges occurred in the U.K.," Def. at 23, referring to the effects of their conduct on Plaintiff's daughter and husband. However, the impact in the U.K. of Defendants' conduct has no bearing on whether there were effects in the U.S. or California. The effects felt by Plaintiff, e.g. emotional strain and reputational harm, were felt while she was in California. Cplt. at ¶¶ 62-65. Thus, the *Calder* effects test has been met, and Plaintiff has shown purposeful direction, as required under the first prong of the test for specific personal jurisdiction.

**b.  Specific Jurisdiction in California: Plaintiff's Claims Arise from Defendants' Forum-Related Conduct**

The second prong of the Ninth Circuit's test for specific personal jurisdiction requires that Plaintiff's claims arise from Defendants' forum-related conduct. D.Mem. at 20. According to Defendants, Plaintiff alleged that the conduct underlying her claims would have occurred regardless of her being in California. D.Mem. at 21-23. Nowhere in the Complaint does Plaintiff make such an assertion.[19] Defendants' interest in Plaintiff's voicemail derived entirely from her personal and professional relationships to celebrities, such as Jolie and Brad Pitt, which are a product of her Hollywood-based career. Moreover, several of the communications Defendants intercepted, accessed and/or prevented Plaintiff from accessing occurred only because Plaintiff was living and working in California at the time. Moreover, Plaintiff's claims arise solely from  Defendants' conduct that was directed at her while she was in California and/or that affected her in California. Accordingly, the second prong is satisfied. So, too, is the third prong's reasonability requirement, which is discussed *infra* at 24-28**.**

---

[19]  Defendants imply this follows from certain facts put forth by Plaintiff, such as the duration and scope of the phone hacking scheme as a whole. Plaintiff provided this information to place Defendants' actions in context and it has no relevance to whether Plaintiff's claims were caused by Defendants' forum-related conduct.

Points & Authorities In Opposition

### c.   General Jurisdiction in the United States

Rule 4(k)(2) enables a court to look to aggregate contacts with the U.S. as whole when evaluating personal jurisdiction. *See Pebble Beach*, 453 F.3d at 1158 (citing *Glencore Grain Rotterdam B.V. v. Shivnah Rai Harnarain Co.*, 284 F.3d 1114, 1126 (9th Cir. 2002)). Personal jurisdiction exists under Rule 4(k)(2) when (1) a plaintiff's claim arises under federal law; (2) the defendant is not subject to the personal jurisdiction of a state court of general jurisdiction; and (3) exercise of personal jurisdiction would not violate due process. *Pebble Beach*, 453 F.3d at 1159. The first requirement is met because Plaintiff's claims arise under the federal SCA and the federal WA.

With respect to the second requirement, the Ninth Circuit has held that "absent any statement from [defendant] that it is subject to the courts of general jurisdiction in another state, the second requirement of Rule 4(k)(2) is met." *Holland America Line Inc. v. Wartsila North America, Inc.*, 485 F.3d450, 462 (9th Cir. 2007).[20]

As for the third requirement, "[t]he due process analysis is identical to the one . . . when the forum was California, except [that] the relevant forum is the entire United States." *Pebble Beach*, 453 F.3d at 1159.

### i.   *Requisite Contacts*

General personal jurisdiction exists when the foreign defendant's "activities in the forum are 'substantial or continuous and systematic, even if the cause of action is unrelated to those activities.'" *Bauman*, 644 F.3d at 920 (quoting *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)) (internal citation omitted).

*The Sun* and *The News of the World* are, or were, tabloid newspapers that contain, in significant part, gossip about celebrities. Many of the celebrities are

---

[20]   In *Holland America*, 485 F.3d at 46, the Ninth Circuit endorsed the rule that [a] defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed. . . . If, however, the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2). Elsewhere, NGN has argued it is not subject to personal jurisdiction in Florida, see *Nat'l Enquirer,* 670 F.Supp. 962 (1987).

Points & Authorities In Opposition

television and film personalities who are citizens or full- or part-time residents of the U.S., or who reside in the U.S. for an extended period of time while employed by U.S.-based corporations in the television and film industries.

NI also owns *The Sunday Times* and *The Times*. Longcroft Decl. ¶4. All four of these publications maintain (or had, in the case of *The News of the World*) websites that are accessible in the U.S.[21] According to Alexa.com, the U.S. is the second largest market for each of its three publication: U.S.-based visitors constitute 10.7% of *The Sun*'s, 21.7% of *The Sunday Times*'s, and 16.1% of *The Times's* website traffic.[22] NGN alleges that it does not sell any print subscriptions in California, but we know that at one point in the past it did sell print subscriptions in the U.S. *See Nat'l Enquirer*, 670 F.Supp. at 966. These numbers are significant because electronic (subscriptions and non-subscription hits to a website) and print circulation numbers are important drivers of advertising sales. Plaintiff is entitled to discovery to determine the total U.S. circulation, in print and electronically, of *The Sun* and of *The News of the World* prior to its demise.[23] Defendants state NGN does not solicit advertising in California, Longcroft Decl. ¶7, but upon information and belief, NGN commonly solicits advertisers from U.S. corporations, including Ford Motor Company, Proctor & Gamble, Coca-Cola Company, California Tourism, and Cisco Systems, Inc.[24]

---

[21] The Court may take judicial notice that electronic subscriptions are now also available to U.S.-based customers. (F.R.E. 201(b)) Longcroft Decl.¶7.

[22] *See* http://www.alexa.com/site info/the sun.ca.uk, http//www.alexa.com/site info/sunday-times-co.uk, http://www.alexa.com/site info/tiemsonline.co.uk (last visited Dec. 5, 2013). *See* Langer Decl. ¶10. Defendants claim there are only a small number of California e-subscribers to *The Sun* and they comprise a small portion of NGN's total revenue. However, it is analytically meaningless to compare revenue from California e-subscriptions to NGN's total combined advertising and circulation revenues.

[23] Plaintiff may be entitled to discovery of circulation information for *The Times* and *The Sunday Times* because these are relevant to NI's contacts.

[24] Wilder Cplt. ¶ 24. See *supra* n. 5.

Points & Authorities In Opposition

Plaintiff is entitled to discovery regarding which U.S.-based corporations purchase advertising from NGN and how much revenue is generated by U.S.-based advertisers.

NGN employs two U.S.-based employees, one of whom is based in California. Longcroft Decl. ¶6. NGN, including its California employee, also enters into negotiations and contracts in the U.S. for the purchase of photographs and other content from U.S.-based sources for publication. *Id.  See also*, *Nat'l Enquirer*, 670 F.Supp. at 966 (discussing NGN's purchases of photographs and other material from freelancers in Florida).

Alone, these direct contacts with the U.S. indicate that NI has a substantial, systematic presence in the U.S.. But, they are further supported by the real and substantial control over NI and NGN exercised by U.S.-based News Corp. (discussed in detail *infra* at 30-34). "[F]ederal courts have consistently acknowledged that … a court [may] exercise personal jurisdiction over an individual or corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court'." *Transfield ER Cape Ltd, v. Indus. Carriers Inc.*, 571 F.3d 221, 224 (2d Cir. 2009) quoting *Patin v. Thoroughbred Power Boats* 294 F.3d 640, 653 (5th Cir. 2002) (collecting cases). *See also Koehler v. Bank of Bermuda,* 101 F.3d 863, 865 (2d Cir. 1996) (stating that jurisdictional acts of a parent company may be imputed to a foreign subsidiary, when the subsidiary is the agent of the parent or the parent exercises such control that the subsidiary is effectively a department of the parent.).  As discussed below, *see infra* at 30-34, NI and NGN are the alter egos and/or agents of News Corp. Therefore, News Corp.'s U.S. contacts may be imputed to NI and NGN for purposes of personal jurisdiction.

### 3.    Exercising Jurisdiction over Defendants is Reasonable[25]

Defendants have failed to make a compelling case that this Court should forgo exercising its jurisdiction, as demonstrated by the following analysis of the seven factors the Ninth Circuit considers when assessing the reasonableness of personal jurisdiction. *See Terracom v. Valley Nat. Bank*, 49 F.3d 555, 561 (9th Cir. 1995).

**Extent of Purposeful Interjection**: Defendants clearly directed their tortious conduct at California and the effects of Defendants' conduct were felt in California. Defendants' conduct was the sole cause of the breaches of federal statutory laws and California statutory and constitutional laws that harmed Plaintiff. Despite this, Defendants claim "the degree of interjection" into California was "so small as to weigh against the reasonableness of jurisdiction." D. Mem. At 25. Defendants have offered no support for this assertion. Moreover, the Ninth Circuit has found jurisdiction reasonable based on substantially less purposeful interjection. In *Brainerd,* the court found jurisdiction reasonable based on a single conversation that the defendant did not even initiate because the defendant knew his comments would affect the plaintiff in the forum state, where the plaintiff *planned* to live and work. *Brainerd*, 873 F. 2d at 1259.  *Cf. Mitan v. Feeney*, 497 F. Supp. 2d 1113, 1120-21 (C.D. Cal 2007).

