1  Louis A. Karasik (Cal. Bar # 100672)
   Alston & Bird LLP
2  333 South Hope Street, 16th Floor
   Los Angeles, CA  90071-3004
3  Telephone:  (213) 576-1148
   Facsimile:   (213) 576-1100
4  Email:  lou.karasik@alston.com

5  Brendan V. Sullivan (*Pro Hac Vice*)
   Tobin J. Romero (*Pro Hac Vice*)
6  Joseph M. Terry (*Pro Hac Vice*)
   Jonathan B. Pitt (*Pro Hac Vice*)
7  Williams & Connolly LLP
   725 Twelfth Street, N.W.
8  Washington, DC  20005
   Telephone:  (202) 434-5000
9  Facsimile:   (202) 434-5029
   Email:  jpitt@wc.com

10
11 Counsel for Defendants News
   Corporation, NI Group Limited f/k/a
   News International Limited, News Group
12 Newspapers Limited

13              **UNITED STATES DISTRICT COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15

| | |
|---|---|
| 16  EUNICE HUTHART,            ) | Case No. CV 13-4253 MWF (AJWx) |
| 17        Plaintiff,           ) | Honorable Michael W. Fitzgerald |
| 18  v.                         ) | **REPLY IN SUPPORT OF** |
| 19  NEWS CORPORATION, NI GROUP ) | **DEFENDANTS' MOTION TO DISMISS** |
| 20  LIMITED f/k/a NEWS         ) | **[FED. R. CIV. P. 12]** |
|     INTERNATIONAL LIMITED, NEWS ) | |
| 21  GROUP NEWSPAPERS LIMITED,  ) | [Filed concurrently with |
| 22  and JOHN and JANE DOES 1-10, ) | Declarations of Christa Jane Band, |
|        Defendants.            ) | David Hibbert, Christopher Charles |
| 23 | Stoddart Longcroft, Craig Wyndham |
| 24 | Orr QC, Jonathan B. Pitt, Marc |
|    | Rogers, and Pete Samson] |

16  EUNICE HUTHART,

        Plaintiff,

v.

NEWS CORPORATION, NI GROUP
LIMITED f/k/a NEWS
INTERNATIONAL LIMITED, NEWS
GROUP NEWSPAPERS LIMITED,
and JOHN and JANE DOES 1-10,

        Defendants.

25

26  Date:          February 24, 2014
    Time:          10:00 a.m.
27  Courtroom:     1600

28  Complaint Filed:  June 13, 2013

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

ARGUMENT ........................................................................................................ 3

I.   THE COURT SHOULD DISMISS ALL CLAIMS UNDER THE DOCTRINE OF *FORUM NON CONVENIENS* ....................................... 3

    A.   THE COURTS OF ENGLAND AND WALES ARE AN AVAILABLE AND ADEQUATE FORUM. ....................................... 3

    B.   THE BALANCING OF PRIVATE AND PUBLIC INTERESTS GREATLY FAVORS ENGLAND OVER THE UNITED STATES. ............................................................................................. 6

        1.   The Private Interest Factors Greatly Favor Transfer. ............... 6

        2.   The Public Interest Factors Overwhelmingly Favor Transfer. ........................................................................... 11

II.  THE COURT LACKS JURISDICTION OVER NI AND NGN. ........... 13

    A.   THE COURT LACKS SPECIFIC JURISDICTION. ......................... 13

        1.   Plaintiff Cannot Meet the Purposeful Direction Test. ............. 13

        2.   Exercising Jurisdiction Would Be Unreasonable. ................... 19

    B.   THE COURT LACKS GENERAL JURISDICTION. ....................... 20

    C.   PLAINTIFF IS NOT ENTITLED TO JURISDICTIONAL DISCOVERY ........................................................................ 23

III. IF THE COURT RETAINS JURISDICTION, IT SHOULD DISMISS ALL CLAIMS FOR FAILURE TO STATE A CLAIM. ...... 23

    A.   PLAINTIFF FAILS TO STATE CLAIMS AGAINST NEWS CORP. AND NI. ................................................................ 23

    B.   THE WIRETAP ACT AND STORED COMMUNICATIONS ACT CLAIMS REQUIRE IMPERMISSIBLE EXTRATERRITORIAL APPLICATIONS OF FEDERAL LAW.... 25

        1.   Neither Federal Statute Applies Extraterritorially. ................. 25

        2.   Plaintiff's Claims Depend on Extraterritorial Application of the Wiretap Act and Stored Communications Act. ............. 28

    C.   PLAINTIFF CANNOT STATE A CLAIM UNDER THE FEDERAL WIRETAP ACT OR CALIFORNIA PENAL CODE..... 30

    D.   PLAINTIFF FAILS TO STATE A CLAIM UNDER THE CALIFORNIA CIVIL CODE. ................................................... 32

i

E.     PLAINTIFF'S CLAIMS ARE TIME-BARRED.............................. 33

**CONCLUSION**............................................................................... 35

REPLY ISO DEFENDANTS' MOTION TO DISMISS

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Air Crash over the Mid-Atlantic on June 1, 2009*,
760 F. Supp. 2d 832 (N.D. Cal. 2010)................................................................ 11

*In re Air Crash over the Mid-Atlantic on June 1, 2009*,
792 F. Supp. 2d 1090 (N.D. Cal. 2011)................................................................ 4

*In re Air Crash over the Taiwan Straits on May 25, 2002*,
331 F. Supp. 2d 1176 (C.D. Cal. 2004)................................................................ 9

*In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043
(C.D. Cal. 2012) ................................................................................................ 34

*Anderson v. Abbott*, 321 U.S. 349, 64 S. Ct. 531, 88 L. Ed. 793 (1944) ................. 24

*Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082
(9th Cir. 2000) ............................................................................................ 15, 20

*In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052
(N.D. Cal. 2010) ................................................................................................ 22

*Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909 (9th Cir. 2011).......... 12, 19, 22, 25

*Bd. of Trs. of Mill Cabinet Pension Trust Fund for N. Cal. v. Valley
Cabinet & Mfg. Co.*, 877 F.2d 769 (9th Cir. 1989) ............................................. 24

*Betz v. Trainer Wortham & Co., Inc.*, 519 F.3d 863 (9th Cir. 2008)........................ 35

*Brainerd v. Governors of the Univ. of Alberta*, 873 F.2d 1257
(9th Cir. 1989) ............................................................................................ 15, 20

*Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124
(9th Cir. 2010) ............................................................................................ 16, 20

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S. Ct. 2174,
85 L. Ed. 2d 528 (1985) .................................................................................... 15

*Carijano v. Occidental Petrol. Corp.*, 643 F.3d 1216 (9th Cir. 2011) ...................... 9

*Cattie v. Wal-Mart Stores, Inc.*, 504 F. Supp. 2d 939 (S.D. Cal. 2007) ................... 23

*Celerity, Inc. v. Ultra Clean Holding, Inc.*, No. C 05–4374,
2007 WL 205067 (N.D. Cal. Jan. 25, 2007)........................................................ 8

*Chapman University v. Atlantic Richfield Co.*, No. CV 12-05680,
2013 WL 3946117 (C.D. Cal. July 30, 2013) ...................................................... 34

*Cheng v. Boeing Co.*, 708 F.2d 1406 (9th Cir. 1983) ........................................... 5, 11

*Compania Naviera Joanna SA v. Koninklijke Boskalis Westminster NV*,
569 F.3d 189 (4th Cir. 2009)................................................................................ 4

*Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446
(9th Cir. 1990) ........................................................................... 5, 9

*Cook v. Champion Tankers AS*, No. 12-cv-01965, 2013 WL 1629136
(N.D. Cal. Apr. 16, 2013) ................................................................ 4

*Daimler AG v. Bauman*, 571 U.S. __, __ S. Ct. __, 2014 WL 113486
(2014) ......................................................... 12, 19, 22, 25

*Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152 (9th Cir. 2012) ............................. 34

*Deirmenjian v. Deutsche Bank, A.G.*, No. CV 06-00774,
2006 WL 4749756 (C.D. Cal. Sept. 25, 2006) ...................... 6, 10

*Dole Food Co., Inc. v. Watts*, 303 F.3d 1104 (9th Cir. 2002) ........................... 15, 20

*Duha v. Agrium, Inc.*, 448 F.3d 867 (6th Cir. 2006) ................................... 9

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 111 S. Ct. 1227,
113 L. Ed. 2d 274 (1991) (*Aramco*) ...................... 26

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*,
284 F.3d 1114 (9th Cir. 2002) .................................. 20

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S. Ct. 839, 91 L. Ed. 1055
(1947) ................................................ 10

*Gullone v. Bayer Corp.*, 484 F.3d 951 (7th Cir. 2007) .................................... 6

*Holland Am. Line Inc. v. Wartsila N.A., Inc.*, 485 F.3d 450
(9th Cir. 2007) ............................................... 21

*Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002) ...................... 31, 32

*Kreek v. Wells Fargo & Co.*, 652 F. Supp. 2d 1053 (N.D. Cal. 2009) .............. 33, 35

*Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764
(9th Cir. 1991) ................................................... 5

*Love v. Associated Newspapers, Ltd.*, 611 F.3d 601 (9th Cir. 2010) ............ 16, 20

*Lueck v. Sundstrand Corp.*, 236 F.3d 1137 (9th Cir. 2001) ...................... 5

*Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218
(9th Cir. 2011) ......................................... 15, 20, 21, 22

*Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 130 S. Ct. 1784,
176 L. Ed. 2d 582 (2010) ...................... 35

*Metro. Life Ins. Co. v. Neaves*, 912 F.2d 1062 (9th Cir. 1990) ................. 15, 20

*Morrison v. National Bank of Australia Ltd.*, 130 S. Ct. 2869,
177 L. Ed. 2d 535 (2010) ...................... 26, 27, 28, 30

*Nat'l Enquirer, Inc. v. News. Grp. News, Ltd.*, 670 F. Supp. 962
(S.D. Fla. 1987) ........................................ 21

*Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101
  (C.D. Cal. 2003) ............................................................ 22

*No Cost Conference, Inc. v. Windstream Commc'ns, Inc.*,
  940 F. Supp. 2d 1285 (S.D. Cal. 2013) ............................ 25

*Pebble Beach Co. v. Caddy*, 453 F.3d 1151 (9th Cir. 2006) ................. 13, 14, 16, 21

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S. Ct. 252,
  70 L. Ed. 2d 419 (1981) ...................................................... passim

*Richardson v. Arco Chem. Co.*, No. CIV. A. 95-6185, 1996 WL 529999
  (E.D. Pa. Sept. 19, 1996) ..................................................... 8

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797
  (9th Cir. 2004) ............................................................ 15, 16, 20

*Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105 (9th Cir. 1979) ............ 24

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422,
  127 S. Ct. 1184, 167 L. Ed. 2d 15 (2007) ................................. 2

*Stowe v. Devoy*, 588 F.2d 336 (2d Cir. 1978) ........................... 30

*United States v. Bestfoods*, 524 U.S. 51, 118 S. Ct. 1876,
  141 L. Ed. 2d 43 (1998) .................................................. 23, 24

*United States v. Bonds*, 608 F.3d 495 (9th Cir. 2010) ................... 25

*United States v. Bowman*, 260 U.S. 94, 43 S. Ct. 39,
  67 L. Ed. 149 (1922) ...................................................... 26

