Brad Greenspan, Pro Se
264 South La Cienega
Suite 1216
Beverly Hills, CA 90211

FILED

2014 MAY -2  PM 4: 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

EUNICE HUTHART,                    )    Case No. CV 13-4253 MWF
                                   )
        Plaintiff,                 )    Honorable Michael W. Fitzgerald
v.                                 )
                                   )
                                   )
                                   )
                                   )
                                   )
NEWS CORPORATION, NI GROUP )            **MEMORANDUM IN SUPPORT**
                                        **AND MOTION FOR**
                                        **INTERVENTION**
LIMITED f/k/a NEWS                 )
INTERNATIONAL LIMITED,             )
NEWS GROUP NEWSPAPERS              )
LIMITED, and JOHN and JANE         )
DOES 1-10                          )
                                   )
        Defendants.                )
                                   )
                                   )
                                   )

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INDEX**

**0-  CASE LAW CITED**                                                 **pg. 3**

**I- INTRODUCTION**                                                   **pg. 4**

**II-BACKGROUND**                                                   **ph. 4**

**III   CONCLUSION**                                               **pg. 22**

PLAINTIFFS' MOTION TO INTERVENE

1

## CASE LAW  CITED

See  Luther v. Countrywide Homes Loans Servicing LP, 533 F.3d 1031, 1033-34        pg.  7(9th
Cir. 2008)
Arakaki v.  Cayetano, 324 F.3d 1078, 1083 (9th Cir. 2003)  pg.10
Donnelly v. Glickman, 159 F.3d 405, 409 (9th Cir. 1998)              pg.10
Northwest Forest Res. Council v. Glickman, 82 F.3d 825, 836 (9th Cir. 1996)        pg.11
United States v. Washington, 86 F.3d 1499 (9th Cir.1996)                           pg.11
Engra, Inc. v. Gabel, 958 F.2d 643,  644 (5th Cir. 1992).                          Pg. 12
Northwest Forest  Resource Council, 82 F.3d at 837.                                Pg. 12
Sierra Club v. United States EPA, 995 F.2d 1478, 1484 (9th Cir. 1993)              pg. 12
 Donnelly, 159 F.3d at 409;                                                        pg.12
U.S. v Alisal Water Corp.,  370 F.3d 915, 919 (9th Cir. 2004)                      pg.12
California ex rel. Lockyer v. U.S., 450 F.3d 436, 441 (9th Cir. 2006).             Pg. 13
Forest Conserv. Council v. U.S. Forest Service,  66 F.3d 1489, 1494 (9th Cir. 1995)  pg.13
Cunningham v. David  Special Commitment Ctr., 158 F.3d 1035, 1038 (9th Cir. 1998).  Pg.13
Yniguez v. Arizona, 939 F.2d 727, 735 (9th Cir. 1991).                            Pg.13
 Southwest Ctr. for Biological Diversity, 268 F.3d at 822                          pg. 13
 Sierra Club, 995 F.2d at 1486                                                     pg. 14
California v. Tahoe Reg'l Planning Agency, 792 F.2d 775, 778 (9th Cir. 1986)).     Pg. 14
Crawford v. Equifax Payment Services, 201 F.3d 877 (7th Cir. 2000).               Pg. 15
M. & I. Corp. v Von Clemm, and Atlantic Refining Co. v Standard Oil Co.,          pg. 15
both supra; Wolpe v Poretsky, 144 F2d 505 (DC Cir 1944), cert den 323 US 777, 85
L Ed 22, 61 S Ct 115, 132 ALR 741 (1944);                                         pg. 15

Ford Motor Co. v Bisanz Bros., 249 F2d 22 (8th Cir 1957)                          pg. 15

Annot, 84 ALR2d 1412 (1962)                                                       pg. 15

Defenders of Wildlife v. Johanns, No. C 04-4512 PJH, 2005 WL 3260986, at          pg. 21
*8 (N.D. Cal. Dec. 1, 2005))

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF

3

## MOTION TO INTERVENE

### INTRODUCTION

1.     Pursuant to Federal Rule of Civil Procedure 24(a), Plaintiffs ("Intervenor") move to intervene. In the alternative, Plaintiffs moves to intervene permissively as defendants pursuant to Rule 24(b).

### BACKGROUND

2.     Plaintiff seeks permission to join the litigation to protect   interests, which may not be adequately protected without involvement of Plaintiff.

New evidence disclosed for the first time to public May 2013 in the Hitech Class Action Case 5:1102509: specifically document confirms for first time and proves Google had additional undisclosed illegal bilateral agreements in place with AskJeeves,Time/Warner AOL, and other potential corporate entities as of March 6, 2005. Such partners and agreements that existed including between AskJeeves, Inc, its surviving acquiror IAC Corp., and TimeWarner/AOL, and Google are uncontested to have existed but were not previously identified by Defendants and HiTech Federal Class Action Plaintiffs had not previously alleged or known to have existed and which violated Federal antitrust statues. All three companies fraudulently concealed the agreements and failed to disclose them in their SEC filings, violating security law and  breaching their fiduciary obligations Directors and officersall companies had.

4

3.     Plaintiff was injured in their business or property by reason of

A) Defendants, ongoing, systematic and fraudulent scheme to maximize financial gain Facilitated by the conduct of Google, and Intel, Objective  unlawful scheme was to obtain billions of dollars in proceeds and profits from i.     rigging the sales of competing internet assets at below fair market prices ii) benefitting from profits generated from illegal phone hacking iii) benefitting and trading confidential information received from the illegal phone hacking iv) covering up the illegal activity using their media properties iv) extorting silence from victims and/or government regulators including bribing police, UK Government ministers, United States Senators, California State Senators and California State Congressmen and Congresswomen and United States Congressmen and Congress serving women, and several related and affiliated lobby qualified law firms, and other agency intermediators, v) offering ad credits and ad promotion in kind without disclosing such transactions to the public or accounting for them in their SEC GAAP Accounting,  and government ministers.