**Burden of Defending in the Forum**: Defendants urge this Court to consider that Plaintiff is a U.K. citizen. However, Plaintiff's citizenship is irrelevant to this analysis. As Defendants underscore, "the law of personal jurisdiction is . . . primarily concerned with the defendant's burden," because a plaintiff has the initial choice of forum. D. Mem. at 25. The availability of a "far superior" alternative forum, *Id*. at 25,

---

[25]   "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1487 (9th Cir. 1993) *holding modified by Yahoo! Inc.*, 433 F.3d 1199 (9th Cir. 2006).

1  is also irrelevant to Defendant's burden and should be considered with respect to the

2  seventh factor in the reasonableness inquiry: the availability of an alternative forum.

3      Defendants make no effort to demonstrate that defending in this forum would

4  be overly burdensome, relying  solely on the fact that NI and NGN are "UK entities

5  with virtually no U.S. contacts." MTD at 25. The mere fact that NI and NGN are

6  foreign defendants is not a *compelling* reason for this Court not to exercise its

7  jurisdiction. For example, in *Bauman*, the Ninth Circuit found, "The burden on the

8  defendant, a large international corporation, to litigate the case in California is not so

9  weighty as to preclude jurisdiction—particularly since 'modern advances in

10  communications and transportation have significantly reduced the burden of litigating

11  in another country.'" *Bauman,* 644 F.3d at 926 (quoting *Sinatra v. Nat'l Enquirer,*

12  *Inc.*, 854 F.2d 1191, 1199 (9th Cir. 1988)). The "modern advances" considered in

13  *Sinatra* included fax machines and discount air travel. As discussed *supra* at 9-11,

14  further technological advances have made litigating abroad even less burdensome

15  today.

16      If, as Defendants contend, NI is merely a holding company, Longcroft Decl. ¶5,

17  to the extent that California litigation would be a burden, it would be borne primarily

18  by NGN. Therefore, while the U.K. may be the more convenient forum for one

19  defendant, NGN, the U.S. is more convenient for another, NC, a Delaware corporation.

20  For these reasons, the second factor favors this Court's exercising jurisdiction over

21  Defendants.

22      **The Extent of Conflict with the Sovereignty of the Defendants' State**: This

23  factor "'is not dispositive [of the reasonableness of exercising jurisdiction] because,

24  if given controlling weight, it would always prevent suit against a foreign national in

25  a United States court.'" *Bauman*, 644 F.3d at 926 (quoting *Jensen*, 743 F.2d at 1333).

26  In applying this factor, this Court should examine connections to the U.S. as whole,

27  not only to California. *Bauman,* 644 F. 3d at 926 (quoting *Core-Vent Corp. v. Nobel*

28

Points & Authorities In Opposition

1   *Indus*. AB, 11 F.3d 1482, 1489 (9th Cir. 1993)).  NI and NGN are wholly-owned
2   subsidiaries of a U.S. corporation and NI and NGN have purposefully directed their
3   conduct towards the U.S., including by soliciting U.S. corporate advertisers, as
4   discussed *supra*. "Therefore, 'sovereignty considerations weigh less heavily than if no
5   U.S.-based relationships were established.'" *Bauman*, 644 F.3d at 926 (quoting
6   *Sinatra*, 854 F.2d at 1200). Furthermore, the effects of Defendants' conduct were felt
7   in the U.S., and it is a well-established principle of international law that a sovereign
8   has territorial jurisdiction when conduct abroad produces effects within its territory.
9   *See Restatement (Third) of the Law of Foreign Relations of the United States,* §402.
10  Given the long-standing acceptance of a nation's prerogative to assert its jurisdiction
11  in such cases, this Court would not violate the U.K.'s sovereignty by exercising
12  jurisdiction in this case.

13      **Forum State's Interest**: California and the U.S. have strong interests in
14  asserting jurisdiction in this suit, regardless of where Defendants' conduct occurred
15  and of Plaintiff's U.K. citizenship. These interests are discussed at length *supra* at 12-
16  14.

17      **Efficient Judicial Resolution**: This factor looks at the location of witnesses and
18  evidence, but it is "'no longer weighed heavily given the modern advances in
19  communication and transportation.'" *Harris Rutsky & Co. Ins. Svcs., Inc.*, 328 F.3d
20  1122, 1133 (9th Cir. 2003) (quoting *Panavision Int'l v. Toeppen*, 141 F.3d 1316, 1323
21  (9th Cir. 1998)). Indeed, this factor  has not been a barrier to bringing a case arising
22  from the phone hacking scandal in Scotland. Lewis Decl. ¶ 5. *See also*, *supra*, at 10-
23  11.[26] Further, Defendants have not shown evidence that it will be unreasonably
24  difficult to produce witnesses if this Court asserts jurisdiction.

25
26      [26]   There may also be relevant documentary evidence located at News Corp.
    headquarters in New York and/or the home office of NGN's California employee.
27  *See supra* n. 5.
28

Defendants point to the many cases with similar facts that have been brought in England and argue that deference should be given to that jurisdiction. MTD at 26. However, whatever deference may be due, it was not sufficient to prevent a Scottish court from exercising jurisdiction, and there is no reason it should prevent this Court from doing so. Furthermore, in no case brought in England did the claimant allege that she was in the U.S. when Defendants illegally intercepted, accessed her communications, or prevented her from accessing her voicemail messages. This case presents unique facts and unique questions of law.

**Importance of the Forum to Plaintiff's Interest in Convenient and Effective Relief**: The mere fact that Plaintiff is not a full-time resident of the forum state does not mean this factor weighs against this Court's exercising jurisdiction. As discussed above, the Ninth Circuit has exercised jurisdiction in cases where the plaintiff was not a resident of the forum state. Defendants cite *Doe v. Geller*, 533 F. Supp. 2d 996 (N.D. Cal. 2008), stating, "this factor weighs in a defendant's favor where, as here, the plaintiff is not a resident of the forum state . . . ." D.Mem. at 26. However, in *Geller*, the "plaintiff's claimed injuries [were] more likely to be suffered in Pennsylvania [than in California]," *id.* at 1006. — a critical distinction in the context of a personal jurisdiction analysis.

Moreover, unlike in *Geller*, California and the U.S. are of utmost importance to Plaintiff's interest in effective relief. Because Plaintiff's career is in the film industry, vindication in California and the U.S. is critical to whether any relief granted is truly effective. Defendants' unlawful conduct caused Plaintiff to miss communications. She was therefore unable to respond to or acknowledge possible business-related communications, which would have undermined her professional reputation with future employers, including U.S. and/or California employers. Defendants' conduct may have caused not only damage to Plaintiff's reputation, but also loss of future employment opportunities in the U.S. and/or California. Similarly, as discussed above,

Points & Authorities In Opposition

publication of information contained in Plaintiff's communications reflected poorly on Plaintiff, professionally and personally, by implicating her as a possible source of this information. Suit in the U.S., generally, and in California, in particular, is therefore far more likely to ameliorate the damage done by Defendants' illegal conduct to Plaintiff's reputation and relationships.

**Existence of an Adequate Alternative Forum**: Even when a defendant shows an adequate alternative forum, "the availability of an alternative forum is not the deciding factor in the personal jurisdiction analysis." *Bauman*, 644 F.3d at 929. This factor favors neither Defendants nor Plaintiffs.

Defendants point to two avenues for Plaintiff to pursue claims arising from the phone hacking scandal. This is disingenuous, as the compensation scheme established by and controlled by NI is now closed and is therefore unavailable to Plaintiff. Lewis Decl. ¶7. This leaves litigation through MTVIL, which is not an adequate alternative forum available to Plaintiff (See *supra* at 4-7; Lewis Decl. ¶¶ 16-23), and, in any event, will not be open for Plaintiff to join by the time this motion has been heard. Lewis Decl. ¶ 15.

**4.     Dismissal Prior to Discovery Would Be Premature**

If the Court finds that personal jurisdiction has not been established based on Plaintiff's allegations and supporting documents, "[jurisdictional d]iscovery 'may be appropriately granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.'" *Twentieth Century Fox Int'l Corp. v. Scriba,* 385 F. Appx. 651, 652 (9th Cir. 2010) (quoting *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir.2008)).[27]  For the court

---

[27]  *See also, Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) (citing *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1992), which found "abuse of discretion when district court denied jurisdictional discovery in light of allegations suggesting jurisdiction did exist"); *Dichter-Mad Family Partners, LLP v. U.S.,* 707 F. Supp.2d 1016, 1052 (C.D. Cal. 2010) *aff'd*,

to grant jurisdictional discovery, a plaintiff need make only a "colorable" showing, which is "something less than a prima facie showing, . . . requiring the plaintiff to come forward with 'some evidence' tending to establish personal jurisdiction over the defendant." *Mitan v. Feeney*, 497 F. Supp. 2d 1113, 1119 (C.D. Cal. 2007)(internal citation omitted). This Court has also found it improper to grant a motion to dismiss based on affidavits alone when a plaintiff has made a *prima facie* showing of jurisdictional facts, because doing so "would permit a defendant to obtain a dismissal simply by controverting the facts established by a plaintiff through his own affidavits and supporting materials." *Pena v. Valo*, 563 F. Supp. 742, 747 (C.D. Cal. 1983) (internal citation omitted).