*United States v. Chao Fan Xu*, 706 F.3d 965 (9th Cir. 2013) ................ 26

*United States v. Cotroni*, 527 F.2d 708 (2d Cir. 1975) ................... 30

*United States v. Peterson*, 812 F.2d 486 (9th Cir. 1987) ................. 25

*United States v. Price*, 361 U.S. 304, 80 S. Ct. 326,
  4 L. Ed. 2d 334 (1960) .................................................... 28

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ..................... 26

*Vivendi SA v. T-Mobile USA Inc.*, 586 F.3d 689 (9th Cir. 2009) ............... 6, 10, 12

*Wash. Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668
  (9th Cir. 2012) ............................................................ 16, 17, 20

*Wood v. Santa Barbara Chamber of Commerce, Inc.*, 507 F. Supp. 1128
  (D. Nev. 1980) ............................................................ 19

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286,
  100 S. Ct. 559, 62 L. Ed. 2d 490 (1980) ................................. 13

*Wyatt Tech. Corp. v. Smithson*, No. 05-1309, 2006 WL 5668246
  (C.D. Cal. Aug. 14, 2006) ................................................. 30

*Wyatt Technology Corp. v. Smithson*, 345 F. App'x 236 (9th Cir. 2009) ................ 30

*Xcentric Ventures, LLC v. Bird*, 683 F. Supp. 2d 1068 (D. Ariz. 2010) .................. 14

*Zheng v. Yahoo! Inc.*, No. C-08-1068, 2009 WL 4430297
(N.D. Cal. Dec. 2, 2009) ......................................................................... 26

## STATE CASES

*Crosse v. BCBSD, Inc.*, 836 A.2d 492 (Del. 2003) ...................................... 24

*Slovensky v. Friedman*, 142 Cal. App. 4th 1518, 49 Cal. Rptr. 3d 60
(2006) ................................................................................................. 34

*Tavernetti v. Super. Ct.*, 22 Cal. 3d 187, 148 Cal. Rptr. 883 (1978) ................. 30, 32

## FEDERAL STATUTES

18 U.S.C. § 2510 .............................................................................. 26, 27, 30

18 U.S.C. § 2511 ...................................................................................... 29

18 U.S.C. § 2701 ................................................................................... 29, 30

## STATE STATUTES

Cal. Civ. Code § 1708.8 .......................................................................... 32, 33

Cal. Penal Code § 631(a) ............................................................................ 31

Cal. Penal Code § 632(a) ............................................................................ 32

Cal. Penal Code § 632.7(a) .......................................................................... 32

## OTHER

H.R. Rep. No. 99-647 ................................................................................ 28

S. Rep. No. 99-541 ................................................................................ 27, 29

8 Charles A. Wright et al., *Federal Practice and Procedure* § 2008.3
(3d ed. 2010) ...................................................................................... 23

17 James W. Moore, *Moore's Federal Practice-Civil* § 111.74
(3d ed. 2013) ..................................................................................... 6, 7

vi

## **INTRODUCTION**

Plaintiff's Opposition only confirms why this matter should proceed in the UK. The facts as alleged or conceded by Plaintiff demonstrate that this case bears only the most attenuated connections to the U.S., and none that would justify exercising jurisdiction over the foreign Defendants, applying U.S. law to the conduct alleged, burdening the parties and witnesses—nearly all of whom are located in the UK—with the costs and inconvenience of litigating in the U.S., or imposing upon this Court and a California jury the task of adjudicating a UK citizen's complaints about the UK conduct of other UK citizens.

Plaintiff concedes she is a UK citizen and resident, as are each of the Defendants she accuses of wrongdoing.[1] She concedes the alleged wrongful conduct is that of UK citizens who, while in the UK and acting on behalf of UK entities, improperly accessed a UK server containing voicemails left on Plaintiff's UK phone—all for the purpose of gathering information to publish in UK newspapers. In contrast, Plaintiff asserts only the barest of connections to the forum: that she happened to be in California on some unspecified number of occasions when individuals in the UK accessed her voicemail.

It is simply not credible for Plaintiff to claim she "chose this forum in order to be assured of proper jurisdiction, given her ongoing ties to the forum." Opp. at 7 n.3. Nor is it consistent with the statements of her counsel. At a press conference announcing that he had "teamed up with U.S.-based lawyer Norman Siegel . . . to take on [Rupert] Murdoch," Mark Lewis, Plaintiff's UK counsel, stated that he had decided to file suit in a U.S. forum because "the American damages in civil claims are far higher than might be awarded in an English court." Pitt Decl. Ex. 3. And in his declaration opposing this Motion, Mr. Lewis argues the English system is

---

[1] News Corp., Plaintiff admits, is being sued only because it is the parent of News Group News (NGN) and News International (NI), not because News Corp. had any involvement in the alleged accessing of her voicemail.

inadequate because it might not permit him to obtain U.S.-style discovery of News Corp. as to liability issues if Defendants were to admit liability.  Lewis Decl. ¶ 16.

The tactical benefits of a U.S. courtroom, however, cannot suffice to make this an appropriate forum for Plaintiff's claims, much less to confer jurisdiction over them.  Plaintiff cites no case in which any court has exercised jurisdiction over out-of-forum defendants, or declined to dismiss for *forum non conveniens*, under the same or similar circumstances.  Indeed, Plaintiff invites the Court to make new law or rule contrary to settled law by, for example:  (1) holding that a UK court cannot provide adequate redress to a UK citizen suing other UK citizens for wrongdoing committed on UK soil; (2) holding that where a plaintiff purports to plead a claim under a U.S. statute, only a U.S. court can provide an adequate forum; (3) holding that any foreign jurisdiction that lacks American-style discovery and has a "loser pays" rule is inadequate; (4) finding personal jurisdiction over a foreign defendant based solely on allegedly foreseeable effects in the forum; (5) piercing the corporate veil on the basis of a Complaint devoid of any allegations of misuse of the corporate form; and (6) holding that the discovery rule suspends a statute of limitations until a plaintiff has <u>actual</u> knowledge of all facts underpinning her cause of action, regardless of how deeply her head was buried in the sand.

For the reasons set forth below, the Court should decline each of these invitations.  There is no need for it to address most of these issues, however.  Because "[t]his is a textbook case for immediate *forum non conveniens* dismissal," *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 435, 127 S. Ct. 1184, 1194, 167 L. Ed. 2d 15, 28 (2007), the Court should exercise its "discretion to respond at once to [the] defendant[s'] *forum non conveniens* plea, and need not take up first any other threshold objection," *id.* at 425.

# **ARGUMENT**

## I.   **THE COURT SHOULD DISMISS ALL CLAIMS UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*.**

The conceded facts plainly establish that the center of gravity of this dispute is the UK—where all of the relevant, alleged conduct took place, where most (if not all) potential witnesses and documents are located, and whose government has actively investigated and prosecuted the very conduct alleged in the Complaint.  Plaintiff cannot cite a single case that has declined to transfer under these circumstances and can offer no compelling reason why this Court should be the first to do so.

### A.   **THE COURTS OF ENGLAND AND WALES ARE AN AVAILABLE AND ADEQUATE FORUM.**

No U.S. court has ever found the courts of Plaintiff's home forum, England, to be inadequate.[2]  Plaintiff does not dispute that she can refile her claims there and that those courts have jurisdiction over her claims (*see* Defs.' Mem. at 8–11; Orr Decl. ¶ 20), recognize several causes of action that provide remedies for the wrongdoing alleged (*see* Orr Decl. ¶¶ 11–18), and have substantial experience resolving voicemail-access claims just like hers (*see* Band Decl. ¶¶ 4–8, 10–14).  Instead, she voices three meritless complaints about the Courts of England and Wales that should have no bearing on the Court's *forum non conveniens* analysis.

*First*, Plaintiff asserts that two particular avenues of recovery in the UK—the Voluntary Compensation Scheme and the Mobile Telephone Voicemail Interception Litigation ("MTVIL") system—are not "available"—the compensation scheme because it has closed, and the MTVIL because the time for having claims consolidated into the current tranche of MTVIL cases is fast approaching.  Opp. at 4–5; Lewis Decl. ¶¶ 7, 15.  But even if Plaintiff were barred from using one or both of the avenues specifically set up to deal with claims like hers, a third remains

---

[2] Defendants' counsel have found no such case, and Plaintiff identifies none.

available:  the regular civil litigation processes of the courts of England and Wales, separate and apart from the MTVIL process or the Voluntary Compensation Scheme. She does not deny that she could file and pursue her claims in English courts.

Moreover, the MTVIL procedures—which offer, by far, the most efficient means of resolving this matter—do remain open to her.  The time for having new claims consolidated into the current tranche of MTVIL cases presently is not set to elapse until January 31, 2014.  *See* Band 2d Decl. ¶ 15.  And even if she missed that date, Plaintiff could apply to have her case consolidated into the current tranche of MTVIL cases, and Defendants would consent.  *Id.*

At some point, however, the Court cannot reward Plaintiff's concerted refusal to avail herself of the opportunities to pursue her claim in the UK.  Plaintiff knew about the MTVIL process well before she filed this lawsuit.  Since the MTVIL's inception, her UK attorney has represented scores of litigants in that very process. She surely knew of it by September 20, 2013, when this Motion was filed. Nevertheless, Plaintiff not only delayed filing in her home forum, she actively sought to forestall this Court's consideration of this Motion until after the claimed January 31, 2014 "deadline" has lapsed.[3]  When a plaintiff "deliberately allow[s] any deadline for filing claims . . . to pass," she "should not be heard to complain that an available forum, having jurisdiction over the parties and over most of the witnesses, is not available." *Compania Naviera Joanna SA v. Koninklijke Boskalis Westminster NV*, 569 F.3d 189, 203 (4th Cir. 2009) (emphasis in original).[4]  In any case, Plaintiff still has access to the courts of England and Wales.

---

[3] Plaintiff initially requested and was granted a hearing date of January 6, 2014, four weeks before the claimed deadline.  *See* Dkt. No. 25 (July 17, 2013); Dkt. No. 39 (Sept. 19, 2013).  She subsequently requested that the hearing date be pushed back to February 10, 2014, and later requested and was granted a second continuance to February 24, 2014.  *See* Dkt. No. 47 (Nov. 15, 2013); Dkt. No. 53 (Dec. 17, 2013).

[4] *Accord Cook v. Champion Tankers AS*, No. 12-cv-01965, 2013 WL 1629136, at *5 (N.D. Cal. Apr. 16, 2013); *In re Air Crash over the Mid-Atlantic on June 1, 2009*, 792 F. Supp. 2d 1090, 1094–95 (N.D. Cal. 2011).

*Second*, Plaintiff suggests English courts could not competently interpret the federal and state causes of action invoked in her complaint. Opp. at 4, 8. But the question is not which court would best apply U.S. law—if it were, no foreign court would ever be adequate, and a foreign defendant could always defeat a *forum non conveniens* motion by pleading U.S. causes of action. That is not the law.[5] A forum is inadequate "only in rare circumstances where the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory, that it is <u>no remedy at all</u>." *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1143 (9th Cir. 2001) (alterations and internal quotation marks omitted).[6] English courts are competent to apply U.S. or California law if necessary, Orr 2d Decl. ¶ 35, but they need not do so, because English law provides a remedy—and has done so for hundreds of similar claimants.