4.     Without  intervention, plaintiff  will be further harmed. The intervention is also necessary to raise additional matters, facts, and Claims while providing to the court supporting evidence. The claims were created from a behind the scenes series  of meetings and communications since late 2003 thru May 1, 2014 between : i) Intermix/MySpace, Inc. ii) News Corp iii) Yahoo iv) Google v) MSN,  vi) AskJeeves vii) JP Morgan viii) Iac Corp ix) Time Warner, Inc.,x) Aol Inc. xi) Fox Interactive xii)

5

Fox xiii) Washington Post

VICTIM OF SAME "BROAD CONSPIRACY"

5.     Submitted herein and by reference and thus such facts and findings will not be re-litigated in these pleadings unless Defendants disputes the accuracy of the rulings and court orders and estoppel created by such settlements entered into by Defendants. This conspiracy included: (1) agreements allowing AskJeeves Director Jeff Yang to purchase 30% of MySpace, Inc. in February 2005 at below fair market value using His RedPoint fund where he is managing Director; (2) agreements allowing Google, TimeWarner/AOL, News Corporation, AskJeeves, IAC, and other defendants to collude to gain economic benefits by i) fabricating prior sale of MySpace stock with backdated agreement in November 2004 and ii) delaying closing of a competitive EUNI MySpace search engine auction for a new commercial search engine agreement in the months leading up to News Corporation acquiring 100% of eUniverse in September 2005; (3) agreements allowing Google to ensure its $4.4 Billion dollar August 2005 secondary is completed by tying up the fast growing online audience of MySpace, significantly growing its share of online search engine advertising while shrinking share of main rival #2 Yahoo; (4) agreements allowing News Corporation to purchase MySpace.com at below fair market value, growing its market valuation and generating billions in incremental profits and a massive online audience to seed new online assets for years to come, while preventing a competitive auction with main rival Viacom.

6

ii. The intended and actual effect of these agreements was to fix and suppress competition. Defendants conspiracy and agreements restrained trade and are per se unlawful under federal law.

Plaintiffs seek injunctive relief and damages for

6.      Pursuant to private right of action under antitrust Federal law, more then 5000 shareholders of MySpace parent company, former  publicly traded eUniverse. Inc. "EUNI" are entitled to a private cause of action for damages  suffered as a result of an Antitrust conspiracy among Defendants.

7.      According to SEC documents, Brad D. Greenspan incorporated Entertainment Universe, Inc. ("EUNI"). On April 14, 1999, eUniverse completed 3 way reverse merger arranged by first CEO, main operator and principal control officer under SEC Sarbanes Oxley federal laws, serving as Chairman and CEO thru October 30, 2003 when as victim of fraud set in motion by Google, refused to participate in Defendants further fraud against and including public shareholders and petitioner Resigned as Officer, and in December from the Board of Directors, which is publicly Stated forth in the eUniverse see SEC Filings including 8k, acquired along with its 100% owned and controlled Myspace.com website assets that News Corporation acquired after misleading shareholders to vote to approve such transaction at the end of September 2005.

8.  The credibility of News Corp's Board including Kleiner Perkins Partner Perkins and Intel Director Thornton has greatly diminished between 2005 and 2012

fueled by its involvement in illegal phone hacking in the UK and the incredible effort made to cover up and deny the deeds for years before finally in 2012, admitting indeed the company had misled the public. Most recently CEO Rupert Murdoch personally donated over $1 million dollars to charity as part of a $6 million dollar single settlement with the family of a UK 13 year old girl who had gone missing and was murdered while also falling victim to one of News Corp's operatives hacking her phone and erasing ' voice mail evidence in the process of trying to find fresh angles for new stories. Its been widely reported that the UK MET has over 5000 suspected victim's of phone hacking from News Corp and while only approximately 200 of the suspected victims have been contacted by police to date, already there are 60 lawsuits in the UK from News Corp phone hacking victims.

i.     The credibility of Google largest shareholder Doerr Director of Defendant is very poor historically and he was forced to abandon a Director seat at Apple, Inc. in 2010 after he was threatened with a complaint by the FTC. Doerr employee Reported the following acts he is a current defendant in a Sexual harassment lawsuit pending in San Francisco State Court.,

9.     News Corporation, struck an undisclosed bilateral agreement with at least Google, on or around September 30, 2005 before the Myspace and parent corporation eUniverse operating in California (later thru name change operated as Intermix, Inc) were acquired and ceased to be publicly traded.

10.     News Corporation which operates Fox and Fox Interactive among other subsidiaries is also alleged and believed to have struck related arrangements or agreements with Ask Jeeves, Inc., IAC Corp, or TimeWarner/AOL, Inc. during

8

1
2

such time.

3       11.     At least one Officer and/or Director of News Corporation and Google

4   have admitted to a second bilateral agreement existing as of late 2006,which

5   Therefore defendants agreements already in place

6
7   for not poaching each other's employees which included Google, AskJeeves, and

8   TimeWarner/AOL formed around existing commercial online advertising

9   agreements to provide and promote Google's online search product . News Corporation

10
11  was merely telling a fabricated story of its 2005 agreement with Google in

12  the 2006 published story by its own employee it got 3rd party publisher to distribute

13  globally, "Stealing MySpace", which it recounted its deal with Google, Kleiner Perkins

14
15  Partner Doerr on Google Board with Perkins  working or representing News

16      12.     During this period, Google was in need of new commercial partners

17  to help it grow. Google's main focus was finding or securing new partner companies

18
19  that had significant number of unique visitors coming to their owned website properties.

20          i. Deal #1: Commercial Ad Sense Pilot Partner Ad Buy and Endorsement
    permission as part of commercial $20,000 purchase made by Google on or around
21  January 2003,  became aware that Greenspan was Chairman and CEO or the

22
23  principal executive officer by or before February 2003. Google negotiated and
    consummated its first direct agreement with eUniverse February 2003. Google had great
24  success after target of Deal#1 profits emerged shortly after eUniverse and Greenspan
    agreed to deal and endorsement.
25

26      ii.     Deal #2: Commercial Search:

27

28                                          · 9

1    at least two of Google's top business development executives thru 2009,
     Gerber, Morris, worked or contacted petitioner directly via email in
2    attempting to consummate a direct commercial search engine online
3    advertising agreement.
     Petitioner opted to terminate Google discussions after announcing
4    execution of a Commercial Search agreement with Yahoo in late October
5    2003, and launch of its SirSearch.com consumer facing brand by and for
     benefit of eUniverse and its 100% owned MySpace division, launched
6    August 2003 but not announced to public until February 2004.