Here jurisdictional discovery would be particularly appropriate given that the vast majority of evidence relevant to personal jurisdiction is in the possession of Defendants. *See Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir. 1986) ("[C]ourts have … required that the party asserting jurisdiction be permitted discovery of facts demonstrating jurisdiction, at least where the facts are peculiarly within the knowledge of the opposing party." (Emphasis added.)) (cited by *Greenpeace, Inc. (U.S.A.) v. State of France*, 946 F. Supp. 773, 789 (C.D. Cal. 1996)).

Therefore, if this Court will not now deny Defendants' motion to dismiss for lack of personal jurisdiction, Plaintiff respectfully requests the Court to permit jurisdictional discovery prior to ruling on the motion.

## C.   PLAINTIFF HAS SUFFICIENTLY PLED FACTUAL MATTER TO STATE CLAIMS TO RELIEF

To survive a motion to dismiss, a complaint need only state a claim that is facially plausible, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and that gives a

---

709 F.3d 749 (9th Cir. 2013) (quoting *Am. West Airlines, Inc. v. GPA Group, Ltd.,* 877 F.2d 793, 801 (9th Cir. 1989) for the proposition that "where pertinent facts bearing on the question of jurisdiction are in dispute, discovery should be allowed").

Points & Authorities In Opposition

defendant fair notice of the claims against him, *Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1121 (9th Cir. 2008). Plaintiff has satisfied this standard and should be allowed to proceed to discovery.[28] Plaintiff sufficiently set forth wrongdoing by both News Corp. and NI and/or their employees or agents. Cplt. ¶¶ 12, 38, 42-43, 59, and ¶¶ 23, 26-27, 32, 35, 37-39, respectively. News Corp. and NI are not, as Defendants allege, named in this lawsuit simply because of their status as parent corporations. *See generally*, D.Mem. at 28-30.

## 1.   Piercing the Corporate Veil

News Corp. and NI are liable for hacking at NGN because NI and NGN are each the alter ego, instrumentality or division of News Corp., as is NGN of NI. When claims arise under federal law courts have applied the alter ego doctrine of federal common law to decide if a parent corporation is liable for its subsidiary's acts. *See, e.g., U.S. v. Bestfoods,* 524 U.S. 51, 63 n. 9 (1998);[29] *Bowoto v. Chevron Texaco Corp.*, 312 F.Supp.2d 1229, 1236 (N.D. Cal. 2004) (federal alter ego doctrine would better effectuate the purposes of federal statutes).[30] Defendants argue the Court should apply U.K. law because NI and NGN are U.K. companies. Def. at 30. But, in *Wehlage v. EmpRes Healthcare*, 821 F.Supp.3d 1122 (2011), the court sat in diversity jurisdiction, *id.* at 1126, and applied the law where the *parent* was incorporated. *Id.*

[28]  *See Jones v. AIG Risk Management, Inc.,* 726 F.Supp.2d 1049, 1059 (N.D. Cal. 2010) (case should proceed to discovery because plaintiff met the plausibility standard).

[29]  The Supreme Court stated, "There is significant disagreement among courts and commentators over whether, in enforcing CERCLA's indirect liability, courts should borrow state law, or instead apply a federal common law of veil piercing." CERCLA, the Comprehensive Environmental Response, Compensation and Liability Act, is federal law.

[30]  This rule has been applied by a federal district court in Delaware, where News Corp is incorporated.  *See U.S. v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1102-05 (D. Del. 1988) ("Since federal law governs the Government's rights and remedies here, federal law must be applied to determine whether the default judgment can be enforced against" a party when to do so would require the corporate veil to be pierced").

Points & Authorities In Opposition

at 1128-29.  Here, that would be Delaware.  Also, in *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F.Supp.2d 1164 (C.D. Cal 2011), this Court held federal law should be applied to federal claims, *id*. at 1169 and applied New York conflict of law principles, looking to New York jurisprudence, *id*. at 1170, 1171.  The cases discussed therein, *id*. at 1172, regarding the alter ego doctrine were diversity cases or were addressing state law claims.

Under federal common law, "[c]orporate separateness is respected unless doing so would work injustice upon an innocent third party" and "disregard of corporate separateness requires that the controlling corporate entity exercise total domination of the subservient corporation to the extent that the subservient corporation manifests no separate corporate interests of its own." *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1294 (9th Cir 1997) (internal quotations omitted). "[F]ederal common law allows piercing of the corporate veil where a corporation uses its alter ego to perpetrate a fraud or where it so dominates and disregards its alter ego's corporate form that the alter ego was actually carrying on the controlling corporation's business instead of its own." *Id.* (citing *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir. 1980)).[31]   Actual fraud is not required. "[T]he corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy.  In such cases, courts of equity [] ... [will] not blindly adhere to the corporate form." *Bangor Punta Operations, Inc. v. Bangor & A.R. Co.* 417 U.S. 703, 713 (1974). *See also, Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1112-13 (9th Cir. 1979) (corporate veil not pierced when "no substantial injustice will result if we

---

[31]  *See also UA Local 343 United Ass'n of Journeymen & Apprentices of Plumbing and Pipefitting Industry of U.S. and Canada, AFL-CIO v. Nor-Cal Plumbing, Inc.,* 48 F.3d 1465, 1475 (9th Cir. 1994) (Federal common law considers "the amount of respect given to the separate identity of the corporation by its shareholders, the degree of injustice visited on the litigants by recognition of the corporate entity, and the fraudulent intent of the incorporators." The corporate veil will be pierced when the first factor and *one of the other two* supports doing so.)

respect the corporation").

The alter ego analysis is highly fact specific, and each case should be evaluated on its own facts. *Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-E*, 542 F.2d 1053, 1063 (9th Cir. 1976). Courts will consider numerous factors when applying the alter ego doctrine.[32] Here, several factors indicate that corporate separateness is a facade. (1) Ownership: NGN is a wholly-owned subsidiary of NI, which is a wholly-owned subsidiary of News Corp and the Murdoch family owns a controlling interest in News Corp. Wilder Cplt. ¶23; Shields Cplt. ¶16.[33] (2) Shared officers and directors: Murdoch family members and close associates comprise a significant share of the directors and officers of News Corp., NI, and NGN. Wilder Cplt. ¶¶5, 25-28, 31-33; Shields Cplt. ¶¶ 16-22, 24, 29. (3) Shared employees: NI, NGN, and News Corp. share employees at the executive level, transferring officers among themselves, e.g., Hinton, James Murdoch, Brooks**,** Cplt. ¶¶23, 27; Wilder Cplt. ¶¶26-28, 34; Shields Cplt.¶¶5-7, 17-18, 79, 94; NGN employees consider themselves to be employed by and to owe loyalty to NI, Sun Transcript;[34] and Murdoch has represented to NGN employees that he, personally, is in a position to protect their interests with regard to future employment. *Id.* (4) News Corp. and NI have represented that they are responsible for NGN's liabilities: Rupert Murdoch, as CEO

---

[32] *See, e.g., U.S. v. Healthwin-Midtown Convalescent Hosp. & Rehab. Ctr., Inc.*, 511 F.Supp. 416, 418-20 (C.D. Cal. 1981) *aff'd*, 685 F.2d 448 (9th Cir. 1982); *Associated Vendors, Inc., v. Oakland Meat Co.,* 210 Cal. App.2d 825, 837-40 (Cal. Ct. App. 1962).

[33] Plaintiff respectfully refers the Court to factual allegations made in the Wilder Cplt., *supra* n. 5, and in Verified and Amended Shareholder Derivative Complaint, Shields v. Murdoch, Civ. No. 1:11-cv-04917 (S.D.N.Y. Aug. 4, 2011) ("Shields Cplt.") *See* Langer Decl. ¶6, Ex. 3, ¶7, Ex. 4.

[34] David Henke et. al. Transcript: Rupert Murdoch Recorded at Meeting with Sun Staff, Exaro News, July 3, 2013 ("Sun Transcript") (transcript of March 6, 2013 staff meeting) *available at* http://exaronews.com/articles/5026/transcript-rupert-murdoch-recorded-at-meeting-with-sun-staff (last accessed Dec. 6, 2013). *See* Langer Decl. ¶8.