An English court would likely not apply U.S. law to this case, Orr 2d Decl. ¶¶ 30–34, but would instead invoke the numerous English causes of action for invasion of privacy and unauthorized access of voicemail data, Orr Decl. ¶¶ 11–18. Plaintiff cannot claim that the application of English law would somehow deprive her of an adequate forum: "[t]he possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the *forum non conveniens* inquiry," *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 247, 102 S. Ct. 252, 261, 70 L. Ed. 2d 419, 430 (1981), and Plaintiff does not even attempt to argue that the causes of action available to her in the UK amount to "no remedy at all."

*Third*, Plaintiff complains that English courts are less plaintiff-friendly than those of the U.S. because they do not permit the same type of expansive discovery

---

[5] *See, e.g., Cheng v. Boeing Co.*, 708 F.2d 1406, 1410–11 (9th Cir. 1983) (Taiwanese courts competent to apply U.S. law); *Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1451 n.3 (9th Cir. 1990) (Filipino courts competent to apply U.S. law; *see generally Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 771 (9th Cir. 1991) ("[E]ven assuming the applicability of U.S. law, appellants have no entitlement to have their case heard in a U.S. court." (internal quotation marks omitted)).

[6] All emphases herein are supplied by the authors unless otherwise noted.

5

and because they allow fee-shifting under the "loser pays" rule. Plaintiffs seeking to avoid transfer to England routinely invoke these features, yet no U.S. court has found English courts to be inadequate. Indeed, U.S. courts have expressly rejected such criticisms.[7] And in any event, "differences in the scope and mode of discovery— indeed, even the complete absence of pretrial discovery" also "do not render a forum inadequate." *Deirmenjian v. Deutsche Bank, A.G.*, No. CV 06-00774, 2006 WL 4749756, at *10 (C.D. Cal. Sept. 25, 2006).[8]

## B.    THE BALANCING OF PRIVATE AND PUBLIC INTERESTS GREATLY FAVORS ENGLAND OVER THE UNITED STATES.

### 1.    The Private Interest Factors Greatly Favor Transfer.

"In cases concerning foreign plaintiffs, [the Ninth Circuit] rarely has reversed a district court's grant of a motion to dismiss for *forum non conveniens*." *Vivendi SA v. T-Mobile USA Inc.*, 586 F.3d 689, 694 (9th Cir. 2009). The Supreme Court has upheld, and noted with approval, district court decisions affording a foreign plaintiff's choice of forum "little weight." *Piper*, 454 U.S. at 242, 244. Not only are "foreign plaintiffs [] entitled to less deference than are plaintiffs who file suit in their home forums," *Vivendi*, 586 F.3d at 693, but whatever nominal deference a foreign plaintiff is owed is diminished even further where, as here, "it appears that the plaintiff's choice . . . was motivated by forum-shopping reasons, such as . . . attempts to win a tactical advantage resulting from local laws." 17 James W. Moore, *Moore's Federal Practice-Civil* § 111.75 (3d ed. 2013); *accord Piper*, 454 U.S. at 242, 255.

---

[7] *Gullone v. Bayer Corp.*, 484 F.3d 951, 958 (7th Cir. 2007) ("Obviously the English Rule is less favorable to plaintiffs whose chances of losing are too great . . . but . . . that must be regarded as the kind of unfavorable difference in legal system that carries little weight. In fact, the U.S. stands almost alone in its approach toward attorneys' fees, and so if we were to find that dismissal was wrong for this reason, we would risk gutting the doctrine of *forum non conveniens* entirely.").

[8] Moreover, as discussed by Defendants' expert, there simply is no basis to claim that pretrial disclosure in England would deny Plaintiff any information or document relevant to any material disputed issue of fact. Orr 2d Decl. ¶¶ 9–16.

The most Plaintiff can say about her connections to California is that she has "resid[ed]" here temporarily at various points in her career and that she is the owner of a California corporation. Opp. at 7. Neither is relevant. Plaintiff avers she is a permanent resident of Liverpool, not of California. Compl. ¶ 4. Her California shell corporation[9] is not a party to this litigation, and, in any event, it cannot transform Plaintiff into a California citizen or make California more convenient than her home forum. Similarly, the allegation that someone listened to Plaintiff's voicemails in the UK at a time when Plaintiff was working in California does not bear on the convenience of litigating this dispute in California rather than in her home country.

Nearly Every Witness Is in England and Would Be Unwilling To Testify in the U.S. Plaintiff's attenuated connection to California is greatly outweighed by "the relative ability of the forums to compel the attendance of significant unwilling witnesses at trial [which] often is considered the most important factor, because the presentation of live testimony often is essential to a fair trial." 17 *Moore's Federal Practice*, *supra*, § 111.74 (internal quotation marks omitted). Plaintiff concedes that she and every individual allegedly involved in accessing her voicemail, every reporter for whom they worked, every law enforcement officer who investigated that conduct, and every member of her family allegedly affected by it, live in England. The Complaint references at least a dozen UK residents by name.[10]

By contrast, Plaintiff identifies only four potential U.S. witnesses—three high-level executives not even alleged to have been involved in or have first-hand knowledge of the accessing of plaintiff's voicemail, and an individual who appears to be at least as well convenienced by a trial in London as in Los Angeles. Plaintiff's

---

[9] The address for Pump Fitness, Inc. is an accountant's office in Cypress, California; the entity appears to have no physical presence. Hibbert Decl. ¶¶ 2-4.

[10] These individuals are: Glenn Mulcaire, Clive Goodman, Gordon Taylor, Colin Myler, Andy Coulson, Sean Hoare (now deceased), Paul McMullan, Rebekah Brooks, Ian Emondson, Neville Thurlbeck, James Weatherup, and Ray Da Haan. Compl. ¶¶ 16, 25, 26, 28, 29, 34, 35, 37, 65.

reference to the three executives—Rupert and James Murdoch and the former Chairman of NI, Les Hinton—is nothing but a strained attempt to create another artificial connection to the U.S.  Because she does not, and cannot, allege that these individuals have relevant first-hand knowledge, she is barred by the "apex rule" from even seeking to depose them, let alone calling them at trial.[11]  Nor does Plaintiff contend that any of these executives resides in California.

That leaves only Angelina Jolie, whom Plaintiff alleges to be not only a witness, but also a close friend who named Plaintiff godmother to her daughter and frequently vacations with Plaintiff.  Compl. ¶ 46.  Plaintiff neglects to mention, however, that Jolie has a home in London that she apparently has made her permanent residence.  Pitt 2d Decl. Ex. 8.  Even if Jolie would view travel to London as burdensome and would not be amenable to appearing there to testify on behalf of her daughter's godmother, that risk hardly justifies expecting every other percipient fact witness to travel from England to California.[12]

Not only are all key witnesses located in the UK, outside the Court's subpoena power, most would be unwilling voluntarily to travel to the U.S. to testify in these proceedings.  Plaintiff's assertion that NGN has "not alleged or provided evidence that a witness is unwilling to appear before this Court," Opp. at 11, is wrong and misstates the applicable standard.  "The proponent of a *forum non conveniens* dismissal is not required to identify potentially unavailable witnesses in exact detail."

---

[11] *See, e.g., Celerity, Inc. v. Ultra Clean Holding, Inc.*, No. C 05–4374, 2007 WL 205067, at *3 (N.D. Cal. Jan. 25, 2007) ("Where a high-level decision maker removed from the daily subjects of the litigation has no unique personal knowledge of the facts at issue, a deposition of the official is improper." (internal quotation marks omitted)); *Richardson v. Arco Chem. Co.*, No. CIV. A. 95-6185, 1996 WL 529999, at *2 (E.D. Pa. Sept. 19, 1996) (applying apex rule to trial subpoenas).

[12] Nor is Jolie a critical witness for Plaintiff. Jolie is one of <u>four</u> potential witnesses whom Plaintiff claims left voicemails for her that were wrongfully accessed, Compl. ¶ 49—the other three being Plaintiffs' husband and daughter, who, as indicated, are residents of England, *id.* ¶¶ 50–51, and Ray Da Haan, whom Plaintiff indicates is located and does business in England, *id.* ¶ 65.

*Carijano v. Occidental Petrol. Corp.*, 643 F.3d 1216, 1231 (9th Cir. 2011).[13]   NGN "can carry its burden by providing circumstantial evidence" that witnesses likely will be unavailable.   *Duha v. Agrium, Inc.*, 448 F.3d 867, 877 (6th Cir. 2006); *accord Contact Lumber Co.*, 918 F.2d at 1451.

NGN easily has met that burden: <u>Seven</u> of the former NGN employees, agents, or contractors named in the Complaint—Glenn Mulcaire, Clive Goodman, Ian Edmondson, Rebekah Brooks, Andy Coulson, Neville Thurlbeck, and James Weatherup, Compl. ¶¶ 16, 25, 26, 29, & 37—have been criminally charged by UK authorities for their alleged involvement in the illegal access of voicemails.  Pitt 2d Decl. Exs. 9 & 10.   *Duha*, which Plaintiff cites repeatedly, described this very situation—where an ongoing "criminal investigation provid[es] a major disincentive to voluntary testimony"—as one in which circumstantial evidence demonstrates that witnesses are likely unavailable.  448 F.3d at 877 (internal quotation marks omitted).  Each of these individuals facing charges in the UK resides there; none currently is employed by News Corp., NI, or NGN; and Goodman, Edmondson, Brooks, and Coulson currently are being tried in London's Old Bailey.  Pitt 2d Decl. Ex. 11.

<u>All Relevant Documents Are in England</u>.  Save for an unelaborated-upon reference to unspecified evidence that "may exist" <u>in New York</u>, Opp. at 9 n.6,[14] Plaintiff effectively concedes that <u>all</u> documents relevant to the litigation are housed not in California, but in England, many of them in the hands of English law

---

[13] *See also In re Air Crash over the Taiwan Straits on May 25, 2002*, 331 F. Supp. 2d 1176, 1198 (C.D. Cal. 2004) ("To carry their burden . . . , defendants must delineate how witnesses not subject to compulsory process are critical to the actions. They are not, however, required to identify each potentially critical witness, nor to submit affidavits that provide significant evidentiary detail."); *see generally Piper*, 454 U.S. at 258 ("Requiring extensive investigation [into, *inter alia*, unavailability of witnesses] would defeat the purpose of [a *forum non conveniens*] motion.").

[14] The support for this assertion is a *New York Times* article reporting on a purported litigation hold notice sent to employees of the *New York Post*.  Plaintiff identifies no *New York Post* employee who has any information relevant to her case.

enforcement.[15]  And she acknowledges that in applying the private-interest factors identified by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S. Ct. 839, 91 L. Ed. 1055 (1947), the Ninth Circuit considers the location of evidence outside of the forum as a factor weighing in favor of dismissal.  But she suggests that technological advances in the processing of electronically stored information effectively have rendered this part of the *Gilbert* test nugatory.  Opp. at 9.  She is wrong.  The Ninth Circuit continues to cite the "presence of the vast majority of original, relevant documents in [a foreign jurisdiction]" as a factor favoring *forum non conveniens* dismissal.  *Vivendi*, 586 F.3d at 696 (emphasis in original).  As Judge Morrow recently explained, "Although modern technological advances have significantly reduced the cost of producing and transporting documents, the location of the records [abroad] makes California, relatively speaking, a less convenient forum."  *Deirmenjian*, 2006 WL 4749756, at *13 (citation omitted).