7

8

9    I.       **Legal Standard for a Motion to Intervene**

10           14.   Petitioner is entitled to intervention as a matter of right under

11   Federal Rule of Civil Procedure 24(a)(2). Rule 24(a)(2) provides that:

12

13                   "Upon timely application anyone shall be permitted to
                  intervene in an action, when the applicant claims an interest relating to
14                the property or transaction which is the subject of the action and the
15                applicant is so situated that the disposition of the action may as a
                  practical matter impair or impede the applicant's ability to protect that
16                interest, unless the applicant's interest is adequately represented by
17                existing parties. Fed R. Civ. P.24(a)"

18   The Ninth Circuit construes Rule 24 liberally in favor of movants for

19   intervention. See Arakaki v. Cayetano, 324 F.3d 1078, 1083 (9th Cir. 2003) (citing

20

21   Donnelly v. Glickman, 159 F.3d 405, 409 (9th Cir. 1998)). "Courts are guided primarily

22   by practical and- equitable considerations." Id. [1]

23   _____

24   [1] When considering a motion to intervene, the court "must accept as true the non-conclusory
     allegations in the motion." Reich v. ABC/York-Estes Corp., "A motion to intervene as a matter
25   of right, moreover, should not be dismissed unless it appears to a certainty that the

26   intervener is not entitled to relief under any set of facts which could be proved under the

27   complaint." Id. (citing Lake Investors Dev. Group v. Egidi Dev. Group,).

28                                              10

                                        PLAINTIFFS' MOTION TO INTERVENE

15.     For reasons set forth herein, Intervenor satisfies requirements of F.R.C.P 24(a)(2) to intervene as a matter of right in present action.

**Intervenor's Motion to Intervene is Timely.**

16.     In considering the timeliness issue, courts consider three factors: (i) the stage of the proceeding at time the applicant seeks to intervene; (ii) prejudice to the existing parties from applicant's delay in seeking leave to intervene; and (iii) any reason for the length of delay in seeking intervention (how long the prospective intervenor knew or reasonably should have known of her interest in the litigation). See United States v. Washington, 86 F.3d 1499 (9th Cir.1996); Engra, Inc. v. Gabel, 958 F.2d 643, 644 (5th Cir. 1992).

**17.**  Intervention is timely because other Plaintiffs or those who believe they are or should be  have recently filed briefs as allowed by the court. After these pleadings were reviewed Intervenor came to realize certain facts and  discovery exist that allow certain new claims that would  greatly benefit all other Plaintiffs. There are also  new issues and matters which the court has not engaged in yet.

18.     Defendants will not be prejudiced by the intervention, as they already are on notice as to the claims  alleged against them and furthermore, defendants have intentionally concealed discovery, documents, and emails from both existing Plaintiff

11

and Plaintiff seeking to intervene. Further,  Intervenor  shares same claims as the current

Federal Plaintiff EH for Intervening Plaintiff to be consolidated to share its recovered

pieces of information  lost for Existing Plaintiff from result of Defendant's Fraudulent

concealment And newly discovered evidence and facts from the UK criminal trials

of 10 News Corporation executives including the CEO's "surrogate" daughter and

Ex-Editor and President of Defendant's #1 and #2 news publications for CEO

To interface with and retain control of such editor run divisions of the GAAP

Aggregating public issuer, News Corporation, makes this  motion to intervene timely.

   For example, defendants have obstructed justice by eliminating Mr. Greenspan as

 a fact/expert witness after defendants struck an arrangement with class counsel in May

2009 to destroy the value of Class's federal case and upside in Brown V. Brewer.

   However, by simply toggling in the previously lost Rule 701 Damage Report,

There is now produced evidence of $32+ billion in earnings and credits that

News Corporation received benefit of thru a September 2005 acquisition of 100%

Of Intermix, inc. (formerly eUniverse, Inc.) holder of 100% of Myspace.com and its

data and user future value.

   Defendant would seek to limit damages to Plaintiff EH and other

Victims based on its published and formerly disclosed to be accurate financials.

This evidence would be sought or required to be seen by future Jury that Plaintiff EH

Requested or that Plaintiff would receive benefit of if filing this claim as independent

action in Federal Court.

News Corporation informing Victims and litigants like EH, that is actually earned an additional $32 billion or more from a transaction News Corporation engineered In 2005 at the same time as entering into and facilitating the criminal acts that 3 employees have admitted were criminal against EH and thousands of other entertainment former employees, consultants, or agents during 2005.

And that News Corporation had taken special accounting and unlawful accounting services on and paid for such services to the same service providor, Ernst and Young and Hogan Hartson Law LLC and Hogan Lovell Law lLC, and  such earnings previously hidden, could thru Court accepting Intervention of new Plaintiff and allowing (Exhibit #1: Rule 701 Damage Report) represents the fact that News Corporation benefited more then most companies thru digital sales of its products between 2005-2014. Its digital products could only be sold by being created with the payments to, hiring, and participation of Actors like Brad Pitt and his wife actress who hired and retained Plaintiff EH during 2005 and 2006 at the very least its uncontested. Because News Corporation sought to maximize profits by creating schemes to bypass the economic limits of the cards he was dealt as CEO of News Corporation by late 2004, Rupert Murdoch was scared of losing control and of being ousted by Directors including Perkins and Dinh, later Hurd helped further bully and control the growth of bribery

13

1    And hacking as Murdoch began to try to fade out of scene with Acquisition

2    Of Dow Jones and letting his right hand Les Hinton, the Halderman to Nixon

3    **FRAUDULENT CONCEALMENT & EMAIL & DISCOVERY SPOILATION**

4
5        19.   Defendants have omitted key discovery previously that caused key

6    evidence and facts to be fraudulently concealed. The fraudulent concealment includes

7    affirmative acts. Therefore, tolling would not take place until the fraudulent

8
9    concealment is fully disclosed. **7th Circuit** *Baker v. F&F Investment*, 420 F.2d 1191

10   (7th Cir. 1970), *cert. den.*, 400 U.S. 821 (1970) (self-concealing conspiracy

11   demonstrates fraudulent

12
13   concealment) (dictum) *United National Records, Inc. v. MCA, Inc.*, 609 F.Supp. 33

14   (N.D. Ill. 1984) (denial of wrongdoing and false statements regarding price increase

15   sufficient to establish fraudulent concealment).

16
17       Therefore, when comparing the impact of fraudulent concealment by Defendants

18   And the late period even at the time of Settlement being rejected, the Court has allowed

19   Intervention for Class Action interventions. [2]

20

21   **Intervenor has a significantly protectable interest in subject matter of the action.**

22
23       20.   Intervenor absolutely can claim "an interest relating to the property or

24   transaction that is the subject of the action." Fed. R. Civ. Proc. 24(a)(2). Intervenor was

25

26   [2] (quoting Agretti, 982 F.2d at 247); see also Alumax Mill Prods.v.Congress Fin. Corp.,
     (allowing nonsettling defendant to challenge a partial settlement that dismissed with
27   prejudice its cross-claims and stripped it of Indemnity contribution rights).