Points & Authorities In Opposition

and Chairman of News Corp, sent an apology letter to the Dowlers, Cplt. ¶ 43; NI issued two public apologies, Cplt ¶ 38; News Corp's Board of Directors approved settlements, Wilder Cplt. ¶8. NI has compensated victims of NGN's conduct and is financing the compensation plan. Cplt. ¶28; D.Mem. at 15-16; Lewis Decl. ¶¶ 9, 11 and 21st Century Fox has indemnified News Corp.–not NI or NGN -- for liabilities arising from the hacking scheme, News Corp. 10-K for 2013 at 20-21, thereby admitting News Corp. may be liable. *See* Langer Decl. ¶4, Ex. l. (5) <u>NC and NI held themselves out as one with each other and with NGN</u>: NI's website states, "News U.K. is part of News Corp." and "News U.K. publishes *The Times, The Sun, The Sunday Times* . . . ;"[35] Rupert Murdoch stated that he is a "traditional proprietor" vis-á-vis NGN and that he is "hands on both economically and editorially," Select Cttee. Minutes at 119 ¶49;[36] Murdoch held daily and/or weekly editorial conversations with Brooks when she was editor of *The News of the World*, Cplt. ¶42; Wilder Cplt. ¶32, which shows News Corp.'s day-to-day control over NGN; News Corp. has issued press releases and made public statements about NI on its website, on quarterly earnings calls, and at its annual shareholder meeting, Wilder Cplt. ¶¶ 67-68, 90-91, 100-101, 146; Shields Cplt. ¶¶ 9-11, 94, 103-104, 117 (6) <u>Failure to respect corporate formalities</u>: Murdoch pursues his own agenda at News Corp., Shields Cplt. ¶5; and the efficacy and independence of the Board of Directors has been questioned, Shield Cplt. ¶¶9, 52-53, 103-105; 108-109. Wilder Cplt. ¶5. (7) <u>NC and NI share office space</u>: News Corp.'s 2012 Annual Report, at 102, referred U.K. requests for documents to 3 Thomas More Square, which is also the "Registered Office" of NI (a/k/a News Corp. U.K. & Ireland

---

[35]  See http://news.co.uk/about-us/ and http://news.co.uk/, respectively.

[36]  House of Lords Select Committee on Communications, The Ownership of the News, Vol 1: Report ("Select Cttee. Minutes"). *See* Langer Decl. ¶14, Ex. 7. Murdoch distinguished his role at NGN from that at Times Newspapers Ltd., where he does not have the same control because the editorial board for The Times and The Sunday Times is independent.  Select Cttee Minutes at 119-20  ¶¶49-50.

Points & Authorities In Opposition

Ltd.);[37] (8) <u>Shared Counsel</u>: NI and NGN have the same lawyers and have advanced the same legal position in this action.

News Corp. and NI attempt to separate themselves from NGN, and from one another through the corporate form, thereby shielding NI and News Corp. from liabilities arising from conduct at NGN.  The alter ego doctrine is intended to prevent such abuses of the corporate form.  Moreover, if News Corp. and NI are allowed to hide behind the corporate form, it would seriously undermine the public policy enacted by the statutes at issue in this case.

This Court should apply California's choice-of-law rules to determine which alter ego doctrine applies to Plaintiff's state law claims.  Plaintiff submits that Delaware's alter ego doctrine -- the law of News Corp.'s incorporation-- should be applied.  Accordingly, because Defendants attempt to escape liability behind the corporate veil, the corporate form should be disregarded in this instance.

## 2.  **Agency Relationship**

A parent corporation can be vicariously liable for the acts of its subsidiary when the subsidiary is an agent of the parent. *Bowoto v. Chevron Texaco Corp.,* 312 F.Supp.2d 1229, 1238 (N.D. Cal. 2004). "To form an agency relationship, both the principal and the agent must manifest assent to the principal's right to control the agent." *U.S. v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010) (internal citations omitted). Agency exists when *either* the principal "actually control[s] the agent, *or* the principal and the agent agree that the principal has the right to do so." *Bauman*, 644 F.3d at 923. "[A]gents may exercise a considerable amount of discretion." *Id.* The facts listed above and in the Complaint make a *prima facie* case that (1) NGN was an agent of NI and of News Corp; (2) NI was an agent of News Corp.; and (3) NI and NGN were

---

[37]  *See* Langer Decl. ¶12, Ex. 6.  "© News Corp. U.K. & Ireland Limited [2013] Registered in England, Number 81701. Registered Office" 3 Thomas More Square, London E98 1XY," http://news.co/uk/boardand-investors/.  *See* Langer Decl. ¶13.

acting within the scope of their authority, as News Corp.'s acquiescence ratified their conduct.

At a minimum, with respect to alter ego liability and agency liability there is a factual dispute concerning the relationships among News Corp., NI, and NGN and this action should proceed to discovery.[38]

### D.   PLAINTIFF HAS STATED CLAIMS UNDER THE STORED COMMUNICATIONS AND WIRETAP ACTS

#### 1.   Application of the SCA and WA to Defendants Is Not an Extraterritorial Application

Defendants' 12(b)(6) motion to dismiss should be denied as to the federal claims pled. Application of the SCA and the WA to Defendants does not require this Court to find that these statutes apply extraterritorially.   "Because conduct with substantial domestic effects implicates a state's legitimate interest in protecting its citizens within its borders, Congress's regulation of foreign conduct meeting this 'effects test' is not an extraterritorial assertion of jurisdiction" *U.S. v. Phillip Morris USA Inc.*, 566 F.3d 1095, 1130 (D.C. Cir. 2009).   This principle was reaffirmed by *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010). *Morrison* held that a non-extraterritorial statute may be applied to foreign conduct that has a sufficient nexus with the U.S.  More particularly, *Morrison* held that the conduct at issue must fall within "the 'focus' of Congressional concern in enacting the statute," where 'focus' is understood as the "object [] of the statute's solicitude." *Id*. at 2884. See also, *U.S. v. Chao Fan Xu*, 706 F.3d 965, 975 (9th Cir. 2013) (quoting *Morrison*).

The legislative history of the SCA and the WA makes clear, and the Ninth Circuit has found, that the "object of the statute's solicitude" was the protection of the

---

[38]  In 2013, after the Complaint was filed, News Corporation was split into two corporations.  The Corporation names used in the Complaint have been retained in this Memo.  Plaintiff's claims run to any and all successors of Defendants.

Points & Authorities In Opposition

right to privacy, balanced with the needs of law enforcement. *Suzlon Energy, Ltd. v. Microsoft Corp.*, 671 F.3d 726, 730 (9th Cir. 2011).[39] "The [Electronic Communications Privacy Act] amend[ed] the 1968 law to update and clarify Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies." S. Rep. 99-541, at *1, 1986 U.S.C.C.A.N. **3555 (1986). Further, "[the SCA] is modeled... to protect privacy interests in personal and proprietary information, while protecting the Government's legitimate law enforcement needs," and § 2701 of the SCA "addresses the growing problem of unauthorized persons deliberately gaining access to, and sometimes tampering with, electronic or wire communications...." *Id.* at *3, *35.

### a.   Nexus with the United States

Defendants violated Plaintiff's privacy while she was working and residing in California and the adverse effects of Defendants' conduct were felt within the U.S. Defendants intentionally sought to access, and prevent Plaintiff's access to, communications between Plaintiff and Jolie while Plaintiff and Jolie were both residing in California. Defendants clearly aimed their criminal conduct at communications occurring within the U.S. and being transmitted by a U.S. electronic service provider via its domestic wireless infrastructure. See Declaration of Plaintiff's technology experts, Nicholas G. Himonidis, dated Dec. 6, 2013 ("Himonidis Decl.") and Martin Griffiths, dated Dec. 6, 2013 ("Griffiths Decl."); Himonidis Decl. ¶¶ 4,6, 7, 10, 13, 15-18, 20, 24-25; and Griffiths Decl. ¶ 11, respectively.

Further, by changing the access code to and deleting messages from Plaintiff's voicemail, Defendants prevented her from receiving communications concerning her personal and professional relationships and obligations. Defendants intentionally and

---

[39]  Relying on S. Rep. 99-541 at *3-5, 1986 U.S.C.C.A.N.**3555 (1986) the Ninth Circuit concluded that protecting privacy interests was "Congress' [sic] primary intent."

willfully prevented Plaintiff from accessing her messages while she was on U.S. soil and, in so doing, deprived her of the use of voicemail services she was contractually entitled to receive from Vodafone. Himonidis Decl. ¶¶ 4, 15; Griffiths Decl. ¶ 12. By illicitly accessing Plaintiff's voicemail and obstructing her access, Defendants violated the SCA.[40] Plaintiff's technology experts confirm that the electronic voice data that constituted the messages left for Plaintiff were in "temporary intermediate storage," 18 U.S.C. § 2510(17), on wireless networks in California and the U.S. to facilitate and complete the transfers that were necessary to ultimately leave these messages for her in her voicemail box. Himonidis Decl. ¶¶ 4, 13-14, 16-17, 24; Griffiths Decl. ¶¶ 7, 11.

Defendants' acts caused Plaintiff, while in the U.S., to experience damage to her professional reputation within the California-based television and film industry Because she did not receive messages, her professional reliability was compromised, and because confidential information from messages on her voicemail was published, her discretion and trustworthiness were compromised. Cplt. ¶¶ 62, 64-65. Defendants' acts also caused damages to her personal and family relationships, which Plaintiff experienced while she was residing in the U.S.. Cplt. ¶¶ 49-51; Huthart Decl. ¶ 15. As demonstrated, there is a strong nexus between Defendants' conduct, the domestic effects of that conduct, and the focus of the statute.

**Wiretap Act Claims**: Defendants argue that Plaintiff has not stated a claim under the WA because the WA does not apply to interceptions abroad. However, Plaintiff seeks to hold Defendant responsible for interceptions that may have occurred in the U.S. Plaintiff alleged that Defendants' agent or agents interfered with her mobile phone communications while she was in the U.S. and that Defendants published information gained by this illicit access. Cplt. ¶¶ 53-55, 57-58, 60-61, 62, 64-65. But,

---

[40] *Perloff v. Stern,* Civ. Act. No. 10-1758, 2011 WL 666167, *2 (E.D. Pa. Feb. 23, 2011) (emphasis added). In *Perloff*, the court found that the plaintiff stated a claim under the SCA. The Plaintiff alleged that the Defendants had reset his password and prevented him from accessing his email.