Moreover, obtaining the relevant documents in this case is not simply a matter of having them scanned and uploaded to a database.  Many are in the hands of the London Metropolitan Police Service ("MPS") and subject to a strict, court-imposed confidentiality order.  *See* Band Decl. ¶ 11.  There is an established protocol whereby parties to the English proceedings may obtain access to this information.  Obtaining documents relevant to this matter outside of those proceedings would be extremely cumbersome and would likely require repeated discovery-related applications to the English courts.  Band Decl.  ¶¶ 12–14; *see generally Vivendi*, 586 F.3d at 696 (the fact that litigating in the forum would require the parties to endure a "cumbersome" discovery process overseas weighed in favor of dismissal).

---

[15] Plaintiff's suggestion that *The Sun*'s lone California employee might have documents at his home office, Opp. at 26 n.26, is wrong: That individual did not even begin to work for *The Sun*, and did not live in California, until long after the events at issue in the Complaint, and he has no documents or information that could conceivably be relevant to any issue in this lawsuit.  Samson Decl. ¶¶ 3–7.

10

## 2.   The Public Interest Factors Overwhelmingly Favor Transfer.

The extensive ties between this lawsuit and the United Kingdom are set forth in detail in Defendant's opening brief and need not be repeated here.  Since the filing of that brief, the UK interest has become only more manifest.

The purported accessing of Plaintiff's UK cell phone is at issue in pending criminal trials in London, wherein evidence was offered as to MPS's investigation into whether Plaintiff's voicemail was improperly accessed, and Plaintiff's appearance on a "target list" in connection therewith.  *See* Band 2d Decl. ¶ 7; Pitt 2d Decl. Ex. 12.  Courts in this Circuit and elsewhere recognize that the existence of civil and criminal investigations in a foreign jurisdiction weighs in favor of *forum non conveniens* dismissal.[16]  It would make little sense to have the criminal and civil claims arising out of Plaintiff's voicemail proceed in different forums.

This case remains the <u>only</u> so-called "hacking" case against NGN that has been brought outside of the UK.  Indeed, this is the only matter pending outside of the courts of England and Wales or the compensation scheme—save for a single case threatened (but not yet commenced) in Scotland, which alleges conduct undertaken by Scottish reporters working for Scottish papers that was investigated by Scottish authorities.  Band 2d Decl. ¶ 8; Band Decl. ¶ 4.  England thus has a clear interest in ensuring even-handed, consistent treatment of claimants by having all of these related disputes resolved in the forums that were set up to deal with them.

In contrast, Plaintiff can assert no meaningful U.S. interest in the litigation.  Indeed, the only U.S. "interests" invoked by Plaintiff are the nation's general interest in ensuring foreign corporations adhere to U.S. law (apparently even when engaged in conduct abroad), protecting the privacy of those who pass through U.S. borders

---

[16] *See Cheng*, 708 F.2d at 1410 (British investigation into airplane accident at issue in *Piper* weighed in favor of *forum non conveniens* dismissal); *In re Air Crash over the Mid-Atlantic on June 1, 2009*, 760 F. Supp. 2d 832, 846 (N.D. Cal. 2010) ("France's interest is especially obvious here because it is also conducting the official civil investigation and an official criminal investigation.").

(apparently even when the invasion of their privacy occurs outside those borders), and protecting those involved in the entertainment industry (apparently even when they are non-residents).  None supports Plaintiff's choice of forum.[17]

The undisputed evidence is that voice data associated with Ms. Huthart's Vodafone account was stored on a server located in the UK, even during periods when she was traveling in the U.S.  Rogers Decl. ¶ 6.  And Plaintiff offers no reason to believe U.S. networks or wires were used to access her messages.[18]

Where a cause of action is based on conduct that took place <u>outside</u> the U.S., any U.S. interest is greatly diminished, even where the conduct has some purported connection to the U.S.  *Vivendi*, 586 F.3d at 694 (U.S. and Washington had no interest in fraud dispute when connection to forum was alleged "use of 'U.S. wires'" and there was no allegation any defendant "took any action <u>from</u> Seattle" or anywhere in the U.S.).  And any U.S. (or California) interest in protecting the privacy of visitors from England hardly would be ill-served by having this matter resolved in England, whose legal system was the model for our own and which has investigated and prosecuted the very conduct alleged in the Complaint.  At the very least, as in *Piper*, "the incremental deterrence that would be gained if this trial were

---

[17] In support of these purported U.S. interests, Plaintiff relies on the now-reversed Ninth Circuit opinion in *Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909 (9th Cir. 2011).  In reversing this decision, the Supreme Court criticized the Ninth Circuit's expansive view of the U.S. interest in purely foreign wrongdoing.  *Daimler AG v. Bauman*, 571 U.S. __, __ S. Ct. __, 2014 WL 113486, at *12 (2014).

[18] Plaintiff attempts to create the specter that U.S. networks or servers somehow were used in the alleged accessing of her voicemails.  Opp. at 36–39; Himondis Decl.; Griffiths Decl.  But these claims at most amount to an argument that: (1) Plaintiff's voicemails might have been temporarily stored on a U.S. server before being stored permanently (and then accessed) in the UK; (2) a UK call placed to Plaintiff while she was in the U.S. might have been routed on a U.S. network before being bounced back to Plaintiff's voicemail box which was at all times located on a server in the UK; and (3) an effort to change Plaintiff's PIN code might have implicated a U.S. network in some manner.  Even if Plaintiff's claims were accurate, they would in no way suggest that the <u>accessing</u> of Plaintiff's voicemails involved a U.S. network, since the voicemails indisputably were located in the UK at the time they were accessed.  Rogers 2d Decl. ¶ 5.  (Moreover, as explained by Defendants' expert, it is simply incorrect that U.S. networks were implicated even in the minimal and irrelevant manner suggested by Plaintiff.  Rogers 2d Decl. ¶¶ 6–8.)

1  held in an American court is likely to be insignificant." *Piper*, 454 U.S. at 2601–61.

2  Any tangential U.S. interest thus pales in comparison to the UK's clear interest in

3  regulating the conduct of its citizens and press, regulating conduct undertaken in its

4  borders, and protecting communications stored on servers in the UK.

5  **II.   THE COURT LACKS JURISDICTION OVER NI AND NGN.**

6  **A.   THE COURT LACKS SPECIFIC JURISDICTION.**

7  Plaintiff does not claim that Defendants committed tortious acts in California

8  or that they purposefully availed themselves of this forum by doing business here.

9  Instead, she asserts that Defendants, though acting entirely outside the forum,

10  nevertheless "purposefully directed" their conduct at this forum.   That theory of

11  jurisdiction is wholly inconsistent with the conceded facts and premised on a

12  misreading of the law.

13  **1.   Plaintiff Cannot Meet the Purposeful Direction Test.**

14  To meet the purposeful direction test, Plaintiff has the burden to show that

15  Defendants "(1) committed an intentional act, which was (2) expressly aimed at the

16  forum state, and (3) caused harm, the brunt of which is suffered and which [they]

17  kn[ew] [was] likely to be suffered in the forum state." *Pebble Beach Co. v. Caddy*,

18  453 F.3d 1151, 1156 (9th Cir. 2006) (internal quotation marks omitted).   Tellingly,

19  the bulk of Plaintiff's discussion of the purposeful direction test (Opp. at 17–20) is

20  devoted to her own attenuated connections to California, not to what is relevant—

21  whether Defendants directed their activities towards the forum.   In doing so, Plaintiff

22  ignores the very purpose of the test—to determine whether "the defendant's conduct

23  and connection with the forum State are such that he should reasonably anticipate

24  being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S.

25  286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490, 501 (1980).

26  Plaintiff's sole argument as to why she meets the test is the assertion in her

27  brief (found nowhere in the Complaint) that Defendants knew she was in California

28  when some of the alleged misconduct took place.   Opp. at 18–19.   This argument

fails in two respects.  *First*, it misconstrues the relevant standard, which requires her to show that Defendants "expressly aimed" their conduct at the forum, not just that Defendants knew she was likely to suffer injuries in the forum.  Because the alleged conduct was aimed at servers in the UK containing voicemails of a UK citizen and undertaken for the purpose of using that information in UK publications, that conduct was aimed at the UK—not California.  *Second*, even if it were enough to show that Defendants knew Plaintiff was in the forum and would be injured there, the Complaint would still be insufficient as it fails sufficiently to allege such facts.

Plaintiff Cannot Establish "Express Aiming."  Because Plaintiff cannot show that Defendants "expressly aimed" their conduct at this forum, she attempts to eliminate this requirement altogether, and asserts that the purposeful direction test can be met simply by demonstrating that Defendants knew she was in California during some of the incidents in question and was likely to suffer harm there.  In so doing, Plaintiff improperly conflates the second and third prongs of the test.  She does so quite literally—the section of her brief that appears under the "express aiming" subheading (Part II.B.2.a.ii) in fact addresses the third prong of the  test— whether Defendants "caused harm, the brunt of which is suffered and which [they] kn[ew] [was] likely to be suffered in the forum state."  *Pebble Beach*, 453 F.3d at 1156 (internal quotation marks omitted); *see* Opp. at 18 (asserting that "known effects of the act . . .  in the forum" are sufficient to satisfy the "express aiming" requirement).  In reality, however, the second and third prongs of the test are distinct and, as the Ninth Circuit made clear in *Pebble Beach*, "showing 'effect' satisfies only the third prong of the [purposeful direction] test."  453 F.3d at 1159–60.[19] Indeed, if Plaintiff were correct that an allegation of foreseeable harm in the forum is sufficient to establish "express aiming," the third prong of the purposeful direction

---

[19] *See also Xcentric Ventures, LLC v. Bird*, 683 F. Supp. 2d 1068, 1073 (D. Ariz. 2010) (foreseeability that "an individual will be harmed in a certain forum location . . . does not amount to express 'express aiming'").

test would be redundant.  And if the requirement of "express aiming" <u>at the forum</u> is to have any independent meaning, surely it cannot refer to a situation in which foreign defendants, acting abroad, commit an alleged intentional tort against a foreign citizen for the purpose of providing content for foreign newspapers.

By attempting to collapse the second and third prongs of the test, Plaintiff ignores the Ninth Circuit's (and the Supreme Court's) repeated admonitions that "'something more' than mere foreseeability [is required]" to justify the assertion of personal jurisdiction."  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 805 (9th Cir. 2004); *accord Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S. Ct. 2174, 2183, 85 L. Ed. 2d 528, 542 (1985).  The assertion of foreseeable harm in the forum is Plaintiff's only purported jurisdictional hook in this matter.  Unsurprisingly, she cites no case in which a court has found the "express aiming" prong of the purposeful direction test satisfied under facts like these.

Indeed, in each of the cases Plaintiff cites where the Ninth Circuit has found the second prong of the test to be satisfied, there was "something more" to tie the defendant to the forum besides the defendant's purported knowledge that the effects of his conduct would be felt there—*i.e.*, "advertisements [that] targeted California residents,"[20] letters sent by the defendant to the forum,[21] phone calls between the defendant and someone in the forum,[22] an "ongoing relationship between [defendant] and [plaintiff] during which [defendant] received catalogs or brochures [sent from

---

[20] *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1230 (9th Cir. 2011) (Opp. at 18 n.4).