28                                            14

the largest common stock shareholder and an officer and Director thru December 10,

2003. "It is generally enough that the interest [asserted] is protectable under some law,

and that there is a relationship between the legally protected interest and the claims at

issue." Sierra Club v. United States EPA, 995 F.2d 1478, 1484 (9th Cir. 1993);

The Ninth Circuit has "taken the view that a party has a sufficient interest for

intervention purposes if it will suffer a practical impairment of its interests as a result of

the pending litigation." California ex rel. Lockyer v. U.S., 450 F.3d 436, 441 (9th Cir.

2006).

21.    Intervenor will lose his chance to prove he was harmed by defendant's

newly disclosed illegal bilateral agreements struck with AskJeeves, Inc. in 2005 and/or

Google in 2006 that was part of HiTech illegal antitrust conspiracy network of co-

conspirators and  defendants including Intel and Google.

22.    Plaintiff-Intervenor has a special interest in presenting evidence that will help

Court and existing Plaintiff. Defendants have also made a significant effort to

defame intervenor and continue to this day. Includes lying and misleading the public

about the origins of MySpace.com and passing off credit to employees of MySpace.com

instead of the management at the time MySpace.com was created in August 2003 which

was led by Intervenor. Defendants have and will continue to cause massive damage to

intervenor thru Defendant's false claims spread thru News Corp

properties and efforts to defame Intervenor. Therefore Intervenor will continue to be

15

damaged unless the new claims, evidence and matters presented in these pleadings are equitably disposed of. See Forest Conserv. Council v. U.S. Forest Service,  66 F.3d 1489, 1494  (9th Cir. 1995)

### Intervenor's Interests Would Be Substantially Prejudiced

23.    To intervene, a movant must show the disposition of the action may "as a practical matter impair or impede" the ability to protect movant's interest, unless the interest is adequately represented by existing parties. Fed. R. Civ. Proc. 24(a)(2); Cunningham v. David  Special Commitment Ctr., 158 F.3d 1035, 1038 (9th Cir. 1998).

24.   Intervenor Brad Greenspan will lose the ability to protect movant's interest as victim of California Privacy laws and State Constitution.

25.    Intervention is appropriate where existing parties do not adequately represent the Intervenors' interests. Donnelly, 159 F.3d at 409 (citation omitted). The Ninth Circuit  considers three factors in determining the adequacy of representation: "(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect." Arakaki, 324 F.3d at 1086 (citing California v. Tahoe Reg'l Planning Agency, 792 F.2d 775, 778 (9th Cir. 1986)).

**EVIDENCE OF DEFENDANTS $32 PLUS BILLION IN BURIED PHONE HACKING PROFITS  historical context as Rule 701 lay witness to benefit Class**

16

**Members**

26.   Intervenors will offer perspectives and knowledge that the existing Plaintiff and Defendants are likely to lack, overlook, or undervalue. "The court also may find that a proposed intervenor's interests are not adequately represented where the intervenor would bring a perspective none of the other parties to the litigation have." Defenders of Wildlife v. Johanns, No. C 04-4512 PJH, 2005 WL 3260986, at *8 (N.D. Cal. Dec. 1, 2005)) (citation omitted); 1994).[3]

The Court should grant intervention because "the magnitude of this case is such that intervention will contribute to the equitable resolution of this case." See Kootenai Tribe. The early presence of interveners may serve to prevent errors from creeping into the proceedings, clarify some issues, and perhaps contribute to an amicable settlement. Postponing intervention in the name of efficiency until after the original parties have forged an agreement or have litigated some issues may, in fact, encourage collateral attack and foster inefficiency. See Kleissler v. U.S. Forest Serv. & also Forest

**Even if the Court finds Intervenor is not entitled to intervene as a matter of right, the Court should exercise its discretion and permit intervention**

27.   A court may grant permissive intervention whenever the movant "has a claim or defense that shares with the main action a common question of law or fact," and when the intervention would not "unduly delay or prejudice the adjudication of the

---

[3] See Spangler v. Pasadena Board of Education, (the court may consider whether interveners "will significantly contribute to the full development of the underlying factual issues in the Suit and the just and equitable adjudication of the legal questions presented.")

original parties' rights." Fed. R. Civ. P. 24(b). As explained above, Intervenor meets all of these requirements. Intervenor is in an analogous posture, and like appellants in Smoke v. Norton, has satisfied the requirements for intervention as of Right under Rule 24(a)(2) and for permission intervention under Rule 24(b)(2).

28. When considering a motion to intervene, the court "must accept as true the non-conclusory allegations in the motion." *Reich v. ABC/York-Estes Corp.,* 64 F.3d 316, 321 (7th Cir. 1995).

29. Permissive intervention is also justified because Intervenor's participation will facilitate an equitable result. See Spangler v. Pasadena Board of Education, 28 552 F.2d 1326, 1329 (9th Cir. 1977) (the court may consider whether intervenors "will significantly contribute to the full development of the underlying factual issues in the suit and the just and equitable adjudication of the legal questions presented."). Intervenor is needed to provide the full facts which do not exist in the current pleadings The Court should grant intervention because "the magnitude of this case is such that intervention will contribute to the equitable resolution of this case." Kootenai Tribe 313 F.3d at 1111. The early presence of intervenors may serve:

i) to prevent errors from creeping into the proceedings, clarify some issues, and

ii) perhaps contribute to an amicable settlement.

Postponing intervention, encourages collateral attack and foster inefficiency.

(see Kleissler v. U.S. Forest Serv. ,157 F.3d 964, 974 (3d Cir. 1998);

18

30.     Motion for Leadership

Motion for Leadership Memorandum and Memorandum in Support Class Certificate

will be submitted to the Court by June 30, 2014.

## III. 24(b) LEGAL ARGUMENT

### The Court should allow the proposed Intervenor to join as a Co-Plaintiff in the action. Federal Rule of Civil Procedure 24(b) provides that:

31.     Rule 24(b) allows permissive intervention if three grounds are met:  (i) the

intervenor shows an  independent ground for jurisdiction; (ii) the motion is timely; and

(iii) there exists a common question  of law and fact between the  intervenor's claim and

the main action. See Comer v. Cisneros, 37 F.3d  775, 801 (2d Cir. 1994). See German

v. Federal Home Loan Mortgage Corp., 896 F. Supp. 1385, 1391 (S.D.N.Y. 1995) ("The

Rule is to be construed liberally");

### (1) There Is An Independent Ground For Jurisdiction

32.     The Proposed Intervenor has claims against one or more same defendants

that arise under the federal antitrust laws, these claims are identical in all material

respects to those alleged in the current Complaint in those actions in which intervention

is sought. Claims happen also during same 2003-2006 timeline

Therefore, pursuant to 28 U.S.C. § 1331(a), the Court has subject-matter

jurisdiction over the claims of the Proposed Intervenor.