Points & Authorities In Opposition

without discovery, Plaintiff cannot know when, where, or how that information was obtained.  Therefore dismissal of Plaintiff's WA claims prior to discovery would be premature, especially since hacking Plaintiff's voicemail likely involved contact with U.S. electronic communication facilities and systems. Himonidis Decl. ¶¶ 4, 6, 7, 10, 13, 15-18, 20, 24-25; Griffiths Decl. ¶ 11.

**Stored Communications Act Claims**: Defendants also argue that Plaintiff did not allege her communications were stored in or accessed from the U.S. However, the SCA is not necessarily limited to communications stored in the U.S.  In *Wyatt Technology Corp. v. Smithson*, 345 Fed. App'x 236, 239 (9th Cir. 2009), the Ninth Circuit upheld the district court's grant of a summary judgment, 2006 WL 5668246 (C.D. Cal. 2006), based on a finding that *Wyatt*, a U.S. corporation, had violated the SCA by hacking into a computer server located in the U.K.  And, in *Suzlon*, the Ninth Circuit expressly declined to rule on whether the SCA applied to communications stored outside the U.S. *Suzlon*, 671 F.3d at 370.  *See also, Zheng v. Yahoo!*, 2009 WL 4430297 (N.D. Cal Dec. 2, 2009) relied on by Defendants is not germane to this case. In that case, all relevant conduct and <u>effects</u> occurred outside the U.S. and the court did not evaluate contacts with the U.S., addressing solely the question of whether the WA and/or the SCA could be applied to purely extraterritorial conduct. *Id.* at *2-4.

Dismissal of Plaintiff's SCA and WA claims would be premature at this time because how, by whom and from where Plaintiff's voicemail was hacked are issues of fact, which Plaintiff cannot know without discovery. *See* Himonidis Decl. ¶¶ 5 n.1, 20, 22-23; Griffiths Decl. ¶¶ 9, 12-14.  Given the breadth of Defendants' illegal activity, it is not unreasonable that they may have contracted with a counterpart located in the U.S.  Further, as a Vodafone customer, communications intended for, originating from, and being temporarily stored for Plaintiff were necessarily carried, in part, on a U.S. wireless network, per a roaming agreement.  Himonidis Decl. ¶¶ 4, 9-10, 13, 15-17; Griffiths Decl. ¶¶ 7, 11-12. Plaintiff does not have access to these

Points & Authorities In Opposition

agreements or to any other arrangements that might have existed regarding storage of voicemails originating from and being and being temporarily stored in the U.S. and/or those intended for a Vodafone subscriber in the U.S.

**2.    Even If Defendants' Conduct Is Extraterritorial,
        Sections 2701 and 2707 of the SCA Apply Extraterritorially**

Although the WA does not apply to interceptions occurring abroad, Congress has manifested clear intent to apply the SCA extraterritorially. Extraterritorial application of a statute is authorized when Congress clearly indicates such an intention. *Morrison*, 130 S. Ct. at 2877.  This is not a "clear statement rule," which would require an explicit statement in the text that "'this law applies abroad.'" *Morrison*, 130 S. Ct. 2883. Rather, in seeking an "affirmative indication" that a statute applies extraterritorially "context can be consulted" as can "other sources of statutory meaning." *Id*. at 2877.

The plain text of § 2510, together with the legislative history of the WA and the SCA, clearly indicate that Congress intended the SCA, but not the WA, to apply extraterritorially.  The plain text of § 2510(a), which defines wire communication for both the WA and the SCA, plainly manifests extraterritorial applicability. However, according to the legislative history, Congress chose to limit the WA's reach to domestic interceptions.

The privacy protections provided by the WA and the SCA apply to "any aural transfer made in whole or in part through the use of facilities... furnished or operated by any person engaged in providing or operating such facilities for the transmission of ... foreign communications or communications affecting... foreign commerce." §2510(a)(1) The extraterritorial intent of this language is supported by three factors.

First, it is well established that Congress has the power to regulate conduct outside the U.S.  *U.S. v. Clark*, 435 F.3d 1100, 1109 (9th Cir. 2006). And, "[w]here Congress uses the phrase[] 'affecting commerce'..., it 'signals an intent to exercise [its]

power to the full.  However, the phrases 'in commerce' or 'engaged in commerce,' are understood to have a more limited reach.'" *U.S. v. Wright*, 625 F.3d 583 (9th Cir. 2010) (internal citations omitted) (emphasis added and change in the original).[41]

Second, "a statute must, if possible, be construed in such a fashion that every word has some operative effect." *U.S. v. Nordic Vill. Inc.*, 503 U.S. 30, 36 (1992).[42] According to this maxim, as used in § 2510, 'foreign commerce' and 'foreign communications' must be interpreted to mean something other than 'interstate commerce' and 'interstate communications', respectively.  They must be interpreted to refer to communications that extend beyond the territory of the U.S.[43]

Third, Congress used language nearly identical to that in § 2510 when it amended the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, so that its protections would apply to "computers used in foreign communications or commerce, despite the fact that hackers are often foreign-based," thereby preventing "foreign theft of information by computer." Senate Judiciary Committee Report, S. Rep. No. 104-357, at *4, *7 (1996), 1996 WL 492169 (Leg. Hist.). As amended in 1996, §1030 defined a "protected computer" as "a computer . . . which is used in interstate or foreign commerce or communication[,]" 18 U.S.C. § 1030(e)(2)(B), and criminalized unauthorized access to a computer to obtain "information from any protected computer if the conduct involved in interstate or foreign communication." 18 U.S.C. §

---

[41] *See also, U.S. v. Weingarten*, 632 F.3d 60, 71 (2nd Cir. 2011) (stating that the "issue of statutory construction would be substantially different if [the statute] prohibited travel for the purpose of engaging in [illicit conduct] where such travel *affects* foreign commerce" rather than where such travel is <u>in</u> foreign commerce").

[42] *See also, TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (indicating a statute should be construed so "no clause, sentence, or word shall be superfluous, void, or insignificant").

[43] *See Ivanov*, 175 F.Supp.2d, at 374 (interpreting 18 U.S.C. § 1030 and explaining that "for the word 'foreign' to have meaning, and not be superfluous, it must mean something other than 'interstate'...'[F]oreign' in this case must mean international.").

Points & Authorities In Opposition

1030(a)(2)(C). If this language extends § 1030 to foreign-based hackers and foreign theft of information, it is reasonable that the nearly identical language Congress had previously used in § 2510—a statute concerned with very similar conduct and with very similar goals—also protected against foreign-based activity.

The plain text of the statute clearly and affirmatively evinces extraterritorial applicability for both the WA and the SCA. However, Congress chose to limit the extraterritorial reach of the WA to interceptions within the U.S. The Senate Judiciary Committee Report states that the language "'communications affecting interstate or foreign commerce[]' . . . is not meant to suggest that the [ECPA] applies to *interceptions* made outside the territorial United States." S. Rep. No. 99-541, at *11-12 (emphasis added.) . Although the Senate Judiciary Committee Report refers to the ECPA as a whole, the restriction on extraterritoriality applies only to interceptions, effectively limiting it to the WA (and possibly the regulations concerning pen registers and trap and trace devices). 'Interception' is not used once in the SCA (and only once in the portion of the ECPA regulating pen registers and trap and trace devices). It follows that Congress carved out or limited extraterritoriality with respect to only interceptions, without affecting the extraterritorial scope of the SCA.  This conclusion is reinforced by the fact that while the June 19, 1986 House Report of the predecessor bill indicated that both interceptions and unauthorized access to stored communications were limited to the U.S., H.R. Rep. No. 99-647, at *32 (June 19,1986), the October 17, 1986 Senate Report of the bill that was ultimately adopted, made the same indication as to interceptions but eliminated it as to stored communications. S. Rep. No. 99-541, at *12.

Defendants argue that, as used in the definition of "wire communication", "foreign communications" and "communications affecting . . . foreign commerce" "merely designate[] types of facilities within the United States that are covered by the Act," D.Mem. at 32-33. However, if this language were intended to define which

facilities the statute covers, it would have been included in the definition of "electronic communications service" or "electronic communications system," which are nowhere limited to U.S. facilities.[44] Plainly, "foreign communications" and "communications affecting foreign commerce" are intended to define the type of communication encompassed by "wire communication." Moreover, even if this language modifies facilities, the language still indicates extraterritorial reach. Under this reading, Defendants' illegal conduct need only "involve[] a 'facility in [foreign] commerce'; it [would not be] necessary for that facility to itself to be 'used' in [foreign] commerce." *Wright*, 625 F.3d 583 at 594 (finding that because a telephone is a facility of interstate commerce, the statute would apply any time a telephone was used to commit the offense, whether intrastate or interstate.)  Defendants also suggest that "foreign communications" and "communications affecting . . . foreign commerce" is "boilerplate" language "insufficient to support extraterritorial application of federal statutes." *U.S. v. Weingarten,* 632 F.3d 60, 66 (2nd Cir. 2011). Such boilerplate language includes express references to foreign commerce "in [the] definitions of 'commerce'" and "in the definition of 'interstate commerce.'" *Morrison,* 130 S. Ct., at 2882. However, as used in § 2510, "foreign commerce" is not part of the definition of "commerce" or "interstate commerce." Rather, the term goes to the heart of the statute's operative text, indicating which communications are considered to be "wire communications." S-Rep. No. 99-541, at *12.[45]

Moreover, the statute does not refer only to "foreign commerce," but also to "foreign communications," which are by their nature transnational, encompassing at

[44]  *Suzlon Energy*, 671 F.3d at 729, found that "the plain text of the ECPA applies its terms to 'any person' without qualification. Any person means any person, including foreign citizens." The statute is similarly broad in defining "electronic communication service" as "*any* service which provides . . . the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

[45]  The type of reference to which *Morrison* refers is found in 18 U.S.C. § 10, where "foreign commerce" is defined for the purposes of Title 18.