[21] *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1085 (9th Cir. 2000) (Opp. at 18 n.14) (defendant sent cease-and-desist letter to plaintiff in forum); *Brainerd v. Governors of the Univ. of Alberta*, 873 F.2d 1257, 1258–59 (9th Cir. 1989) (Opp. at 18) (defendant sent letter to forum); *Metro. Life Ins. Co. v. Neaves*, 912 F.2d 1062, 1064 (9th Cir. 1990) (Opp. at 18 n.16) (defendant mailed letter to forum that was used to perpetrate alleged fraud).

[22] *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1112 (9th Cir. 2002) (Opp. at 18) (defendant "knew that the decisionmakers for Dole were located in California, and communicated directly with those California decisionmakers"); *Brainerd*, 873 F.2d at 1257 (Opp. at18) (defendant participated in phone calls with person in forum).

---

15

the forum],"[23] or the fact that the defendant had placed itself "in direct competition with [the plaintiff] in [the forum]."[24]  Plaintiff points to nothing of the sort in this case.  Nor can she, as all relevant acts allegedly were committed by UK citizens in the UK for the purpose of obtaining source material for UK newspapers.

In substance, Plaintiff's argument is identical to those the Ninth Circuit repeatedly has rejected.   In *Schwarzenegger*, for example, the Ninth Circuit unequivocally rejected the plaintiff's claim that the second prong was met because the defendant allegedly knew that he (1) was in California and (2) likely would suffer injury there as a result of the defendant's conduct:

> It may be true that Fred Martin's intentional act eventually caused harm
> to Schwarzenegger in California, and Fred Martin may have known that
> Schwarzenegger lived in California.   But this does not confer
> jurisdiction, for Fred Martin's express aim was local.   We therefore
> conclude that the Advertisement was not expressly aimed at California.

374 F.3d at 807.  Two subsequent cases, *Pebble Beach* and *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601 (9th Cir. 2010), are particularly instructive here, because each involved allegations of tortious conduct by a nonresident in the UK that had effects in California.  In both cases, the Ninth Circuit determined that, despite an allegation of "known effects" in the forum, and knowledge that the plaintiff was present in the forum, the absence of any other meaningful connection between defendant and the forum precluded the exercise of specific jurisdiction.[25]  As in those

---

[23] *See Wash. Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 675 (9th Cir. 2012) (Opp. at 17).

[24] *See Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1130 (9th Cir. 2010) (Opp. at 17).

[25] *See Pebble Beach*, 453 F.3d at 1158 (plaintiff had impermissibly relied "exclusively on the possible foreseeable effects" of the infringement); *Love*, 611 F.3d at 609 ("Where a defendant's 'express aim was local' the fact that it caused harm to the plaintiff in the forum state, even if the defendant knew that the plaintiff lived in the forum state, is insufficient to satisfy the effects test.").

1    cases, the facts as alleged and conceded here are wholly inconsistent with a finding

2    that Defendants "expressly aimed" their conduct at California.

3         <u>Plaintiff Cannot Establish that NI & NGN Knew Their Acts Would Cause</u>

4    <u>Harm in California</u>.   Plaintiff's failure to allege express aiming, by itself, defeats

5    jurisdiction.   But even under Plaintiff's mistaken view of the purposeful direction

6    test, jurisdiction still would be lacking because the Complaint does not allege that

7    Defendants <u>knew</u> Plaintiff was in California on the dates question.   That defect is

8    independent grounds for dismissal.

9         The Complaint alleges only that Plaintiff worked in Los Angeles from January

10   to June 2004 and from March to May 2005 (Compl. ¶¶ 47–48), and that "[o]n

11   occasions from 2004 to 2005" her voicemail account was accessed by investigators

12   working for *News of the World* "as a means to obtain information about Ms. Jolie"

13   (Compl. ¶¶ 49, 52).   It does not allege the investigators knew she was in California at

14   the time of the alleged incidents.[26]   Indeed, Plaintiff concedes some of the alleged

15   incidents in 2004 and 2005 took place "while she was . . . <u>in the United Kingdom</u>."

16   Compl. ¶ 49.   And the only evidence of purported "hacking" that Plaintiff claims to

17   have—provided to her by MPS—apparently indicates that her voicemail was

18   accessed "when she was in the United Kingdom" in July 2005 and in 2006, well after

19   Plaintiff says she departed California in May of 2005.   *See* Compl. ¶¶ 53, 60–61.

20        Nor can Defendants' supposed knowledge of Plaintiff's whereabouts be

21   inferred from the facts alleged.   Plaintiff says she worked with Angelina Jolie on the

22   L.A. set of *Mr. & Mrs. Smith* in 2004 and 2005 and was targeted "as a means to

23   obtain information about Ms. Jolie."   Compl. ¶ 52.   But it does not follow that by

24

25   ───────────────

     [26] "Constructive" knowledge is not enough.   In *Washington Shoe*, the Ninth
26   Circuit drew a clear distinction between a defendant's <u>actual knowledge</u> that harm
     will occur in the forum, on the one hand, and mere foreseeability, on the other.
27   Specific jurisdiction exists only "where a defendant <u>knows</u>—as opposed to being
     able to foresee—that an intentional act will impact another state."   704 F.3d at 677.
28   Indeed, without actual knowledge that its actions will impact the forum, a defendant
     cannot be said to have <u>purposefully</u> directed its activities toward it.

1  targeting Plaintiff, the investigators allegedly hired by NGN were targeting <u>the</u>
2  <u>forum</u>.  As a factual matter, *Mr. & Mrs. Smith* was shot not only in California, but
3  also in New York and Italy.  Pitt 2d Decl. Ex. 13.[27]  And, in fact, Plaintiff nowhere
4  alleges she was targeted because of her physical proximity to Ms. Jolie on the
5  California set of *Mr. & Mrs. Smith*.  To the contrary, Plaintiff claims to have a close
6  off-set relationship with Ms. Jolie that predates her involvement with *Mr. & Mrs.*
7  *Smith*; specifically notes that the two travelled together, Compl. ¶ 46; and claims that
8  "Defendants' interest in [her] voicemail derived <u>entirely</u> from her personal and
9  professional relationships to celebrities, such as Jolie and Brad Pitt," Opp. at 20.
10  Moreover, not all of the stories Plaintiff claims were sourced with information
11  obtained from her voicemail had an obvious California bent.  Indeed, one was about
12  Ms. Jolie taking motorcycle lessons from Plaintiff's friend "in Kent, England."
13  Compl. ¶ 65.  And as indicated, Ms. Jolie also apparently resides in England, with
14  the intention of making it her permanent residence.  Pitt 2d Decl. Ex. 8.

15      These facts are plainly inconsistent with the conclusion that Defendants'
16  interest in Plaintiff was driven by her physical location rather than the nature of her
17  relationship with Jolie.  Accordingly, there is nothing in the Complaint to support the
18  inference that NGN knew (or cared) where Plaintiff was physically located on the
19  occasions when her voicemail was accessed.  For all of these reasons, Plaintiff has
20  not pleaded facts sufficient to establish that NGN knew she was in California, much
21  less that it targeted the forum.

22      But even if she had done so, the third prong of the purposeful direction test
23  still would not be satisfied, because it does not follow that NGN knew Plaintiff
24  would suffer the claimed injuries—emotional and reputational harm—in California.

---

[27] The only evidence Plaintiff puts forth to suggest NGN should have known
*Mr. & Mrs. Smith* was shot in California is the fact that the film was produced by a
News Corp. subsidiary, 20th Century Fox.  Opp. at 19 n.17.  Plaintiff cites no reason
(legal or factual) why each filming location and the names of all stunt personnel for
every film produced by 20th Century Fox in the U.S. should be imputed to NGN, the
tertiary News Corp. subsidiary in the UK that allegedly engaged the investigators.

Plaintiff claims her relationships with her daughter and husband suffered because, as a consequence of the investigator's deleting certain messages left by them (or causing the messages to be moved into Ms. Huthart's "saved" file), Plaintiff was unable to return those messages. Compl. ¶¶ 50–51. But Plaintiff's family lives in the UK. So to the extent NGN knew or should have anticipated that the conduct would cause tension within the Huthart household, it would have been more reasonable to assume this family drama would play out in the Hutharts' Liverpool home rather than an L.A. soundstage. Likewise, to the extent NGN knew Plaintiff's professional reputation would be damaged as a result of missing work-related voicemails, it does not follow that NGN also knew such damage would be suffered in California, rather than in England, where she is based.

### 2.     Exercising Jurisdiction Would Be Unreasonable.

Even if Plaintiff satisfied the purposeful direction test, exercising jurisdiction over Defendants would remain unreasonable for the reasons set forth above in support of *forum non conveniens* dismissal. *See* Part I, *supra*; *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 507 F. Supp. 1128, 1137–38 (D. Nev. 1980) (the reasonableness factors are "analogous to those of forum non conveniens"). Those arguments need not be repeated here. But two observations are in order.

*First*, the section of Plaintiff's brief that discusses the reasonableness requirement is replete with citations to the Ninth Circuit's opinion in *Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909 (9th Cir. 2011), which the Supreme Court recently reversed 9-0 and criticized for, *inter alia*, "pa[ying] little heed to the risks to international comity." *Daimler AG v. Bauman*, 571 U.S. __, __ S. Ct. __, 2014 WL 113486, at *12 (2014).

*Second*, it is worth noting that, with two exceptions, the cases Plaintiff cites in which the Ninth Circuit held the purposeful direction test to be satisfied were

---

brought by actual <u>residents</u> of the forum.[28]   And in the remaining two cases the plaintiff had a place of business in California that consisted of more than a mailbox at an accountant's office, *see* Part I, *supra*.[29]   Thus, even setting aside the fact that the defendant's connections to the forum in each of these cases were much stronger than those of Defendants here, the exercise of jurisdiction was reasonable in those cases in part because of the forum's compelling interest in protecting its residents. Whatever interest California and the U.S. have in protecting Liverpool residents from UK-based phone "hacking" carries significantly less weight.   *See Love*, 611 F.3d at 610 ("California has no interest in applying its law to the conduct in question. None of the parties remaining in this suit is a citizen of California.").

## B.    THE COURT LACKS GENERAL JURISDICTION.

Plaintiff claims the Court also has general jurisdiction over NI and NGN. Opp. at 21–23.   The Ninth Circuit labeled a similar gambit by the plaintiff in *Schwarzenegger* "implausibl[e]," even though there—unlike here—the defendant had some meaningful contacts with California that were relevant to the dispute.[30]

---

[28] *See Washington Shoe*, 704 F.3d at 670 ("Washington Shoe is a Washington corporation that has done business in the state of Washington for over 100 years."); *Brayton Purcell*, 606 F.3d at 1126 ("Appellee Brayton Purcell LLP . . . is a law firm based in Novato, California, located within the [f]orum."); *Dole Food*, 303 F.3d at 1108 ("Plaintiff-appellant Dole U.S. is incorporated under the laws of Hawaii and has its headquarters and principal place of business in California."); *Bancroft & Masters*, 223 F.3d at 1084 ("Plaintiff-appellant … is a small California corporation that sells computer and networking products and support services.   [It] does almost all of its business in the San Francisco area."); *Brainerd*, 873 F.2d at 1260 (describing plaintiff as a "resident" of Arizona).