### (2) There Exist Common Questions Of Law And Fact Between The Intervenors'

19

**Claims And The Underlying Actions**

33.     The Proposed Intervenor claims are based upon same

violations of federal law as the underlying action. Thus, it is

indisputable that the intervenors' claims and the claims asserted in the underlying

actions have many common -- indeed identical -- questions of law and fact.

Diduck v. Kaszycki & Sons Contractors, Inc., 149 F.R.D. 55, 59 (S.D.N.Y. 1993)

(intervention  granted where "the intervenor's claims raise identical questions of law

and fact to those currently before the Court");

34.   A court may grant permissive intervention whenever the movant "has a claim

or defense that shares with the main action a common question of law or fact," and

when the intervention would not "unduly delay or prejudice the adjudication

of the original parties' rights." Fed. R. Civ. P. 24(b). As explained above, Intervener

meets all of these requirements. Intervener is in an analogous posture, and like

appellants in Smoke v. Norton, has satisfied the requirements for intervention

as of Right under Rule 24(a)(2) and for permission intervention under Rule 24(b)(2).

Indeed, as Mayfield makes clear, one may challenge a settlement agreement to which he

is not a party if the agreement will cause him " 'plain legal prejudice,' as

when 'the settlement strips the party of a legal claim or cause of action.' "Mayfield, 985

F.2d at 1093[3] Under the discretionary standard, Intervener's burden is far lower than that

20

1   required for intervention as a matter of right. See Defenders of Wildlife, see also

2   Northwest Forest Res. Council.

3

4   **(3) Policy Considerations In Class Actions Strongly Favor Granting Intervention**

5   **Motions**

6

7       35.   In class actions, intervention is "highly desirable" "to ensure adequate class

8   representation." Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 202 (S.D.N.Y. 1992)

9   (rejecting defendants' argument that intervention was untimely).

10

11      The decision in Shields v. Washington Bancorporation, Civ. A. No. 90-1101,

12  1992 WL 88004 (D.D.C. Apr. 7, 1992), is instructive. In Shields, the court denied a

13  motion for class certification because the plaintiff was not an adequate class

14

15  representative. Id. at *1.   Subsequently, a new plaintiff moved to intervene as the class

16  plaintiff. Id.

17

18      36.   In this case, failing to pursue immediate intervention  and insertion of new

19  evidence and  matters and testimony  would harm existing Plaintiff and thousands of

20  other Absentee Class members substantially.

21

22   It  also prevent Intervenor from  taking  advantage of  Federal anti-

23  retaliatory whistleblower statues and protections petitioner is due. The impairment to

24  Intervenor's interest from the Court's ruling if intervention is not  granted is sufficient

25

26  to qualify for intervention as of right.

27      37.   The Intervenor is willing to be represented by counsel f  so "undue delay,

28                                      21

PLAINTIFFS' MOTION TO INTERVENE

complication, or procedural difficulty remain unlikely."

McNeill, 719 F. Supp. at 250; see also German v. Federal Home Loan Mortgage Corp.,

899 F. Supp. 1155, 1166-67 (S.D.N.Y. 1995)

**IV. CONCLUSION**

38.     For the reasons described above, Intervenor respectfully requests the Court

grant The motion to intervene as a matter of right pursuant to Rule 24(a), or, in the

alternative, permissively pursuant to Rule 24(b) and approve the order attached herein.

39.     The Intervenor further respectfully requests the Court grant in such

motion, the right to serve the Complaint in Intervention (Exhibit #2) , Motion for

Partial Summary Judgment (Exhibit #3) , and Motion for Preliminary 17200 Injunction

and/or Motion of  Contempt for Violation 2006 California State Attorney 17200

Permanent Injunction entered into  consent decree on behalf of Defendant News

Corporation with State Attorney (Exhibit #4) related and precedential rulings and

briefings attached as  herein.

DATED: May 2, 2014

Respectfully submitted,

Brad D. Greenspan, Pro Se
264 South La Cienega Blvd.
Suite 1216
Beverly Hills, CA 90211

22

1

2   EXHIBIT #1
3   Rule 701 Damage Report

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GREENSPAN,                                                    )
                                                             )    C.A. No. 9567-Ml
          Plaintiff,                                         )
               v.                                            )
                                                             )
     NEWS  CORPORATION, et al                                )
          Defendants                                         )
                                                             )
                                                             )
                                                             )
                                                             )

RULE 701 DAMAGE REPORT

Cases Cited                                                                          pg.3

I      INTRODUCTION                                                                   pg. 4

II OVERVIEW OF ASSIGNMENT                                                             pg. 6

SUMMARY: $32.453 Billion in damages suffered by Class Members

III    TRANSACTION BACKGROUND                                                         pg. 6

IV     COMPANY BACKGROUND                                                             pg. 6

V      INDUSTRY ENVIRONMENT IN 2005                                                   pg. 6

VI     PROBLEMS WITH THE MANAGEMENT FORECAST AND                                      pg. 7
       DR. WILLIAM KENNEDY'S DAMAGES REPORT

VII    TRANSACTION BACKGROUND AND ASSUMPTIONS                                         pg. 11

VIII   DAMAGES ANALYSIS                                                               pg. 12

IX-    CONCLUSION:                                                                    pg. 15

EXHIBIT 1   - BACKGROUND / WORK EXPERIENCE                                            pg. 16

EXHIBIT 2—Chart - Monthly unique visitors MySpace                                    pg. 18

CASES CITED

Lightning Lube, Inc.  v, Witco Corp. 4F.3d  11433d Cir. 1993          pg.      4

United States v. Figueroa-Lopez, 125 F.3d 1241, 1246

(9th Cir. 1997)                                                       pg.     5

Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190, 1196

(3d Cir. 1995)                                                        pg.    6

In Doft & Co. V. Travelocity                                          pg.    8

Marcel v. See, Inc                                                    pg.   10

Henry v. Hess Oil Virgin Islands Corp                                 pg.   10

Rowe v. State Farm Mut. Auto. Ins. Co.,                               pg.   10

United States v. Bighead, 128 F.3d 1329, 1335 (9th Cir. 1997)         pg.   10

## DECLARATION OF LAY OPINION UNDER RULE 701 BY BRAD D. GREENSPAN:  CEO, DIRECTOR, FOUNDER PAID SEARCH DIVISION, HEAD OF M&A THRU OCTOBER 30, 2003. ONLY EXECUTIVE TO HAVE   COMPLETED A GOOGLE VS. YAHOO SEARCH AUCTION

## I    INTRODUCTION

I , Brad Greenspan, declare:

1.    I submit this declaration in support of the Plaintiff Class Members.

The following is based on upon my personal knowledge and if called as a Witness I could and would testify competently thereto.