Points & Authorities In Opposition

a minimum communications that originate or terminate in a foreign country, and, at a maximum, communications that both originate and terminate in one or more foreign countries and have a sufficient nexus with the U.S. [46]

Defendants also point to *Zheng*, 2009 WL 4430297, at *2-4, for the proposition that the SCA has no extraterritorial effect. In that case, the court assumed that because the WA did not apply extraterritorially, the SCA also did not apply extraterritorially. However, as discussed above, the WA and the SCA are sufficiently different that one cannot automatically apply the same theory to both statutes, and the legislative history that the *Zheng* court relied on pertained to only interceptions. The *Zheng* court also pointed to the statute's lack of procedures for obtaining an interception or access to stored communications abroad. However, it would be irrational for Congress to include such provisions: "A warrant issued by a United States court would neither empower a United States agent to conduct a search [abroad] nor would it necessarily compel the intended target to comply. It would be a nullity, or in the words of the Supreme Court, 'a dead letter.'"[47] *Terrorist Bombings*, 552 F.3d at 171 (quoting *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 274 (1990)). The statute's lack of procedures regulating investigations by U.S. agents in foreign countries is not necessarily evidence against applying the SCA extraterritorially.

### a.   Extraterritoriality of Criminal Statutes Can Be Inferred

Although the statutory text and legislative history of the SCA provide sufficient evidence to overcome the presumption against extraterritoriality,

---

[46] *See Weingarten*, 632 F.3d at 67-71 (discussing the meaning of 'foreign commerce' in Title 18 and finding that "travel in foreign commerce" encompasses travel between two foreign nations so long as there is a territorial nexus with the U.S.).

[47] "[I]t takes little to imagine the diplomatic and legal complications that would arise if American government officials traveled to another sovereign country and attempted to carry out a search of any kind, professing the authority to do so based on an American-issued search warrant." *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 157, 171 (2d Cir. 2008) ("*Terrorist Bombings*").

Points & Authorities In Opposition

Congressional intent to apply a criminal statute extraterritorially may also be inferred when a criminal statute is "not logically dependent on [its] locality for the government's jurisdiction' but [is] enacted because of 'the right of the government to defend itself against obstruction, or fraud wherever perpetrated . . . ." *U.S. v. Bowman*, 260 U.S. 94, 98 (1922).  Such statutes address offenses that "to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds . . . ." *Id*. at 98.  According to the Ninth Circuit, extraterritoriality may be inferred "from the nature of the offenses and Congress' [sic] other legislative efforts to eliminate the type of crime involved." *U.S. v. Vasquez-Velasco*, 15 F.3d 833, 839 (9th Cir. 1994) (quoting *U.S. v. Felix-Gutierrez*, 940 F.2d 1200, 1204 (9th Cir. 1991)).[48]  *See also, U.S. v. Thomas*, 893 F.2d 1066, 1068 (9th Cir. 1990).[49]

Here, the principles of *Bowman*, as interpreted by the Ninth Circuit, are met.  Hacking crimes are by their nature not associated with any particular locus.  It is the nature of modern communications systems to enable data to be carried, stored and accessed remotely.  Foreign communications that originated in the U.S. but ultimately are stored abroad are possible only by using U.S.-based communications facilities to

---

[48]   The Ninth Circuit has applied this reasoning to find that drug trafficking and child pornography laws apply extraterritorially.  *See Weingarten*, 632 F.3d at 60.

[49]   Morrison made no reference to *Bowman* and did not overrule the applicability of *Bowman* to criminal statutes.  *See* Organized Crime, U.S. ATTORNEYS' BULLETIN, at 17 (Nov. 2012).  *See also, e.g., U.S. v. Leija-Sanchez*, 602 F.3d 797, 799 (7th Cir. 2010) ("Whether or not *Aramco* and other post-1922 decisions are in tension with *Bowman*, we must apply *Bowman* until the Justices themselves overrule it. . . .  The Supreme Court has neither overruled *Bowman* nor suggested that the courts of appeals are free to reconsider its conclusion."); *U.S. v. Campbell*, 798 F. Supp. 2d 293, 303-04 (D.D.C. 2011) (stating that *Morrison* neither limits nor overrules *Bowman*), *collected in* Ryan Walsh, Extraterritorial Confusion: The Complex Relationship Between *Bowman* and *Morrison* and A Revised Approach to Extraterritoriality, 47 VAL. U. L. REV. 627, 675 n. 97 (2013).  *See also, Id*. at 648 n. 95 (stating that "since the Court decided *Morrison*, lower courts have ignored the decision with regard to criminal statutes and rely more heavily on *Bowman*," and collecting cases).

Points & Authorities In Opposition

transfer the information, thus falling squarely within the scope Congress intended for the SCA.  Consequently, if a person is immune from criminal liability simply because he is outside the territorial U.S., this would substantially curtail the scope and usefulness of the SCA, creating a serious loophole for transnational criminal activity aimed at U.S. residents and corporations.

In addition, like drug trafficking laws and child pornography laws, the SCA is part of a larger legislative scheme, specifically, one aimed at protecting the privacy of data and communications. *See* 18 U.S.C. §§ 1030 *et seq.*, 2510 *et seq.*, 2701 *et seq.*, 3121 *et seq*.  Like drug trafficking, protecting the privacy of communications and the integrity of communications and data transported by U.S. based facilities is essential to the functioning of and to the economic and security interests of the U.S.

Extraterritorial application of 18 U.S.C. §2701 is also appropriate under well-established principles of international law, according to which extraterritorial jurisdiction can be based on five principles, including territorial jurisdiction and protective jurisdiction. *Chua Han Mow v. U.S.*, 730 F.2d 1308, 1311 (9th Cir. 1984).  Territorial jurisdiction includes criminal acts aimed at the territory of a nation that produce effects within that country. *Restatement (Third) of Foreign Relations Law* §402, Cmt. d.  Here, Defendants directed their conduct at Plaintiff while she worked and resided in the U.S. and the harm caused by this conduct was felt by Plaintiff while she was residing in the U.S.

The scope of civil liability under 18 U.S.C. §2707 is based on violations of "this chapter," including 18 U.S.C. §2701.  *See U.S. v. Vilar*, 729 F.3d 62, 74-75 (2d Cir. 2013) (stating that civil and criminal liability under a single statute must have the same scope because otherwise "judges can give the same statutory text different meanings in different cases," and citing *Clark v. Martinez*, 543 U.S. 371, 386 (2005)).  Therefore, because §2701 applies extraterritorially to Defendants' conduct under *Bowman*, as discussed, Defendants are civilly liable under §2707.

1

2

### E.   PLAINTIFF HAS SUFFICIENTLY STATED CLAIMS UNDER CALIFORNIA LAW

3

4

#### 1.   California Penal Code Sections 631, 632 and 632.7

5

Plaintiff alleged facts sufficient to state claims under California Penal Code

6

§§ 631, 632, and 632.7, contained in the California Privacy Act.[50]  "[V]irtually all

7

decisions construing the Privacy Act" have broadly interpreted the legislature's intent

8

to protect privacy rights.  *Ribas v. Clark*, 38 Cal. 3d 355, 359 (Cal. 1985).[51]

9

#### a.   Penal Code §631:Wiretap Act

10

Under the California WA, Cal. Penal Code §631(a), Plaintiff must allege fact

11

showing Defendants (i) intercepted a wire communication, or (ii) disclosed the content

12

of an intercepted wire communication, or (iii) participated, directly or indirectly, in the

13

interception or disclosure of a wire communication.

14

#### i.   *Defendants Intercepted a Wire Communication*

15

Plaintiff alleged that "Defendants . . . intentionally intercepted, interfered

16

with, accessed and hacked Plaintiff's voicemail messages on her cellular telephone

17

system . . ." and "intentionally made unauthorized connections to the voicemail on

18

Plaintiff's cellular telephone system without the consent of Plaintiff or any other party

19

to the voicemail communications" while Plaintiff was in California. Cplt. ¶101. *See*

20

*also* Cplt. ¶¶ 47-54, 58, 60, 62-66.  Plaintiff also alleged that Defendants intentionally

---

21

[50]  Defendants have not moved to dismiss Plaintiff's Third Claim For Relief, for violations of Plaintiff's right to privacy under Article I, Section 1, of the California State Constitution, or Plaintiff's Sixth Claim For Relief, for intrusion into private affairs.  Defendants have therefore waived any and all defenses permitted to be made by motion under Federal Rule of Civil Procedure 12(b)(2)-(5).  Fed. R. Civ. P. 12(h)(1)(B).