[29] *Mavrix*, 647 F.3d at 1222 ("Mavrix keeps a Los Angeles office [and] employs Los Angeles-based photographers . . . ."); *Metro. Life Ins.*, 912 F.2d at 1064 (defendant sent fraudulent letter to Metropolitan Life facility in California).

[30] 374 F.3d at 801 (noting Schwarzenegger's allegation that Martin imported his merchandise through California ports and had retained services of California-based direct-mail marketing company); *see also Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1119 (9th Cir. 2002) (court lacked general jurisdiction in dispute over grain-contract, even though defendant had shipped grain into Port of Los Angeles and had designated sales agent in the state).

Plaintiff distinguishes her argument only by suggesting that the Court should assert jurisdiction on the basis of NGN's aggregate contacts not with California, but with the U.S. as whole, pursuant to Rule 4(k)(2).   The reach of that provision is, however, quite "limited," *Pebble Beach*, 453 F.3d at 1154, and the Ninth Circuit has noted that "in the fourteen years since Rule 4(k)(2) was enacted, none of our cases has countenanced jurisdiction under the rule," *Holland Am. Line Inc. v. Wartsila N.A., Inc.*, 485 F.3d 450, 462 (9th Cir. 2007).   Nor should this Court.

*First*, Plaintiff asserts that U.S. courts should exercise some sort of universal jurisdiction over celebrity gossip because "many" celebrities spend some time here. Opp. at 21–22.   The Ninth Circuit rejected this argument in *Mavrix*, where it held that a gossip website was not subject to general jurisdiction in California simply because it reported on celebrities who live in the state.   *See* 647 F.3d at 1225.

*Second*, Plaintiff points to the fact that NGN's newspaper websites do not deny access to residents of California or other states.   Opp. at 22.   The Ninth Circuit, however, has repeatedly held that this does not provide a basis for jurisdiction.   *See, e.g.*, *Mavrix*, 647 F.3d at 1227; *Pebble Beach*, 453 F.3d at 1160.

*Third*, Plaintiff cites a 1987 opinion from a Florida District Court as evidence that "at one point in the past" NGN sold print subscriptions in the U.S.   *See* Opp. at 22 (citing *Nat'l Enquirer, Inc. v. News. Grp. News, Ltd.*, 670 F. Supp. 962, 966 (S.D. Fla. 1987)).   Plaintiff fails to mention both that the evidence in *National Enquirer* showed NGN had 85 subscribers in the U.S. (of a 5,021,630 total) and that the Florida court was unimpressed by this statistic, holding that NGN "is certainly not subject to general jurisdiction in Florida." *Id*. at 967.[31]

*Fourth*, Plaintiff cites a complaint filed in the *Wilder* case as purported evidence that NGN commonly solicits advertisers from U.S. companies.   Opp. at 22.

---

[31] Currently there are no print sales of *The Sun* (NGN's remaining publication) in California, and less than one-seventh of one percent (less than .0014%) of the online subscriber base of *The Sun* is in California.  Longcroft 2d Decl. ¶ 7.

The *Wilder* complaint provides no evidence to support this assertion, and an untested complaint in an unrelated action cannot support jurisdiction in any event. *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010); *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1113 (C.D. Cal. 2003). Thus, the declaration from NI's CFO that NGN does not directly solicit advertising from the U.S. is uncontroverted, as is the fact that U.S. advertising revenue accounts for less than 1% of NGN's total advertising revenue. Longcroft 2d Decl. ¶ 6; *see* Mem. at 20 (citing cases holding insignificant revenue from forum is insufficient basis for jurisdiction).

*Fifth*, Plaintiff notes that NGN has all of <u>two</u> U.S. employees (and only <u>one</u> in California), and asserts that because these employees may enter into contracts on its behalf in the U.S., general jurisdiction exists. Opp. at 23. But "even the physical presence in the forum state of . . . a 'substantial sales force' is insufficient to establish general jurisdiction." *Mavrix*, 647 F.3d at 1226 (citations omitted). Plaintiff makes no allegation that either of NGN's two U.S.-based employees or any of the contracts they purportedly have entered into has anything to do with her case.

*Finally*, Plaintiff argues that News Corp.'s contacts with the U.S. should be imputed to NI and NGN because of the "substantial control" News Corp. supposedly exercises over its subsidiaries. Opp. at 23. This notion too appears to spring from the Ninth Circuit's discredited *Bauman* opinion. In overturning *Bauman*, the Supreme Court chastised the "sprawling view of general jurisdiction" reflected in the Ninth Circuit's opinion that would "subject foreign corporations to general jurisdiction whenever they have an in-state . . . affiliate." 2014 WL 113486, at *10 (internal quotation marks omitted). And it specifically noted that *Bauman*'s requirement that the parent "substantially control the subsidiary's activities" "hardly curtails the overbreadth of the Ninth Circuit's agency holding." *Id.* at *10 n.15 (internal quotation marks omitted).

**C.   PLAINTIFF IS NOT ENTITLED TO JURISDICTIONAL DISCOVERY.**

"[A] district court may properly refuse or limit jurisdictional discovery if the plaintiff has not made a sufficient showing that there may be a basis for exercise of jurisdiction, or if the proposed discovery seems unlikely to shed light on the jurisdictional question."  8 Charles A. Wright et al., *Federal Practice and Procedure* § 2008.3 (3d ed. 2010).   Plaintiff has made no colorable showing that any information she could hope to obtain in jurisdictional discovery would cure the core deficiencies in her arguments.  In any event, the only discovery materials Plaintiff seeks are NGN's U.S. circulation numbers and information about the amount of revenue NGN generates from U.S.-based advertisers.  Opp. at 22–23.  NGN has supplied this information with this filing.  *See* Longcroft 2d Decl. ¶¶ 6–7.

**III.   IF THE COURT RETAINS JURISDICTION, IT SHOULD DISMISS ALL CLAIMS FOR FAILURE TO STATE A CLAIM.**

**A.   PLAINTIFF FAILS TO STATE CLAIMS AGAINST NEWS CORP. AND NI.**

News Corp. or NI can only be held directly liable if it participated in the alleged voicemail hacking.  *See United States v. Bestfoods*, 524 U.S. 51, 64–65, 118 S. Ct. 1876, 1886, 141 L. Ed. 2d 43, 57–58 (1998).  Yet despite years of civil litigation (including many cases prosecuted by Plaintiff's UK counsel), multiple Parliamentary and criminal proceedings, the Leveson Inquiry, and extensive press coverage of the conduct at issue, Plaintiff cannot muster a single fact suggesting that News Corp. or NI participated in the alleged voicemail hacking by NGN.  *See Cattie v. Wal-Mart Stores, Inc.*, 504 F. Supp. 2d 939, 945 (S.D. Cal. 2007) (dismissing claim against parent because *Bestfoods* "requires a parent entity to participate directly in the wrongdoing, something Plaintiff has not alleged").  Plaintiff concedes this but argues that, if the Court applied federal common law (to federal claims) and Delaware law (to California claims) to the question whether to pierce the corporate

REPLY ISO DEFENDANTS' MOTION TO DISMISS

1  veil, the parent companies could be held indirectly liable for alleged acts of NGN.

2  Opp. at 30, 34.  Regardless of the choice of law, Plaintiff fails to state a claim.

3       Under federal common law, whether to pierce the corporate veil depends on:

4  "'the amount of respect given to the separate identity of the corporation by its

5  shareholders, the degree of injustice visited on the litigants by recognition of the

6  corporate entity, and the fraudulent intent of the incorporators.'"  *Bd. of Trs. of Mill*

7  *Cabinet Pension Trust Fund for N. Cal. v. Valley Cabinet & Mfg. Co.*, 877 F.2d 769,

8  772 (9th Cir. 1989) (quoting *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105,

9  1111 (9th Cir. 1979)); *see also* Opp. at 31 & n.31.  Plaintiff cobbles together a list of

10  supposed "facts," *see* Opp. at 32–33, most of which are unpleaded and would not be

11  sufficient to establish the first factor, *see Seymour*, 605 F.2d at 1112.  Moreover, in

12  the Ninth Circuit, "disrespect for a corporation's separate identity alone is an

13  insufficient reason to pierce the corporate veil"—a plaintiff must also establish

14  "fraudulent intent or injustice."  *Valley Cabinet*, 877 F.2d at 773.  Fraudulent intent

15  requires "proof of fraud in the formation of the corporation or fraudulent misuse of

16  the corporate form after incorporation."  *Id.* (emphasis omitted).  In Delaware, a

17  plaintiff "must plead facts supporting an inference that the corporation . . . has

18  created a sham entity designed to defraud investors and creditors."  *Crosse v.*

19  *BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003).

20       The Complaint makes no claim that News Corp. or NI formed NGN with

21  fraudulent intent or misused its corporate form.  Nor does it allege Plaintiff would

22  suffer injustice were the Court to respect the corporate form.  Plaintiff simply

23  complains in her brief that News Corp. and NI seek to be shielded "from liabilities

24  arising from <u>conduct at NGN</u>."  Opp. at 34.  But that is exactly what the fundamental

25  principle of limited liability requires; and "[l]imited liability is the rule, not the

26  exception."  *Bestfoods*, 524 U.S. at 61 (quoting *Anderson v. Abbott*, 321 U.S. 349,

27  362, 64 S. Ct. 531, 537, 88 L. Ed. 793, 802 (1944)).  Plaintiff's claims against News

28  Corp. and NI must be dismissed.  *See, e.g.*, *No Cost Conference, Inc. v. Windstream*

*Commc'ns, Inc.*, 940 F. Supp. 2d 1285, 1298 (S.D. Cal. 2013) (dismissing claims against parents when complaint failed to allege facts establishing fraud or injustice).

Plaintiff also asserts that News Corp. and NI should be liable for NGN's alleged conduct because NGN supposedly acted as their agent in soliciting the alleged voicemail "hacking." Opp. at 34–35.  In making this assertion, Plaintiff yet again relies primarily on the view of agency articulated in *Bauman*, which the Supreme Court criticized for its "overbreadth."  2014 WL 113486, at *10 n.15; *see* Opp. at 34.[32]   Under a proper view of agency, Plaintiff must demonstrate at a minimum that NGN acted on its parents' behalf, was subject to their control, and both the parents and NGN manifested assent to such control.  *See, e.g.*, *United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010) (cited at Opp. at 34).  The Complaint fails to allege that News Corp. and NI controlled NGN's newsgathering techniques, that there was mutual assent to such control, or that NGN was acting on behalf of News Corp. or NI when it allegedly hired a private investigator to access Plaintiff's voicemails to obtain information for articles to be published in NGN's newspapers.

## B.   THE WIRETAP ACT AND STORED COMMUNICATIONS ACT CLAIMS REQUIRE IMPERMISSIBLE EXTRATERRITORIAL APPLICATIONS OF FEDERAL LAW.

### 1.   Neither Federal Statute Applies Extraterritorially.

Plaintiff concedes the Wiretap Act does not apply extraterritorially, Opp. at 39, as she must:  The Ninth Circuit and courts therein have repeatedly so held.  *See, e.g.*, *United States v. Peterson*, 812 F.2d 486, 492 (9th Cir. 1987) (Kennedy, J.).  She contends nevertheless that the Wiretap Act's fraternal statutory twin, the Stored Communications Act (SCA), should be given extraterritorial reach.  Her argument is foreclosed by the Ninth Circuit's decision in *Peterson* and those decisions following it; is directly contrary to the sole decision in this Circuit directly addressing the

---

[32] *Bauman*'s relevance here is further undermined by the fact that it addressed "the test for agency to be applied in the context of personal jurisdiction . . . not the rules governing the test for vicarious liability."  644 F.3d at 923.