2.    This declaration is made under Rule 701 based on my experience.

3.    Rule 701 allows lay witness declarations limited to those opinions or inferences, which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and © not based on scientific, technical, or other specialized knowledge within the scope of Rule 701.

4.    I am also in a unique position to provide a valuation amount Under Rule 701. Most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. See, e.g., Lightning Lube, Inc.  v, Witco Corp. 4F.3d 11433d Cir. 1993)

4

(no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

5.      The amendment does not distinguish between expert and lay witnesses, but rather between expert and lay testimony. Certainly it is possible for the same witness to provide both lay and expert testimony in a single case. See, e.g., United States v. Figueroa-Lopez, 125 F.3d 1241, 1246 (9th Cir. 1997) (law enforcement agents could testify that the defendant was acting suspiciously, without being qualified as experts; however, the rules on experts were applicable where the agents testified on the basis of extensive experience that the defendant was using code words to refer to drug quantities and prices). The amendment makes clear that any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702 is governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules.

The amendment is not intended to affect the "prototypical example(s) of the type of evidence contemplated by the adoption of Rule 701 relat(ing) to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from

5

inferences." Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190, 1196 (3d Cir. 1995).

## II    OVERVIEW OF ASSIGNMENT

-Updated/revised damages assessment for benefit of Plaintiff Class Members.

## SUMMARY: $32.453 Billion in damages suffered by Class Members

## III    TRANSACTION BACKGROUND

i)    $12.00 cash out merger with two investment banks providing fairness valuation reports created

ii)    after the $12.00 price was chosen by CEO and accepted by Board of Issuer.

## IV    COMPANY BACKGROUND

Company was online entertainment and social networking website creator and also for purposes of report owned 100% of MySpace, Inc. At the time of its sale in 2005 for approximately $649 million dollars, the purchase of the public shareholder's equity was reported to be $580 million and there existed a $69 million dollar obligation to pay the minority shareholders of MySpace, Inc. according to agreements signed in February 2005 by and between Redpoint, Inc. and Intermix, Inc, and MSV LLC.

## V    INDUSTRY ENVIRONMENT IN 2005

i)    Unique in that the pace of online advertising was growing much faster then other industries in the United States.

ii)     Google had just successfully raised $4.4 billion dollars and announced the sale in August 2005.

iii)    According to company documents and testimony of former head of online search and CEO and founder of MySpace.com and Issuer, Issuer had opportunity to run a search auction as of at least August 2005 between at least Google, Yahoo, Microsoft, AskJeeves, and AOL.

iv)    Google and AOL set market price for value of search assets on or around the 3rd and 4th quarters of calander 2005, closing a new Search Partnership in December 2005.

v)     In this transaction, Google invests $1 Billion into AOL, valuing AOL to be worth $20 billion by virtue of the 5% stake Google takes for its investment.

## VI    PROBLEMS WITH THE MANAGEMENT FORECAST AND DR. WILLIAM KENNEDY'S DAMAGES REPORT

i)     The damage report by Anders Minkler & Diehl LLP is helpful to confirm the problem areas with management forecasts and the banker fairness opinions. The expert also cites certain evidence that is useful in triangulating the valuations we calculate and conclude in this report are more accurate and sound.

ii)    Because of both unreliable forecasting historically proven by management for MySpace, Inc. and because MySpace was an early stage company experiencing significantly greater then average growth rates, Kennedy should not have opted to  follow banker's fairness opinion method to use the 2009/20010 DCF method for a company like Intermix and merely hoped to gain accurate methods for

7

an accurate valuation of MySpace merely by adjusting the underlying financials.

      iii)    *In Doft & Co. V. Travelocity*, the Delaware Court made several

precedential determinations when faced with the task of weighing using

management forecasts for a new fast growing company in a fast changing market

environment, stating:

    a)    *"The court may consider "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court."*

    b)    *"Both parties used a DCF approach and a comparable company approach to value the shares. "*

    c)    *"A DCF analysis is a useful tool for valuing shares and is frequently relied on by this court in appraisal actions."*

    d)    *"The utility of a DCF analysis, however, depends on the validity and reasonableness of the data relied upon. As this court has recognized, "methods of valuation, including a discounted cash flow analysis, are only as good as the inputs to the model."*

    e)    *"The problem in this case is that the most fundamental input used by the experts—the projections of future revenues, expenses and cash flows—were not shown to be reasonably reliable."*

    f)    *"Delaware law clearly prefers valuations based on contemporaneously prepared management projections because management ordinarily has the best first-hand knowledge of a company's operations."*

    g)    *" Here, management prepared the 5-year projections for the period 2002-2005 and gave them to Sabre for use in its routine planning processes."*

    h)    *"Often, projections of this sort are shown to be reasonably reliable and are useful in later performing a DCF analysis. In this case, however, the court is persuaded from a review of all the evidence that the Travelocity 5-year plan does not provide a reliable basis for forecasting future cash flows. "*

    i)    *"Travelocity's management held the strong view that these projections should not be relied upon because the industry was so new and volatile that*

*reliable projections were impossible."*

j) *"Punwani further testified that because of the limited financial history of Travelocity, together with a rapidly evolving marketplace, it was difficult "to forecast the next quarter, let alone five years out."*

k) *"Id. "We were really not in a position to be able to put any credence on the numbers, both on the revenue and on the cost side. And the only way to get credibility in our numbers would have been to take those models and put them through reasonability checks ... [that] were never done because, when we built these frameworks, I'll call them, in the year 2000, we were in a period of explosive growth. We were growing at 150 percent per year .... No one really knew what the right number was." Id. at 381-82. "*

l) *" Id. at 383. "It was bad enough before when we did the data, and we had this new variable that got thrown into our lap, which totally destroyed our ability to have any confidence in projections beyond one quarter out." Id. "*

m) *"Although it was aware of the 5-year forecasts, Salomon did not conduct a DCF analysis of Travelocity as part of its work in connection with the merger. The testimony of Anwar Zakkour, Salomon's managing director, is especially relevant on this issue: "*

n) *"Q. Did Salomon Smith Barney prepare a discounted cash flow analysis of Travelocity in connection with this transaction?     A. Absolutely not. "*

o) *" Q. Why was no discounted cash flow analysis prepared in connection with this transaction? "*