22

23

24

[51]  *See also, Ribas*, 38 Cal. 3d at 359 (finding the California Legislature indicated "in broad terms its intent to protect the right of privacy of the people of this state from what it perceived as a serious threat to the free exercise of personal liberties that cannot be tolerated in a free and civilized society"); *Tavernetti v. Superior Court*, 22 Cal. 3d 187, 190 (Cal. 1978) ("Section 631, subdivision (a), *broadly* prohibits the interception of wire communications and disclosure of the contents of such intercepted communications." (emphasis added)), *accord People v. Suite*, 101 Cal. App. 3d 680, 686 (Cal. Ct. App. 1980).

25

26

27

28

and willfully accessed and listened to and/or recorded Plaintiff's voicemail messages before they were received or heard by Plaintiff.  Cplt. ¶¶ 49-51, 54-55.

Despite Defendants' contentions to the contrary, Plaintiff was not required to allege Defendants hacked a "facility for transmitting voicemail messages."  D.Mem at 38.  Defendants rely on *Moore v. Cal. State Bd. of Accountancy*, 2 Cal. 4th 999, 1011-12 (1992).   However, in *Moore*, the California Supreme Court rejected Defendants' reasoning, stating: "[A] court's objective is to ascertain and effectuate the underlying legislative intent.  This fundamental rule overrides the *ejusdem generis* doctrine . . . if application of the doctrine . . . would frustrate the intent underlying the statute."  *Id*. at 1012.  Moreover, Defendants err in claiming that Plaintiff's cellular telephone and voicemail system is not an "instrument of any internal telephonic communication system," used to transmit communications (such as voicemails).  Cal. Penal Code §631(a).  Given that California courts interpret the statute broadly, as discussed above, to proscribe "the invasion of privacy resulting from the continual and increasing use of such [new] devises and techniques," Cal. Penal Code §630, it is only reasonable that the statute include Plaintiff's cellular telephone and voice-mail system.

### ii.   *Defendants Disclosed The Content of an Intercepted Wire Communication*

"[D]ivulging the contents of an intercepted communication is an independent act that further intrudes on the privacy of the parties to the communication, beyond the intrusion occasioned by the initial interception[,]" "regardless of the original legality of the interception." *Tavernetti*, 22 Cal. 3d. at 193.  Plaintiff alleged that, in order to increase newspaper sales, Defendants published the information they obtained from Plaintiff's intercepted voicemail messages. Cplt. ¶¶ 15-26, 33, 52-54, 58-68.  These messages were "sent from, or received at" a place within California and were intended for Plaintiff only. Cplt. ¶¶ 47-51, 58-68.  Defendants were not authorized either to access Plaintiff's voicemail messages, or to divulge information contained therein.

Points & Authorities In Opposition

*See generally*, Cplt. ¶¶ 49-51, 54, 55, 57.

Defendants argue that Plaintiff did not allege facts showing Defendants accessed Plaintiff's private communications "while [they were] in transit or passing," as required by §631(a). D.Mem. at 38 (citing *People v. Wilson*, 17 Cal. App. 3d 598, 602-03 (Cal. Ct. App. 1971)). But, *Wilson's* holding that the conduct at issue did not violate §631(a) is inapplicable to this case. In contrast to the facts of this case, *Wilson* concerned messages that were: (1) divulged by their intended recipient, (2) "with the consent of all parties," (3) after they had been received. *Id*., *compare to* Cplt. ¶¶ 49-57.

### iii.   Defendants Participated, Directly or Indirectly, in the Interception or Disclosure of a Wire Communication

Plaintiff clearly alleged that the three Corporate Defendants ". . . agree[d] with, employ[ed], . . ., or conspired with [persons] to unlawfully do, or permit, or cause to be done" the illegal, unauthorized interception of Plaintiff's voicemail message and the publication of information contained therein. Cplt. ¶¶ 100-01.

**California Eavesdropping Statute (Cal. Penal Code §632):** Plaintiff has made a *prima facie* case showing that Defendants violated California's Eavesdropping Statute, Cal. Penal Code §632, therefore, Defendants' motion to dismiss for failure to state a claim under §632 should be dismissed.

Section 632(a) prohibits eavesdropping upon or recording a "confidential communication." A conversation is confidential "if a party to that conversation has an objectively reasonable expectation that the conversation is not being overhead or recorded." *Flanagan v. Flanagan*, 27 Cal. 4th 766 (Cal. 2002). *See also*, Cal. Penal Code §632(c) (West 2011). Plaintiff alleged that Defendants recorded voicemail messages before Plaintiff received and listened to them. Cplt. ¶¶ 52-55. Plaintiff reasonably expected that her voicemail messages (communications) would not be listened to, overhead, or recorded by anyone. Cplt. ¶¶ 49-51, 52, 58-68; Huthart Decl.

¶16.  These facts are sufficient to make a *prima facie* case showing that Plaintiff has a claim for relief under this statute.

Defendants assert that Plaintiff was required to allege "an act of eavesdropping or recording contemporaneous with a communication." D.Mem. at 39 (emphasis added).  However, in *Flanagan*, the Court interpreted §632(c) to "include[] . . . any conversation under circumstances showing that a party desires it not to be overhead or recorded[,]" "regardless of whether the party expects that the content of the conversation may later be conveyed to a third party." *Flanagan*, 27 Cal. 4th at 774-75.  *Flanagan's* language regarding "simultaneous dissemination [of a communication] to an unannounced second auditor," D.Mem. at 39 (quoting *Flanagan,* 27 Cal. 4th at 775), was dicta illustrating "the critical distinction between eavesdropping upon or recording a conversation and later disseminating its contents." *Id*.  The court was merely clarifying that §632 does not prohibit "later" dissemination–for example by publication–of the communication.  Since Defendants recorded the voicemail message before it was received–i.e., before the communication was completed, this recording was precisely the kind prohibited by §632.

Defendants' reliance on *Marich v. MGM/UA Telecomms., Inc.*, 113 Cal. App. 4th 415, 431 (Cal. Ct. App. 2004), is likewise unavailing. *See* D.Mem at 39.  *Marich* sustained the lower court's holding that the act of editing a recording was not an independent violation of §632, in addition to the original recording, finding that to hold otherwise would be the same as finding a new violation "every time that the original eavesdropper listens to the illegal recording." *Marich*, 113 Cal. App. At 431.  Moreover, *Marich* was actually quoting *People v. Drennan*, 84 Cal. App. 4th 1349, 1356 (2000), which stated, in full, that §632 prohibits "(1) a 'real time' interception of a communication, by which the perpetrator listens to the communication as it occurs; and (2) a mechanical recording of a communication for later play back."

**California Telephonic Communication Interception Statute (Cal. Penal**

**Code §632.7):** Defendants also contend that Plaintiff has not stated a cause of action under California Penal Code §632.7 because Plaintiff's messages were not "transmitted," as the term is used in the statute.  D.Mem. at 40.  However, Plaintiff's voicemail messages are clearly within the ambit of the statute's protection.  The plain language of the statute states that "communication" "includes, but is not limited to, communications transmitted by voice, data, or image, including facsimile[,]" Cal. Penal Code §632.7(c)(3) (emphasis added), and §632.7 has been interpreted to prohibit "the intentional interception or recording of a communication involving a cellular phone or a cordless phone." *Flanagan*, 27 Cal. 4th at 775-776.

**Constructive Invasion of Privacy:** Plaintiff's Complaint shows that Defendants constructively invaded Plaintiff's privacy when they captured a sound recording of Plaintiff's personal and familial activities, using an auditory enhancing device.  Defendants' conduct was offensive to a reasonable person: intentionally recording Plaintiff's voicemail without authorization for the sole purpose of financial gain clearly violates basic notions of privacy and reasonable conduct. Cplt. ¶¶ 47-55, 60-66, 112-13, 116.  The Complaint sets forth facts showing Defendants recorded Plaintiff's personal and familial activities, including personal communications concerning her husband and daughter. Cplt. ¶¶ 47-51, 58-66; Huthart Decl. ¶¶ 11, 15.

Plaintiff clearly alleged that Defendants used an auditory enhancing device, i.e., a device without which Defendants would not have been able to capture a recording.  Cplt. ¶¶ 52-55, 60-67.  While "auditory enhancing device" may "include 'powerful telephoto lenses and hyperbolic microphones,'" D.Mem. at 41 (quoting 2009 Cal. Legis. Serv. Ch. 449 (A.B. 524 §1(b)), there is no reason to assume the statute includes only these devices.  The statute was intended to prohibit the "invasion of private areas that would otherwise be impossible without trespassing," without the use of such a device.  2009 Cal. Legis. Serv. Ch. 449 (A.B. 52 §1[b]).  Defendants used cellular telephones and land-line phones to enable them to trespass into

Plaintiff's voicemail and record her messages and thereby violated the statute.  *See* Cplt. ¶¶ 20, 31, 49-67 (especially ¶55).