SCA's reach, *Zheng v. Yahoo! Inc.*, No. C-08-1068, 2009 WL 4430297 (N.D. Cal. Dec. 2, 2009); and contravenes the Supreme Court's repeated instruction that statutes may be given extraterritorial effect only where Congress "clearly expressed" its "affirmative intention" to give a statute such effect, *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 111 S. Ct. 1227, 1230, 113 L. Ed. 2d 274, 282 (1991) (*Aramco*) (internal quotation marks omitted).[33]

Plaintiff argues that the definition of "wire communication" set forth in the Electronic Communications Privacy Act of 1986 (ECPA), 18 U.S.C. § 2510(1), "clearly indicate[s]" that the SCA applies abroad because it uses the phrases "foreign communications" and "affecting . . . foreign commerce." Opp. at 39. But the definition of "wire communication" on which she relies so heavily is shared by both the Wiretap Act and the SCA, and the Ninth Circuit and the district courts in this Circuit have repeatedly held that Section 2510(1) does not give the Wiretap Act extraterritorial effect. Mem. at 32 (collecting cases). Plaintiff points to no other statutory provision that justifies treating the two acts differently.

Instead, Plaintiff attempts to resolve this contradiction by resorting to selected bits of legislative history. She contends that even though, in her view, the "plain text" of Section 2510(1) indicates both acts apply extraterritorially, the legislative history shows that Congress "chose to limit" the Wiretap Act, but not the SCA, to domestic applications. Opp. at 39. But the legislative history she cites only confirms

---

[33] Plaintiff wrongly claims *United States v. Bowman*, 260 U.S. 94, 43 S. Ct. 39, 67 L. Ed. 149 (1922), held the presumption against extraterritoriality does not apply to criminal statutes. Opp. at 43–44. *Bowman* recognized that the presumption does apply to "[c]rimes against private individuals or their property," and carved out a narrow exception for criminal statutes that are "not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated." 260 U.S. at 98; *see United States v. Vilar*, 729 F.3d 62, 73 (2d Cir. 2013). That narrow exception does not apply here. Plaintiff's reading is also inconsistent with *Morrison v. National Bank of Australia Ltd.*, 130 S. Ct. 2869, 2877, 177 L. Ed. 2d 535, 546–47 (2010) (applying presumption against extraterritoriality to the Exchange Act, which imposes both criminal and civil liability) and the Ninth Circuit's post-*Morrison* precedent, *United States v. Chao Fan Xu*, 706 F.3d 965, 974–75 (9th Cir. 2013) (applying the presumption to a criminal RICO case).).

1  that her purported reading of the statute is wrong, and that neither the SCA nor the

2  Wiretap Act has extraterritorial reach.  The Senate Report to the ECPA states that

3  Section 2510(1)'s reference to "communications affecting . . . foreign commerce"

4  merely "recognizes that private networks and intra-company communications

5  systems are common today and brings them within the protection of the statute," but

6  is "not meant to suggest that the [ECPA] applies to interceptions made outside the

7  territorial United States."  S. Rep. No. 99-541, at 12 (1986).

8      Plaintiff seizes upon the fact that the latter sentence refers to "interceptions,"

9  but not to accessing stored communications, to suggest Congress must have intended

10 the SCA to apply abroad.  Opp. at 41.  But that sentence does not purport to establish

11 an exhaustive list of ECPA provisions that lack extraterritorial effect, much less does

12 it provide the "clear" and "affirmative indication" necessary to overcome the

13 presumption against extraterritoriality.  *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct.

14 2869, 2883, 177 L. Ed. 2d 535, 553–54 (2010).  Moreover, Plaintiff ignores the prior

15 sentence from the report explaining that the "foreign commerce" language merely

16 describes the types of <u>facilities</u> subject to the statute.  That explanation logically

17 applies in the context of the SCA and undercuts any argument that the act covers

18 extraterritorial conduct.  Finally, the House Report to an earlier version of the ECPA,

19 also cited by Plaintiff, Opp. at 41, further demonstrates that Congress did not intend

20 the SCA to reach extraterritorial conduct:

21      By the inclusion of the element "affecting . . . interstate or foreign

22      commerce" in [18 U.S.C. § 2510(1)] the Committee does not intend that

23      the [ECPA] regulate activities conducted outside the territorial United

24      States.   Thus, insofar as the Act regulates the "interception" of

25      communications, for example, it . . . regulates only those 'interceptions'

26      conducted within the territorial United States.  <u>Similarly, the controls</u>

27      <u>. . . regarding access to stored wire and electronic communications are</u>

28      <u>intended to apply only to access within the territorial United States</u>.

H.R. Rep. No. 99-647, at 32–33 (1986) (citations omitted).[34]

## 2. Plaintiff's Claims Depend on Extraterritorial Application of the Wiretap Act and Stored Communications Act.

In the alternative, Plaintiff suggests that her claims do not require extraterritorial application of the federal statutes because the alleged misconduct affected her "privacy" rights while she was in the U.S.  In her view, Congress's "focus" in enacting both statutes was to protect "privacy."  Opp. at 35–36.  She thus argues that the statutes apply to the foreign conduct alleged here because it produced "effects" on her privacy in the U.S.  *Id.*

Plaintiff's "effects" test is contrary to the Supreme Court's governing decision in *Morrison*, which rejected the Second Circuit's attempt to "divin[e]" the general purposes of the Securities Exchange Act and infer from those purposes that Congress "would have wanted" to apply the act whenever foreign conduct produced "effects" in the U.S.  130 S. Ct. at 2878–79.  That approach, the Supreme Court explained, was wholly divorced from the text of the statute and "unpredictable in application."  *Id.* at 2878.  It instructed that courts should instead look to the <u>text</u> of the relevant statute both in deciding if a statute applies extraterritorially and, if not, in deciding the focus of the statute's concern.  *Id.* at 2878, 2881 & n.5, 2884 & n.9.

---

[34] Plaintiff's remaining arguments as to the SCA fare no better.  First, she contends that applying the SCA to "communications that extend beyond the territory of the U.S." is necessary to give the words "foreign commerce" and "foreign communications" operative effect.  Opp. at 40.  But Defendants' argument is not that a "communication" must both be sent from and received in the U.S. to fall within the purview of the ECPA, but rather that the proscribed <u>conduct</u> (<u>intercepting</u> a live communication or <u>accessing</u> a stored communication) must occur here.  Second, Plaintiff claims the legislative history of a 1996 amendment to the Computer Fraud and Abuse Act (CFAA) shows that Congress intended to extend CFAA to the "foreign theft of information by computer," and that because CFAA and the SCA contain similar language, it is "reasonable" to infer the SCA also applies "against foreign-based activity."  Opp. at 40–41.  Plaintiff cannot rely on the legislative history of that amendment to draw any reliable conclusions about the meaning of another statute enacted a decade earlier by a different Congress.  *United States v. Price*, 361 U.S. 304, 313, 80 S. Ct. 326, 332, 4 L. Ed. 2d 334, 340 (1960).

1    In this case, the statutory text makes clear that the focus of the Wiretap Act
2    and SCA is not "privacy" generally, but rather specific misconduct.  Specifically, the
3    Wiretap Act makes it unlawful to "intercept[]" a communication or to use or disclose
4    a communication obtained through an "interception."  18 U.S.C. § 2511(1)(a), (c),
5    (d).  Though the act may be concerned with privacy, Congress pursued that purpose
6    by focusing specifically on "interception."  Thus, the Act must be construed to
7    regulate only those interceptions conducted within U.S. territory.  *See* S. Rep. No.
8    99-541, at 12 (confirming this interpretation).  It nowhere purports to regulate acts on
9    foreign soil merely because they produce some ripple "effect" on privacy in the U.S.

10    The SCA is no different.  It provides that it is unlawful to "access[] without
11    authorization" a communication "while it is in electronic storage."  18 U.S.C.
12    § 2701(a).  Thus, the statute focuses on the act of accessing communications while in
13    storage—not on protecting privacy generally.

14    Plaintiff does not dispute that her Complaint fails to allege facts indicating that
15    any interceptions took place in the U.S., or that her voicemail data either was
16    accessed from or stored in the U.S. at the time of access.  As to the Wiretap Act, she
17    merely theorizes that Defendants "<u>may</u> have contracted with a counterpart located in
18    the United States."  Opp. at 38.  But such baseless speculation is insufficient to state
19    a claim and does not entitle Plaintiff to discovery.

20    As to the SCA, Plaintiff now argues that the voicemails may have been
21    "temporarily stored" on U.S. networks, "albeit for extremely short periods of time,"
22    Himondis Decl. ¶ 4, en route to their ultimate storage in the UK.  Opp. at 38.  But
23    that is irrelevant, because Plaintiff does not and cannot claim her messages were
24    accessed during that "extremely short period[] of time," and the SCA prohibits
25    accessing a communication only "<u>while it is in</u>" storage.  18 U.S.C. §§ 2510, 2701.
26    It does not matter where a communication was previously located.  The Complaint
27    does not allege Defendants accessed voicemails "while" they were in temporary
28    storage on U.S. networks—it alleges they did so by calling Plaintiff's phone number,

29

1    entering a PIN, and accessing her voicemail box.  Compl. ¶ 54.  At that point, the

2    voicemails were in permanent, rather than temporary, storage on Vodafone's UK

3    servers.  Himondis Decl. ¶ 4.  Plaintiff cannot state a claim under the SCA.[35]

4          Finally, it makes no difference that Plaintiff alleges <u>other</u> connections with the

5    U.S.—for example, that she was physically present in California or that her own

6    communications traveled in part over domestic networks.  *See Morrison*, 130 S. Ct.

7    at 2884 (noting that the presumption against extraterritoriality does not retreat

8    "whenever <u>some</u> domestic activity is involved in the case" (emphasis in original)).

9    Courts have directly addressed and rejected such tenuous connections in the context

10   of the Wiretap Act.  *Stowe v. Devoy*, 588 F.2d 336, 341 n.12 (2d Cir. 1978); *United*

11   *States v. Cotroni*, 527 F.2d 708, 711 (2d Cir. 1975); *see* Opp. 36–38.

12
13   ## C.   PLAINTIFF CANNOT STATE A CLAIM UNDER THE FEDERAL WIRETAP ACT OR CALIFORNIA PENAL CODE.

14         Plaintiff's claims under the Federal Wiretap Act and California Penal Code all

15   fail for the same reason.  Both statutes prohibit "the <u>interception</u>" of communications

16   and the "disclosure of the contents of such <u>intercepted</u> communications."  *Tavernetti*

17   *v. Super. Ct.*, 22 Cal. 3d 187, 190, 148 Cal. Rptr. 883, 885 (1978).[36]  To "intercept" a

18   communication is to seize it "contemporaneous" with its live transmission—not to

19   retrieve it after it has reached its destination and been placed in storage.  *Konop v.*

20   *Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002).  Thus, neither statute

21   _____

22   [35] Plaintiff claims *Wyatt Technology Corp. v. Smithson*, 345 F. App'x 236 (9th
23   Cir. 2009), held that the SCA "is not necessarily limited to communications stored in
     the U.S."  Opp. at 38.  But that case did not address extraterritoriality.  In any event,
24   although the e-mail at issue in that case was stored on a UK server, there is no
     indication that the perpetrator was outside the U.S. when he accessed the e-mail.  *See*
25   *Wyatt Tech. Corp. v. Smithson*, No. 05-1309, 2006 WL 5668246 (C.D. Cal. Aug. 14,
     2006), *aff'd in part, rev'd in part*, 345 F. App'x 236 (9th Cir. 2009).