*"A. Because this was an industry that was in flux. And the management team itself, which should have been the team that was most able to put together a set of projections, would have told you it was virtually impossible to predict the performance of this company into any sort of reasonable future term. And they in fact had very little confidence with even their 2002 forecast numbers because of that. "*

p) *"Q. Is a discounted cash flow methodology a methodology that is commonly used by Salomon Smith Barney in valuing companies?*

*A. Valuing mature companies, yes."*

q) *"The court reluctantly concludes that it cannot properly rely on either party's DCF valuation. The goal of the DCF method of valuation is to value future cash*

*flows. Here, the record clearly shows that, in the absence of reasonably reliable contemporaneous projections, the degree of speculation and uncertainty characterizing the future prospects of Travelocity and the industry in which it operates make a DCF analysis of marginal utility as a valuation technique in this case. If no other method of analysis were available, the court would, reluctantly, undertake a DCF analysis and subject the outcome to an appropriately high level of skepticism. The court, however, now turns to the other method of valuation offered by the parties.* "

iv) The application of the *Daubert* standard rests on the level of generality of the expert's study. The more removed the expert's data is from the facts of the particular case the more unreliable and speculative his testimony becomes. For example, in both *Marcel v. See, Inc.*, and *Henry v. Hess Oil Virgin Islands Corp.*, the court excluded the expert's testimony because the projections of future earnings were based on general industry studies that failed to take into consideration the specific circumstances of the plaintiff. In *Rowe v. State Farm Mut. Auto. Ins. Co.*, by contrast, the court allowed the projections because they were based on the past billing history of the plaintiff, who as a result of his injuries could not longer practice Law.

v) Rule 702's analysis is ordinarily prospective. Expert testimony is helpful if it "*will* assist the trier of fact." Fed.R.Evid. 702 (emphasis added). Thus a District court may not exclude expert testimony simply because the court can, at the time of summary judgment, determine that the testimony does not result in a triable issue of fact. Rather the court must determine whether there is "a link between the expert's testimony and the matter to be proved." *United States v. Bighead,* 128 F.3d 1329, 1335 (9th Cir. 1997)

10

## VII  TRANSACTION BACKGROUND AND ASSUMPTIONS

i)      Based on the evidence reviewed, the Intermix Board avoided using the experienced valuation M&A technology banker, JP Morgan's Zakkour. News Corp received the benefit of keeping this banker from representing Issuer. Namely that News Corp did not have to overcome or pay the up to $1.3+ Billion that Zakkour estimated MySpace was worth prior to the July 18, 2005 merger Agreement being signed.

a) Zakkour leads Citibank's valuation/fairness report and is engaged by Ask Jeeves Board of Directors along with Allen & Co. in February 2005 and values AskJeeves worth at least $1.85 million at the time it signs a merger agreement with IAC Corp. in March 2005.

b) AskJeeves lead director David Carlick engaged Zakkour and Allen & co.  to work for and represent Ask Jeeves in February 2005, while he was at the same time Director and Chairman of Intermix. In addition Andrew Sheehan, his partner in his venture capital fund VantagePoint, a control shareholder in Intermix was a director of both Intermix and MySpace, Inc. Geoff Yang a long time director of AskJeeves was also a director of MySpace, Inc.

c) The AskJeeves/IAC a stock for stock merger does not close until July 19, 2005.

d) In April 2005, Zakkour joins JPMorgan. JPMorgan served as the investment bank for IAC in the March 2005 announced merger with Ask Jeeves.

e) One Board member of IAC Corp during this period is also the Chairman of

Investment bank Allen & Co. IAC also discloses it retains and works with Allen & Co. as their banker in ongoing basis.

f) News Corp Director Stan Schuman in 2005 was and is one of most senior bankers at Allen & Co. of senior bankers at Allen & Co.

g) As of July 13, 2005 or earlier, Zakkour and JPMorgan have been retained to value Intermix, Inc. and on July 16, 2005, Zakkour's team leading the efforts for JP Morgan and News Corp, provides a valuation for MySpace, Inc. of $1,040 - $1,367. Zakkour according to Kennedy, uses "2006 EBITDA Multiples"

h) Defendants further determined they would not allow Deutsche Bank to write a fairness opinion or be one of the two bankers it ultimately retained.

i) On or around July 13, 2005, Issuer retained both Thomas Weisel and Montgomery. Both banks had not completed the valuation work or provided a full valuation report prior to being retained. Unlike Montgomery and Thomas Weisel, Deutsche Bank had already created and provided to at least Rosenblatt and Sheehan, a Valuation report as of May 2005.

## VIII   DAMAGES ANALYSIS

## 1)   Financial Projections for MySpace, Inc. using actual 2005 results known:

a) The most accurate way to ascertain the valuation for MySpace, Inc. is to build a new set of financial projections more reliable then the management forecast and then combine this data with the most unconflicted comparable valuation report that existed at the time.

12

b) We take the last actual quarter to quarter financial results for MySpace, Inc. and use these as the base information which we know is accurate and build a multi year forecast, initially we continue the actual growth rate and over time reduce such growth rate to be conservative.

c) Last Actual results for MySpace, Inc.: $3.74 million in revenue for the March 2005 ending quarter which grew to $6.15 million in revenue for June 2005 quarter – 64% growth quarter to quarter.

d) Last actual results for MySpace, Inc: $463,000 in EBITDA for the March 2005 quarter which grew to $1.58 million in EBITDA for the June 2005 quarter.

e) Using these growth rates, we then use Kennedy's 55% EBITDA margin and being conservative we reduce this to 45% for 2006. In 2007, we reduce growth rate from 64% to 32%. In 2008, we reduce the quarterly growth rate to 22%. Below we summarize the annual forecast.

f) (CY2006) Our MySpace, Inc. forecast using most recent actual results shows $264.21 million in annual revenue for 2006 and EBITDA of $118.89 million

g) (CY2007) Our MySpace Inc. forecast shows $999 million in revenue and EBITDA of $449.55 million.

h) (CY2008) Our MySpace, Inc. forecast shows $2.43 billion & EBITDA of $1.09 billion.