### F.   PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

Plaintiff's claims are timely and should not be dismissed on statute of limitations grounds.  The statute of limitation for civil claims under both the SCA and the WA is two years from the date when the claimant "first discovered or had a reasonable opportunity to discover" the violation.  18 U.S.C. §2707(f) and 18 U.S.C. §2520(e).  The California state law claims under Article I, Section 1 of the California State Constitution, California Civil Code §§ 1708.8(b), 1708.8(d) and 1708.8(e), and California Common Law for Intrusion Into Private Affairs are also governed by a two-year statute of limitations.[52]

In California, federal and state courts apply the discovery rule when it would be "manifestly unjust to deprive Plaintiffs of a cause of action before they are aware that they have been injured."[53]  *Raphael v. State Farm Fire and Cas. Co.*, 1990 WL 58238, *3 (9th Cir. 1990).  Under the discovery rule, a cause of action accrues when the plaintiff has "inquiry notice," that is, when the "plaintiff either (1) actually discovered his injury and its negligent cause or (2) could have discovered injury and cause through the exercise of reasonable diligence."  *April Enter.*, 147 Cal. App.3d at

---

[52]   Cal. Penal Code §§ 630, 631, 632, 632.7 and 637(2)(a) are governed by a one-year statute of limitations.  Plaintiff reserves the right to amend the Complaint to the extent facts obtained later in the litigation, including, but not limited to during discovery, reveal that Plaintiff's claims under the California Penal Code are timely.

[53]   "[In] all the types of actions where courts have applied the discovery rule[, t]he injury or the act causing the injury, or both, have been difficult for the plaintiff to detect.  In most instances, in fact, the defendant has been in a far superior position to comprehend the act and the injury . . . .  Thus, there is an underlying notion that plaintiffs should not suffer where circumstances prevent them from knowing they have been harmed.  And . . . Defendants should not be allowed to knowingly profit from their injuree's ignorance."  *April Enterprises v. KTTV*, 147 Cal. App.3d 805, 831 (Cal. Ct. App. 1983).

Points & Authorities In Opposition

827 (internal quotations omitted).[54]   In a case dealing specifically with covert monitoring of communications, *Montalti v. Catanzariti*, 191 Cal. App.3d 96 (Cal. Ct. App. 1987), the court stated, "The Legislature has declared its purpose to protect the citizens of this state from secret monitoring of their private communications. It would be incongruous and inconsistent with that stated aim to hold that the statute of limitations begins to run while the monitoring remains secret." *Id*. at 99-100 (citation omitted).

Plaintiff's complaint made specific allegations of when and how she discovered Defendants had hacked her voicemail.[55] Cplt. ¶¶ 60-61. More specifically, Plaintiff's declaration states that on July 6, 2011, the MPS informed her of evidence that Defendants had hacked her cellular telephone and/or voicemail while she was in England.[56] Huhart Decl. ¶12. Plaintiff filed her Complaint less than two years after July 6, 2011. Plaintiff did not know and had no reason to know she had been targeted by the Hacking Scheme prior to July 6, 2011. Huhart Decl. ¶13. In fact, Defendants had made a concerted effort to cover-up their hacking activities, Cplt. ¶¶ 22-32, and the Crown Prosecution Service's full charge-sheet against Defendants was not dated until July 24, 2012. Cplt. ¶61.

Unlike the plaintiffs in the cases cited by Defendants, prior to her meeting

---

[54]  *See also, e.g., Ward v. Westinghouse Canada, Inc.*, 32 F.3d 1405, 1407 (9th Cir. 1994) (under the discovery rule, the statute of limitations begins to run when a reasonable person in Plaintiff's position is on "inquiry notice" of "potential wrongdoing"); *Montalti v. Catanzariti*, 191 Cal. App.3d 96, 99 (Cal. Ct. App. 1987) (claim accrues when Plaintiff knew or should have known of defendants's unlawful acts).

[55]  California law does not require Plaintiff to plead specifically *when* the cause of action accrued; it is the Defendants' responsibility to offer evidence of this date if it raises the statute of limitations as a defense. *California Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1406-07 (9th Cir. 1995).

[56]  While the Complaint does not specifically allege the date when the meeting with the Metropolitan Police occurred, at this incipient stage of the proceeding, Plaintiff may amend her Complaint as a matter of right. *New v. Armour Pharm. Co.*, 67 F.3d 716 (9th Cir. 1995).

52

with the MPS, Plaintiff never suspected that the problems she experienced with her cellular telephone voicemail were caused by wrongdoing of any kind.  Rather, Plaintiff believed there was a technical problem with the voicemail service and/or her cellular telephone and contacted Vodafone more than once.  Cplt. ¶¶ 49, 56.

Contrary to Defendants' allegations, Plaintiff was not placed on inquiry notice on or before April 2011.  Huthart Decl. ¶¶ 12-13.  No reasonable person would have had reason to believe they were hacked merely because NI and NGN issued statements in April 2011 admitting to hacking activities in England.  These statements did not put Plaintiff on "inquiry notice" that she might have been the target of Defendants' hacking in England or the U.S.  This is true even though Plaintiff had been having problems with her voicemail while in the U.S. in 2004 and 2005.  It was reasonable for Plaintiff to believe that she was experiencing service problems during that period.  NI and NGN statements were issued some six or seven years later, and she had no reason to connect them to her long-past service problems.

Nor did the fact that *The News of the World* and *The Sun* published stories in 2004 and 2005 that contained private information known to an intimate group of individuals put Plaintiff on "inquiry notice."  Plaintiff knew that she had not revealed this information to either publication and, again, had no reason to believe she had been hacked.  Defendants' April 2011 statements were broad statements, giving no indication as to who the targets were, which stories had relied on illicitly obtained information, and whether any hacking had affected anyone in the U.S.  Plaintiff had no reason to suspect she was a victim of Defendants' conduct.[57]

Most significantly, the Ninth Circuit and California state courts have held that the question of when a party actually discovered, or reasonably should have

---

[57]   It was most reasonable to believe that these tabloids had obtained information about Jolie and Pitt through a source, rather than through Plaintiff's voicemail, even after the hacking was revealed.

Points & Authorities In Opposition

discovered, his or her cause of action is a question of fact and therefore, the instant motion to dismiss is not a proper vehicle to decide this issue. *See, e.g., Akkerman v. Mecta Corp.*, 72 Fed. Appx. 652, 654 (9th Cir. 2003) (a jury should make the finding of when plaintiffs actually suspected or reasonably should have suspected defendant's wrongdoing); *DISH Network LLC v. Vicxon Corp.*, 923 F. Supp.2d 1259 (S.D. Calif. 2013) (the question of when plaintiffs first had a reasonable opportunity to discover a violation is a question of fact).[58]

Finally, contrary to Defendants' suggestion, the Court should not take judicial notice of NI's April 2011 "public admission" of liability as foreclosing the argument that the statute of limitations began to run later than April 2011. D.Mem at 45. In *Chapman Univ. v. Atl. Richfield Co.*, CV 12-05680 DOC ANX, 2013 WL 3946117, *3 (C.D. Cal. July 30, 2013), the court held that "[a]lthough a Court may take judicial notice of the foundational documents and their facts, the Court is not permitted to take notice concerning 'one party's opinion' as to how the recognized documents and their facts should be interpreted." *Id*. (citing *San Luis Unit Food Producers v. U.S.*, 772 F. Supp.2d 1210, 1216 n. 1 (E.D. Cal. 2011)).

When the parties offer alternative explanations of the facts, this Court should not grant a motion to dismiss under Rule 12(b)(6). *Id*. (citing *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). Therefore, Defendants' motion to dismiss should be denied, leaving the issue of when Plaintiff had reasonable opportunity to discover that her voicemail had been hacked, an issue of fact, to be decided at trial.

## CONCLUSION

For the reasons shown, Defendants' Motion to Dismiss should be denied in all respects, and for such other and further relief as the Court deems just and proper,

---

[58]   The cases cited by Defendants also find that the issue of when a plaintiff knew or should have known of wrongdoing is an issue of fact. *See, Migliori v. Boeing North Am., Inc.*, 114 F.Supp.2d 976 (C.D. Cal. 2000); *Bibeau v. Pac. Northwest Research Found. Inc.*, 188 F.3d 1105, 1108 (9th Cir. 1999).

including but not limited to, leave to file an Amended Complaint and/or the opportunity to conduct discovery.

Dated: December 9, 2013

SIEGEL TEITELBAUM & EVANS, LLP

/s/ Norman Siegel
Norman Siegel
Saralee Evans
Herbert Teitelbaum

McLAUGHLIN & STERN LLP

/s/ Paul H. Levinson
Steven J. Hyman
Paul H. Levinson
Bruce A. Langer

THE STEIN LAW FIRM

/s/ Craig J. Stein

Attorneys for Plaintiff*

*The Attorneys wish to express their appreciation to Kate Fletcher, Jonathan Jeremias, Jacqueline Gerrald and Harleigh Tensen for their assistance in the preparation of this Memorandum.

Points & Authorities In Opposition