26   [36] Plaintiff contends that Defendants have not moved to dismiss her claims
     for invasion of privacy under the California Constitution and common law.  Opp. at
27   46 n.50.  To the contrary, Defendants moved to dismiss those claims, along with the
     remainder of the Complaint, on the grounds of *forum non conveniens*, lack of
28   personal jurisdiction, failure to pierce the corporate veil, and untimeliness.

covers Plaintiff's allegations that Defendants retrieved "voice-mail messages <u>left</u> and <u>stored</u>" in her voicemail box.  Compl. ¶ 1.

Plaintiff does not dispute that she fails to state a claim under the Federal Wiretap Act, but she nonetheless attempts to preserve her claims under the various sections of the California Penal Code.  Plaintiff concedes, however, that each of those claims is governed by a one-year statute of limitations.  Opp. at 51 n.52. Accordingly, those claims are time-barred and warrant only brief discussion here.

To begin with, Plaintiff cannot state a claim under the California Wiretap Act, which prohibits intercepting a communication "while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within th[e] state."  Cal. Penal Code § 631(a).  As the quoted language makes clear, an interception must occur contemporaneously with the sending, transmission, or receipt of the communication.  The statute therefore does not cover Plaintiff's allegations that Defendants acquired her voicemails while they were in storage.  It is immaterial that the alleged misconduct occurred "before" the voicemails "were received or heard by Plaintiff," Opp. at 47, because the statute prohibits acquiring communications only "while" they are "being . . . received."

Plaintiff also fails to state a claim under the provision of the California Wiretap Act prohibiting unauthorized connections to a "telegraph or telephone wire, line, cable, or instrument."  Cal. Penal Code § 631(a).  Her argument that a voicemail storage system qualifies as an "instrument" under the statute, Opp. at 47, lacks merit: "[I]nstrument" must be understood in context with "wire, line, [and] cable," all systems for <u>transmitting</u>, rather than <u>storing</u>, communications.  Mem. at 38.[37]

---

[37] Contrary to Plaintiff's contention, Opp. at 47, this interpretation is wholly consistent with the legislature's intent.  As Plaintiff acknowledges, the purpose of the statute was to prohibit the "interception" of communications, Opp. at 46 n.51 (quoting *Tavernetti*, 22 Cal. 3d at 190), which concerns the acquisition of <u>live</u>, rather than <u>stored</u>, communications.  Plaintiff also cannot state a claim under the remaining provisions of the California Wiretap Act prohibiting disclosing intercepted communications or conspiring to violate the statute, because she fails to allege any underlying violation of the statute.  *Cf. Konop*, 302 F.3d at 879 n.7.

Plaintiff's claim under the California Eavesdropping Statute fails for similar reasons. That statute prohibits recording a communication while it "is carried on among the parties." Cal. Penal Code § 632(a). Plaintiff does not allege any communications were being "carried on" at the time of Defendants' conduct. Rather, she alleges the communications were being held in electronic storage.

Lastly, Plaintiff cannot state a claim under the section of the California Penal Code concerning cordless or cellular telephones. That section applies only to "communication[s]" being "transmitted between" a cellular telephone and another phone. Cal. Penal Code § 632.7(a). It does not cover stored communications. Plaintiff points out that the statute provides that "Communication" "includes, but is not limited to, communications transmitted by voice, data, or image, including facsimile." *Id.* § 632.7(c)(3). But that language does not eliminate the transmission requirement as Plaintiff suggests. Instead, it simply recognizes that communications may be transmitted in different forms—*e.g.*, "by voice, data, or image."

## D. PLAINTIFF FAILS TO STATE A CLAIM UNDER THE CALIFORNIA CIVIL CODE.

Plaintiff's claim under Section 1708.08 of the California Civil Code also fails. That statute concerns a particular type of misconduct, which is different from that alleged by Plaintiff in two respects. *First*, Plaintiff has not alleged that Defendants captured a recording "of the plaintiff engaging in a personal or familial activity." Cal. Civ. Code § 1708.8(b). Plaintiff attempts to obscure this point by referring generically to "Plaintiff's personal and familial activities." Opp. at 50. But what the Complaint actually alleges is that Defendants accessed and/or recorded messages left by family members or other third parties. Compl. ¶¶ 49–51. Nowhere does it allege that Defendants recorded "the plaintiff" herself engaging in any activity.

*Second*, Plaintiff does not allege Defendants used a "visual or auditory enhancing device" within the meaning of the statute. Cal. Civ. Code § 1708.8(b). Her contention that telephones qualify as such devices, Opp. at 50, is meritless.

32

Telephones operate by sending and receiving communications—not by "enhancing" a person's visual or auditory senses. They are thus unlike the devices, such as telephoto lenses and parabolic microphones, covered by the statute. *See* Mem. at 41.

### E.     PLAINTIFF'S CLAIMS ARE TIME-BARRED.

Plaintiff now concedes her claims under the California Penal Code are time-barred. Opp. at 51. Her remaining claims are barred as well. *See Kreek v. Wells Fargo & Co.*, 652 F. Supp. 2d 1053, 1060 (N.D. Cal. 2009) (citing "numerous decisions" in this Circuit and elsewhere "where plaintiffs were found to be on inquiry notice as a matter of law on a motion to dismiss"). The alleged and judicially noticeable facts demonstrate that, by April 8, 2011:

1) Plaintiff knew she did not receive certain messages that were left on her Vodafone voicemail account in 2004 and 2005. Compl. ¶ 49.

2) Plaintiff suspected something was awry and contacted Vodafone to complain (and there is no indication that Vodafone led Plaintiff down the wrong path, for example, by suggesting that some technical problem might be to blame). Compl. ¶ 49; Huthart Decl. ¶ 11.

3) NGN newspapers, including *News of the World*, had published articles about Angelina Jolie that contained information known only to Plaintiff and perhaps one or two others in Ms. Jolie's private circle. Compl. ¶¶ 62–65.

4) The voicemail "hacking" allegations had received massive and worldwide publicity, and were the subject of numerous UK Parliamentary inquiries, UK police investigations, and press reports (including the 2006 news report Plaintiff's own counsel describes as "my light-bulb moment"). Compl. ¶¶ 16, 23–25, 29, 32–36; *see also* Mem. at 44 (citing sources).

5) NI and NGN publicly had acknowledged that "[e]vidence has recently come to light" supporting numerous "breach of privacy claims against the *News of*

1    *the World* over wrongful voicemail interception during th[e] period [2004 to

2    2006]." Pitt 2d Decl. Ex. 14; Mem. at 45.[38]

3    Thus, by April 8, 2011, Plaintiff had, at minimum, a "reasonable ground for

4    suspicion" that persons associated with NGN had wrongfully accessed her voicemail.

5    *Slovensky v. Friedman*, 142 Cal. App. 4th 1518, 1529, 49 Cal. Rptr. 3d 60, 68 (2006).

6    She nevertheless delayed filing suit until June 13, 2013, two years and two months

7    after being on inquiry notice of her claims. Plaintiff offers two excuses for her delay.

8    *First*, she asserts that the NI/NGN apology contained only "broad statements"

9    and did not identify her as a victim. Opp. at 53. But the question is not whether

10   Plaintiff knew, with certainty, that she had claims against NGN as of April 2011;

11   rather, it is whether, based on the information available to her at the time, Plaintiff

12   had reason to <u>suspect</u> her voicemail had been wrongfully accessed.[39] At minimum,

13   the April 2011 statement provided her with something she had looked for but

14   supposedly had not found previously: an explanation as to why she did not receive

15   certain important voicemail messages in 2004 and 2005. This triggered a duty to

16   investigate and file claims within the two-year limitations period.

17   *Second*, Plaintiff claims that, despite the information contained in the April

18   2011 apology, until she met with MPS in July 2011 she continued to "believe" that

19   unspecified "service problems" prevented her from receiving certain voicemails in

20   2004 and 2005. Opp. at 53. But Plaintiff gives no indication why, despite all of the

22   [38] Plaintiff's assertion that the Court should not take judicial notice of the
     April 2011 statement is meritless. "Courts in the Ninth Circuit routinely take judicial
23   notice of press releases." *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d
     1043, 1062 (C.D. Cal. 2012). Moreover, the document is referenced in the
24   Complaint, Compl. ¶ 37, and is judicially noticeable for that reason alone. *See Davis
     v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012). *Chapman University
25   v. Atlantic Richfield Co.*, No. CV 12-05680, 2013 WL 3946117, at *3 (C.D. Cal. July
     30, 2013), cited by Plaintiff, Opp. at 54, is not to the contrary. There, the Court
26   simply refused to credit a party's interpretation of an otherwise judicially noticeable
     document. 2013 WL 3946117, at *3. The statement at issue here speaks for itself
27   and is offered not for its truth, but to prove that the statement was made.

28   [39] Inquiry notice exists even when the plaintiff does not know the identity of
     the alleged wrongdoer. *See* Mem. at 44 n.19 (citing cases).

facts cited above, it was <u>reasonable</u> for her to continue to hold this belief after April 2011, particularly given that she makes no allegation that anyone at Vodafone ever corroborated her supposed theory that technical glitches were to blame. Plaintiff also claims that, despite having suffered major personal and professional anguish as a result of the alleged conduct, she simply did not think to connect the information in the NI/NGN statement to her "long-past service problems." *Id.* These excuses miss the point, because "[t]he question of whether inquiry notice exists is objective." *Betz v. Trainer Wortham & Co., Inc.*, 519 F.3d 863, 876 (9th Cir. 2008), *abrogated on other grounds by Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 130 S. Ct. 1784, 176 L. Ed. 2d 582 (2010). By any objective measure, the alleged and judicially noticeable facts as of April 2011 would have caused a reasonable person to investigate further.[40] The Court should find that all of Plaintiff's claims are untimely.

## CONCLUSION

For the foregoing reasons, as well as those discussed in Defendants' opening Memorandum, the Court should dismiss all claims with prejudice.

Dated: January 22, 2014

LOUIS A. KARASIK (SBN #100672)
**ALSTON & BIRD LLP**


/s/ Louis A. Karasik
Louis A. Karasik

*Attorneys for Defendants News Corporation, NI Group Limited f/k/a News International Limited, News Group Newspapers Limited*

---

[40] Plaintiff admits that 700 other alleged victims had already settled claims similar to hers as of February 2013. Compl. ¶ 40. The fact that similarly situated individuals (many of whom were represented by Plaintiff's own UK counsel, Mark Lewis) were able to bring <u>and settle</u> claims by this point in time—four months before Plaintiff initiated this action—is further indication that Plaintiff could have acted more promptly than she did. *See Kreek*, 652 F. Supp. 2d at 1060 ("The fact that other similarly situated plaintiffs were able to file an identical action . . . by November 2005 affirms this order's finding that plaintiffs were on inquiry notice more than two years before the complaint was filed in April 2008.").