## 2) ITS APPROPRIATE TO CONSIDER AND USE A COMPARABLE COMPANY VALUATION ON A STAND-ALONE BASIS

a)   We then determine that the May 2005 Deutsche Bank valuation report

13

which uses comparable company EBITDA valuations is reasonable and the prudent work of unconflicted investment bankers trying to demonstrate their good faith and knowledge of the internet sector to Intermix in their efforts to be retained by Intermix to contact potential buyers.

b)     Our decision is further confirmed thru review of the recent Delaware case in Doft & Co. V. Travelocity where the court states as part of its decision to reject management's forecast and a valuation using DCF in favor of singularly using comparable company valuation method.

c)     *"A comparable company analysis is often used in connection with a DCF analysis.  The court, however, may use a comparable company valuation on a stand-alone basis in an appraisal action when it is the only reliable method of valuation offered by the parties. In Borruso v.  Communications Telesystems Int'l, the court relied on a comparable company analysis because neither expert was comfortable using a DCF analysis to value the company's shares due to the limited financial data of the company available as of the merger date.  753 A.2d 451, 455 n.5  (Del. Ch. 1999)."*

d)     We use the Deutsche report 2008 multiple for MySpace, Inc. of 22.5X which is the top end of the "Estimated multiple range" as we believe this is appropriate since based on the Kennedy report, Google stood out as the most similar growth and profitability rates to MySpace, Inc.

e)     Next we plug in the MySpace's new forecast EBITDA for 2008 which is multiplied by the 22.5X comparable company EBITDA, resulting in a **Valuation of $24.52 Billion for 100% of MySpace, Inc.**

f)     We agree with Kennedy's takeover premium analysis and the need to adjust valuation based on this analysis. In addition, we again take heed of the recent

14

Delaware court decision in Doft & Co. V. Travelocity where the court affirms this

analysis and recommends adding a premium to the buyout value as final step,

stating,

> "Delaware law recognizes that there is an inherent minority
> trading discount in a comparable company analysis because "the
> [valuation] method depends on comparisons to market multiples
> derived from trading information for minority blocks of the comparable
> companies. The equity valuation produced in a comparable company
> analysis does not accurately reflect the intrinsic worth of a corporation
> on a going concern basis. Therefore, the court, in appraising the fair
> value of the equity, "must correct this minority trading discount by
> adding back a premium designed to correct it."

g)    Therefore, we use Kennedy's 35% takeover premium and summarize:

| | control premium | Controlling value Indication | Option Exercise | Value MySpace |
|---|---|---|---|---|
| 2008 EBITDA MULTIPLE | 35% | $33.102B | ($69M) | **$33.033 Billion** |

Indication  **$32.453B**

**Based on the alternative guideline public company analysis provided above,
MySpace was undervalued by $32,453 billion ($33.033B - $580M).**

**IX-  CONCLUSION:**

I declare on penalty of perjury under the laws of the United States of America that

the foregoing is true and correct. Executed this April 28, 2014 in Los

Angeles

_____

Brad D. Greenspan (SEAL)

EXHIBIT 1  - BACKGROUND / WORK EXPERIENCE

QUALIFICATIONS OF EXPERT

-I have approximately 12 years of industry experience.

-I was CEO and founder of eUniverse, Inc. from its inception in 1998 as my idea thru October 30, 2003.

-I was the founder of MySpace.com while Chairman and CEO of eUniverse in 2003.

PROFESSIONAL QUALIFICATIONS

-Educational & Professional Certification

   i)      Two years of Law Society Undergraduate at University of Santa Barbara
   ii)    Bachelors of Political Science, 1996 University of Los Angeles

PROFESSIONAL RECOGNITIONS AND AFFILIATIONS

   i)      Morgan Stanley's Internet analyst announced in November 2003 that Issuer eUniverse as of October 2003's 6 month ending data, was the #1 fastest growing portal on the Internet eclipsing AOL and Yahoo.

   ii)    Founder of Myspace.com.

   iii)   Founder of eUniverse

PRESENTATIONS AND PUBLICATIONS

i) Between 1999-October 2003 I co-created and presented Issuer's financial forecasts and was sole decision maker on all internet strategy and determined allocation of funds if any for any new project.

PROFESSIONAL EXPERIENCE

   1996-19980 President of Palisades Capital a merchant investment bank where I raised over $60 million dollars for 4 public companies.

   1999- October 30, 2003 – Chairman and CEO of eUniverse, Inc.

16

-I was initial and first head of Search for eUniverse, Inc., the issuer and signed first search partnership with Overture acquired and operated as Yahoo in 2003.

2004-2005- Palisades Technology – I was partners with Yahoo and operated a search toolbar division for game companies including leading casual games company Big Fish Games and Browser companies like AvantFind.com

2006-president, President LiveUniverse, Inc. – a network of entertainment websites

2008-present, President of LiveVideo, Inc. – a Los Angeles based network of entertainment websites

2006-present, Chairman of BroadWebAsia, Inc., - operates HupoTV.CN a Chinese video entertainment website

2006-2009, Co-Founder and Board Member, Michigan based Draths Corporation, clean technology leader in renewable green chemistry. Management led by Michigan State University professors and green chemistry award winners Dr. Karen Draths and Dr. John Frost.

2006-present, Board Member, Borba Corporation

2010-present- Managing Director of Social Slingshot Pte Ltd, a Singapore based incubator fund partnered with the Singapore Government's National Research Foundation (NRF). I was awarded this $5 million dollar fund to encourage me to work with Singapore entrepreneurs and their universities entrepreneur programs.

TESTIMONY IN TRIAL OR DEPOSITION

i) Greenspan V. eUniverse, 2004, Delaware Judge Strine. (See summary of trial where I provided Delaware counsel evidence to uncover backdating fraud against defendants)

ii) Delagado V. Intermix. I was expert witness for LA City and provided fact information and background for the city of Los Angeles prosecutors in their adware consumer case against Intermix that was settled after Intermix's listing expired.

EXHIBIT 2- Monthly unique visitors as reported by Comscore for Myspace.com
Compared to certain key months where Microsoft and Google offered MySpace or
its parent company certain economic offers which provide a value per month these
companies are willing to pay or value MySpace search at for the latest
traffic/audience statistics that are available during the month a deal is offered up
for MySpace.

| | | |
|---|---|---|
| July 2005 | 21.21M uniques | |
| August 2005 | 21.81M uniques | $14.807 |
| September 2005 | 21.6M uniques | |
| October 2005 | 24.25M uniques | |
| November 2005 | 24.68M uniques | |
| December 2005 | 32.2M uniques | $22.1 Million Value |
| January 2006 | 35.5M uniques | MSFT $800M OFFER |
| February 2006 | 37.34M uniques | |
| March 2006 | 41.88M uniques | |
| April 2006 | 48.03M uniques | |
| May 2006 | 51.44M uniques | |
| June 2006 | 52.34M uniques | |
| July 2006 | 54.52M uniques | $25.0 Million Value |
| August 2006 | 55.78M | GOOGLE $900 OFFER |
| September 2006 | | |